IN THE

# United States Court of Appeals for the Fourth Circuit

In re: ELIZABETH JANE PEIFFER,

*Appellant*

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

DAVID ANTHONY RUNYON,

*Defendant*.

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 4:08-cr-00016-RBS-DEM
(The Honorable Rebecca Beach Smith)

## APPELLANT'S MOTION FOR STAY
## PENDING APPEAL AND FOR EXPEDITED REVIEW

CATHERINE E. STETSON
TIARA BROWN
SIMON CHIN
HOGAN LOVELLS US LLP
555 13th Street, NW
Washington, D.C. 20004-1109
(202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Appellant*

June 30, 2023

## DISCLOSURE STATEMENT

Under Fed. R. App. P. 26.1 and Local Rule 26.1, Appellant Elizabeth Peiffer represents the following:

- She is an individual, not a publicly held corporation or other publicly held entity.

- No publicly held corporation has a direct financial interest in the outcome of this litigation.

- This case does not arise out of a bankruptcy proceeding.

- This is not a criminal case in which there was an organizational victim.

/s/ Catherine E. Stetson
Catherine E. Stetson

**TABLE OF CONTENTS**

**Page**

DISCLOSURE STATEMENT ...................................................................................i

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ..............................................................................................1

BACKGROUND ...............................................................................................3

ARGUMENT ...................................................................................................8

   I.  APPELLANT WILL LIKELY PREVAIL ON APPEAL.................................................9

      A. Ms. Peiffer's Continued Representation of Defendant Violates the Virginia Rules of Professional Conduct ..........................9

      B. The District Court's Order Violates Petitioner's Rights.....................16

   II.  THE EQUITIES OVERWHELMINGLY FAVOR A STAY ........................................18

      A. Appellant and Defendant Face Irreparable Harm ...............................19

      B. The Public Interest Favors a Stay.......................................................20

   III.  THIS COURT SHOULD EXPEDITE REVIEW ...................................................22

CONCLUSION ...............................................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

CERTIFICATE OF CONFIDENTIALITY

ADDENDUM:

     Addendum A—District Court's Order (ECF 820)

     Addendum B—Transcript of Status Hearing (ECF 819)

     Addendum C—Memorandum in Support of Motion to Withdraw (ECF 815)

Addendum D—Sealed Declaration of Elizabeth Peiffer (ECF 815, Ex. A)

Addendum E—Declaration of Peter Swanson (ECF 815, Ex. B)

Addendum F—Declaration of Prof. George Rutherglen

# TABLE OF AUTHORITIES

**Page(s)**

**CASES:**

*Caplin & Drysdale, Chartered v. United States*,
  491 U.S. 617 (1989)..................................................................................21

*Christeson v. Roper*,
  574 U.S. 373 (2015)..................................................................................11

*Hunter v. Earthgrains Co. Bakery*,
  281 F.3d 144 (4th Cir. 2002) ...................................................................12

*Martel v. Clair*,
  565 U.S. 648 (2012)..................................................................................11

*McFarland v. Scott*,
  512 U.S. 1256 (1994)................................................................................20

*McFarland v. Scott*,
  512 U.S. 849 (1994)............................................................................16, 21

*Nken v. Holder*,
  556 U.S. 418 (2009)...............................................................................8, 20

*Teague v. Lane*,
  489 U.S. 288, *reh'g denied*, 490 U.S. 1031 (1989)...............................22

*United States v. Blackledge*,
  751 F.3d 188 (4th Cir. 2014) ........................................................11, 12, 15

*United States v. Cronic*,
  466 U.S. 648 (1984)..................................................................................16

*United States v. Gonzalez-Lopez*,
  399 F.3d 924 (8th Cir. 2005), *aff'd and remanded*, 548 U.S. 140
  (2006).........................................................................................................21

*United States v. Gonzalez-Lopez*,
  548 U.S. 140 (2006)..................................................................................21

**Page(s)**

*United States v. Jennette*,
387 F. App'x 303 (4th Cir. 2010) ........................................................12

*United States v. Muslim*,
944 F.3d 154 (4th Cir. 2019) ...............................................................12

*United States v. Plunkett*,
No. 22-7225, 2023 U.S. App. LEXIS 8853 (4th Cir. Apr. 13, 2023) ................19

*United States v. Runyon*,
707 F.3d 475 (4th Cir. 2013) .................................................................3

*United States v. Runyon*,
574 U.S. 813 (2014)..............................................................................3

*United States v. Runyon*,
994 F.3d 192 (4th Cir. 2021) .................................................................3

*United States v. Smith*,
640 F.3d 580 (4th Cir. 2011) ...............................................................15

*United States v. Wenk*,
771 F. App'x 229 (4th Cir. 2019) ........................................................11

**STATUTES:**

18 U.S.C. § 3599................................................................................11, 19, 20

18 U.S.C. § 3599(a)(2)................................................................................16

28 U.S.C. § 2255 ...........................................................................*passim*

**RULES:**

4th Cir. R. 12(c) .........................................................................................22

Va. Code Ann. § 1.1 (West 2000)...........................................................9, 10

Va. Code Ann. § 1.1, cmt. 5 (West 2000)...................................................10

**Page(s)**

Va. Code Ann. § 1.3(a) (West 2000) ...................................................................9, 10

Va. Code Ann. § 1.7 (West 2000).........................................................................9

Va. Code Ann. § 1.7(a) (West 2000) .....................................................................9

Va. Code Ann. § 1.7(a)(2) (West 2000) .............................................................9, 10

Va. Code Ann. § 1.7, cmt. 8 (West 2000).............................................................9

Va. Code Ann. § 1.16(a)(1) (West 2000) .............................................................10

Va. Code Ann. § 1.16, cmt. 1 (West 2000)...........................................................10

Va. Code Ann. § 1.16, cmt. 3 (West 2000)...........................................................15

Va. Code Ann. § 6.2(a) (West 2000) ....................................................................10

**OTHER AUTHORITY:**

*Request a Legal Ethics Opinion*, Virginia State Bar,
   https://vsb.org/Site/lawyers/leo-request.aspx ...............................................15

# United States Court of Appeals for the Fourth Circuit

---

In re: ELIZABETH JANE PEIFFER,

*Appellant*

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

DAVID ANTHONY RUNYON,

*Defendant*.

---

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 4:08-cr-00016-RBS-DEM
(The Honorable Rebecca Beach Smith)

---

**APPELLANT'S MOTION FOR STAY
PENDING APPEAL AND FOR EXPEDITED REVIEW**

---

## INTRODUCTION

This is a complex federal death penalty case with a multi-week evidentiary hearing scheduled to resume on November 1. In late April, appointed habeas counsel Elizabeth Peiffer's mother was diagnosed with Stage IV cancer. Ms. Peiffer immediately became a crucial caregiver for her mother, and these obligations prevent her from continuing to competently and diligently represent her client, David

1

Runyon, in the coming months. After consulting with Virginia State Bar ethics counsel, Ms. Peiffer concluded she faces a conflict of interest between her caretaking duties and her responsibilities to Mr. Runyon. Accordingly, with the support of her client and co-counsel, Ms. Peiffer moved to withdraw.

The District Court denied Ms. Peiffer's motion. It concluded Ms. Peiffer did not have a conflict and that her continued involvement was necessary to ensure "continuity" in Mr. Runyon's representation. The court, however, disregarded Ms. Peiffer's sworn representations—as an officer of the court—about her lack of capacity and Bar counsel's recommendation that she withdraw. The court also disregarded that Ms. Peiffer's continued, conflicted representation would violate Mr. Runyon's rights as a death-sentenced person.

In the same order, the court ordered the completion of discovery by August 31, 2023, set an evidentiary hearing for November 1, 2023, and denied a stay pending appeal. Given Ms. Peiffer's conflict of interest and the impending deadlines, Ms. Peiffer arguably violates her ethical duties every day she remains in the case. Mr. Runyon also faces irreparable harm by being denied adequate representation during this crucial phase of his habeas proceedings.

Appellant requests a stay of proceedings pending resolution of this appeal. Appellant also moves for expedited review by this Court.

# BACKGROUND

In 2009, David Anthony Runyon was convicted and sentenced to death in the United States District Court for the Eastern District of Virginia (No. 08-cr-00016). His convictions and sentences were affirmed on direct appeal, and his petition for certiorari was denied, *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013), *cert. denied*, 574 U.S. 813 (2014).

Mr. Runyon moved to vacate his sentence pursuant to 28 U.S.C. § 2255 in 2015, ECF No. 478, and amended that motion in 2016, ECF No. 511. The District Court denied that motion without a hearing in January 2017. ECF No. 560. This Court granted a certificate of appealability and, in February 2021, vacated the dismissal of Mr. Runyon's section 2255 motion "to the extent that it dismissed without a hearing Runyon's claim of ineffective assistance of counsel for failure to investigate and present evidence of his brain damage and mental health," remanding that claim for a hearing. *United States v. Runyon*, 994 F.3d 192 (4th Cir. 2021).

In 2014, the District Court appointed Michele Brace of the Virginia Capital Representation Resource Center (VCRRC), as habeas counsel, while denying appointment of any additional counsel, stating that "one attorney is sufficient," despite the complex and voluminous record. ECF No. 410 at 8. The court noted it would consider appointing second counsel if "circumstances arise in the future to warrant the appointment." *Id.* at 12.

In 2015, Ms. Brace moved for appointment of the Federal Defender Services of Eastern Tennessee, Inc. (FDSET) and Dana Hansen Chavis, the supervisor of FDSET's capital habeas unit, as co-counsel. ECF No. 433 at 1. Ms. Brace explained that second counsel was "necessary because . . . the remaining investigation, work with experts, claim identification, and drafting of pleadings exceeds Attorney Brace's capacity to competently develop and prepare the motion on her own." *Id.* at 2. Ms. Brace further explained that VCRRC's caseload precluded it from providing Ms. Brace with assistance in Mr. Runyon's case. *See* ECF No. 425 at 2 n.2. The court granted the appointment of a second attorney—but declined to appoint FDSET itself: "The court does not appoint organizations to represent individual criminal defendants; rather, the court appoints individual attorneys to represent individual defendants." ECF No. 435 at 5.

In November 2021, Ms. Brace moved to withdraw for medical reasons and sought substitution of Elizabeth Peiffer, another VCRRC attorney. ECF No. 648. The court granted both requests. ECF No. 649.

During a February 2023 evidentiary hearing, it became apparent that one or both FDSET attorneys had not fully complied with their discovery obligations. The court accordingly determined that FDSET counsel were conflicted. They immediately withdrew, leaving only Ms. Peiffer to litigate Mr. Runyon's section 2255 proceedings.

In April 2023, Mr. Runyon moved to appoint Kathryn Ali as counsel and notified the court that attorneys from Covington & Burling LLP had agreed to represent him (*pro bono*) as counsel of record with *pro hac vice* motions forthcoming. *See* ECF Nos. 802, 803. The court granted this motion in part, appointing Ms. Ali as second counsel, based on "the seriousness of the capital penalty in this case, the amount of discovery yet to be completed, and the complexity of the case." *See* ECF No. 810 at 1-2. Regarding the Covington attorneys, however, the court advised it "does not intend to appoint, nor to otherwise admit, *pro hac vice*, any additional attorneys." *Id.*

In late April 2023, Ms. Peiffer's seventy-five-year-old mother fell in her home. Decl. of Elizabeth Peiffer ¶ 3 (Peiffer Decl.), ECF No. 815-1. Subsequent tests revealed she has Stage IV breast cancer that has metastasized to her hip, spine, ribs, lungs, and liver. *Id.* ¶¶ 3-7. Her condition has left her unable to safely move or care for herself without assistance. *Id.* ¶¶ 8-12. Although Ms. Peiffer's mother has begun treatment, it will be months before its effectiveness can be assessed. *Id.* ¶ 14. Ms. Peiffer is a crucial part of her mother's care team for the foreseeable future. In this same period, Ms. Peiffer will be expected to meaningfully and competently represent Mr. Runyon in preparing for the approaching discovery deadline and evidentiary hearing.

Ms. Peiffer's mother's diagnosis and subsequent developments have made significant demands on Ms. Peiffer's time, attention, and availability. *Id.* ¶¶ 10-13. Her mother has had radiation treatment, requires assistance to safely walk and care for herself, *id.* ¶ 14, and will soon begin further treatments, *id.* ¶ 15. It remains unclear what impact the progression of the disease will have on her health, and what side effects the treatment may cause. *Id.* As a result, it is extremely difficult for Ms. Peiffer to make plans or commitments for the foreseeable future. *Id.* ¶¶ 4, 9-18.

Upon review of the Virginia Rules of Professional Conduct, and after consultation with ethics counsel for the Virginia State Bar, Ms. Peiffer reached the difficult conclusion that it was necessary to withdraw from Mr. Runyon's case given the significant constraints on her capacity and potential for serious conflicts of interest. *Id.* ¶ 18.

Ms. Peiffer accordingly immediately moved to withdraw and to substitute attorneys from Covington, whom Mr. Runyon has retained as *pro bono* counsel. ECF No. 814. She substantiated the basis for her motion—including her consultation with Bar counsel—in a sworn sealed declaration. *See* Peiffer Decl.

The court denied the motion, concluding Ms. Peiffer does not have "a conflict of interest necessitating withdrawal." ECF No. 820 at 2. The court did not consider the advice Ms. Peiffer received from ethics counsel, apparently because it was not presented in the form of a written "ethics opinion." Tr. of Proceedings, June 16,

2023 at 8 (June 16, 2023 Tr.). The court also considered the motion, filed at what it described as the "eleventh hour" of the proceedings, to be untimely. ECF No. 820 at 2.

In the same order, the court ordered all discovery to be completed by August 31, 2023, and scheduled a multi-week evidentiary hearing to begin on November 1, 2023. ECF No. 820 at 3-4. The court also denied a stay pending appeal. *Id.* at 4. The court reasoned, "There's just been too much going on and prejudice to all concerned would occur" from a stay. June 16, 2023 Tr. at 58.

On June 26, 2023, Ms. Peiffer noticed this appeal. ECF No. 821. After receiving notice of Appellant's intention to file these motions on June 27, counsel for the Government responded on June 28 that they oppose these requests.

In the face of a fast-approaching discovery deadline and subsequent evidentiary hearing in this death penalty case, the denial of Ms. Peiffer's motion has left Mr. Runyon with one attorney with serious impairments to her capacity and another who has been involved in his case fewer than three months. Meanwhile, the Government has three actively participating counsel in these proceedings, two of whom have been involved since the trial. Mr. Runyon stands alone in this posture; to counsel's knowledge, every other federal death row prisoner litigating a section 2255 petition has at least two (and in many instances, many more) active counsel of record.

# ARGUMENT

To obtain a stay pending appeal, a movant must establish that (1) she is likely to succeed on the merits; (2) she and her client will be irreparably harmed absent a stay; (3) a stay will not substantially injure the Government; and (4) a stay serves the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). Factors one and two "are the most critical." *Id.* The third and fourth factors "merge when the Government is the opposing party." *Id.* at 435. Appellant hits all these marks: The District Court's denial of her motion to withdraw, in the face of serious ethical conflicts, was unsupportable, and her continued participation in the case will cause both her and her client irreparable harm. The Government will not be prejudiced by a brief continuance, and the public has an abiding interest in ensuring non-conflicted and adequate counsel in *any* criminal case—especially a capital case.

To ensure the stay is limited and the proceedings below are not unduly delayed, this Court should expedite review. Appellant did not seek withdrawal to cause delay, and had the court allowed the Covington attorneys to substitute for Ms. Peiffer, Mr. Runyon would have had no difficulty meeting the District Court's schedule.

**I.    APPELLANT WILL LIKELY PREVAIL ON APPEAL.**

**A.    Ms. Peiffer's Continued Representation of Defendant Violates the Virginia Rules of Professional Conduct.**

The District Court's conclusion that Ms. Peiffer does not have a conflict necessitating withdrawal directly contradicts the plain text of the Virginia Rules of Professional Conduct. As confirmed by ethics counsel for the Virginia State Bar, Peiffer Decl. ¶ 18, Ms. Peiffer's continued representation of Mr. Runyon under the circumstances presented to the court violates at least three provisions of Virginia's governing ethical standards. *See* Va. Code Ann. §§ 1.1, 1.3(a), 1.7 (West 2000).

"[A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest." *Id.* § 1.7(a). Such a conflict exists here because "there is a significant risk that [Ms. Peiffer's] representation of [Mr. Runyon] will be materially limited by . . . a personal interest of [Ms. Peiffer]," namely, her interest in caring for her mother. *See id.* § 1.7(a)(2). Ms. Peiffer's "loyalty to [Mr. Runyon] is also impaired" because her responsibility to care for her mother will prevent her from "carry[ing] out an appropriate course of action for [Mr. Runyon]." *See id.* § 1.7, cmt. 8. Given this "concurrent conflict of interest," Ms. Peiffer's continued representation of Mr. Runyon violates her duties under Rule 1.7.

Ms. Peiffer's inability, under the present circumstances, to provide competent, diligent, and prompt representation also violates her duties under Virginia Rules of Professional Conduct sections 1.1 and 1.3(a). "Competent handling of a particular

matter includes . . . adequate preparation." *Id.* § 1.1, cmt. 5. In any representation, "[a] lawyer shall act with reasonable diligence and promptness." *Id.* § 1.3(a). As the District Court recognized, the underlying habeas case is complex, and there is significant outstanding discovery. *See* ECF No. 810 at 2. In a given case, "[t]he required attention and preparation are determined in part by what is at stake." Va. Code Ann. § 1.1, cmt. 5. What is at stake here is a man's life. Preparing the habeas claims of a death row inmate for an evidentiary hearing and subsequent proceedings requires the utmost attention and preparation. *See* ECF No. 810 at 2. Ms. Peiffer's caretaking obligations will prevent her from adequately completing discovery or preparing for the upcoming evidentiary hearing. *See* Peiffer Decl. ¶¶ 11-18. These obligations will also make it difficult for Ms. Peiffer to communicate promptly with her client and to reliably arrange travel and court appearances, particularly when it comes to preparing witnesses over multiple days. *See id.*

As continued representation of Mr. Runyon would violate Rules 1.1, 1.3(a), and 1.7(a)(2) of the Virginia Rules of Professional Conduct, Ms. Peiffer is ethically and professionally obligated to withdraw. *See* Va. Code Ann. § 1.16(a)(1) (West 2000); *see also id.*, cmt. 1 ("A lawyer should not . . . continue representation in a matter unless it can be performed competently, promptly, without improper conflict of interest and to completion."). A violation of the Virginia Rules constitutes "good cause" for an attorney to seek to withdraw from a representation. *See id.* § 6.2(a).

Ms. Peiffer's family situation renders her no longer capable of competently and diligently representing Mr. Runyon pursuant to 18 U.S.C. § 3599 and in accordance with her ethical duties. *See* Peiffer Decl. ¶ 18. Accordingly, it is in the "interests of justice" to allow Ms. Peiffer to withdraw and permit Mr. Runyon's chosen substitute counsel to appear as counsel of record. *See Martel v. Clair*, 565 U.S. 648, 658 (2012) ("interests of justice" standard applies to motions for substitution under 18 U.S.C. § 3599); *Christeson v. Roper*, 574 U.S. 373, 377 (2015) (per curiam) ("[S]ubstitution should be granted when it is in the 'interests of justice.' ") (citation omitted); *see also* ECF No. 820 at 2 (applying "interests of justice standard" to withdrawal motion).

The District Court abused its discretion by denying Ms. Peiffer's motion. In making this assessment, this Court considers three factors: "(1) timeliness of the motion; (2) adequacy of the court's inquiry; and (3) whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense." *United States v. Blackledge*, 751 F.3d 188, 194 (4th Cir. 2014) (internal quotation marks and citation omitted). For the third factor, "a total lack of communication is not required: rather an examination of whether the extent of the breakdown prevented the ability to conduct an adequate defense is the necessary inquiry." *United States v. Wenk*, 771 F. App'x 229, 230 (Mem.) (4th Cir. 2019) (per curiam) (cleaned up). All three factors favor reversal. And because the District

11

Court made an error of law in its timeliness determination, that "is by definition an abuse of discretion." *Hunter v. Earthgrains Co. Bakery*, 281 F.3d 144, 150 (4th Cir. 2002).

On the first factor—timeliness—the District Court concluded that the motion to withdraw was an "untimely filing . . . at the 'eleventh hour'." ECF No. 820 at 2. Its conclusion appears to be based on its belief that "this case has been going on an inordinate amount of time, and it needs to move forward." *See* June 16, 2023 Tr. at 15. But the basis for Ms. Peiffer's motion to withdraw—her mother's sudden cancer diagnosis—did not arise until late April. Ms. Peiffer filed her motion as soon as practicable—within just a few days—after obtaining the necessary information from her mother's doctors to support her decision, consulting with Bar counsel, and concluding that she had a conflict of interest requiring her withdrawal.

In any case, neither the duration of prior proceedings in a matter, nor a court's belief that a case is at the "eleventh hour" and should be near completion, is relevant to the timeliness inquiry. Instead, a court must consider "the temporal proximity of the motion to trial or another proceeding," as well as "the resulting delay on the overall proceedings." *United States v. Muslim*, 944 F.3d 154, 166 (4th Cir. 2019). This Court has found a motion to withdraw made just weeks *before trial* to be timely. *See Blackledge*, 751 F.3d at 194 (citing *United States v. Jennette*, 387 F. App'x 303, 307 (4th Cir. 2010)). Here, Ms. Peiffer filed her motion almost five months before

the resumption of the evidentiary hearing, which had not even been scheduled at the time of the motion. *See* ECF No. 820 at 1, 3-4. Furthermore, given Ms. Peiffer's limited capacity and the availability of substitute counsel, *see* ECF No. 815 at 7-13, permitting withdrawal would not have caused delay. Ms. Peiffer did not simply present the court with a problem (her conflict of interest requiring withdrawal). She instead presented a solution that (had the court accepted it) would have required no delay in the proceedings below. Because the court failed to consider and apply the relevant factors in its timeliness inquiry, it made "an error of law," which "is by definition an abuse of discretion." *Earthgrains*, 281 F.3d at 150.

On the second factor, the District Court failed to conduct an adequate inquiry. The court completely disregarded Ms. Peiffer's sworn representations about her lack of capacity and the recommendation from Virginia State Bar ethics counsel that Ms. Peiffer withdraw. The court's reasoning that Ms. Peiffer's continued involvement was necessary for "continuity" and "institutional knowledge," ECF No. 820 at 2, ignores both the reality that Ms. Peiffer is not available to meaningfully assist in preparing Mr. Runyon's case for a hearing and Ms. Peiffer's representations that while she does not have capacity to continue serving as counsel of record, she would ensure her availability to answer questions to provide any necessary continuity. The court instead suggested that another attorney in Ms. Peiffer's office could step in— disregarding the fact that among the attorneys in her office, only Ms. Peiffer has had

significant involvement in the case and a relationship with the client, and that Ms. Peiffer's current circumstances have put a significant strain on her office, which comprises only two other attorneys. *See* June 16, 2023 Tr. at 12-17; ECF No. 435 at 5 ("The court does not appoint organizations . . . [but] rather . . . appoints individual attorneys to represent individual defendants.").

The court also failed to consider the support of Ms. Peiffer's client and co-counsel for the motion to withdraw and substitute, both of whom recognized that Ms. Peiffer's lack of capacity would leave Mr. Runyon's legal team short-handed. *See id.* at 6. At the status hearing, the court made no inquiry of Mr. Runyon, who was present, *see* June 16, 2023 Tr. at 3, about his desired legal representation. Instead, the court's apparent solution to Ms. Peiffer's caregiving responsibilities was to have Ms. Peiffer do less work and have Ms. Ali take the "lead role," *see id.* at 6, 10, 16—effectively endorsing Ms. Peiffer's representation that her capacity will be materially limited.

The court also failed to engage in any inquiry about the recommendation Ms. Peiffer received from ethics counsel. In response to Ms. Peiffer's representation that she felt obligated to withdraw after consulting with ethics counsel, the court summarily dismissed the argument: "I haven't received any ethics opinion." *Id.* at 8. That was the extent of the court's inquiry. The court's apparent requirement of a written ethics opinion ignores the fact that the Virginia State Bar's Standing

14

Committee on Legal Ethics will issue a legal ethics opinion only for "a hypothetical set of facts" and "may decline to issue an opinion if the question raised is the subject of collateral litigation." *Request a Legal Ethics Opinion*, Virginia State Bar, https://vsb.org/Site/lawyers/leo-request.aspx (last visited June 30, 2023). While an existing ethics opinion dispositive of the inquiry might be the gold standard, the court received a representation from Ms. Peiffer—an officer of the court, sworn under penalty of perjury—that she had concluded she had to withdraw after consultation with the Virginia State Bar's Ethics Department. Peiffer Decl. ¶ 18. This should have been accorded significant weight by the court. *See* Va. Code Ann. § 1.16, cmt. 3 ("[A] lawyer's statement that professional considerations require termination of the representation ordinarily should be accepted as sufficient.").

On the third factor, Ms. Peiffer attested she lacks capacity to fulfill her duties to her gravely ill mother and her death-sentenced client. Ms. Peiffer's inability to competently and diligently represent Mr. Runyon thus will lead to "a 'breakdown' of attorney-client communication so great that the principal purpose of the appointment—the mounting of an adequate defense incident to a fair trial—[will be] frustrated." *United States v. Smith*, 640 F.3d 580, 588 (4th Cir. 2011). "[B]ecause the district court failed to engage in an adequate inquiry, its factual determination" that Ms. Peiffer is capable of providing Mr. Runyon adequate representation "is not entitled to clear error review." *Blackledge*, 751 F.3d at 195. But even if it were, this

third factor still would favor reversal. As Ms. Peiffer has attested, her unpredictable circumstances will likely interfere with her ability to communicate and visit reliably with her client as necessary in preparing for and litigating the evidentiary hearing. *See* Peiffer Decl. ¶¶ 12-18.

Given that all three factors favor Ms. Peiffer, as well as the District Court's error of law, this Court is likely to hold that the District Court abused its discretion.

**B.     The District Court's Order Violates Petitioner's Rights.**

In addition to violating Virginia's ethics rules, Ms. Peiffer's continued representation of Mr. Runyon under these circumstances—particularly absent substitute counsel—would deprive Mr. Runyon of his federal constitutional and statutory rights to assistance of counsel as a person facing the death penalty.

Because Mr. Runyon is an indigent person under a sentence of death, he is entitled to the appointment of counsel to assist him in litigating his motion for relief pursuant to 28 U.S.C. § 2255. *See* 18 U.S.C. § 3599(a)(2); *McFarland v. Scott*, 512 U.S. 849, 854–857 (1994).

When, as here, counsel's capacity is sharply limited by conflicting personal obligations, that right is violated. *See United States v. Cronic*, 466 U.S. 648, 654, 655 n.14 (1984). Ms. Peiffer's limited capacity renders her performance inadequate, especially for a complex habeas proceeding in a capital case. The impact of counsel's diminished representation is particularly grave where, as here, proceedings

will determine whether a death-sentenced defendant received the Sixth Amendment's fundamental right to effective assistance of counsel.

Just last month, the District Court determined that "[g]iven the seriousness of the capital penalty in this case, the amount of discovery yet to be completed, and the complexity of the case," it was appropriate to appoint two attorneys for Mr. Runyon. ECF No. 810 at 1-2. Now, despite sworn statements from Ms. Peiffer that she is no longer in a position to assist, the court has seemingly reversed course. This effectively leaves Mr. Runyon with only one counsel, appointed less than two months ago, to litigate his section 2255 petition. Due to issues created by prior, now-withdrawn counsel, much of the time Ms. Ali has spent thus far has necessarily been focused on attempting to resolve discovery issues, limiting her ability to prepare for the approaching hearing. Mr. Runyon should not have to proceed in this crucial phase of his habeas case without adequate representation from one of his attorneys.

The absence of two attorneys of record runs counter to (i) the text of 18 U.S.C § 3599, (ii) the text of the EDVA's CJA plan (which directs that "[d]ue to the complex, demanding, and protracted nature of death penalty proceedings, the court should consider appointing at least two attorneys" to litigate § 2255 post-conviction petitions in federal capital cases), and (iii) norms in federal capital cases; every other person in the United States litigating a capital section 2255 has at least two counsel of record, and in many instances more. *See* ECF No. 803 at 2–4 & n.5.

On the first and third factor of the analysis into whether the District Court abused its discretion, the same arguments apply here. On the second factor, the court additionally failed to engage in an adequate inquiry about the violation of Mr. Runyon's constitutional and statutory rights. Despite Ms. Peiffer's representations that she could not act as competent counsel, the court did not ask what, if any, participation, Ms. Peiffer has been able to have in Mr. Runyon's defense since she began caring for her mother and how much she anticipated being able to have going forward, especially leading up to the evidentiary hearing. In fact, the court assumed (wrongly) with no further inquiry that Ms. Peiffer was seeking to withdraw from Mr. Runyon's case, while still substantially participating in other cases. *See* June 16, 2023 Tr. at 13-16. Nor did the court ask whether Mr. Runyon, who was present at the hearing and supports Ms. Peiffer's withdrawal under the circumstances, believed Ms. Peiffer could still adequately represent him. The court erred in failing to examine the impact of Ms. Peiffer's time, capacity, and attention constraints on Mr. Runyon and his defense, as well as Mr. Runyon's beliefs about the adequacy of his representation.

## II.    THE EQUITIES OVERWHELMINGLY FAVOR A STAY.

The harm to Ms. Peiffer, Mr. Runyon,  and the public interest overwhelmingly favor a stay, which would result in no harm to the Government.

**A.     Appellant and Defendant Face Irreparable Harm.**

In the absence of a stay, Mr. Runyon and Ms. Peiffer would face significant, certain, and irreparable harm from being forced into an ethically compromised attorney-client relationship that would deprive Mr. Runyon of his rights to adequate representation.  As the record before the District Court showed, and as Professor George Rutherglen of the University of Virginia School of Law confirms, Ms. Peiffer will face continual conflicts of interest over at least the next several months, as she is forced to choose between caring for her mother and preparing for Mr. Runyon's defense.  *See* Rutherglen Decl. at 4.  Every day Ms. Peiffer remains in the case is arguably a violation of her ethical duties to her client—a violation that cannot be undone.  *See United States v. Plunkett*, No. 22-7225, 2023 U.S. App. LEXIS 8853, at *3 n.* (4th Cir. Apr. 13, 2023) (citation omitted) ("[I]rreparable harm . . . befalls an attorney 'forced to continue representing a client against his or her wishes.' ").

Mr. Runyon also faces irreparable harm.  Without a stay, he would continue to be the only person litigating a capital section 2255 motion scheduled for an evidentiary hearing with, effectively, only one counsel of record.  *See* ECF No. 803 at 3–4 & n.5.  The court acknowledged as recently as mid-May 2023 that this is a complex case with a massive record and that appointing two lawyers was appropriate.  ECF No. 810 at 1-2.  The discovery deadline and evidentiary hearing are fast-approaching.  Every day Mr. Runyon is forced to continue with inadequate

counsel is one fewer day he has to prepare with competent counsel.  That is time and an opportunity Mr. Runyon cannot recover.

**B.      The Public Interest Favors a Stay.**

When the Government is the opposing party, the third and fourth stay factors—the harm to the opposing party and the public interest—"merge"; the Government's interest *is* the public interest.  *Nken*, 556 U.S. at 435.  Here, the public interest overwhelmingly favors a stay.  Forcing Ms. Peiffer and Mr. Runyon to remain in a conflicted attorney-client relationship, with impending deadlines, would undermine the public interest in ensuring adequate representation in capital cases, vindicating Mr. Runyon's right to counsel of choice, and serving the interests of justice and finality.

A stay is critical to ensure Mr. Runyon receives adequate representation.  "Our system of justice . . . depends for its legitimacy on the fair and adequate representation of all parties at all levels of the judicial process . . . When we execute a capital defendant in this country, we rely on the belief that the individual was guilty, and was convicted and sentenced after a fair trial." *McFarland v. Scott*, 512 U.S. 1256, 1264 (1994) (Blackmun, J., dissenting from denial of certiorari).  Federal habeas proceedings are critically important for the correction of constitutional errors in capital cases.  *Id.* at 1263.  Indeed, in enacting 18 U.S.C. § 3599, Congress determined that access to counsel is critical during federal habeas proceedings.  *See,*

*e.g.*, *McFarland*, 512 U.S. at 859 ("By providing indigent capital defendants with a mandatory right to qualified legal counsel in these proceedings, Congress has recognized that federal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty."). Here, however, one of Mr. Runyon's two attorneys of record is incapacitated by a conflict of interest that renders her unable to provide adequate representation. This Court should stay proceedings to ensure that Mr. Runyon does not have to proceed in this critical phase of his case with inadequate counsel.

There is also a strong public interest in vindicating Mr. Runyon's right to his counsel of choice. Mr. Runyon has the right to be represented by qualified, chosen counsel "willing to represent the defendant even though he is without funds." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624–625 (1989). Here, Mr. Runyon selected attorneys from Covington as substitute counsel, with whom he has developed a relationship of trust and confidence. Unless the proceedings are stayed, he will be deprived of his right to be represented by his chosen counsel, in violation of his constitutional rights. *See, e.g.*, *United States v. Gonzalez-Lopez*, 399 F.3d 924, 928–930 (8th Cir. 2005), *aff'd and remanded*, 548 U.S. 140 (2006) (citation omitted) ("As a general rule, 'defendants are free to employ counsel of their own choice and the courts are afforded little leeway in interfering with that choice.' ").

The Government should recognize there is a public interest in ensuring Mr. Runyon receives adequate representation. If these issues concerning Mr. Runyon's counsel are not resolved now, they could present bases for relief in the future, thus undermining "the principle of finality which is essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989). Once again, there would have been no delay had the motions to withdraw and substitute been granted. The interests of justice would not be undermined by a brief continuance.

## III. This Court Should Expedite Review.

Local Rule 12(c) allows parties to move to expedite an appeal for briefing and oral argument. Expedited review is warranted here because of the public interest in a speedy resolution to this appeal and an expeditious conclusion to Mr. Runyon's habeas proceedings. The United States opposes this request.

Appellant proposes the Court enter the following expedited schedule, which still gives the Government a full 30 days to prepare and file its brief:

> Appellant's opening brief: July 21, 2023
>
> Joint appendix: July 21, 2023
>
> Appellee's response brief: August 21, 2023
>
> Appellant's reply brief: September 1, 2023
>
> Oral argument: During the September 19-24 sitting

# CONCLUSION

For the foregoing reasons, the Court should grant a stay of proceedings and of the June 20, 2023, order pending appeal and grant expedited consideration.

June 30, 2023

Respectfully submitted,

/s/ Catherine E. Stetson

CATHERINE E. STETSON
TIARA BROWN
SIMON CHIN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004
Tel:  (202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Appellant*

# CERTIFICATE OF COMPLIANCE

I certify that the foregoing complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f), this motion contains 5,166 words.

This foregoing complies with the typeface and type style requirements because this motion has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point font.

June 30, 2023                                   /s/ Catherine E. Stetson
                                                Catherine E. Stetson

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on June 30, 2023. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

June 30, 2023                                    /s/ Catherine E. Stetson

                                                 Catherine E. Stetson

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
**CERTIFICATE OF CONFIDENTIALITY, LOCAL RULE 25(c)**

No. _____23-5_____ Caption: In re: Elizabeth Jane Peiffer _____

Appellant _____

(appellant, appellee, petitioner, respondent, other)

certifies the following information regarding sealing of the document(s) described below:

1. Identify document(s) filed (e.g., sealed appendix volume, sealed version of brief):

Sealed Version of Motion _____

2. Is sealing of document(s) necessary?

☐ No
☑ Yes, to protect material sealed under the Privacy Policy for Electronic Case Files, or
    by statute, rule, regulation, or order

3. Date(s) of order(s) sealing the material or, if there is no order, the authority relied upon to treat
the material as sealed:

June 16, 2023 Order to Seal Declaration, Judge Rebecca Beach Smith, United States District Court for
the Eastern District of Virginia, David Anthony Runyon v. United States of America (No. 4:15-cv-108).

4. Terms of order sealing the material, including who is permitted access to sealed material (if
filed ex parte, document must be marked SEALED and EX PARTE):

Declaration of Elizabeth J. Peiffer ordered sealed.

5. (For SEALED APPENDIX) Sealed record material has been separated from any unsealed
record material and placed in a separate, sealed volume of the appendix.

☐ Yes

6. (For SEALED BRIEFS, SEALED DOCUMENTS) Two versions of document are filed:
Sealed version with sealed material highlighted and public version with sealed material redacted.

☑ Yes

# CERTIFICATE OF SERVICE

I certify that on  June 30, 2023  the sealed document(s) identified in this Certificate of Confidentiality were served on the following parties or counsel of record outside of CM/ECF at the addresses listed below.  Service may be made by direct email or other electronic means with the prior written consent of the party to be served.  In consolidated criminal cases, identify which sealed appendix volumes were served on each party or attorney.

Brian James Samuels
brian.samuels@usdoj.gov

Richard D. Cooke
richard.cooke@usdoj.gov

Lisa Rae McKeel
lisa.mckeel@usdoj.gov

Carrie Lee Ward
carrie.ward@usdoj.gov

| /s/ Catherine E. Stetson | 06/30/23 |
| --- | --- |
| Signature | Date |

**TABLE OF CONTENTS**

<b><u>Page</u></b>

Addendum A—District Court's Order (ECF 820) ..................................................A1

Addendum B—Transcript of Status Hearing (ECF 819) ......................................A6

Addendum C—Memorandum in Support of
Motion to Withdraw (ECF 815) .......................................................................A66

Addendum D—Sealed Declaration of
Elizabeth Peiffer (ECF 815, Ex. A) ................................................................A82

Addendum E—Declaration of Peter Swanson (ECF 815, Ex. B) ........................A90

Addendum F—Declaration of Prof. George Rutherglen.......................................A93

# Addendum A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

      Petitioner,

v.                                                CIVIL NO. 4:15cv108
                                      [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

      Respondent.


ORDER


At the request of the United States, the parties convened before the court on June 16, 2023, for a status hearing to address the parties' inability to reach an agreement regarding the timeline for discovery and the continuation of Petitioner's evidentiary hearing. See ECF Nos. 809 at 7; 796 (Order directing the parties to reach such an agreement)[1]; 817 (Minute Entry). Petitioner was present throughout the hearing. The court heard argument of counsel regarding (1) issues with discovery and in agreeing to a proposed schedule; and (2) Ms. Elizabeth Peiffer's Motion to Withdraw and Substitute Pro Bono Counsel, which was filed on June 7, 2023. ECF No. 814.

---

[1] After the court's initial order directing the parties to reach an agreement on a proposed schedule, the court subsequently granted three motions and requests to continue the deadline for such. See ECF Nos. 801, 807, 810.

**A2**

## I.

For the reasons stated from the bench, the court finds that Ms. Peiffer's withdrawal would not be in the "interests of justice." Martel v. Clair, 565 U.S. 648, 652 (2012); see Christeson v. Roper, 574 U.S. 373 (2015). To the contrary, in order to ensure that Petitioner receives adequate representation while maintaining continuity of counsel and the institutional knowledge of the Virginia Capital Representation Resources Center ("VCRRC")[2], the court finds that it is in the "interests of justice" for Ms. Peiffer to remain as counsel for Petitioner. See id.

Further, for the reasons stated from the bench, while the court is sympathetic to Ms. Peiffer's family situation, the court does not find that she has a conflict of interest necessitating withdrawal under Virginia Rules of Professional Conduct 1.7(a)(2), 1.1, or 1.3(a). See ECF No. 815 at 3-4 (Memorandum in Support of Ms. Peiffer's Motion to Withdrawal). Moreover, the court has considered the untimely filing of the Motion to Withdraw at the "eleventh hour" in these proceedings, and has fully heard the matter with all of the reasons and argument for Ms. Peiffer's withdrawal, together with the prejudice resulting to Petitioner and the United States, which opposed the withdrawal. The court concludes that the "interests of justice" would not be served by granting the Motion to

---

[2] The Virginia Capital Representation Resource Center has lead Petitioner's habeas proceedings since November 5, 2014. See ECF No. 410 (Order appointing Ms. Michele Brace of the VCRRC).

A3

Withdraw. Accordingly, Ms. Peiffer's Motion to Withdraw, ECF No. 814, is **DENIED**.[3]

Ms. Peiffer and Ms. Ali shall remain counsel for Petitioner, distributing their duties as they see fit, as co-lead counsel. Ms. Peiffer and Ms. Ali may continue to utilize the services of pro bono attorneys, but no applications/motions from the individual attorneys for pro hac vice admission are currently before the court, as none have been submitted.[4] The court has expressed an intention, at this juncture, not to admit any additional attorneys to represent Petitioner in this limited matter on remand from the Fourth Circuit,[5] but it has no specific and proper applications to consider, with time being of the essence. See infra Part II.

## II.

Next, after hearing argument of counsel and for the reasons stated from the bench, the court **ORDERS** that all discovery be

---

[3] For the reasons stated from the bench, the court **GRANTED** Ms. Peiffer's Motion to Seal, ECF No. 812, regarding the declaration in support of her Motion to Withdrawal, ECF No. 814.

[4] Attached hereto as Exhibit A is a blank application form required by the Local Rules of this court. See Local Rule 83.1(E). The application has necessary information for consideration by the court to exercise its discretion for any individual pro hac vice appointment.

[5] The Fourth Circuit remanded this matter on only one limited issue: Whether Petitioner's trial counsel "failed to provide him with effective assistance, in violation of the Sixth Amendment, by failing to investigate adequately his brain injury and potential mental illness and introduce such evidence in mitigation during the penalty phase of trial." United States v. Runyon, 994 F.3d 192, 204 (4th Cir. 2021).

3

**A4**

completed by 5:00 P.M. on August 31, 2023. The evidentiary hearing shall resume on November 1, 2023, at 11:00 A.M., and shall begin at 11:00 A.M. each day thereafter, until completion. The parties are **DIRECTED** to meet and confer, on or before June 28, 2023, to agree on the form and method of document exchange; to address any issues with and resolutions thereto of the Protective Order, ECF No. 652; and to discuss the format, scope, and presentation of evidence at Petitioner's evidentiary hearing. If no agreement can be reached, or if further issues otherwise necessitate an additional status hearing, the parties are **DIRECTED** to notify the court of such need by 5 P.M. on June 28, 2023, after which the court will set a status hearing.

The Clerk is **DIRECTED** to send a copy of this Order to counsel for Petitioner, the United States Attorney at Newport News, and Mr. Robert Lee of the Virginia Capital Representation Resource Center. Finally, the court **DENIED** a stay of this Order pending appeal at the conclusion of the hearing, for the reasons of record for its rulings.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
Senior United States District Judge

REBECCA BEACH SMITH
SENIOR UNITED STATES DISTRICT JUDGE

June 20, 2023*

* This Order was effective immediately after issued from the bench on June 16, 2023, at 1:40 P.M., at which time the hearing was adjourned.

4

A5

# Addendum B

N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - -
                                        )
UNITED STATES OF AMERICA,               )
                                        )
v.                                      )   CRIMINAL ACTION NO.
                                        )   4:08cr16
DAVID ANTHONY RUNYON,                   )
                                        )
          Defendant.                    )
                                        )
                                        )
          AND                           )
                                        )
DAVID ANTHONY RUNYON,                   )
                                        )
          Petitioner,                   )   CIVIL ACTION NO.
                                        )   4:15cv108
v.                                      )
                                        )
UNITED STATES OF AMERICA,               )
                                        )
          Respondent.                   )
                                        )
- - - - - - - - - - - - - - - - - - -


                TRANSCRIPT OF PROCEEDINGS

                     (Status hearing)

                    Norfolk, Virginia

                     June 16, 2023



BEFORE:   THE HONORABLE REBECCA BEACH SMITH
          United States District Judge

**A7**

APPEARANCES:

       UNITED STATES ATTORNEY'S OFFICE
       By:  Brian Samuels
           Lisa R. McKeel
           Assistant United States Attorneys
           Counsel for the United States


       VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER
       By:  Elizabeth J. Peiffer
                And
       ALI & LOCKWOOD LLP
       By:  Kathryn M. Ali
           Counsel for the Defendant

**A8**

(Hearing commenced at 12:04 p.m.)

THE CLERK:  In case number 4:15cv108, David Anthony Runyon, petitioner, versus United States of America, respondent; and case number 4:08cr16, United States of America versus David Anthony Runyon.

Mr. Samuels and Ms. McKeel, is the government ready to proceed?

MR. SAMUELS:  The government is ready.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE CLERK:  Ms. Peiffer, Ms. Ali, is the defense ready to proceed?

MS. ALI:  Yes, Your Honor.  Good afternoon.

THE COURT:  Good afternoon.

Counsel, I will briefly review the current status of where we've been since the last hearing, and I will then address outstanding matters.  I would recognize Mr. Runyon. You are David Anthony Runyon?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  So Mr. Runyon is here with his counsel, and counsel for the United States are present.  On February 7, 2023, Petitioner's evidentiary hearing began following the Fourth Circuit's remand on the limited issue of whether Petitioner's trial counsel, "Failed to provide him with effective assistance in violation of the Sixth Amendment by

JODY A. STEWART, Official Court Reporter

failing to investigate adequately his brain injury and potential mental illness and introduce such evidence in mitigation during the penalty phase of the trial."

That's from *United States v. Runyon*, 924 F.3d 192 at 204. It's a 2021 Fourth Circuit case. I will not go through all of the lengthy history that has occurred to date, but the last time that we convened on this case was in February of 2023. Petitioner's counsel from the Federal Public Defender services in Eastern Tennessee were withdrawn from the case, and for the reasons I ruled on the bench, as stated from the bench and in court and for further reasons, that have occurred in the Eastern District of Tennessee. On February 24, 2023, the Court continued the evidentiary hearing.

The Court by written order also directed Ms. Peiffer and the United States, "To come to an agreement regarding the discovery schedule moving forward, including the necessary lengths of any continuance of the evidentiary hearing and to submit the proposed schedule to the Court by close of business on Friday, March 24, 2023." That order is ECF Number 796.

On March 23, 2023, petitioner, by counsel, filed an unopposed motion to continue the scheduling deadline until April 14, 2023, which the Court granted the following day. On April 14, 2023, petitioner, by counsel, filed a motion to

continue the scheduled deadline until May 5, 2023, which the Court granted on April 18th, 2023. On May 5, 2023, petitioner filed a status report and proposed schedule in which counsel suggested that discovery should be due on August 31, 2023, and that the evidentiary hearing could begin in October of 2023. The United States responded to that status report on May 17, 2023. In its response the United States objected to that length of a delay and, "Requested that the Court hold a prompt status hearing to discuss the status of discovery and the lack of agreement regarding the continuation of the evidentiary hearing." So that was why we were initially here today, and we certainly will get to that.

In the meantime, on April 12, 2023, petitioner, by counsel, moved to appoint a second attorney, Kathryn Ali, and the Court granted that motion, and Ms. Ali was appointed on May 17, 2023. I note that the Court had the discretion whether to appoint Ms. Ali or not, because the second attorney is discretionary, and the defendant was already represented by Ms. Peiffer and the Virginia Capital Resources Center, who have been in this case for some time since it started the collateral proceedings.

Then on June 7, 2023, Ms. Peiffer moved to withdraw from her representation of the petitioner due to her mother's cancer diagnosis. I would note that there is an

outstanding motion to seal Ms. Peiffer's declaration, and I have reviewed that because it contains personal information relating to her mother's diagnosis and care.

Is there any objection to the Court sealing that document?

MR. SAMUELS: No, ma'am.

THE COURT: Ms. Peiffer, I assume that you still want that sealed?

MS. PEIFFER: Yes, Your Honor. Thank you.

THE COURT: Well, I grant the outstanding motion to seal, and that declaration will be sealed.

Now, the first issue we will take up is Ms. Peiffer's withdrawal, and I will tell you at a threshold level that I am not inclined to allow you to withdraw at this point, Ms. Peiffer, and there are a number of reasons. I will state my reasons. You can then respond.

There is no indication here that you are not still going to be with the Virginia Capital Resource Center, and if you're going to be with that Center, even if you can't at this juncture necessarily take a lead role, Ms. Ali is certainly capable of taking a lead role. She was a law clerk in this court for Judge Doumar. She has experience in death penalty cases, and that is why the Court admitted her, because of her experience, and she moved, as did Ms. Peiffer, to allow her in. That was allowing her in on

the Court's discretion without having any information in regard to Ms. Peiffer's mother's condition.

So at a threshold level, there are already two attorneys in this case, and Ms. Ali is certainly qualified. If she's not, she shouldn't have submitted all that she did to the Court saying she was totally qualified to go forward with this case, and those submissions were verified, her experience by the Court, and the Court is familiar with her, her having served as a law clerk in this court. I didn't work directly with her, but I certainly am familiar with her.

Secondly, as I said, there is no indication that Ms. Peiffer is leaving the Virginia Capital Resource Center or that the Virginia Capital Resource Center is in any way closing. Every case needs some kind of institutional memory and continuity, in other words, an attorney that's been with the case. I am certainly not inclined to let an attorney or the Capital Resource Center withdraw. Ms. Brace started this habeas with the Center, then the Court was assured she was ill. The Court was assured that Ms. Peiffer would take over and proceed in this case, and that the Virginia Capital Resource Center would proceed.

Certainly, at this juncture, this case started in 2008. It started a bit before that, but filed in 2008, and so, consequently, at this juncture this Court is not

inclined to let the habeas attorney withdraw. I'm very sympathetic to Ms. Peiffer's family illness. I'm sympathetic to family situations, and she may not for a while be able to take the lead here, but you've got very capable co-counsel. Now, if you want to make some remarks to that, certainly, Ms. Peiffer, I will let you, and I will let the United States respond.

Ms. Peiffer.

MS. PEIFFER: Your Honor, since most of the explanation and reasons why I believe I'm required to withdraw as set forth in the motion and declaration, I'll have very brief responses to Your Honor's comments. The first is that, although I had elected to, after reviewing the ethical rules and consulting with the bar of ethics department, I believe it is appropriate and necessary for me to withdraw because I can't fulfill my ethical obligations to Mr. Runyon due to my personal conflict of interest that has arisen and disabled by that conflict of interest and particularly to the Rules 1.1, 1.3 and 1.7, I feel obligated to withdraw, and I have done that after consultation with ethics counsel at the bar.

THE COURT: I haven't received any ethics opinion, and I don't know of any cases on point. Are you staying with the Virginia Capital Resource Center? Are you employed by them?

MS. PEIFFER: Your Honor, I am currently employed by the Capital Representation Resource Center. I have not been working my normal schedule. I have been unable to work my normal schedule since April 28th due to my involvement and responsibilities for caring for my mother, and my schedule has been very unpredictable, and I have had a great degree of flexibility, and because of that, that is why I believe that I am not able to competently represent Mr. Runyon because of the degree of unpredictability that has taken over my schedule and my life at this point due to my mother's illness.

I have not been working in the way that I would need to to prepare for his evidentiary hearing or to support Ms. Ali as co-counsel in the case. I have not been able to do that due to my other obligations. I have the option of taking compassionate relief from the Resource Center, and I will do so if that's needed to address my mother's medical situation.

But the situation is evolving and changing, and I'm not -- to be frank with the Court, it changes every day, and I am not sure of my stance for the future, but that degree of unpredictability and my concern that I cannot adequately represent Mr. Runyon with an approaching evidentiary hearing and the work that would need to be done to prepare for that is to prepare and to follow the Court's orders regarding the

discovery in this case, I don't feel like I can fulfill those obligations, and that's why I did move to withdraw in this case.

THE COURT: The Court is of the opinion you are not fulfilling your obligation to withdraw. There's probably not a person in this room that has not had a close family member very will or had a difficult family situation, including the undersigned judge, a very similar family situation, and I'm not saying I'm not sympathetic but there are still ways to meet your obligations because that's what a person has had to do at some junctures, and as far as I'm concerned, that's why you have Ms. Ali to take a lead role.

You would be, in my opinion, violating your duties to Mr. Runyon by not staying in this case because you have the institutional memory, and it doesn't mean that you have to work on the case every day, but there are computers, there are e-mails, there's telephones. Ms. Ali is in the State of Virginia. Her office is in Northern Virginia, as I understand it, and you're in Charlottesville. So there are certainly means to communicate, and nobody is saying that you have to be lead counsel necessarily, but you're co-counsel, and if you leave, I'm still going to require the Capital Resource Center to be in this case. So you can let Mr. Lee know that. You can't take on a case like this and then the attorneys one by one -- there is an obligation.

You have the records, you've done the discovery, you've filed the motions. One of the experts is now deceased. One of the attorneys, I believe, had cancer. This case is getting too stale at this point. We've got to continue on with it, and we are going to continue on with it, absent another reason other than you've told me. If it was your health, that would be different. It may be hard on you. But nobody is saying that you've got to file the briefs and do everything because you've got Ms. Ali, your co-counsel.

So nobody from the bar has told me you have to withdraw. I've looked at the caselaw. There is a family illness, but that doesn't mean if you take leave, then Mr. Lee will have to step in, even if you take compassionate leave, you are still with the Resource Center. So at this juncture, unless I hear something more persuasive, I'm going to deny your motion. In my opinion, the interest of justice requires that you and the Capital Resource Center stay in this case.

Let me hear from the United States, but at this juncture, unless I hear something more persuasive from you, and you're saying you don't have anything any more than what you've told me. I'm not granting withdrawal.

MS. PEIFFER: Your Honor, may I address several of your points, response?

THE COURT: You can, but don't repeat. Be as quick

as possible.  We have other matters to address.

MS. PEIFFER:  Absolutely.  The first regarding the Resource Center, we have operated under the Court's instructions that I was appointed to the case and not the office.  The office institutionally has had very little involvement with the case.  I have performed the brunt of the work in this case, the relationship with Mr. Runyon, and participation in the evidentiary hearing so far.

THE COURT:  Wait just a minute, please.  I want to interject something.  Ms. Brace was let out because she was ill, and you took Ms. Brace's place.  You were both with the Capital Resource Center.  So Ms. Brace was with this case, the continuity through the habeas action, and appeared in this case at the inception of it.  She got out right at the inception of when we had to have the evidentiary hearing. She was in the case as was the Capital Resource Center.  So she got out with the understanding that the Capital Resource Center would still be in the case, and you would be the attorney from the Capital Resource Center.  I agreed to let you all associate the Federal Public Defender of Tennessee and you lost control of that one.

MS. PEIFFER:  Well, Your Honor, I was appointed from the Resource Center, but the other attorneys at the Resource Center did not have a substantial involvement in the case.  And that was -- they are currently impacted by my

situation, which also has made me unavailable to work on our other cases. We are a very small office of only three attorneys. So my inability to work at full capacity, and the need to accommodate that on our other cases, and my reduced contribution, has had a proportionately great effect on the office. And in the interest of efficiency and moving it forward, which I know is in the interest of all of the parties, that was why we suggested substitute counsel who would be able to move the case forward on the schedule that we had proposed, which we would not be able to do if I was involved -- I would not be able to commit to a hearing because of my current situation and to just -- I'm trying to keep it brief as directed by Your Honor, but I just want to clarify, I believe I am currently operating under a conflict of interest because I am -- my personal commitment and my personal responsibilities are creating a significant risk that the representation of Mr. Runyon is materially limited. So that is the reason why I believe, and the bar advised, that it is appropriate, and that's why I moved to withdraw from the representation.

THE COURT: As far as the Court is concerned, if the Capital Resource Center did you not have enough resources, it needs to seek more. That's number one. Number two, I would be interested, and I may inquire, if necessary, a list of all the cases that you have because

**A19**

this is certainly one of the oldest cases that you have. So if you are taking on new cases, and you're putting Mr. Runyon's case behind those, that is unethical, in my opinion.

In other words, if you're taking on new capital cases, and you're not getting out of more recent capital cases that haven't been nearly as far as this case, that is not right. This case had a full jury trial. He was convicted with three segments for a death penalty case. The jury rendered the verdict, not the Court. The law required the jury to render the death penalty verdict, and not the Court, which is then directed under the law to impose that sentence of the jury.

The case went to the Fourth Circuit on appeal and was affirmed. Then it went to the Supreme Court, with cert. denied. Then it came back here. It was a habeas petition that had things even in there alleging that the attorneys hadn't used the correct font. That was actually one of the numerous grounds. Then it gets ruled on by this court, and it goes to the Fourth Circuit on appeal. Everything is upheld but the one issue of whether the two attorneys were ineffective because they didn't pursue or produce certain evidence on potential mental health issues. They testified. The habeas evidentiary hearing started at lasted seven to eight days. They, the attorneys, have testified here why

they didn't and what was going on.

Then when Ms. Chavis appeals, it comes out on the objection of the government that certain documents haven't been seen, certain documents haven't been produced, and the record will show this. Then, as I understand it, a closet with at least 40 bankers boxes of evidence was found at the Tennessee Federal Public Defender's office that Ms. Chavis had put there.

So, consequently, this case has been going on an inordinate amount of time, and it needs to move forward, and the Court itself has not dragged its feet. This came back to court on this one issue in 2021, and then I continually notified counsel we need to set a hearing. I set a hearing, I believe, at the insistence of the government about a year later. So it needs to keep moving along. People are going to have problems. That is one of the issues now. There are problems. There are problems with the experts, one has died. There's problems with the trial attorneys getting ill. At least they have testified at this point. Then there were problems with, and it wasn't the government, withholding discovery information. It was the petitioner's counsel withholding that. That was a nightmare for the Court, for Mr. Runyon, and for everybody involved with what occurred and with the case.

So, consequently, we all have problems. It's human

nature.  I know you have a problem, Ms. Peiffer, but there are attorneys and other people in that office, and there is you, you can communicate.  You can communicate with Ms. Ali, who is extremely competent.  So she's in the case, and the case can move forward.  If she has a question about something thus far, at least she has someone to ask.  Can you tell me why this was filed?  You don't necessarily have to do all the substantive work, but the continuity has to be there, and it has to be there now through you, and if not through you, through the Virginia Capital Resource Center. Mr. Lee, the director of the Center, is an attorney.

I will do what I have to do to keep the Virginia Capital Resource Center in this case.  Three attorneys and Mr. Lee apparently have not stopped taking new cases.  I'd be interested in the cases that you have.  I bet you don't have many that go back to 2008.  I would be very interested.

So unless you can produce something other than what you have told the Court that, number one, I understand your situation.  I'm very sympathetic to your situation.  But the situation, in my mind, is not grounds to withdraw.  If you feel you have a conflict, I don't feel you have a conflict. I don't see any conflict because a family member is ill.  I just don't see the conflict.  So I find that you don't have a conflict that prevents you from proceeding on with this case, even if on a limited basis, and I find that you don't

A22

have an ethical obligation to withdraw. I find you have an ethical obligation not to withdraw at this late juncture.

Now, is there anything else?

MS. PEIFFER: I'll consult with my co-counsel, Your Honor.

All right. Nothing further at this point, Your Honor.

THE COURT: All right. Thank you.

Mr. Samuels, Ms. McKeel.

MR. SAMUELS: Thank you, Judge. Your Honor, we certainly have a great sympathy for Ms. Peiffer's family situation. When we were investigating this case, and we were doing the early litigation on it, Ms. McKeel, my colleague, had some very difficult family situations, as well, during that time that we worked through.

But the concern that the United States has is the concern that the Court had referenced, which is the issue of continuity, the issue of institutional memory. I think it is just important to note that Ms. Brace was appointed in this case back in 2015 from the Virginia Capital Resource Center at the onset of the habeas proceedings. Ms. Peiffer assumed her responsibilities in late 2021, and that was through the Court's order, ECF 649, and the Court permitted that substitution with the understanding that it would not cause a further delay in the proceedings.

I think it's also important to note that since Ms. Peiffer has been involved in late 2021, it's been about a year and a half, there has been significant ground plowed in this case. There has been a lot of discovery exchanged. We went a long way down the road on this evidentiary hearing. The lawyers testified. Lay witnesses testified. There were many prehearing pleadings that were filed.

The concern of the United States is that there be a thread in counsel's team, in habeas counsel's team, that's linking to what has been done before, and that would be Ms. Peiffer, Your Honor. So for those reasons, we agree that she should be involved in this and not the capacity that she was, but she does provide the link between what's going to go on in the future and what has happened in the past. She has had a lot of contact with the attorneys at the Federal Defender's office, and that's where all these discovery issues and these disclosures should stem from, so we do think it's an important link to maintain, Your Honor. Thank you.

THE COURT: One thing that I would add is that if Ms. Peiffer or the Virginia Capital Resource Center is not in the case, they have the electronic database of this case, and so if something comes up, they know where to go. In other words, it is not just transferring a database, it's having the memory and the knowledge to know where to go and

get things.

So the reasons that I've said, as far as I'm concerned, I just don't see anything that would serve the interests of justice in Mr. Runyon's case to allow Ms. Peiffer to withdraw. She can certainly take a lesser role, as Mr. Samuels and the Court indicated, and the Court understands that. But certainly to completely withdraw and to withdraw basically the firm, the group that has been representing Mr. Runyon throughout these habeas proceedings, would not serve the interest of justice from his standpoint, in my opinion.

Now, is there anything else that you want to say, Ms. Ali?

MS. ALI: Just briefly, Your Honor, if I may. I understand that the Court has -- I think I understand the Court has ruled on the motion.

THE COURT: No, I'm asking you if you have any comment about the motion. I've indicated upfront how I feel about the motion, and it's been pending, and that's why I didn't just rule on it. I knew we are going to have this hearing, and I wanted to articulate my reasons on record, and if you all wanted to respond, I certainly will consider any response. I have left out Ms. McKeel, but Mr. Samuels has responded.

MS. ALI: I won't repeat the argument that

Ms. Peiffer made. I'll just add, you know, we think that it is critical that Mr. Runyon have more than one counsel here for the reasons that we said in our motion, and I understand that technically if Ms. Peiffer is still in the case, then he's got two appointed counsel. But functionally, that's not going to be the case. Ms. Peiffer has really had significant constraints on her time over the last month since all of this unfolded, and my understanding that that will continue for at least the next three to four months.

The Court acknowledged in the order appointing me, and I'll note also that I was appointed in that order as second counsel solely for the purposes of this hearing. This is a complex case. There is a lot of discovery yet to be completed, and I am getting up to speed. I'm trying to learn the case, but I'm not sure that Ms. Peiffer continuing to be in the case functionally serves those two counsel. The Court made a judgment in the appointment order that it was appropriate for him to have two counsel.

I understand that that doesn't mean that both have to be serving a lead counsel function. But Ms. Peiffer is not in a position, as I understand it, and based on the constraints on her time, to really competently represent Mr. Runyon in any capacity right now. I understand the Court's comments about the office and the Resource Center and Mr. Lee, but they are aware of the case. They have been

doing some work on the case, but they are not -- they do not have the personal relationship with Mr. Runyon. They are not up to speed on all the developments in the case, and they have not been involved in the way that Ms. Peiffer has.

So I'm not sure -- it's not a substitute to have somebody else from that office come in, especially -- we put all this in our motion, but we have substitute counsel standing ready to come into the case. I see Your Honor shaking your head, so I'm happy to move on.

THE COURT: I haven't responded to that yet, but that's a different issue whether I'm going to let five attorneys come in here *pro hac vice*. We had a problem with that before with Ms. Bales, Ms. Chavis, and the Tennessee Public Defender. I did that against my better judgment, but we will get to that in a minute. There are five attorneys sitting in here. Do you know what a hearing is like with various attorneys jumping up and down and, well, Ms. Bales prepared this witness so she has to do it, and the record will go back and show that, and then there was conflict between the *pro hac vice* counsel.

I mean, there were a lot of problems, even admitting Ms. Bales from the Federal Public Defender's office in Tennessee. They would say, well, I didn't prepare that witness. I can't do that. And this person has been admitted *pro hac vice*, so they need to do it. We will get

to that in a minute, but that is not bearing, in my opinion, on whether Ms. Peiffer stays in the case or not. If you want me to, I'll do an amended order and make you lead counsel, and I'll make you both co-counsel. I'll do it right now. Then you two can decide how you split your responsibilities.

MS. ALI: Again, I'm not going to repeat the arguments Ms. Peiffer made, but I think the Court understands our position. We put it in our motion. But from our perspective, it is not a substitute for him having two counsel. I understand the Court's position that it is discretionary, but as we put in our motion, the CJA plan for this district specifically says that the Court should consider having at least two counsel in a capital 2255, and as we said in our motion as well, every other person litigating -- every other person litigating a capital 2255 has at least two lead counsel of record and in many instances many more than two.

So Mr. Runyon would really functionally only have one counsel of record in the case if Ms. Peiffer is not permitted to withdraw and no additional counsel are permitted to appear as counsel of record. Mr. Runyon would be standing alone in that posture.

THE COURT: I don't agree with you because this habeas has gone on, and is at the final stage. It's not

like the inception of a habeas case where all of -- I've forgotten, what was it 60 grounds or something was fully briefed, ruled upon, argued, and so forth. I don't know how many grounds, I'd have to look back. This isn't the inception of a habeas case where the petition hasn't been filed. It's been heard on appeal. It's now here on one narrow ground. So this is quite distinctive and distinguishable from what you're saying because this is not a new habeas proceeding from the inception where -- I don't know how many hundred pages I wrote where I went through every single ground, and it went up to the Fourth Circuit and one ground came back, and that's the only ground. So it's a very narrow habeas case at this point, and, in fact, that's why I was hesitant to even appoint a second counsel in the middle of the evidentiary hearing, because it is within my discretion. It is not required, and the Virginia Capital Resource Center and Ms. Peiffer, since it got to this narrow issue, have been in this case, and Ms. Brace from the Center before that. On all of that, I still appointed you, and exercised my discretion, but it's not required, and it's only on one narrow issue. If you're not up to it, tell me. I'll let you withdraw. We will get somebody else. Are you up to it, Ms. Ali?

MS. ALI: I am prepared to stay in this case and represent Mr. Runyon, as I have agreed to do and as I

represented to the Court.

THE COURT: All right.

MS. ALI: Nothing further, Your Honor.

THE COURT: Anything further from anyone?

MR. SAMUELS: Not from the United States, Your Honor. Thank you.

THE COURT: Ms. Peiffer, anything further from you?

MS. PEIFFER: Not at this time.

THE COURT: Well, for the reasons that I've stated, I deny Ms. Peiffer's motion to withdraw as counsel. I designate the two attorneys as co-counsel, and they can determine how to divide the responsibilities as between them in Mr. Runyon's case at this juncture. As for the reasons I've said, Ms. Peiffer must remain in the case, but I'm not going to repeat them all. The institutional memory of the whole Virginia Capital Resource Center that's been in this case since 2015 is necessary, in my opinion, to serve the interests of justice for Mr. Runyon.

So, consequently, I would also suggest if the Virginia Capital Resource Center -- this is a suggestion -- is overworked, then they review their cases and decide that they can't take on any new cases, but you don't drop cases that you have been in for coming on soon almost nine to ten years. So you just can't drop cases. You stop adding cases. But for any reason, for all the reasons I've said, I

exercise my discretion and find that in the interest of justice, and the interest of justice that I am interested in is Mr. Runyon and the continuity of counsel for his case, particularly on this very narrow issue of whether his trial counsel was ineffective for not pursuing the mental health route in the case.

Again, I appointed Ms. Ali, and she can -- they can serve as co-counsel.

The next matter I think we need to look at it, in Ms. Peiffer's motion to withdraw she renews her request for Covington, it's a very large national firm, attorneys to be admitted *pro hac vice* to represent petitioner *pro bono*. I would note that despite this request, no *pro hac vice* motions have been filed at this time. So you can't be admitted *pro hac vice* until the individual attorneys file a motion to this effect. That's number one.

Number two, I see no reason to admit, at least it appears five attorneys in here to be *pro hac vice* because that can put the hearing out of control. To the extent they want to volunteer their time to you, Ms. Ali and Ms. Peiffer, they can. There is nothing that keeps them from acting *pro bono*. They can certainly, if their firm wants it and permits it, they can act *pro bono*. They can advise you, and you and Ms. Peiffer can use them however you deem appropriate. But I see no reason to start admitting

attorneys *pro hac vice* to be here for this continued evidentiary hearing. The record will show what happened before with the *pro hac vice* situation. So, consequently, I welcome any *pro bono* help you can get. That's up to you, Ms. Peiffer and Ms. Ali, whether you need *pro bono* help. Number one, that's up to you. Number two, it's up to their attorneys and their law firm. I permit the attorneys to be *pro bono*, but the Court is not inclined to admit them *pro hac vice* in this case. They can be present at the hearing, whatever you decide, but not as counsel in the case. There is no requirement that they be admitted *pro hac vice* to be present. So if they want to file the motions, you can file them, but be prepared for my decision, unless there are other factors to consider.

My decision at this juncture is no for the above reasons. Now let's go to why we were supposedly here in the first place, which is to look at the schedule going forward for discovery and a continued evidentiary hearing date.

You asked for the conference, status conference, Mr. Samuels, and I'll let you speak first.

MR. SAMUELS: I did, Your Honor, and thank you. I'd just like to put on the record where we are with this. Since we took our break at the end of February, and I believe at that time the Court had ordered the government and Ms. Peiffer at the time to come together and to come up

with a prosed schedule for the disclosure of additional materials and resumption of the evidentiary hearing by March 24th, but we have been unable to do that, Your Honor. The government has agreed to, I believe, two extensions of the Court's original order. We moved it first to April 14th and then to May 5th, and then there was a status report, I believe, filed by Mr. Runyon's counsel that asked us to commit to August 31st for a deadline for turning over materials.

Your Honor, this is about six months after we paused the hearing. Let me tell the Court what we have received to date and the manner of it so the Court can understand some of the challenges we have had. We have received two disclosures of documents. Both of those only since we set this hearing. We had asked for the hearing on May 17th. The Court granted that, I believe the same day, and said we had to do it within 30 days. We are at the end of that time period, the end of the 30 days. We received the first disclosure on May 31st. These disclosures are coming to us, Your Honor, through Covington's document platform, so they are involved in the case.

THE COURT: They can't be coming through that platform. They can assist *pro bono*. But if you're not admitted in a case as counsel, you're not on the docket sheet as any type of counsel of record, and local counsel of

record are responsible. The responsible attorneys, reportable to the Court, are Ms. Ali and Ms. Peiffer.

MR. SAMUELS: To be clear, Your Honor, it is Ms. Ali that is informing us that the documents are ready, but then we have to go through a platform that I understand is Covington's platform to actually get the documents. That has caused us a little bit of a delay in the first instance where we didn't actually get the documents until June 1st.

The second one we received notice of yesterday at 4:00. We were not able to get that until this morning. There are these indices that have accompanied the disclosures. The first set of documents was about 315 pages, and the second set was about 437. The indices don't really tell us anything about what the documents are or where they came from other than they came from some Winston & Strawn boxes, but we don't know their relation to the penalty phase of this case or whose folder they came from or anything like that, which did seem to us as contrary to what the Federal Defender in Tennessee said they would do, which is they would have all these indices when they produced the documents. There's no indication as to whether these documents have been turned over to us before, and as we have gone through them, we have recognized a good number of them are documents we have seen before and have been introduced in the hearing.

In the first production there were about 25 pages or so that were entirely redacted. I don't mean partially redacted. I mean the page is blacked out, and we don't really understand why that has occurred.

But in the second production, I mentioned 437 pages, over 250 of those 437 pages are fully redacted, fully blacked out. I know there has been a claim of disorganization that occurred with the Federal Defender's Office in Tennessee, but it just seems that that disorganization is being passed on to the government.

And to put this in perspective, Your Honor, I brought with us these binders at the end of our table there. Those binders, and there is several of them, they constitute about 1,600 documents. Those are the documents that we received between February 14th and February 21st. No redactions. There were a number of key documents in there that should have been provided that we would have used at the hearing.

Now it has taken counsel four months to give us these 700 documents, many of which we already have, a good number of which are redacted. We have to go through these hundreds of documents to determine what has already been produced.

Now, Ms. Ali has kept us updated. She sends us e-mails, but it does appear, Your Honor, that the goalpost

and problems that they are having are constantly shifting here. With every e-mail there are more documents or more problems or more review needed. I think we started with 45 boxes, and then we moved to 57, then we moved them to 70. Certain boxes are needing to be scanned. I think again Covington has been involved in that.

There are now new digital devices and CDs being found, and the phrase that we have come to expect is that this is a tremendous volume of materials that would require significant time and effort to review and also unexpected complications and disorganized materials.

Your Honor, we have asked for the status conference because we need to get this done. We are here on this narrow issue. We believe we have most of the documents that are germane to this hearing, including very critical documents that had been withheld that very much undercut some of the claims that had been made, particularly with respect to what Dr. Merikangas knew with respect to these brain scans. That was such a critical piece of the argument that was presented to the Fourth Circuit, and even Dr. Merikangas, in his affidavit, said he never got these brain scans. Then we later found out that he did.

We would like to get a firm schedule where we can expect these documents. We don't think the burden of deciding what has been given to us and what has not been

given to us should fall on us. If there are going to be these serious redactions that are done, perhaps they can be submitted to the Court *in camera* because it does seem like those are excessive. We just want a date where this can be set so we can plan for the resumption of this evidentiary hearing.

We had asked habeas counsel to also proffer how they expect this hearing is going to go. We have gone a long road on this. We have put in trial counsel. We are up to the point. I think we are about to do experts. But given what has been disclosed, given this new information, that does seem to impact how they would proceed with their claim that trial counsel was ineffective.

We think before we restart this hearing, there should be some sort of proffered explanation how they intend to proceed, given what we have uncovered in these new documents, Your Honor. We would propose a sooner date for the full disclosure of the documents, perhaps in a month's time, and then working to set this evidentiary hearing.

I know there has been some discussion with former trial counsel, Mr. Woodward and Mr. Hudgins. They do have some avoid dates in July and August. We would really like to move forward and get this scheduled, Your Honor. We think we need the Court's assistance to move this along. I'm sorry it's come to that, Your Honor.

THE COURT: Well, I am too. I'm quite disappointed.

MR. SAMUELS: I understand.

THE COURT: I would say that, number one, it is petitioner's burden here. This is a habeas proceeding. This is his burden, not the United States' burden. That's number one. Number two, you only produce relevant documents. The Court is not going to sift through all the documents in this case. We have had a full trial. We have had a full habeas petition briefed and ruled upon, and you're not going to do "a document dump." That's not the way this is going to proceed. And if it proceeds that way after I have said it's not going to proceed that way, I'm warning everybody we are going to have some possible sanction or contempt proceedings because this is just not proper and contrary to the Court's orders.

The documents may not come from Covington. If you want to get them, Ms. Ali, and you want to sift through them for relevance, then you do it with whatever help you can get in your office or *pro bono*, but we are not going to have attorneys who aren't even admitted in the case producing them directly to the government through their servers and their indices. You are responsible for their production to opposing counsel and the Court. You're in the case, Ms. Ali, and you're in the case, Ms. Peiffer, and it is your

role as attorneys to produce relevant documents. This is not happening here. This is everything that could possibly be. It's just not going to be. If the Court has to sit down and look through hundreds of these documents and determines there are a lot of irrelevant documents after I said you produce only relevant documents to the issue at hand, we are going to have problems. Not only are we going to look to sanctions or contempt, we are going to look to it from whoever is doing this. Because this isn't right. We've got one narrow issue, and there were just a couple of things with a couple of doctors and information. We've heard already all the testimony from the lay witnesses.

MR. SAMUELS: Your Honor, if I can clear something, I do think there has been an effort to narrow down the documents from the much larger subset so that they are trying to give us relevant documents, but the problem is they can't tell us whether they have given us the documents before. So then we have to look through and decide are these new documents or there's documents we have seen before. There is no way to cross-reference it, and that creates the difficulty, Your Honor. Thank you, Judge.

THE COURT: Ms. Ali.

MS. ALI: Thank you, Your Honor. If I could just respond to some of the points that Mr. Samuels made. The first is I think, as he just attempted to explain, I don't

think the complaint here is that we are doing a document dump. I think we have been making enormous effort to only produce relevant documents and that actually explains the redactions issue. Under the protective order in this case, only material relevant to claim six can be produced. The language of the protective order prevents disclosure of information not relevant to claim six, and so that explains the redaction.

Some of the documents, and trial counsel, for example, let's say it's a memo with guilt phase information and penalty phase information about all kinds of things. We have made -- we have endeavored to comply with the protective order here to redact information that is not relevant to claim six. So that is the only basis of redactions in this case, that is the only reason the United States is getting information that is redacted, and I have explained that to Mr. Samuels in e-mail exchanges.

In terms of the aegis location and not understanding the provenance of the documents, we share those problems. We share that frustration. The documents that we received from counsel, which we didn't receive from Tennessee counsel until April, some of them have an index, and where that exists, we, of course, provided it to the government, and where it doesn't exist, we have tried to create it.

But we can't create documents that don't exist, and we are trying to provide the documents in as orderly and efficient fashion as possible. But these files were -- I think it will not surprise Your Honor, given the water under the bridge here -- incredibly disorganized. I have never seen anything like it.

These are boxes full of loose documents where we don't know if these were Tennessee counsel's files, which has required an enormous effort to review these documents. We don't know where they came from. We don't have an index, just as the United States doesn't have an index. We are also trying to get to the bottom of this, but if the documents don't say, some of them are undated, unsigned memos. If they don't say what they are, we can't fix that. We can't create that out of thin air.

I think in terms of the volume, I understand the government's frustration that the ground keeps shifting. We share that frustration. We received 57 bankers boxes between April 6 and the 10th. These are the boxes that we have described as ECF 808 in the status report. We completed an initial review of that volume very quickly, and I narrowed it down to something around 1,000 documents that are potentially relevant to claim six.

We then made an effort to identify which documents have been turned over to prior counsel, but, again, we are

JODY A. STEWART, Official Court Reporter

really limited in our ability to do that because Tennessee counsel had primary responsibility or maybe exclusive responsibility over the documents, and not only did they just provide us documents in the disorganized fashion that I just explained, but the attorneys who were involved with preparing those documents, collecting those documents, keeping those documents in Tennessee aren't there anymore. So the people who are providing us the documents also themselves had nothing to do with the documents.

So the chain of custody is broken here, and we don't have a way to fix that. Just as the government is frustrated, we were also frustrated. We learned in May that the Tennessee counsel had additional documents that had not been provided to us that we had never heard about before, and we received 13 additional boxes in the beginning of May. We were told that these were paper files, and while they were, there were 13 boxes full of files. In those boxes were also electronic files on USB drives that we didn't know anything about on -- I'm sorry, on USB drives, on CDs and including on floppy disks. So we are now trying to get through that electronic volume.

But just as the government is frustrated that the number of documents keeps changing, we are dealing with the same problem, and we trying to get through them as quickly as possible, but that is -- we are doing the very best that

we can, Your Honor, under the circumstances, but we are making significant effort to try to only produce documents that are relevant to claim six to produce a narrow set of material and to provide documents that have not been turned over to the government. Again, that's difficult for us to do.

There is no way that -- you know, typically in a big case you would have metadata or some way to de-duplicate electronic documents. We don't have that there. This is all a manual review and is a manual review being done by people who weren't involved in the prior production.

So our ability to de-duplicate manually is significantly limited in that way. So I can assure the Court that we are making every effort possible to get through the documents as quickly as possible to make an orderly production, to be incredibly responsive when the government has raised issues, both in terms of accessing the documents, but also question the provenance of documents or redactions, but the situation is what it is.

I will say, you know, I think I do my job, counsel's job now in the case to try to clean this up, to try to right the ship here on discovery. I understand what happened in the past with the documents is appalling, and we are here to try to fix it, and we are doing our very best, but there are -- just as the government is frustrated, we

are also frustrated by the continuing issues. I think, I hope we have got to the bottom -- that we have received the last of the boxes, but, you know, if you had asked me on May 1st are there more documents coming, I would have said I think we have everything, and then we find out there is more. So we are also dealing with change in circumstances, and, you know, trying to keep things moving forward as quickly and efficiently as possible.

THE COURT: I understand, Ms. Ali, and very much appreciate your efforts. But, frankly, that was the responsibility of the Virginia Capital Resource Center, Virginia Capital Representation Resource Center, whatever, because they were always lead counsel. Tennessee was only appointed *pro hac vice*. None of the Tennessee counsel. If you look at the docket, they were Ms. Chavis was *pro hac vice*, then Ms. Bales was *pro hac vice*. So they were only admitted *pro hac vice*.

So they weren't who the Court would look to. The Court has always looked to the Virginia Capital Resource Center, and that's another reason. So if there is any problem here, what happened is, it looks like to the Court, Virginia Capital Resource just relegated or delegated it all to Tennessee. Now they say, oh, we want out. This is not the right way to practice law, particularly in a case this serious. The Court may need to look at your funding,

because this is not right.

The Virginia Capital Resource Center was in this case. I'm looking at the docket of this case. They came in, and it was first Ms. Brace. She got out. Then Ms. Peiffer came in, and then Ms. Ali. So you've got two lead attorneys that you didn't have before. All of this came up with the *pro hac vice* attorneys where everything was relegated to them. Ms. Chavis, *pro hac vice*; Ms. Bales, *pro hac vice*. So, in any event, it looks like to me that the Virginia Capital Resource Center just dropped the ball.

So as far as I'm concerned, lead counsel was responsible for documents, and you're responsible now. Ms. Peiffer is responsible. You took on this case. You represented to the Court you could handle it. The dates were set when you came in. The Court kept granting you continuances, and we are just not going to go through and re-invent this entire situation. It's one narrow issue now.

I am also going to say something about what also came up at the last hearing and whether there were misrepresentations to the Fourth Circuit Court of Appeals. That is extremely serious, because it appeared Ms. Chavis had argued something there or somebody had argued something there, I'd have to go back and look at the record, but it implied things that as turned out to be not fact from the documents finally presented but not earlier disclosed. So

there may be real problems here.

This is concerning to the Court because it was implied that Mr. Hudgins had done one thing when in point of fact, the facts were the other way. There were certain reports, there were representations. It was beginning to come out. And that's when everything fell apart, when they were ordered to produce certain things, and so forth. So they were *pro hac vice* counsel. The case apparently was relegated to them or delegated to them, whichever word you want to use. And it's Virginia Capital Resource Center that has been the lead counsel throughout this habeas petition, and now you are apparently co-counsel, and it's got to be straightened out, Ms. Ali.

We have got to proceed, and I am hopeful you can work all of this out by the end of the proceedings in this court. And if you're going to familiarize yourself with this case, Ms. Ali, you've got to go through the documents and decide what is relevant. You have looked at them to determine what is relevant?

MS. ALI: Yes, Your Honor, of course. Again, I don't take Mr. Samuels to be saying that we are producing any documents that are not relevant. I think his complaints was primarily about the pace of the production and the redactions, which were the points that I was trying to address. Part of it, there is a tension between speed and

an orderly process. Part of the reason this has taken a long time, because there is an enormous volume of documents, and we are making an enormous effort on our end to narrow it down to things that are only relevant and to comply with the requirements of the protective order, which require redacting material that is not relevant to claim six.

So that explains it. The volume of production that we have been making to the government is far from a document dump. We have been trying to produce only documents that are relevant to claim six and documents that have not been produced in the past.

On the latter point, we are having issues because of all of the various points I have raised where we just -- there is no easy way to cross-check documents. We are attempting to do that manually but it is -- there is no way to make it a perfect process in terms of not producing things that have already been produced, and, of course, we want to err on the side of making sure that anything that is relevant to claim six, if we cannot be certain it has been produced to the government before, that we are producing it this time so that we avoid the problems we had the last time around.

THE COURT: Okay. Mr. Samuels.

MR. SAMUELS: Your Honor, to use an example of what I'm talking about, in the latest production we got this

morning, we got certain reports of interview at the front of the production, and then we got the same reports of interview at the back of the production. I understand that there has to be some leeway and some possible duplication here, because then at the back of the document here, I've got 90 pages of this, just black pages. I mean, if this is not relevant, I don't know that I need it, and there may be two pages in there.

THE COURT: Pass those up to the Court, please.

MR. SAMUELS: Yes, ma'am.

THE COURT: The black pages. How many pages is it?

MR. SAMUELS: I think this is 90 pages, Your Honor. There might be a couple of pages in there that are not redacted, but that is 90 out of these some over 250 in this production that are fully redacted in that manner. I don't know what those are. I don't know where they come from. I don't know what they pertain to. That was concerning when we got that this morning, Your Honor, and I haven't had a chance to talk with Ms. Ali about it because we just uncovered it, but I did want to raise it.

THE COURT: Looks like there is one page with something on it in all of this.

MR. SAMUELS: There may be one or two, Your Honor, and then the rest, and I believe that came from one electronic file. When we printed it out, it came that way.

MS. ALI: I'm happy to explain, Your Honor.

THE COURT: All right. Do so, please.

MS. ALI: So part of the issue here is that the files we received from prior counsel, I don't mean to be a broken record, but they were disorganized. Sometimes what we received, rather than individual documents, five-page memo, a 20-page interview notes, something like that, we received just loose files or huge files where lots of documents have been produced together.

We don't want to -- because the provenance of the document is important, it felt to us like the better course was to keep the documents in the format, unless it was very clear that certain portions of the document could be -- were separate documents, to produce the entire document.

I think if we had produced just one page out of 100-page document, where even if you only got one page were relevant, I would probably hear complaints that we produced an incomplete portion of the document. But we don't know what these documents -- the way that they were scanned to us was often at the folder level, and so we would get documents in one file. Sometimes hundreds or thousands of pages.

We are happy to sit down and meet and confer with the government about how to proceed in a way that complies with the mandate of the protective order and, of course, discovery order. But they have not asked for that, and when

they have come to us with questions, we have been very responsive.  I understand that they didn't uncover the issue until this morning, so we haven't had a chance to discuss, but I think that this is something that we can work out with the government through a meet and confer process about that.

If they don't want to receive information redacted that is not relevant to claim six, we can talk about a different solution, but what we are trying to do is comply with the letter of the protective order, which requires redacting material that is not relevant to claim six.  When we were receiving documents from prior counsel, they look like this.  It may be that one page out of 100 documents.

THE COURT:  Well, then it's your duty to receive them, to go through them and pull out the documents.  This is unacceptable.  I'm looking at this.  If you say, well, they will ask why we only produced one page.  You have only produced one page, because the rest of it is completely blacked out.  That's all you have produced, that I can see, is one page.  The rest of the 90 pages are just blacked out pages.  I'm going to make all of it an exhibit.  Do you have a copy of this page?

MR. SAMUELS:  I do, Your Honor.

THE COURT:  That's the only page that I see in here that has anything on it.  I'm flipping through.  But that's petitioner's counsel's duty.  You don't just send -- you're

wasting paper. Just sending this bulk over the line, oh, we produced 100 some documents. But you didn't. This is not producing a document. These are blacked out of complete pages. There is one in here, and it's from John Babineau, and it looks like it's about Dr. Cunningham. It's his CV, and it's just a very short e-mail. I'll put this back in the packet where it came from, and I'm going to make the entire packet Court Exhibit Number 1 because this is no way to produce discovery. This is Court Exhibit Number 1.

(Court Exhibit 1 received in evidence.)

MS. ALI: Your Honor, the way that we typically would produce documents is that if a document is a single document, we don't just take a piece of it off. I think that there is an e-mail with an attachment. The attachment is not relevant to claim six. The e-mail potentially is relevant to claim six. So we produced that. But if we don't produce a complete document, that also is not how you produce discovery.

So we are trying to comply with ordinary ESI protocols, with the protective order in this case, but I will meet and confer with counsel for the government about the process going forward to make this more efficient and streamlined. What we are trying to do here is not "pepper" the government with documents. We are trying to get them only what is relevant to claim six out of an enormous volume

of sort of raw materials that we have received. We are trying to comply with the sort of ordinary production protocols and the protective order, which is why the documents are being produced that way. It is time consuming to go through and check for redactions. If there is a more streamlined process to do that, we are happy to discuss with the government and maybe put in the protective order, if that's what we decide in terms of moving forward. But, again, we haven't had a chance to discuss this because this is the first we are hearing of it.

THE COURT: It sounds to the Court that all the habeas documents were turned over to the Federal Public Defender in Tennessee, and they obviously were not sorted and prepared to go forward for an evidentiary hearing that was a year and a half after the case had come back. It was certainly sufficient time to go through the documents on the one issue. That's what it sounds like to me, is that these are just closets of documents that were, I guess, part of the whole habeas petition, and we had this hearing set, and nobody took the time or the effort to go through them and sort them for the hearing that was set a year and a half after the case was remanded.

MS. ALI: I can only speak to the documents as we receive them. I don't, of course, know what they looked like before, but the documents as we received them were not

organized in a way that one would expect in a case like this where the provenance of the documents is important.

Sometimes trial counsel -- the reason the review is time-consuming is that in some instances you have boxes of files that are clearly from one place or another, and in other instances you have material from the 2255 mixed in with trial counsel file, and it is not clear whether they are original documents or copies. So we are -- I can only provide the Court my word that we are doing our very best to go through that and try to separate out, find everything that is responsive to claim six and produce only that in compliance with the discovery order and the protective order in this case.

THE COURT: I know that you're doing everything you can, Ms. Ali, and I'm not saying you are not because I think you are. My concern is exactly with what we were talking about at the inception of this hearing. I mean, this could go on and on and on. The attorneys will say, I just got into this case. Well, I don't have the continuity of the case. I wasn't there when these documents were in the closet. That's correct, but it bolsters the Court's earlier ruling because you didn't even know what was presented to the Fourth Circuit from these documents.

This is becoming a real problem, and so that's certainly one of the reasons that the Capital Resource

Center, Ms. Peiffer for now, but that Center has to be responsible and stay in the case. I believe it's funded by the state. I believe the state resources go to the Virginia Capital Resource Center. So it's being funded by public funds, including federal funds for this case. They are responsible. They are attorneys, and they have ethical responsibilities and they are responsible ultimately. They have been in this case, as I said, since the beginning of the habeas proceeding. The docket reflects that. The Tennessee attorneys were only *pro hac vice*, and then now everybody is blaming it all on the *pro hac vice* attorneys. Do you see what happens?

Okay. Let me hear from Mr. Samuels, any suggestions he has. Ms. Ali has given hers.

MR. SAMUELS: She has, Your Honor. Your Honor, I won't belabor the other issues. I'm happy to try and work with Ms. Ali and Ms. Peiffer to see what we can resolve on indices, production, and that sort of thing. But I point those out, Your Honor, just as an example of how the organization, and the need, I think, to set a firm deadline here on when the disclosures are going to be complete so that we can move forward with the resumption of the evidentiary hearing.

The concern I have, and again I don't want to go back into everything that the defender's office in Tennessee

have, but I understood that some of these materials are put in different electronic databases and were available for searching. This does seem to be a new wholesale search that has taken time. I just think that we all work better with a deadline, Your Honor. We all work better with a firm date for this to be completed. I would ask the Court and ask Ms. Ali as to when she can commit to completing this disclosure.

She has provided us some updates and told us we have gone through certain boxes, we've got so many left to go. Maybe several documents from one pocket of information, but documents doesn't necessarily equal page numbers. What can they commit to in terms of producing and finishing the production of the documents, and when can we get on track for resuming the evidentiary hearing?

I think we had gone a long way on that evidentiary hearing. There may be some things that the United States wants to pursue with former trial counsel now that we have the new information we have. That's why, again, I suggested that there be some sort of outline from habeas counsel as to how they expect the evidentiary hearing to proceed given the disclosures that do seem to effect some of the claims -- the claim that's being pursued here.

So I would like a firm date, an expectation from habeas counsel as to what and how they expect that hearing

to go and then to be able to move forward and reset that hearing, Your Honor.

THE COURT: Ms. Ali.

MS. ALI: What we had committed to or said that we thought we could finish discovery in the prior status update was the end of August for producing -- getting through all the documents and making all of our productions to the government.

At the time we made that representation, it was everybody's understanding that Ms. Peiffer would continue to serve as new counsel in the case, and that I would be coming in the case as second counsel, and that we would both be working together on this. I think if I am alone trying to get through these documents and make progress here, I'm not sure about that. At the time we made that representation, that was also before we had received the additional documents, unexpectedly received these additional documents from Tennessee counsel, which as I mentioned, not only was a significant volume of paper but also, you know, you pull the file out, and out falls a flash drive with electronic file on it. So we then have to go through and determine are these duplicates, things we already have, or are they new documents.

So I think I would like to be able to say that we can commit to that -- we can -- despite those additional

significant hurdles, that we can stick with the August 31st deadline, and I think if I may, Your Honor, the issue of witness availability came up briefly when Mr. Samuels was speaking. It's my understanding he has been in touch with former trial counsel to get their availability. We also endeavored to reach out to trial counsel. We have Mr. Woodward, but Mr. Hudgins said he would prefer to speak with the government.

Of the experts that were scheduled to testify in February but did not for all the reasons that are on the record, the first block of availability where everybody would be available is -- are the first three weeks of November. So there are pockets when one or two or some of the experts are available before that. But the first time when everybody would be available over a five- or seven- or ten-day period, are the first three weeks of November. So I don't know if -- it may make sense to start there and work backward. Obviously, we defer to the Court on how to schedule this, but we are committed to trying to get it done. We are committed to try to look at the documents as quickly as possible.

I will represent to the Court, I will represent to the United States, that if we get an August 31st deadline, we are not going to drag our feet. We want to get through the documents too. This is something we want to get past as

well.  This is the threshold issue that we need to get past to really be able to start preparing for the hearing.

So we have been laser focused on that, we have been spending, I think at this point, you know, many hundreds, if not thousands of hours trying to get through these documents, which were delivered to us in a manner that nobody expected, and we are working hard to get through this, to get this case to a hearing.

But I also can't control the witness availability. I'm happy to walk through -- I have the specific conflict from all the witnesses, but these are -- they are going to testify at trials, or out of the country, things like that.

THE COURT:  I don't need that information now. Counsel, the first thing is you need to meet and confer, it seems to me, and only counsel that are admitted in this case will be part of the meet and confer.  You are fully admitted.  I looked at the docket sheet, and you are listed as a lead counsel on the docket sheet, both of you are. Ms. Peiffer and Ms. Ali are listed as lead counsel.  I only require that one of you be there to meet and confer, but it's only record counsel.  Whatever *pro bono* help you get, you get.  But nobody has been admitted *pro hac vice*, and nobody's been admitted as a lead counsel except the two of you, Ms. Peiffer and Ms. Ali.  So the meet and confer will be between record counsel.  That would be one or the other

or both. Ms. McKeel and Ms. Samuels. Ms. Ward, she's got COVID.

MR. SAMUELS: She does, Your Honor.

THE COURT: She is with the Justice Department.

MR. SAMUELS: She is with the capital case section up there.

THE COURT: Either one of you, Ms. Peiffer or Ms. Ali, and you can meet and confer, and that needs to be done and completed on or before June 28th. I would make it a week from today, but there is a holiday in there, and this gives you a few extra days. So you meet and confer on or before June 28th, and you get what we have talked about, schedule on what you plan to present, the way the presentation is to go, and how you're going to exchange your documents, and any discussions that you need to make that you've mentioned here today, any discussions about the protective order, any discussions about how you're going to exchange the documents, any discussions about how you're going to do to the presentation, organization of the documents, what you've talked about today. You both said it would be helpful at this juncture to sit down and meet and confer.

If you are not able to do that, and you cannot get along or whatever, I don't anticipate that with either set of counsel, but you need to notify the Court no later than

5:00 p.m., none of this midnight filing, and I'm going to start setting times deadlines, timing deadlines because my experience has been that you leave your chambers at 7:00, and you come back the next morning, and there have been filings all night or up until midnight. Because we can see the time filings come in.

Since we are dealing with the summer, we are dealing with the holiday season, and I need to know if there is any reason for us to convene because you have not been able to properly meet and confer. So you need to report to the Court. You can do it jointly or you can do it separately. But you need to report to the Court on or before 5:00 p.m. on June 28th, 2023. The discovery in this case is to be completed on or before August 31, 2023.

The evidentiary hearing in this case will begin November 1, 2023. We are not going to repeat any of the evidence that has been presented unless there is additional on that particular point. In other words, we are not going to repeat evidence, but can add to it. I didn't get the number of days, but we were in here how many days?

MR. SAMUELS: I think from the 7th through the 14th, Your Honor.

THE COURT: We are not going to be repeating that evidence. That evidence is of record in this case. So somebody needs to be aware of that, and I'm not saying you

can't call the trial attorneys again or whatever, but we are not going to have repeat evidence. The hearing will start on November 1, and you all try to, in your scheduling, get an idea of how long it's going to take because it will start on November 1 and just keep right through until it's done, not taking a break.

I have two trials in that period, but they are civil trials, and I will move them. So you should block out November 1 through the 10th at minimum. I think the 10th is a holiday, but we may have to be here. So I would certainly hope that we can finish it by early the next second week of November. That way you can be lining up your witnesses and your schedule. We start at 11:00 each day. That way the Court can take care of the business that it has to routinely do, and the witnesses can get here. I know one set of counsel is coming from Newport News, and at least on a daily basis, which can be a problem. And Ms. Ali will be here from Northern Virginia and Ms. Peiffer from Charlottesville.

Is there anything further? So you've got your deadlines. You've got your deadlines for meet and confer with a report to the Court June 28th, 5:00 p.m., 2023. Discovery completed on or before August 31, 2023, and the hearing to start November 1 at 11:00 a.m. 2023. Do you have any questions?

MR. SAMUELS: I do, Your Honor. We can include

this as part of our meet and confer, but I think as part of this we may have some motions regarding the scope of the resumed hearing, but that's something we can bring to the Court at a later date if acceptable.  Thank you, Judge.

MS. ALI:  If I could just be briefly heard, Your Honor.  I understand the Court has ruled on Ms. Peiffer's request to withdraw from this case.  I make an oral motion that the Court stay that ruling pending appeal.  Here we think we are likely to proceed on the merits.  I understand the Court disagrees, but for the reasons that we stated in our motion and on the record here, most notably, we think there is a significant risk that Ms. Peiffer's continued representation will be materially limited, but that means she is operating under a conflict of interest here under Virginia Rule 1.1, 1.3(a) and 1.7(a)(2).

Again, for the reasons stated in our motion earlier today, we think Mr. Runyon will be irreparably harmed if he is not permitted to have additional counsel of record here given the circumstances that Ms. Peiffer is operating under in which she is not able to competently represent him going forward.  At the same time we have lined up potential substitute counsel.  I understand the Court has indicated that Your Honor will deny -- I mean, likely to deny.

THE COURT:  Let me just say.  I said you could have any *pro bono* help that you want, but I'm not inclined to

admit all these attorneys that you want *pro hac vice* in the case. We had a number of problems before with that. That's all I've said. You can get the help that you need. It's just you're responsible. The Court looks to counsel of record, lead counsel. That's where a Court looks to hold the attorney responsible.

So, consequently, I'm not going to admit *pro hac vice* because they don't have the same level of responsibility to the Court. We need lead counsel, and we've got two lead counsel. I also said that another attorney from Virginia Capital Resource Center could come into the case. So Ms. Peiffer doesn't have to be here for everything between now and then. As I understand it, her mother is very ill. She has Stage IV cancer. I don't know what her prognosis will be, and I'm not going there. But Ms. Peiffer has to stay in the case. You can take the lead, Ms. Ali. Moreover, she can ask to have someone else admitted from the Virginia Capital Resource Center to be substituted for her on the case. I have said that. The Court, and Mr. Runyon, and the government need the continuity of the Virginia Capital Resource Center, that has been in this case since 2015, as counsel, as co-lead attorney.

So that is what I said. You have not offered any substitute for Ms. Peiffer, just she gets out, and the whole

Capital Resource Center gets out, and that is what is not acceptable to the Court. I will not stay my order. My order remains. If you want to -- if Mr. Lee or Ms. Peiffer wants to submit substitute counsel from the Virginia Capital Resource Center, that's fine, and I will approve. But I'm not going to stay my order to let the Virginia Capital Resource Center out of this case completely at this late juncture. There's just been too much going on and prejudice to all concerned would occur. The motion to withdraw is not timely, is not in the interest of justice for Mr. Runyon, and I've considered all of your arguments. I'm not going to stay my ruling.

MS. ALI: Understood, Your Honor. Thank you.

THE COURT: Pardon?

MS. ALI: Understood, Your Honor.

THE COURT: All right. Is there anything else?

MR. SAMUELS: No, Your Honor, not from the United States. Thank you.

THE COURT: Then the Court stands in recess until Tuesday.

(Hearing adjourned at 1:37 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


X_____/s/_____x
                    Jody A. Stewart
                X_____6-20-2023 _____x
                        Date

# Addendum C

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION**

DAVID ANTHONY RUNYON,

           Petitioner

       v.

UNITED STATES OF AMERICA,

           Respondent.

Case No. 4:15-cv-108

Initial Criminal No. 4:08-cr-16-3
CAPITAL § 2255 PROCEEDINGS
HON. REBECCA BEACH SMITH

**MEMORANDUM IN SUPPORT OF MOTION FOR ATTORNEY ELIZABETH
PEIFFER TO WITHDRAW DUE TO UNFORESEEN PERSONAL CIRCUMSTANCES
AND FOR LEAVE TO SEEK *PRO HAC VICE* ADMISSION AND SUBSTITUTION OF
*PRO BONO* COUNSEL**

For the reasons set forth below and pursuant to 18 U.S.C. § 3599(e), Petitioner David

Anthony Runyon and undersigned counsel, Elizabeth Peiffer, move for Ms. Peiffer's withdrawal

and for leave to seek *pro hac vice* admission and substitution of attorneys from Covington &

Burling LLP ("Covington") in these proceedings.

Several weeks after Mr. Runyon filed his Motion for Appointment of Counsel, *see* ECF

Nos. 802 & 803, Ms. Peiffer's mother was suddenly diagnosed with Stage IV breast cancer, which

has metastasized to other parts of her body including her bones, lungs, and liver.[1] Significant

uncertainties regarding treatment and prognosis remain, but medical consultations and other

---

[1] Although Ms. Peiffer's mother was preliminarily diagnosed on April 28, that diagnosis was not immediately confirmed by an oncologist, and the treatment and care plan remained uncertain pending further medical evaluation. *See* Ex. A, Sealed Decl. of Elizabeth Peiffer ¶¶ 3-7 (hereafter, "Peiffer Decl."). It now is clear that Ms. Peiffer's mother will need substantial and ongoing care, and that Ms. Peiffer needs to be available to serve as a caregiver during treatment. Undersigned counsel endeavored to consult with Mr. Runyon, notify the United States, and file this Motion as soon as practicable in light of these fluid and evolving circumstances.

**A67**

developments in recent days have made clear that Ms. Peiffer's responsibilities as a caregiver will prevent her from continuing to competently perform her role as counsel for Mr. Runyon and will create conflicts of interest between her responsibilities to care for her mother and those as counsel to Mr. Runyon.

In light of this unexpected change in circumstances, and for the reasons explained in more detail below, Ms. Peiffer respectfully requests leave to withdraw and be dismissed as counsel in these proceedings, and Mr. Runyon respectfully renews his request to be represented in this matter on a *pro bono* basis by substitute counsel from Covington, led by Peter Swanson and Nicholas Xenakis.

Counsel have consulted with Mr. Runyon on this matter, who supports the requested substitution. Counsel also notified counsel for the United States on June 5 of their intent to file this Motion. Counsel for the United States responded on June 7 to state that they had not had a chance to confer internally concerning this Motion and may not be able to do so until the week of June 12.

## I.      Recent Unforeseen Changes In Ms. Peiffer's Personal Circumstances Require Her To Withdraw From This Litigation.

As laid out more fully in the attached sealed declaration, on April 28, 2023, Ms. Peiffer's 75-year-old mother fell while walking down a hallway in her home. A series of medical tests, X-rays, and CT scans conducted after that fall revealed that Ms. Peiffer's mother has Stage IV breast cancer that has metastasized to bones in her hip, spine and ribs, as well as to each of her lungs and her liver. Peiffer Decl. ¶¶ 3-7.

Ms. Peiffer's mother's medical condition has left her unable to move safely without assistance and has highlighted the need for substantial accommodations at her home. *Id.* ¶¶ 8-12.

2

**A68**

Although Ms. Peiffer's mother has begun treatment, it will be at least three to four months before the effectiveness of that treatment can be assessed. *Id.* ¶ 14. These unanticipated and very serious developments have made significant demands on Ms. Peiffer's time, attention, and availability, and she has determined that it will be difficult for her to make plans or commitments for the foreseeable future due to her mother's unpredictable medical situation. *Id.* ¶¶ 4, 9-18. She has concluded, after consulting with counsel for the Virginia State Bar, that she is required to withdraw. *Id.* ¶ 18.

A. **The Law and Governing Professional Rules Support Ms. Peiffer's Motion.**

In light of these developments, and in the absence of an extended continuance, "there is a significant risk that [Ms. Peiffer's] representation of [Mr. Runyon] will be materially limited by . . . a personal interest of [Ms. Peiffer]," namely, her interest in caring for her mother. *See* Va. R. Prof. Conduct 1.7(a)(2). Ms. Peiffer's "loyalty to [Mr. Runyon] is also impaired" because her responsibility to care for her mother will prevent her from "carry[ing] out an appropriate course of action for [Mr. Runyon]." *See* Va. R. Prof. Conduct 1.7, cmt. 8. Thus, Ms. Peiffer has a "concurrent conflict of interest," and continued representation of Mr. Runyon would violate her duties under the Virginia Rules of Professional Conduct. *See* Va. R. Prof. Conduct 1.7(a).

Ms. Peiffer is also unable to provide competent and diligent representation to Mr. Runyon in this death penalty case in accordance with her duties under Virginia Rules of Professional Conduct 1.1 and 1.3(a). "Competent handling of a particular matter includes . . . adequate preparation." *See* Va. R. Prof. Conduct 1.1, cmt. 5. As this Court has recognized, this case is complex, and there is significant outstanding discovery. *See* Order at 2, ECF No. 810. Further, "[t]he required attention and preparation [in a case] are determined in part by what is at stake[.]" *See* Va. R. Prof. Conduct 1.1, cmt. 5. As a death penalty case, this matter requires the most

3

**A69**

heightened attention and preparation. *See* Order at 2, ECF No. 810. Ms. Peiffer's caretaking obligations will prevent her from adequately preparing for the continued hearing and will make it difficult to reliably arrange travel and court appearances, particularly when it comes to the presentation of witnesses over multiple days. Peiffer Decl. ¶¶ 11-18.

Continued representation under these circumstances therefore would violate Rules 1.1, 1.3(a), and 1.7(a)(2) of the Virginia Rules of Professional Conduct, necessitating Ms. Peiffer's withdrawal. *See* Va. R. Prof. Conduct 1.16(a)(1); *see also id.*, cmt. 1 ("A lawyer should not . . . continue representation in a matter unless it can be performed competently, promptly, without improper conflict of interest and to completion."). Continued representation under these circumstances—particularly in the absence of substitute counsel—would also deprive Mr. Runyon of his rights as a person facing the punishment of death. *See* U.S. Const. amends. 5, 6, 8.

Because of these evolving developments and circumstances beyond her control, Ms. Peiffer no longer has the capacity to competently and diligently represent Mr. Runyon pursuant to 18 U.S.C. § 3599 and in accordance with her ethical duties. Peiffer Decl. ¶ 18. In these circumstances and due to Ms. Peiffer's unavailability, it is in the "interests of justice" to allow Ms. Peiffer to withdraw from this case and to provide Mr. Runyon with substitute counsel. *See Martel v. Clair*, 565 U.S. 648, 658 (2012) (holding that "interests of justice" standard applies to motions for substitution under 18 U.S.C. § 3599); *Christeson v. Roper*, 574 U.S. 373, 377 ("[A] motion for substitution should be granted when it is in the 'interests of justice.'"); *see also* 2/22/2023 Tr. at 1099, 1105 (applying "interests of justice standard" to motion to withdraw).

## II.   In Light Of These Unexpected Changed Circumstances, Mr. Runyon Renews His Request To Be Represented By *Pro Bono* Counsel From Covington.

As a result of the unexpected developments described in Section I—which arose after Mr. Runyon filed his Motion for Appointment of Counsel and evolved in material ways after the Court

granted that Motion in part—Mr. Runyon respectfully renews his request to be represented in these § 2255 proceedings by *pro bono* counsel from Covington. At the time this Court previously "advise[d] that the court does not intend to appoint, nor to otherwise admit pro hac vice, any additional attorneys," Mr. Runyon was represented by appointed counsel Ms. Peiffer, who joined Mr. Runyon's legal team in November 2021, with the appointment of Kathryn Ali to join as "second counsel." ECF No. 810 at 2. Now, however, Ms. Peiffer is no longer able to competently fulfill her obligations as appointed counsel for Mr. Runyon, and Mr. Runyon therefore seeks permission for substitute *pro bono* counsel from Covington to represent him as counsel of record.

### A. Designating More Than One Attorney to Serve as Counsel of Record is Critical.

Because he is an indigent person under a sentence of death who lacks the funds to hire an attorney or to pay any costs related to the prosecution of a proceeding under 28 U.S.C. § 2255, Mr. Runyon is entitled to the appointment of counsel to assist him in litigating his motion for relief pursuant to 28 U.S.C. § 2255. *See* 18 U.S.C. § 3599(a)(2); *McFarland v. Scott*, 512 U.S. 849, 854–57 (1994). If Ms. Peiffer is permitted to withdraw from the litigation, Mr. Runyon will be represented only by Ms. Ali, who has been appointed solely for the limited "purpose of moving the case forward on the one issue now before the court for an evidentiary hearing," ECF No. 810 at 2.

This is a complex proceeding. Indeed, in appointing Ms. Ali, the Court determined that "[g]iven the seriousness of the capital penalty in this case, the amount of discovery yet to be completed, and the complexity of the case," it was appropriate for Mr. Runyon to have more than one counsel of record. *See* ECF No. 810 at 1–2. That ruling was—and is—manifestly correct. The claim remanded for further proceedings—trial counsel's failure to investigate and present evidence of Mr. Runyon's psycho-social history, brain damage, and mental health—involves complicated

**A71**

scientific, factual, and legal issues, including several neurological and psychological evaluations of Mr. Runyon, the facts concerning trial counsel's mitigation investigation, and whether trial counsel's conduct comported with prevailing professional standards. The record in this case is voluminous—spanning hundreds of thousands of pages—and the continued evidentiary hearing will involve numerous expert and lay witnesses.

Further, the withdrawal of Tennessee counsel and Ms. Peiffer's unavailability leave Mr. Runyon without *any* counsel who has worked on the case for more than a few months. While Ms. Ali is working diligently to learn the case, she is new to this long-running litigation. And unfortunately, due to issues created by prior, now-withdrawn counsel, much of the time dedicated so far by Mr. Runyon's team has necessarily been focused on attempting to right the ship on discovery and document production issues, thus limiting their ability to focus on preparing for the continued evidentiary hearing. Mr. Runyon should not have to bear the consequences of his former counsel's conduct, especially given that this is a capital case and may be his last opportunity to present evidence.

This situation stands in stark contrast to counsel for the United States, who have been involved in this case for more than fifteen years—since Mr. Runyon's original trial—and at least three of whom (Mr. Samuels, Ms. McKeel, and Ms. Ward, who is appearing *pro hac vice*) have suggested they intend to appear at the June 16 status conference and otherwise appear to be actively engaged in the litigation. This disparity is particularly notable given that it is Mr. Runyon who bears the burden of proof in this proceeding.

Permitting additional, substitute counsel to appear would also be consistent with this District's Criminal Justice Act ("CJA") Plan, which directs that "[d]ue to the complex, demanding, and protracted nature of death penalty proceedings, the court should consider appointing at least

**A72**

two attorneys" to represent prisoners pursuing 28 U.S.C. § 2255 post-conviction petitions in federal death penalty cases. *See* United States District Court for the Eastern District of Virginia Criminal Justice Act Plan § XIV.E.2 (approved Nov. 6, 2019) (hereafter, "E.D. Va. CJA Plan").[2] *See also* ECF No. 803 at ¶ 5 (noting that this District's CJA Plan is consistent with Guide to Judicial Policies and Procedures, which recommends appointment of "at least two counsel" for § 2255 proceedings in capital cases, 7 Guide to Judicial Policies and Procedures, ch. VI, § 6.01(A)(2), as well as CJA Plans of many (if not most) other courts).[3] And it would align with the uniform practices of every court currently handling a § 2255 proceeding involving an indigent federal capital defendant, every one of which has two or more counsel, with the sole exception being where a large institutional Capital Habeas Unit is handling the case, in which instance three or more lawyers from the Capital Habeas Unit usually assist. *See* ECF No. 803 at 3–4 & n.5.

### B. Permitting Covington *Pro Bono* Attorneys to Serve as Counsel of Record Will Facilitate An Orderly And Efficient Completion of This Proceeding.

Here, attorneys from Covington led by Mr. Swanson and Mr. Xenakis are prepared, with the Court's permission, to step in as *pro bono* counsel for Mr. Runyon in light of Ms. Peiffer's change in circumstances and resulting request to withdraw, and need only to be admitted to the District *pro hac vice*.[4]

Although the Court has discretion to control its courtroom, there is a general presumption that well-qualified attorneys will be granted *pro hac vice* admission absent some compelling

---

[2] *Available at* https://www.vaed.uscourts.gov/sites/vaed/files/EDVA%20CJA%20PLAN.pdf (last visited June 5, 2023).

[3] It should be noted that counsel appointed pursuant to § 3599 are responsible not only for litigating § 2255 proceedings, but also for "all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and shall also represent the defendant in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant." 18 U.S.C. § 3599(e).

[4] The proposed Covington team includes, in addition to Mr. Swanson and Mr. Xenakis, Santiago Zalazar, Eric O'Brien, Meaghan Ryan, and Tyler VanderMolen.

**A73**

reason. *Cf., e.g.*, *A1 Procurement, LLC v. Thermcor, Inc.*, No. 2:15-CV-15, 2015 WL 13733927, at \*4 (E.D. Va. Nov. 18, 2015), *report and recommendation adopted in part*, No. 2:15CV015, 2016 WL 184397 (E.D. Va. Jan. 15, 2016) (acknowledging that "[i]t is up to each individual court to set its own standard" for "approving or denying an attorney's *pro hac vice* admission," but citing cases suggesting that there must be some legitimate, specific basis for denial, such as "uncivil behavior or abusive language by an attorney;" "an attorney's impact on judicial economy," as in a situation "where a party's out-of-state counsel has continually thwarted the progress of the litigation;" or where there have been "conflicts of interest or clear-cut violations of the rules").[5]

Here, no such reason exists, and significant considerations weigh in favor of permitting *pro hac vice* admission. The Covington team is well-qualified to represent Mr. Runyon in this § 2255 proceeding, and the individual lawyers satisfy all requirements for admission *pro hac vice* to this Court. *See* Ex. B, Decl. of Peter J. Swanson ¶¶ 4-6 (hereafter, "Swanson Decl."). Both Mr. Swanson and Mr. Xenakis have experience in criminal matters, including death penalty matters, and Mr. Xenakis previously worked as a federal public defender in this District. *See* ECF No. 803 at ¶¶ 14-16 (describing the experience of Covington team members with respect to complex litigation, expert-heavy cases involving extensive document review, and death penalty and post-

---

[5] Other federal courts employ an even stronger presumption, holding that "[a]bsent a showing of unethical conduct rising to a level that would justify disbarment, the court ***must admit*** the attorney" seeking pro hac vice admission. *Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997) (emphasis added) (citing *In Re Evans*, 524 F.2d 1004 (5th Cir. 1975)); *see also Sanders v. Russell*, 401 F.2d 241, 245 (5th Cir. 1968) (while "district courts have broad discretion in prescribing requirements for admission to practice before them," they lack discretion to "limit[] the number of pro hac vice appearances"); *id.* at 246 ("It is difficult to see how the concern of the District Court in decorum, dignity, competency, good character or amenability to service and discipline is served by a numerical limitation . . . lack of necessity— in the judge's view—simply is not and cannot be a proper basis for exclusion [of additional out-of-district counsel] . . . The trial court cannot substitute its judgment for that of the litigant in the choice or number of counsel that the litigant may feel is required to properly represent his interests.") (cleaned up).

conviction matters).[6] Covington has agreed to represent Mr. Runyon on a *pro bono* basis, and it does not intend to seek reimbursement from the Court for its fees or costs incurred in connection with such representation. Swanson Decl. ¶ 3. Counsel for Mr. Runyon have conferred with Geremy Kamens, the Federal Public Defender for the Eastern District of Virginia, who has recommended Covington as capable and available to assist in litigating Mr. Runyon's § 2255 proceedings at no cost to the Court, a factor this District's CJA Plan specifically instructs that the Court "should consider." *See* E.D. Va. CJA Plan § XIV.E.4 ("When appointing counsel in a capital § 2255 matter, the court should consider the recommendation of the Federal Public Defender, who will consult with the Federal Capital Habeas § 2255 Project.").

The only reason the Covington lawyers cannot simply enter their appearances and join Mr. Runyon's team as counsel of record without first seeking permission is that they are not admitted to practice before this Court. But this should not be a barrier to their ability to represent Mr. Runyon, who has selected the Covington team members as his *pro bono* counsel of choice. On the contrary, this is precisely why the process for *pro hac vice* admission exists.

This District's CJA Plan expressly contemplates foreign lawyers serving as counsel of record in § 2255 proceedings like this one. Although the CJA Plan requires CJA panel members in *non-capital* cases to be "members in good standing of the federal bar of this district and the Fourth Circuit Court of Appeals" and "maintain an office in this district," E.D. Va. CJA Plan IX.C.3.a & b, no such requirement exists for counsel seeking appointment in capital § 2255 proceedings. To the contrary, the CJA Plan expressly permits "[o]ut of district counsel" to be

---

[6] During his tenure with the Office of the Federal Public Defender for the Eastern District of Virginia, Mr. Xenakis was admitted to practice *pro hac vice* before this Court. Mr. Xenakis is also admitted as a member of the bar of the United States Court of Appeals for the Fourth Circuit, on which he served as a law clerk, and argued cases in that Court while a member of the Office of the Federal Public Defender.

9

**A75**

appointed "in capital § 2255 cases to achieve high quality representation together with cost and other efficiencies."[7] *Id.* at XIV.E.6.

"High quality representation," cost reductions, "and other efficiencies" are precisely what Covington offers here. The Court is aware of the discovery issues that arose during the February 2023 hearing. As described in the Memorandum in Support of the Motion to Appoint Counsel, ECF No. 803, attorneys and litigation support staff from Covington, in conjunction with Mr. Runyon's counsel of record, have been working diligently to address these issues and conduct an efficient and reliable review of the voluminous case files transferred from prior counsel.

To date, Mr. Runyon's current counsel have received a total of seventy bankers boxes with tens of thousands of files as well as a hard drive containing 126 GB of data, including over 187,000 files, and a flash drive containing 14.2 GB of data, including nearly 9,000 files, from former counsel. The paper and electronic files received from former counsel were disorganized and required Mr. Runyon's current counsel to conduct a preliminary review of these files to identify a narrower set of materials requiring potential disclosure under the Court's discovery order. That review was conducted promptly, resulting in the identification of roughly 900 documents from fifty-seven of the bankers boxes and roughly 4,300 files from the hard and flash drives.[8] Covington attorneys, along with Mr. Runyon's counsel of record, have made significant progress regarding the necessary document-by-document review of the roughly 900 paper documents to identify materials that require production, and they completed a production to the government on May 31,

---

[7] Covington counsel are not seeking formal CJA appointment in this case but the same principles apply to retained *pro bono* counsel.

[8] As described in Petitioner's Status Report and Proposed Schedule, ECF No. 808, Mr. Runyon's former counsel sent fifty-seven bankers boxes on April 6, 7, and 10, 2023. The review of these fifty-seven boxes identified nearly 900 documents that are potentially relevant to Claim 6 and require further review. On May 2, 2023, Mr. Runyon's counsel received an additional thirteen bankers boxes from Mr. Runyon's former counsel. The review of the files from the thirteen additional boxes is ongoing and may result in additional files that require further review.

2023. Covington plans to enlist a dedicated team of attorneys to complete an expedited first-level review of the remaining roughly 4,300 electronic files. Covington attorneys and staff already have dedicated hundreds of hours to Mr. Runyon's case, and the firm has covered a number of out-of-pocket expenditures related to document scanning, storage, and production. Covington will continue to provide expertise, cost reductions, and other efficiencies to ensure the timely identification and production of relevant information to the government.

Permitting Covington *pro bono* lawyers to formally appear in the case would help to ensure both that this litigation can move forward efficiently and that Mr. Runyon is adequately represented in his § 2255 proceedings. Absent admission *pro hac vice*, the role that Covington attorneys can play in this case and the ability of counsel to expeditiously proceed to an evidentiary hearing will be limited in significant ways. For example:

- Based on the hearing record and documents reviewed to-date, it appears that there are at least five expert witnesses and several lay witnesses relevant to Mr. Runyon's ineffective assistance of counsel claim who were disclosed prior to the February 2023 hearing but who have not yet testified due to the interruption of proceedings. If Ms. Ali is the only lawyer permitted to formally appear and examine witnesses and present evidence, the lion's share of witness and exhibit preparation work will necessarily fall on her, which would unduly limit her ability to prepare for the hearing and could slow these proceedings down considerably. Among other things, it would significantly limit the number of witnesses who could be prepared during any particular day (whereas, if multiple counsel are permitted to examine witnesses, multiple witnesses could be prepared simultaneously on parallel tracks). Permitting multiple attorneys to present evidence and examine witnesses will help facilitate an orderly and efficient presentation to the Court.

- Likewise, if Ms. Ali is the sole counsel of record, she will be solely responsible for arguing any discovery or other disputes that may arise in the coming months, which will detract from her ability to prepare witnesses and otherwise prepare for the upcoming hearing.

- Permitting attorneys from Covington to serve as counsel of record will also ensure that they can assist with and appear on any briefing concerning both discovery-related issues and the ultimate merits of Mr. Runyon's remaining claim.

11

**A77**

- To the extent the United States seeks to depose any of Mr. Runyon's witnesses, a ruling that precludes any attorney other than Ms. Ali to prepare any such witnesses and defend their depositions will be inefficient for similar reasons. For example, this would prevent the counsel team from being able to proceed with multiple depositions on parallel tracks.

- Permitting attorneys from Covington to serve as counsel of record would mean that Covington counsel are officially speaking for Mr. Runyon and subject to the Court's authority, and thus presumably would give the United States more confidence and trust in dealing with Covington concerning outstanding discovery disputes, hearing logistics, and other issues. *See, e.g.*, *Belue v. Leventhal*, 640 F.3d 567, 576–77 (4th Cir. 2011) (noting that "pro hac vice attorneys are 'held to the same professional responsibilities and ethical standards as regular counsel,' particularly in this modern era where "[t]he legal profession has become a national one, and justice in any true sense must transcend the parochial . . .") (citation omitted).

These considerations are particularly weighty here given that Mr. Runyon has selected and retained Covington as his *pro bono* counsel. The principles underlying the Sixth Amendment support honoring his selection.

The Sixth Amendment protects the right of a non-indigent defendant to select the counsel of his choice. *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006); *Wheat v. United States*, 486 U.S. 153, 159 (1988). The Amendment also guarantees indigent defendants like Mr. Runyon the right to be represented by qualified, chosen counsel "willing to represent the defendant even though he is without funds." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624–625 (1989). Because this choice is the very "root meaning of the constitutional guarantee," *Gonzalez-Lopez*, 548 U.S. at 147–48, the Supreme Court has instructed that when a defendant is denied qualified counsel of his choice, it is a structural constitutional violation and does not matter whether a subsequent trial has otherwise been fair. *Id.* at 146 ("[The Sixth Amendment] commands, not that a trial be fair, but that a particular guarantee of fairness be provided—to wit, that the accused be defended by the counsel he believes to be best."). Under the current

**A78**

circumstances, refusing to permit Mr. Runyon's counsel of choice to fully participate in his representation would also deprive Mr. Runyon of the care and attention he and his case deserve given that he is facing the punishment of death. *See* U.S. Const. amends. 5, 6, 8.

Mr. Runyon understands that this right is not unlimited. But Supreme Court precedent makes clear that none of those limitations applies to his choice of the Covington lawyers to represent him. Mr. Runyon has not chosen counsel who lacks bar membership, has a conflict, is unwilling to carry on the representation, or fails the ethical standards of profession. *See Wheat*, 486 U.S. at 159–60. On the contrary, Covington's attorneys are members in good standing of their respective bars, have already signed a representation agreement with Mr. Runyon and begun work on his case, and are free from ethical conflicts and disciplinary history.

That the members of the Covington team are out-of-state attorneys should not interfere with Mr. Runyon's choice of counsel. *See, e.g.*, *United States v. Ensign*, 491 F.3d 1109, 1114–15 (9th Cir. 2007) ("We have held that a defendant's right to the counsel of his choice includes the right to have an out of-state lawyer admitted pro hac vice.") (internal quotations omitted); *Fuller v. Diesslin*, 868 F.2d 604, 607 (3d Cir. 1989) ("[W]e conclude that the right to counsel pro hac vice is encompassed analytically within the right to counsel of choice, and as such should be examined within the analytic framework generally employed in right to counsel of choice cases."). Out-of-district admission in this case will not "hinder the efficacious administration of justice." *United States v. Panzardi Alvarez*, 816 F.2d 813, 817–18 (1st Cir. 1987). Once again, the opposite is true: the Covington attorneys possess the requisite resources to professionally and efficiently review and disclose discovery as well as the courtroom experience to conduct the evidentiary hearing in an efficient and orderly manner.

**CONCLUSION**

For the foregoing reasons, Ms. Peiffer respectfully requests that the Court grant her request to withdraw from this litigation, and Mr. Runyon respectfully requests that the Court grant leave for the Covington lawyers to file *pro hac vice* motions and be substituted as counsel of record in this litigation.

Dated: June 7, 2023

Respectfully Submitted,

/s/ Elizabeth J. Peiffer

Elizabeth J. Peiffer, VSB No. 71353
Capital Representation Resource Center
1155 Seminole Trail #6391
Charlottesville, VA 22906
Telephone (434) 817-2970
Fax (434) 817-2972
epeiffer@vcrrc.org

Kathryn M. Ali, VSB No. 97966
Ali & Lockwood LLP
300 New Jersey Avenue N.W., Suite 900
Washington, D.C. 20001
Telephone (202) 651-2475
katie.ali@alilockwood.com

**A80**

**CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2023, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Carrie Lee Ward
Department of Justice
Capital Case Section
1331 F Street, NW
Room 650
Washington, DC 20530
Telephone (202) 923-7154
Fax: (202) 305-9779
Carrie.Ward@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

/s/ Kathryn M. Ali

**A81**

# ADDENDUM D

# FILED UNDER SEAL

# Addendum E

**A91**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

|  |  |  |
|---|---|---|
| David Anthony Runyon,<br>　　　　　Petitioner,<br><br>v.<br><br>United States of America,<br>　　　　　Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Original Criminal No. 4:08-cr-16-3<br>Original Civil No. 4:15-cv-108<br>**Capital § 2255 PROCEEDINGS**<br><br>HON. REBECCA BEACH SMITH |

## Declaration of Peter A. Swanson

I, Peter A. Swanson, hereby declare as follows:

1. I am a partner in the Washington, D.C. office of Covington & Burling, LLP ("Covington"). I provide this declaration in support of the Motion for Attorney Elizabeth Peiffer to Withdraw Due to Unforeseen Personal Circumstances and for Leave to Seek Pro Hac Vice Admission and Substitution of Pro Bono Counsel ("Motion").

2. In the Motion, Petitioner requests, *inter alia*, leave to seek *pro hac vice* admission and substitution of attorneys from Covington.

3. Petitioner has retained Covington as counsel in connection with the above-captioned matter. Covington has agreed to represent Mr. Runyon on a *pro bono* basis and does

not intend to seek reimbursement from the Court for its fees or costs incurred in connection with this representation.

4. The proposed Covington team for this matter includes myself, Nicholas Xenakis, Santiago Zalazar, Eric T. O'Brien, Meaghan Ryan, and Tyler G. VanderMolen.

5. I meet the requirements for *pro hac vice* admission set out in Local Civil Rule 83.1(E) and Local Criminal Rule 57.4(D). The other proposed team members have represented to me that they satisfy the requirements for *pro hac vice* admission set out in Local Civil Rule 83.1(E) and Local Criminal Rule 57.4(D), and to the best of my knowledge, information, and belief, they do satisfy these requirements.

6. If the Motion is granted, the proposed Covington team members will promptly file *pro hac vice* admission applications and pay the required fee.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and understanding.

Executed on June 6, 2023, at Washington, DC.

Peter A. Swanson
Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-5111
pswanson@cov.com

2

**A92**

# Addendum F

DAVID ANTHONY RUNYON,   )
                                 )
            Petitioner,   )
                                 )    Case No. _____
       v.                )
                                 )
UNITED STATES OF AMERICA,  )
                                 )
           Respondent.  )
                                 )

**DECLARATION OF GEORGE RUTHERGLEN**

1.      Since 1976, I have been a full-time faculty member at the University of Virginia School of Law, where I am currently a Distinguished Professor of Law. Upon graduation from law school, I served as a law clerk at the United States Court of Appeals for the Ninth Circuit for Judge J. Clifford Wallace and at the United States Supreme Court for Justices William O. Douglas and John Paul Stevens. Since 1980, I have been an active member of the Virginia State Bar and I am admitted to practice before the state and federal courts in Virginia and before the United States Supreme Court.

2.      In various cases, I have served as an expert on legal ethics, including issues of conflict of interest. I have also represented prisoners making claims of ineffective assistance of counsel. At our law school, I have also made several presentations to faculty and alumni on legal ethics, derived from the courses I have taught on Professional Responsibility and Civil Procedure. From 1990 to 1994, I served as Chair of the Advisory Committee on Fourth Circuit Rules.

**A94**

3.	In preparing this affidavit, I have examined the Memorandum in Support of Motion for Attorney Elizabeth Peiffer to Withdraw Due to Unforeseen Personal Circumstances and for Leave to Seek *Pro Hac Vice* Admission and Substitution of *Pro Bono Counsel* (hereafter Motion to Withdraw); the Transcript of Proceedings (Status hearing) (hereafter Transcript); the Virginia Rules of Professional Conduct; and the Rules of the United States District Court for the Eastern District of Virginia.

4.	Under Virginia Rule of Professional Conduct 1.7(a)(2), "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest," which exists if "there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to . . . a third person or by a personal interest of the lawyer." A significant risk that the representation will be materially limited includes, under Rule 1.1, the risk that a lawyer will not be able to "provide competent representation to a client," including the "thoroughness and preparation reasonably necessary for the representation." In addition, under Rule 1.3(a), the obligation that "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

Under the comment to Rule 1.1, "[c]ompetent handling of a particular matter . . . includes adequate preparation. The required attention and preparation are determined in part by what is at stake; major litigation and complex transaction ordinarily require more elaborate treatment than matters of lesser consequence." Rule 1.1 comment [5]. The stakes for Mr. Runyon in this case could not be higher, since he was convicted and sentenced to death and the § 2255 motion challenges his conviction and sentence.

5.      Ms. Elizabeth Peiffer served as co-counsel of record for petitioner, Mr. Runyon, in this case. On April 28, 2023, she learned that her mother had Stage IV breast cancer, which subsequent tests confirmed to have spread to bones in her hip, spine, and ribs, and to each of her lungs and to her liver. On June 7, 2023, she filed the motion to withdraw from representation of Mr. Runyon because of her mother's condition, which makes her mother unable to move safely without assistance and requires drastic medical treatment, whose extent and effectiveness cannot be ascertained for at least three to four months. Motion to Withdraw at 2-3. After obtaining confirmation from ethics counsel for the Virginia State Bar, Ms. Peiffer concluded that she could not continue to represent Mr. Runyon consistently with her obligations to care for her mother.

6.      Ms. Pfeiffer's withdrawal from representation requires leave of court under Rule 1.16(c). The conclusion that "representing the client is likely to result in violation of the Rules of Professional Conduct or other law" constitutes good cause for granting leave. Rule. 6.2(a). Moreover, a "lawyer's statement that professional considerations require termination of the representation ordinarily should be accepted as sufficient." Rule 1.16 comment [3]. And in this case, Ms. Peiffer consulted with ethics counsel from the Virginia Bar, who similarly advised that she withdraw, as she attested in a sworn declaration.

7.      Nevertheless, the District Court denied the motion to withdraw, opining that co-counsel, Ms. Kathryn Ali, could take on the role of lead counsel in place of Ms. Peiffer. Transcript at 10. Ms. Ali, however, does not, by herself, have the resources to handle the complicated issues of document production, not to mention those on the merits, that would be required of her. Motion to Withdraw at 5-6, Transcript at 35-38. This is especially so given the August 31 deadline for producing the documents in this case. Transcript at 50.

8.     The record before the District Court also showed that the conflicts of interest created by the medical condition of Ms. Pfeiffer's mother will continually arise, at least over the next three to four months, which encompasses the deadline for completing discovery at the end of August. And, of course, the treatment of Ms. Pfeiffer's mother could extend much longer, reaching the upcoming hearing on the merits of Mr. Runyon's motion. Since her mother's diagnosis, Ms. Pfeiffer's "schedule has been very unpredictable." Transcript at 9, leading to a substantial risk that she will be unable to attend conferences and hearings and to engage in the preparation necessary to effectively represent Mr. Runyon at those proceedings. The denial of her motion to withdraw will not put an end to these issues, but rather creates the near certainty that they will come up again in more urgent form as her representation is compromised by specific events arising from her mother's very serious illness. Such issues could come up in renewed motions to withdraw based on specific circumstances that prevent Ms. Pfeiffer's participation in this case, and if not in that form, in the impaired representation of Mr. Runyon would go officially unnoticed and become practically irreparable as this case proceeds.

9.     In addition to violating the Commonwealth's ethics rules, Ms. Peiffer's continued representation of Mr. Runyon under these circumstances—particularly in the absence of substitute counsel—would deprive Mr. Runyon of his rights as a defendant sentenced to death. He can effectively litigate his claims only through an attorney not distracted and preoccupied with a severe family medical emergency.

10.     All these impending problems could have been addressed by allowing attorneys from the firm of Covington & Burling to appear *pro hac vice* and to serve as lead counsel. The District Court observed that such a motion had not yet been properly made, but that if it were, she would

4

be strongly inclined to deny it. Transcript at 21-22, 56-57. Her reasons had to do with prior experience in this case with attorneys admitted *pro hac vice*, who complicated prior hearings and apparently were blamed by other counsel for delays in the case, Transcript at 21-22, 48. The Court also added that attorneys admitted *pro hac vice* "don't have same level of responsibility to the Court" as those regularly admitted to practice in the Eastern District of Virginia. Transcript at 57.

11.     The attorneys previously admitted *pro hac vice* in this case have no known relationship with the attorneys at Covington & Burling seeking admission *pro hac vice*. For purposes of ethics, conflicts of interest, competence, and discipline, the actions of one attorney can be attributed to another only in very limited circumstances, none of which are present in this case. Conflicts of interest can be imputed from one attorney in a law firm to others in the same firm. Rule 1.10. Attorneys have duties with respect to attorneys whom they supervise and they cannot participate in another attorney's violation of the rules of professional responsibility. Rule 5.1. More generally, an attorney engages in professional by violating the rules of profession responsibility through the acts of another. Rule 8.4. In the present case, no evidence supports the conclusion that the attorneys seeking admission *pro hac vice* have any tendency to engage in the same conduct as the attorneys previously admitted in this case, let alone any deficiency in their ability to represent Mr. Runyon.

12.     The Court also offered the opinion that attorneys admitted *pro hac vice* "don't have the same level of responsibility to the Court" as attorneys regularly admitted to practice before the Court. Transcript at 57. But the Local Rules for the Eastern District of Virginia make it clear that attorneys in either category have exactly the same responsibility to conform to the same

5

procedural rules and are subject to the same form of discipline. Rules of the United States District Court for the Eastern District of Virginia Rule 83.1(E)(2), (M). The Court leaves unexplained its conclusion that it can exercise less control over attorneys admitted *pro hac vice*. Judging by the transcript of the hearing on the motion to withdraw, the Court is perfectly capable of exercising control over any attorneys who appear before her.

13. A last reason offered by the Court to deny the motion to withdraw is that it "is not timely." Transcript at 58. This argument would have force if timeliness were measured from the beginning of this case, in 2008. Transcript at 7-8. But Ms. Peiffer filed the motion to withdraw as soon as the seriousness of her mother's condition was ascertained after April 28, 2023. She acted within weeks, not years of obtaining notice of the reason for finding a conflict of interest.

14. There are sound reasons to grant Ms. Peiffer's motion to withdraw and no reasons to deny it.

Executed this 28th day of June 2023, in Charlottesville, Virginia.

_George Rutherglen_
George Rutherglen

A99

Appendix

Resume of George Rutherglen

| | |
|---|---|
| Home Address: | 2533 Midway Farm Rd.<br>Charlottesville, VA   22901<br>Telephone:  (434) 977-0687 |
| Office Address: | University of Virginia<br>School of Law<br>580 Massie Road<br>Charlottesville, VA   22903-1789<br>Telephone:  (434) 924-7015 |
| Personal Data: | Born September 12, 1949, in Portland, Oregon<br>Married to Jessica Feldman<br>Two children, Susannah and Michael |
| Education: | J.D., 1974, Boalt Hall, University of California, Berkeley<br>Order of the Coif<br>Articles Editor, California Law Review<br><br>A.B. (Philosophy), 1971, University of California, Berkeley<br>Undergraduate at M.I.T.:   1967-70<br>Phi Beta Kappa |
| Employment: | Distinguished Professor of Law, 2003-<br>Barron F. Black Research Professor 2015-18<br>Earle K. Shawe Professor of Employment Law, 2020-<br>2011-14, 1997-98<br>Edward F. Howrey Research Professor, 2004-09<br>O.M. Vicars Professor, 1994-2002<br>Earle K. Shawe Professor of Employment Law, 2001-02<br>Edward F. Howrey Research Professor, 2000-01<br>F. Palmer Weber Research Professor, 1995-97<br>John Allan Love Professor, 1990-94<br>John V. Ray Research Professor, 1991-94<br>Professor of Law, 1982-1990<br>Associate Professor, 1980-82<br>Assistant Professor, 1976-80<br>Director, Graduate Program for Judges, 1995-2001<br><br>Law Clerk to Justices William O. Douglas and John Paul Stevens |

Supreme Court of the United States 1975-76

Law Clerk to Judge J. Clifford Wallace
      United States Court of Appeals for the Ninth Circuit
      1974-75

Professional Associations:    Virginia State Bar
      Editorial Board, Journal of Maritime Law and Commerce

      Chair, Maritime Law Section of the AALS, 1999-2000
      Chair, Advisory Committee on Fourth Circuit Rules, 1990-94

Courses Taught:    Admiralty
      Civil Procedure
      Civil Rights
      Class Actions
      Conflict of Laws
      Employment Discrimination
      Federal Courts
      International Civil Litigation
      Philosophy of Law
      Professional Responsibility

Publications:    Civil Rights in the Shadow of Slavery
      (Oxford University Press 2013)

      Civil Rights Actions:  Enforcing the Constitution
      (Foundation Press 5th ed. 2022) (and earlier editions) (with
      Peter W. Low, John C. Jeffries, Jr., and
      Pamela S. Karlan)

      Transnational Civil Litigation:  Principles and Prospects
      (West 2d ed. 2022) (and earlier edition)

      Employment Discrimination Law:  Visions of Equality in Theory
      and Doctrine (5th ed. Foundation Press 2021) (and earlier
      editions)

      Major Issues in the Federal Law of Employment
      Discrimination and Annotated Bibliography
      (Federal Judicial Center 5th ed. 2012) (and earlier editions)

      The United States Courts of Appeals:  Reexamining
      Structure and Process After a Century of Growth
      (1989) (as consultant to the ABA Standing Committee

on Federal Judicial Improvements)

Protecting Recent Immigrants and Aliens from
  Discrimination in Employment:   The American
  Experience, Internal Labor Organization (1994)
Admiralty, Human Rights, and International Law, 62 Va. J. Int'l
  L. 181 (2021)

Universal Injunctions:   Why Not Follow the Rule, 107 Va. L. Rev.
  Online 300 (2021)

Statutes of Limitations: Claims Forgotten, Forgiven, or Foregone,
  72 Rutgers U. L. Rev. 1 (2019)

Disaggregated Discrimination and the Rise of Identity Politics,
  26 Wm. & Mary J. Race, Gender, and Soc'l Justicce
  391 (2020)

Territoriality and Its Troubles in The Restatement and Beyond:
  The Past, Present and Future of U.S. Foreign
  Relations Law 3711 (Paul B. Stephan & Sarah H.
  Cleveland 2020)

Reconstruction in Legal Theory, Minn. L. Rev. Online (2020)

Self-Portrait in a Complex Mirror: Review of The Making of a
  Justice: Reflections on My First 94 Years by John Paul
  Stevens, Va. L. Rev. Online.

The Problem with Procedure: Some Inconvenient Truths about
  Aspirational Goals, 56 San Diego L. Rev. 1  (2019)

The Rights of Aliens under the United States Constitution:   At the
  Border and Beyond, 57 Va. J. Int'l L. 707 (2018)

In What Sense a Coup?   A Review of The Framers' Coup: The
  Making of the United States Constitution by Michael J.
  Klarman, 34 J. L. & Pol. 117 (2018)

The Rule of Recognition in Reconstruction:   A Review of
  *Secession on Trial:   The Treason Prosecution of Jefferson
  Davis*, Va. L. Rev. online (2017)

9

The Rights of Aliens under the United States Constitution:   At the
Border and Beyond, 57 Va. J. Int'l L. 707 (2018).

What Happened to the Framers of the Federal Rules? Generational
Change and the Transformation of the Rulemaking Process,
J. Sup. Ct. Hist. 193 (2017)

The Origins of Arguments Against Reverse Discrimination:
Lessons from the Civil Rights Act of 1866, in "The
Greatest and Grandest Act":   The Civil Rights Act of 1866
from Reconstruction to Today (Christian Samito, ed. 2018)

The Constitution and Slavery Overseas, 39 Seattle U. L. Rev. 695
(2016)

Thirteenth Amendment, in 5 American Governance 189 (Stephen
L. Schechter ed., Macmillan Reference USA, 2016)

Fisher II:   Whose Burden, What Proof?, 20 The Green Bag 2d
19 (2016).

Personal Jurisdiction and Political Authority, 32   J.L. & Pol. 1
(2016)

The Rights of Aliens under the United States Constitution:   At the
Border and Beyond, 57 Va. J. Int'l L. 707 (2018).

The Civil Rights Act of 1964, in The American Middle Class:   An
Economic Encyclopedia of Progress and Poverty
(2017)

"The Great Task Remaining Before Us":   Lincoln and
Reconstruction, in The Gettysburg Address:
Perspectives on Lincoln's Greatest Speech 191
(Sean Conant, ed., Oxford University Press, 2015).

Private Rights and Private Actions:   The Legacy of Civil
Rights in the Enforcement of Title VII, 95 B.U.
`          L. Rev. 733 (2015).

Concrete or Abstract Conceptions of Discrimination, in
Philosophical Foundations of Discrimination Law 115
(Deborah Hellman & Sophia Moreau eds., Oxford
University Press, 2013).

10

Sovereignty, Territoriality, and the Enforcement of Judgments (with James Y. Stern), in Foreign Court Judgments and the United States Legal System (Paul Stephan, ed. 2014).

Title VII as Precedent:   Past and Prologue for Future Legislation, 10 Stan. J.C.R. & C.L. 159 (2014).

The Civil Rights Act of 1964, in The American Middle Class: An Economic Encyclopedia of Progress and Poverty (Robert Rycroft ed., forthcoming 2014).

The Way Forward After *Wal-Mart*, 88 Notre Dame L. Rev. 871 (2012).

Sovereign Immunity in Benedict on Admiralty (2019) (and earlier editions)

The Thirteenth Amendment, The Power of Congress, and the Shifting Sources of Civil Rights Law, 112 Colum. L. Rev. 1551 (2012)

Constitutionalizing Employees' Rights:   Lessons From the History of the Thirteenth Amendment, 27 Wis. J. Gender & Society 162 (2012)

*Wal-Mart*, *AT&T Mobility*, and the Decline of the Deterrent Class Action, Va. L. Rev. Online (2012)

*Ricci v. DeStefano*: Affirmative Action and the Lessons of Adversity, 2009 Sup. Ct. Rev. 83

Textual Corruption in the Civil Rights Cases, 34 J. Sup. Ct. Hist. 164 (2009)

Public Employee Speech in Remedial Perspective, 34 J. L. & Pol. 129 (2008)

Private Action, State Action, and the Thirteenth Amendment, 94 Va. L. Rev. 1367 (2008)

Structural Reform Revisited, 95 Calif. L. Rev. 1387 (2007) (with John C. Jeffries, Jr.)

11

The Badges and Incidents of Slavery and the Power of Congress to Enforce the Thirteenth Amendment, in The Promises of Liberty: The History and Contemporary Relevance of the Thirteenth Amendment (Alexander Tsesis, ed., Columbia University Press 2010)

Civil Rights in Private Schools:   The Surprising Story of *Runyon v. McCrary*, in Civil Rights Stories (Myriam E. Gilles & Risa Goluboff, eds. Foundation Press 2007)

Lawyer for the Organization:   An Essay on Legal Ethics, 1 Va. L. & Bus. Rev. 141 (2006)

Deforming the Federal Rules: An Essay on What's Wrong with the Recent *Erie* Decisions, 92 Va. L. Rev. 707 (2006) (with Earl Dudley)

Disparate Impact, Discrimination, and the Essentially Contested Concept of Equality, 74 Ford. L. Rev. 2313 (2006)

Private Law and Public Reason, 92 Va. L. Rev. 1503 (2006)

Distributing Justice: The September 11th Victim Compensation Fund and the Legacy of the Dalkon Shield Claimants Trust, 12 Va. J. Soc. Pol'y & Law 673 (2005)

Controversy, Consensus, and the Concept of Discrimination, 49 St. Louis U. L.J. 1021 (2005)

The Improbable History of Section 1981: Clio Still Bemused and Confused, 2003 Sup. Ct. Rev. 303

Custom and Usage as Action Under Color of State Law: An Essay on the Forgotten Terms of Section 1983, 89 Va. L. Rev. 925 (2003)

Teaching Procedure, Past and Prologue, 47 St. Louis U. L.J. 13 (2003)

Structural Uncertainty Over Habeas Corpus and the Jurisdiction of Military Tribunals, 5 Green Bag 2d 397 (2002)

Future Claims in Mass Tort Cases:   Deterrence,

12

**A105**

Compensation, and Necessity,
88 Va. L. Rev. 1989 (2002)

*International Shoe* and the Legacy of Legal Realism,
2001 Sup. Ct. Rev. 347

Dead Ships, 30 J. Maritime L. & Comm. 677 (1999)

Ironies, Inconsistencies, and Intercollegiate Athletics:
Title IX, Title VII, and Statistical Evidence of
Discrimination, 1 Va. J. Sports & L. 177 (1999)
(with Earl Dudley)

A Farewell to Tournaments?   The Need for an Alternative
Explanation of Law Firm Structure and Growth,
84 Va. L. Rev. 1695 (1998) (with Kevin Kordana)

The Influence of Feminism on American Law: The
Case of Employment Discrimination, America Ho
(1998) (Japanese journal of American law)

Pleasure Boating and Admiralty: Increasing Conformity
and Decreasing Significance, 29 J. Maritime
L. & Comm. 305 (1998)

Affirmative Action in Faculty Appointments: A Guide
for the Perplexed, in Diversity and Community
in the Academy (C. Wolf-Devine, ed. 1997)

The Federal Rules for Admiralty and Maritime Cases:
A Verdict of Quiescent Years, 27 J. Maritime
L. & Comm. 581 (1996)

Disabilities, Discrimination, and Reasonable Accommodation,
46 Duke L.J. 1 (1996) (with Pamela S. Karlan)

Better Late Than Never:   Notice and Opt-Out at the
Settlement Stage of Class Actions,
71 N.Y.U. L. Rev. 258 (1996)

From Race to Age:   The Expanding Scope of Employment
Discrimination Law, 24 J. Legal Stud. 491 (1995)

Sexual Harassment:   Ideology or Law? 18 Harv. J.L. & Pub.

Policy 487 (1995)

Discrimination and Its Discontents,
81 Va. L. Rev. 117 (1995)

The Theory of Comparable Worth as a Remedy for
Discrimination, 82 Geo. L.J. 135 (1993)

Reconstructing *Erie*: A Comment on the Perils of
Legal Positivism, 10 Constitutional
Commentary 255 (1993)

Not With a Bang But A Whimper: Collisions, Comparative
Fault, and the Rule of *The Pennsylvania*,
67 Tul. L. Rev. 733 (1992)

Reconsidering Burdens of Proof: Ideology, Evidence,
and Intent in Individual Claims of Employment
Discrimination, 1 J. Soc. Policy & L. 43 (1993)

After Affirmative Action: Conditions and Consequences
of Ending Preferences in Employment,
1992 U. Ill. L. Rev. 339

Dilemmas and Disclosure: A Comment on Client Perjury,
19 Am. J. Crim. L. 267 (1992)

Admiralty and Bankruptcy Revisited: Effects of the
Bankruptcy Reform Act of 1978,
65 Tulane L. Rev. 503 (1991)

The Contemporary Justification for Maritime Arrest
and Attachment, 30 Wm. Mary L. Rev. 541 (1989)

Affirmative Action Under the Constitution and Title VII:
From Confusion to Convergence, 35 U.C.L.A. L. Rev. 301
(1988) (with Daniel R. Ortiz)

Disparate Impact Under Title VII: An Objective Theory
of Discrimination, 73 Va. L. Rev. 1297 (1987)

Claims of Employment Discrimination Under
Title VII of the Civil Rights Act of 1964,
in Statistical Methods in Discrimination

14

Litigation (D. Kaye & M. Aickin, eds. 1986)

Procedures and Preferences:   Remedies for Employment
        Discrimination, 5 Rev. Litigation 73 (1986)

Notice, Scope, and Preclusion in Title VII Class Actions,
        69 Va. L. Rev. 11 (1983)

Conflicts of Law and Morality–The Relevance of Moral
        Reasoning, 67 Va. L. Rev. (1980)

Title VII Class Actions, 47 U. Chi. L. Rev.   688 (1980)

Sexual Equality in Fringe-Benefit Plans,
        65 Va. L. Rev. 199 (1979)

In What Sense a Coup?   A Review of The Framers' Coup: The
        Making of the United States Constitution by Michael J.
        Klarman, 34 J. L. & Pol. 117 (2018)

Book Review, We Shall Overcome, L. & Hist. Rev. (2010)

Book Review, Friendly Adversaries, 77 Judicature 49 (1993)

Book Review, Abolition in a Difference Voice,
         78 Va. L. Rev. 1463 (1992)

Book Review, Legal Theory and the Common Law,
        76 Va. L. Rev. 1441 (1990)

Book Review, Theories of Free Speech,
        7 Ox. J. Leg. Stud. 115 (1987)

Note, Parolee's Right to Bail,
        62 Calif. L. Rev. 521 (1974)

Presentations:          Funding Legal Services
                        University of Virginia School of Law
                        May 11, 2018

                        Legal Ethics in the Cloud:   Protecting Confidential Information in
                        the Age of the Internet
                        University of Virginia School of Law
                        May 8, 2015

15

**A108**

Current Issues in Legal Ethics
University of Virginia School of Law
May 4, 2012 and May 1, 2009 (with George Cohen)

Legal Ethics in the Electronic Age
University of Virginia School of Law
May 4, 2007 (with George Cohen)

Legal Ethics: Attorney for the Organization
University of Virginia School of Law
May 5, 2006, May 4, 2007 (with George Cohen)

Diversity and Professional Ethics
University of Virginia School of Law
Nov. 3-4, 2005

Current Issues in Professional Responsibility,
University of Virginia School of Law, June 29, 2001

Evidence, Procedure, and Class Action Issues,
Workshop on Employment Law for Federal Judges
Federal Judicial Center and New York University,
March 16-17, 2000

When Is a Precedent Not a Precedent?
Appellate Judges Seminar, Appellate Judges
Conference of the ABA, April 21, 1999

Practical Solutions to Real World Ethical Problems,
Virginia Bar Association,
Sept. 15-16, 1995

Legal Ethics in Employment Law,
Virginia Bar Association,
Oct. 18, 1994

The Corporate Attorney-Client Privilege,
Virginia Bar Association, July 30, 1993

Current Issues in Legal Ethics, University of
Virginia School of Law, July 14, 1992

Current Issues in Legal Ethics, University of

16

**A109**

Virginia School of Law, March 6, 1992

Recent Developments in the Federal Law of
Employment Discrimination,
Orientation Seminar for Federal Judges
Federal Judicial Center, Sept. 1, 1987

Individual Claims of Discrimination in Employment
Under Title VII, ALI-ABA, June 12, 1987

Recent Developments in the Federal Law of       Employment
Discrimination, Seminar for Appellate Judges
Federal Judicial Center, Oct. 30, 1986

Statistics for Judges and Attorneys
U.S. Department of Labor, May 28, 1986

Selected Cases:        Morse v. Republican Party of Virginia,
517 U.S. 186 (1996)

Neitzke v. Williams, 490 U.S. 319 (1989)

Seaboard System Railroad v. Caldwell,
238 Va. 148, 380 S.E.2d 910 (1989),
*cert. denied*, 493 U.S. 1095 (1990)

*In re* A.H. Robins, Bergstrom v. Dalkon Shield
Claimants Trust 91 F.3d 128 (4th Cir. 1996)

Raymond Lee X v. Murray, 888 F.2d. 1387
(4th Cir. 1989) (table)

Pressly v. Hutto, 875 F.2d. 316 (1987) (table)

Nusbaum v. Terrangi, 210 F.Supp.2d 784 (E.D.Va.2002)

Presentations:        Funding Legal Services
University of Virginia School of Law
May 11, 2018

Legal Ethics in the Cloud:   Protecting Confidential Information in
the Age of the Internet

17

University of Virginia School of Law
May 8, 2015

Current Issues in Legal Ethics
University of Virginia School of Law
May 4, 2012 and May 1, 2009 (with George Cohen)

Legal Ethics in the Electronic Age
University of Virginia School of Law
May 4, 2007 (with George Cohen)

Legal Ethics:   Attorney for the Organization
University of Virginia School of Law
May 5, 2006, May 4, 2007 (with George Cohen)

Diversity and Professional Ethics
University of Virginia School of Law
Nov. 3-4, 2005

Current Issues in Professional Responsibility,
University of Virginia School of Law, June 29, 2001

Evidence, Procedure, and Class Action Issues,
Workshop on Employment Law for Federal Judges
Federal Judicial Center and New York University,
March 16-17, 2000

When Is a Precedent Not a Precedent?
Appellate Judges Seminar, Appellate Judges
Conference of the ABA, April 21, 1999

Practical Solutions to Real World Ethical Problems,
Virginia Bar Association,
Sept. 15-16, 1995

Legal Ethics in Employment Law,
Virginia Bar Association,
Oct. 18, 1994

The Corporate Attorney-Client Privilege,
Virginia Bar Association, July 30, 1993

Current Issues in Legal Ethics, University of
Virginia School of Law, July 14, 1992

18

Current Issues in Legal Ethics, University of
Virginia School of Law, March 6, 1992

Recent Developments in the Federal Law of
Employment Discrimination,
Orientation Seminar for Federal Judges
Federal Judicial Center, Sept. 1, 1987

Individual Claims of Discrimination in Employment
Under Title VII, ALI-ABA, June 12, 1987

Recent Developments in the Federal Law of Employment
Discrimination, Seminar for Appellate Judges
Federal Judicial Center, Oct. 30, 1986

Statistics for Judges and Attorneys
U.S. Department of Labor, May 28, 1986