No. 23-5

IN THE
United States Court of Appeals for the Fourth Circuit

---

In re: ELIZABETH JANE PEIFFER,
*Appellant*

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

DAVID ANTHONY RUNYON,
*Defendant*.

---

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 4:08-cr-00016-RBS-DEM
(The Honorable Rebecca Beach Smith)

---

**JOINT APPENDIX VOLUME II**

---

RICHARD D. COOKE
919 East Main Street Suite 1900
Richmond, Virginia 23219
(804) 819-5471
richard.cooke@usdoj.gov

BRIAN J. SAMUELS
LISA MCKEEL
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, Virginia 23606
(757) 591-4000
brian.samuels@usdoj.gov

*Counsel for the United States*

CATHERINE E. STETSON
TIARA BROWN
SIMON CHIN
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004-1109
(202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

**VOLUME I**

District Court Docket Report ................................................................................ JA1

Criminal Indictment (ECF 3) .............................................................................. JA56

Memorandum Order (ECF 410) ........................................................................... JA73

Motion for Clarification of Sealing Procedure (ECF 425) ................................. JA86

Memorandum Order (ECF 426) ........................................................................... JA89

Motion to Appoint Co-Counsel (ECF 432) ........................................................ JA96

Memorandum in Support of Motion to Appoint Co-Counsel (ECF 433) .......... JA98

Order (ECF 435) ................................................................................................ JA109

Motion to Vacate, Set Aside, or Correct Sentence (ECF 478) ......................... JA115

Response to Motion to Vacate, Set Aside, or Correct Sentence
 (ECF 497) .................................................................................................. JA241

**VOLUME II**

Amended Motion to Vacate, Set Aside, or Correct Sentence
 (ECF 511) .................................................................................................. JA382

Response to Amended Motion to Vacate, Set Aside, or
 Correct Sentence (ECF 536) ..................................................................... JA531

Opinion (ECF 560) ............................................................................................ JA690

Motion to Withdraw and to Appoint Substitute Counsel (ECF 648) ............... JA740

Order (ECF 649) ................................................................................................ JA743

Agreed Pre-Evidentiary Hearing Scheduling Order (ECF 657) ....................... JA747

Notice of Compliance with Pre-Hearing Disclosures Order (ECF 687) .......... JA749

Notice of Compliance with Pre-Hearing Disclosures Order (ECF 690) .......... JA752

Motion to Appoint Co-Counsel (ECF 691) ...................................................... JA755

Memorandum in Support of Motion to Appoint Co-Counsel (ECF 692) ........ JA758

Order (ECF 695) .................................................................................... JA763

Renewed Motion to Appear *Pro Hac Vice* (ECF 725) .................................. JA765

Memorandum in Support of Renewed Motion to Appear
*Pro Hac Vice* (ECF 726) ........................................................................ JA768

Order (ECF 751) .................................................................................... JA776

## **VOLUME III**

Reply in Support of Petitioner's Motion for Witness to
Testify by Video (ECF 754) ............................................................... JA778

Attachment A to Reply in Support of Petitioner's Motion for Witness to
Testify by Video (ECF 754-1) ............................................................ JA788

Attachment B to Reply in Support of Petitioner's Motion for Witness to
Testify by Video (ECF 754-2) ............................................................ JA789

Attachment C to Reply in Support of Petitioner's Motion for Witness to
Testify by Video (ECF 754-3) ............................................................ JA795

Application to Appear *Pro Hac Vice* (ECF 764) ...................................... JA800

Application to Appear *Pro Hac Vice* (ECF 772) ...................................... JA801

Transcripts from Evidentiary Hearing, February 7, 2023 (ECF 774) ............. JA803

Transcripts from Evidentiary Hearing, February 8, 2023 (ECF 776) ............ JA1029

## **VOLUME IV**

Transcripts from Evidentiary Hearing, February 9, 2023 (ECF 781) ............ JA1236

Transcripts from Evidentiary Hearing, February 10, 2023 (ECF 782) .......... JA1391

## **VOLUME V**

Transcripts from Evidentiary Hearing, February 13, 2023 (ECF 784) .......... JA1603

Transcripts from Evidentiary Hearing, February 14, 2023 (ECF 785) .......... JA1790

Transcripts from Evidentiary Hearing, February 15, 2023 (ECF 786) .......... JA1829

Order (ECF 787) ............................................................ JA1881

Renewed Motion to Withdraw (ECF 788)............................ JA1884

Status Update Regarding Petitioner's Discovery Disclosures (ECF 789)...... JA1885

Response to Status Update Regarding Petitioner's
Discovery Disclosures (ECF 793) .................................... JA1893

Exhibit A to Response to Status Update Regarding Petitioner's
Discovery Disclosures (ECF 793-1).................................. JA1920

Transcripts from Evidentiary Hearing, February 22, 2023 (ECF 794) .......... JA1924

Notice Regarding Filing of Maio Declaration (ECF 795)............................ JA1967

Order (ECF 796) ............................................................ JA1969

Notice Regarding Filing of Peiffer Declaration (ECF 797)........................... JA1974

Declaration of Peiffer (ECF 797-1) .................................. JA1976

Reply to Response of U.S. to Disclosure Status Updates (ECF 798)............. JA1979

Order (ECF 799) ............................................................ JA1984

Petitioner's Unopposed Motion to Continue (ECF 800) ............................ JA1987

Order (ECF 801) ............................................................ JA1991

Motion to Appoint Counsel (ECF 802) ...................................... JA1992

Memorandum in Support of Motion to Appoint Counsel (ECF 803) ............ JA1994

## <u>VOLUME VI</u>

Response to Order Requesting Status Report (ECF 804)............................. JA2003

Petitioner's Motion to Continue (ECF 805) .................................... JA2007

Memorandum in Support of Petitioner's Motion to Continue (ECF 806) ..... JA2010

Order (ECF 807) ............................................................ JA2018

Status Report and Proposed Schedule (ECF 808) ................................ JA2019

Response to Proposed Schedule (ECF 809) ...................................... JA2025

Order (ECF 810) ............................................................ JA2033

Motion to Withdraw and to Substitute *Pro Bono* Counsel (ECF 814)............ JA2036

Memorandum in Support of Motion to Withdraw (ECF 815)........................ JA2039

Exhibit: Declaration of Peter Swanson (ECF 815, Ex. B).............................. JA2054

Transcript of June 16, 2023 Proceedings (ECF 819).................................... JA2057

Order (ECF 820) ....................................................................................... JA2116

Notice of Appeal (ECF 821)...................................................................... JA2120

Joint Response to Court Order (ECF 823).................................................. JA2122

Motion for Stay and to Expedite (23-5, Doc. 8) ......................................... JA2125

Declaration of Prof. George Rutherglen (23-5, Doc. 8, Addendum F) .......... JA2159

Petition for Writ of Mandamus (23-6, Doc. 3) ............................................ JA2179

**VOLUME VII (Sealed)**

SEALED Declaration of Elizabeth Peiffer (ECF 815, Ex. A)........................ JA2228

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | : | |
| | : | |
| Petitioner, | : | |
| v. | : | No. 4:08-CR-00016 |
| | : | CAPITAL § 2255 PROCEEDINGS |
| UNITED STATES OF AMERICA, | : | Hon. Rebecca Beach Smith |
| | : | |
| Respondent. | : | |

## AMENDED MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT A SENTENCE

Michele J. Brace, VSB No 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville VA 22903
Telephone (434) 817-2970
Fax (434) 817-2972
mbrace@mindsort.com

Dana Hansen Chavis, *Pro Hac Vice*
Federal Defender Services
 of Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
dana_hansen@fd.org

**COUNSEL FOR PETITIONER DAVID ANTHONY RUNYON**

**JA382**

Table of Contents

Table of Contents.................................................................................................i

List of Attachments and Exhibits ......................................................................vi

Preliminary Statement .........................................................................................1

Factual Background ..............................................................................................2

Procedural History................................................................................................8

Claims for Relief..................................................................................................11

Claim 1:   The Participation Of Two Dishonest Law Enforcement Officers Tainted
           Runyon's Trial. ...................................................................................11

    A.     The United States Failed To Timely Disclose The Participation Of Two
           "Dirty Cops," Which Tainted Runyon's Trial. .....................................11

           1.     Robert Glenn Ford.....................................................................11

           2.     Clifford Dean Posey ..................................................................14

Claim 2:   The Prosecution Failed To Disclose Impeaching And Exculpatory Evidence In
           Violation Of The Fifth, Sixth, And Eighth Amendments, United States
           Constitution...........................................................................................16

Claim 3:   Counsel Rendered Ineffective Assistance At The Guilt Phase Of Trial By Failing
           To Investigate, Present, Highlight, And/Or Argue Evidence Of Innocence. ........21

    A.     Chad Costa............................................................................................21

    B.     Cat Voss................................................................................................25

    C.     Scott Linker ..........................................................................................26

    D.     Rose Wiggins ........................................................................................27

    E.     David Runyon's Whereabouts The Day Of The Crime.........................28

    F.     Cell Tower Testimony Regarding Michael Draven................................29

    G.     Runyon's Shopping List........................................................................31

i

**JA383**

H.      Testimony Regarding The Bullets. ...........................................................................32

Claim 4:  Counsel Abdicated The Responsibility To Advocate For Runyon At The Eligibility Phase When He Failed To Address The Relevant Issue And Did Not Discuss Established Facts That Weighed Against The Statutory Aggravating Circumstance Of Substantial Planning. ..........................................................35

Claim 5:  Trial Counsel Was Ineffective For Failing To Investigate, Discover, And Present Evidence That David Runyon Was Incompetent To Stand Trial. ...........................38

Claim 6:  Counsel Rendered Ineffective Assistance By Failing To Investigate And Present Mitigating Evidence Regarding Runyon's Psycho-Social History, Brain Damage And Mental Health. ...................................................................................41

A.      Counsel Hudgins Appeared In The Case Too Late To Effectively Investigate And Present Mitigation. ...............................................................................41

B.      Counsel Abandons The Incomplete Mental Health Investigation And Presents Repetitive Lay Person Testimony. ................................................46

C.      A Complete Psycho-Social History And Its Implications Would Have Added Weight to Mitigating Factors, Reduced The Weight Of Aggravating Factors And Informed the Jurors About Runyon's Lesser Moral Culpability. ...............50

1.      Readily-Available Records. ....................................................................50

1.1  Medical records ...................................................................................51

1.2  Letters From Runyon ..........................................................................52

1.3  Jail Records ..........................................................................................52

1.4  Brain Scans ..........................................................................................53

1.5  Prosecution Expert Reports ...............................................................53

1.6  David Dombrowski (Biological Father) Medical Records .............53

1.7  Suk Cha Runyon (Biological Mother) Medical Records ...............54

2.      Readily-Available Lay Witness Accounts .........................................54

2.1  Witnesses Relevant to the "Abuse of Women" Aggravator .........56

2.2  Witnesses Relevant to the Family Violence Mitigating Factors ................59

2.3  Witnesses to the 1996 Car Accident and Runyon's Personality Change ...61

  **2.4 Witnesses Who Knew Runyon In the Time Span Preceding His Arrest.**..65

  **2.5 Evidence Relevant To the Juror-Created Mitigator That Runyon Was Led To Believe Cory Voss Was Molesting His Daughter** ...........................67

  **3. Readily-Available Expert Analysis And Opinions** ........................................67

  **3.1 Allan F. Mirsky, Ph.D., ABPP-CN** ...................................................................68

  **3.2 James R. Merikangas, M.D., L.L.C.**...................................................................71

  **3.3 Mark D. Cunningham, Ph.D., ABPP**...................................................................72

  **3.4 Richard G. Dudley, Jr., M.D.**...............................................................................76

 **D. Counsel's Failure To Investigate And Present Mitigating Evidence Undermines Confidence In Runyon's Death Sentence.**.........................................81

**Claim 7: Runyon's Sixth Amendment Right To Confront The Witnesses Against Him Was Violated When The Prosecution Presented Police And Informant Testimony Of Statements From His Co-Defendant, Michael Draven. Furthermore, His Trial Counsel Were Ineffective When They Failed To Object To The Admission Of This Testimony And Failed To Ask The Court For A Limiting Instruction That They Could Not Be Considered As Evidence of Runyon's Guilt.** ............................84

**Claim 8: Ineffective Assistance of Counsel On Direct Appeal.**....................................................86

**Claim 9: Runyon's Conviction Under 18 U.S.C. § 924(c) Is Unconstitutional Because It Was Procured In Violation Of The Due Process Clause, The Equal Protection Clause, And The Fifth, Sixth, and Eighth Amendments Of The Constitution.** *Johnson v. United States***, 135 S. Ct. 2551 (2015).**................................................................88

 **A. Introduction**..................................................................................................................88

 **B. Relevant Statutes**.........................................................................................................89

 **C. The Definition of "Crime of Violence" is Unconstitutional.** ...............................91

 **D. Runyon's Conviction For Murder With A Firearm In Relation To A Crime of Violence Is Unconstitutional.**.........................................................................................93

  **1. Carjacking Is Not A Crime of Violence.**.........................................................94

  **2. Conspiracy Is Not A Crime of Violence.**.........................................................97

 **E. Resentencing Is Required Because Runyon Was Sentenced To Death Based On An Unconstitutional Statute.**..............................................................................97

**JA385**

**Claim 10:** The Jury Instructions At The Sentencing Phase Unconstitutionally Lowered the Government's Burden Of Proof In Violation Of The Fifth, Sixth, and Eighth Amendments. *Ring v. Arizona*, 536 U.S. 584 (2003). ...................................................99

**Claim 11:** The Death Sentences Are Unconstitutional Because They Are Based On Aggravating Circumstances That Fail To Narrow And/Or That Are Arbitrary And Overbroad. ..................................................................................................... 102

**Claim 12:** Runyon Was Denied Due Process Of Law, Equal Protection Of The Law, The Right To Be Free Of Cruel And Unusual Punishment, And Effective Assistance Of Counsel Because The Death Penalty Was Disproportionately And Unconstitutionally Applied According To Race, And Trial And Appellate Counsel Made No Objection Based On This Fact. ................................................... 105

**Claim 13:** Runyon's Death Sentence Is Disproportionate And Arbitrary In Violation Of The Fifth And Eighth Amendment And Trial And Appellate Counsel Were Ineffective For Failing To Raise This Issue. ....................................................... 111

**Claim 14:** Runyon's Death Sentence Violates The Eighth Amendment Because He Is Severely Mentally Ill. ........................................................................................... 115

**Claim 15:** Selection Of The Grand Jury And/Or The Petit Jury Venire For Runyon's Case Was Tainted, And Trial Counsel Unreasonably Failed To Request And Examine The Jury Selection Records. ............................................................................... 117

    **A.** Selection Of The Grand Jury And/Or Petit Jury Venire Jury Was Tainted... 117

    **B.** There Was A Failure To Fully And Accurately Comply With The Jury Selection Plan And The Provisions Of 28 U.S.C. § 1861 *et seq.*.......................... 118

    **C.** A Person Who Did Not Qualify Participated In Runyon's Trial ...................... 122

    **D.** Trial Counsel Unreasonably Failed To Request Or Examine Any Jury Selection Records, In Violation Of The Sixth Amendment. ............................... 123

**Claim 16:** The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes, And Trial Counsel Unreasonably Failed To Object To These Unconstitutional Strikes. ......................................................................... 124

    **A.** The Relevant Law.................................................................................................. 124

        **1.** The Prosecution Engaged In Racial Discrimination In Its Exercise Of Peremptory Strikes. ........................................................................................ 127

        **2.** The Prosecution Engaged In Gender Discrimination In Its Exercise Of Peremptory Strikes. ........................................................................................ 129

iv

**JA386**

    B.      **Trial Counsel Unreasonably Failed To Object To The Prosecution's Discriminatory Exercise Of Peremptory Strikes.** ................................................... 130

**Claim 17:  The Voir Dire Conducted In This Case Violated Runyon's Fifth and Sixth Amendment Rights To A Fair Trial And Impartial Jury, And Trial Counsel Unreasonably Failed To Object.** ...................................................... 133

    A.      **The Voir Dire Was Constitutionally Inadequate.** ................................................. 133

    B.      **Trial Counsel Rendered Ineffective Assistance Regarding Voir Dire.** ........... 138

**Claim S2:  The Trial Court Unlawfully Excluded The Potential Jurors Based Solely On Their Juror Questionnaire Responses Without Voir Dire, And Trial Counsel Unreasonably Failed To Object And Unreasonably Participated.** .......................... 139

**Prayer for Relief** ................................................................................................................. 140

**Verification** ........................................................................................................................ 141

**Certificate of Service** ......................................................................................................... 141

**JA387**

## List of Attachments and Exhibits

1     Placeholder[1]

2     Merikangas Report, 9/25/15

3     McNally Declaration, 3/11/09

4     Cronin Declaration, 9/26/15

5     Hudgins Declaration, 9/22/15

6     Woodward Declaration, 9/24/15

7     Costa Declaration, 9/30/15

8     Cunningham Declaration, 9/25/15

9     Cat Voss Declaration, 9/10/15

10    David Dalton Declaration, 9/28/15

11    Paula Dalton Declaration, 9/28/15

12    Matt Long Declaration, 9/29/15

13    Scott Linker Declaration, 9/24/15

14    Excerpt – Cell Phone Tracking Evidence

15    Babineau letter regarding death authorization, 2/10/09

16    Portsmouth Jail Records, 2008

17    David Dombrowski progress notes

18    Lake Martin Community Hospital response

19    Hudgins time schedule with mark-ups ECF No. 165

20    Dr. Mirsky letter, 7/2/09

---

[1] Exhibit 1, ECF No. 478-1, is no longer relevant to Petitioner's claims, and as such is not attached to the instant Amended Motion Under § 2255 To Vacate, Set Aside or Correct a Sentence. However, to avoid confusion, the exhibit numbers remain as they were in Petitioner's initial § 2255 motion. ECF No. 478, pp. v-vi. Four additional exhibits have been added, Exhibits 37-39.

21      Mirsky & Hudgins emails, 7/22-23/09

22      Dr. Mirsky letter, 9/18/09

23      Army medical records

24      Runyon's handwritten letter regarding 1996 car accident

25      Suk Cha Runyon medical records

26      David Dombrowski declaration, 9/23/15

27      Mark Runyon declaration, 9/25/15

28      Maria Runyon declaration, 9/16/15

29      Dr. Dudley report, 9/29/15

30      Thomas Preston interview, 10/4/08

31      Robert Seeger declaration, 8/24/15

32      Deborah Seeger declaration, 8/24/15

33      Captain Harris Declaration, Fayetteville, GA police dept., 1/13/16

34      Scotty Fleming criminal history

35      Dr. Mirsky report, 8/28/15

36      Teresa Norris declaration, 9/29/15

37      *Racial Disparities* Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary

38      Cohen Bell Declaration

39      Declaration of Michele J. Brace

S-1     Filed under seal with Sealed Claim S2

vii

**JA389**

Petitioner, David Anthony Runyon, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rule 2 of the Rules Governing Section 2255 Proceedings ("2255 Rules"), requests that this Court vacate the criminal judgment entered against him, grant him a new trial and/or vacate, set aside, or correct the sentence imposed.[2]

**Preliminary Statement**

At the time of this filing, investigation of Runyon's claims for relief continues. Runyon has noted, *infra*, the claims which remain under investigation. Runyon's First Motion for Discovery remains pending. ECF No. 491.

To the extent any of Runyon's claims or subclaims might be perceived as inconsistent with each other, this is expressly permitted under Fed. R. Civ. P. 8(d)(2) and (d)(3). A court may not construe a statement in one claim or subclaim as an admission against another alternative or inconsistent claim or subclaim. *See Independent Enterprises Inc. v. Pittsburgh Water and Sewer Auth.*, 103 F.3d 1165, 1175 (3d Cir. 1997); *Rodriguez-Suris v. Montesinos*, 123 F.3d 10, 20-21 (1st Cir. 1997); 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* §1283. The rule against implicit admission applies regardless whether the party alleges inconsistent facts or inconsistent legal theories. *Id. See also Smith v. Cashland, Inc.*, 193 F.3d 1158, 1161 (10th Cir. 1999) (where plaintiff alleged in sexual harassment suit that she was wrongly fired, former employer could assert simultaneously in defense that (i) plaintiff was not fired, she resigned; and (ii) plaintiff was fired, but solely because of poor performance); *Peter Kiewit Sons' Co. v. Summit Construction Co.*, 422 F.2d 242, 271 (8th Cir. 1969) (plaintiff simultaneously may (i) assert that contract is valid and sue for breach; and (ii) repudiate agreement and seek recovery on quantum meruit claim).

---

[2] In accordance with Rule 2 of the Rules Governing Section 2255 Proceedings, Runyon sets forth the facts and claims entitling him to relief but does not provide full legal argument or citation.

1

**JA390**

**Factual Background**

Catherina (Cat) Voss, the wife of a Newport News naval officer, Cory Voss, and mother of two small children, used her husband's time at sea to engage in a series of affairs. The culmination of these was an intense extramarital affair with co-defendant Michael Draven. Wishing to be together, Voss and Draven hatched a plan to: (1) kill her husband when he returned to shore; (2) plan the killing in a manner so they would not be implicated; and, (3) use the proceeds of his Navy gratuity death benefit and life insurance, approximately $300,000, to bankroll their new "family." Setting the scheme in motion, Draven scoured the internet, soliciting, unsuccessfully, the assistance of people to commit a "murder for hire." Draven and Voss decided to make the killing look like a robbery and they scouted locations, deciding upon the ATM at the Langley Federal Credit Union (LFCU) in Newport News.

It was then that Draven met David Runyon. At 5 feet 3 inches tall, Runyon is a small, slim Asian-American man. His mother is Korean and his father is a white American. Runyon's face is asymmetrical due to paralysis on the right side. He has small marks over his face and head from the impact of shattered glass during a car accident. Runyon, an honorably-discharged Army veteran, had subsequently been unable to maintain gainful employment for reasons that are discussed below. Ultimately, he supported himself by participating in clinical drug trials. Draven, who had never really held down any job, met Runyon in March 2007, at one such drug trial when the two were placed in adjoining beds for a few weeks. According to the prosecution, Draven used this time to recruit Runyon to kill Cory Voss.

On April 20, 2007, Cat Voss opened an account at the Langley Federal Credit Union, depositing only the minimum amount of $5.00. No further funds were ever deposited.

On April 29, 2007, in Runyon's hometown of Morgantown, West Virginia, Runyon met with George Koski to purchase a Taurus .357 handgun. They engaged in leisurely conversation, and Runyon provided Koski with his full name and driver's license information. Runyon made a

2

**JA391**

transaction at an ATM in Morgantown. According to cell phone records, Runyon was still in West Virginia at 8:37 p.m.

Shortly before 11:30 p.m. that same day, Cat Voss asked her husband, who had by then returned home from sea, to drive to the LFCU and (notwithstanding the impossibility of the task) make a withdrawal. Cell phone records indicated he spoke with Cat Voss along the way and the ATM camera recorded his futile attempts at completing her request. Data from area cell towers indicated Draven was near the credit union at this time. The ATM camera recorded an unidentified person entering the passenger side of Cory Voss's truck and the two driving away from the ATM. A few minutes later, the ATM camera showed Cory Voss had returned to the ATM, made a second unsuccessful attempt at withdrawing money, and drove away. The next day, Cory Voss was found dead in his truck in a parking lot adjacent to the credit union. He had been shot five times.

The following day, Cat Voss collected a $100,000 Navy gratuity death benefit. In three months, Voss and Draven had spent it all.

Voss and Draven knew they were suspects in the crime and gave false statements to police. Throughout the remainder of 2007, law enforcement monitored multiple cell phones owned by Voss and used by her and Draven, as well as Voss's landline. Incoming and outgoing phone numbers, as well as conversations, were recorded. Officers spoke with Voss, Draven, their family, friends and acquaintances. Voss sought help from Navy personnel and even elected officials, to collect the life insurance proceeds. The life insurance company withheld the death pay-out because Voss was a suspect. Gov't Tr. Ex. 281, 281-011. Draven's parents counseled him about how to divert suspicion. They helped Draven remove his belongings from Voss's house to give a false appearance that Draven was not living there. Draven's mother falsely claimed he was at their house at the time of the crime and, later, that he delivered newspapers with her, an alibi rebutted by cell tower data.

3

**JA392**

On November 13, 2007, officers approached Runyon in West Virginia about the death of Cory Voss. Runyon voluntarily provided a sample for DNA testing. Runyon's DNA was not connected to the crime.

Voss and Draven learned their friends had been summoned before a grand jury. They encouraged their friends to lie about their intimate relationship. Tr. 994-99; 1009-12, 7/9/09.

On December 11, 2007, police searched the house where Runyon lived, his car, his storage unit, and a prior residence. The prosecutors later used at trial items found during those searches, including: phone numbers for Cat Voss and Michael Draven; a box of .357 magnum bullets with five missing bullets; notes mentioning the LFCU and a length of time consistent with travel to Virginia; and a *list* of items (but not the actual items) including: tarp, trash bag, Taser, Spyderco knife, contacts, watch cap, black hoody sweatshirt, black BDU pants, black jungle boots, black dress socks, gel shoe inserts, leather gloves. *United States v. Runyon*, 707 F.3d 475, 486 (2013); Tr. 1034-36, 1043-45, 7/9/09, Gov't Tr. Ex. 217, 217-001.

Also on December 11, 2007, Runyon was taken to the Morgantown Police Department and interrogated on video tape. Runyon denied involvement in the crime. He was arrested on state charges.

On December 13, 2007, into the early morning hours of December 14, 2007, police interrogated and arrested Michael Draven. At their request, Draven telephoned Voss and asked her to come to the police station. When Voss arrived, she was arrested and interrogated. Voss inculpated herself, said she did not know Runyon but once spoke to him by phone when Draven was incarcerated, and said she did not pay Runyon to kill her husband.

A federal indictment issued on February 13, 2008, charging Catherina Voss, her boyfriend, Michael Draven, and David Runyon with five counts: (1) conspiracy to commit murder for hire, 18 U.S.C. § 1958(a); (2) carjacking resulting in death, 18 U.S.C. § 2119 and 18 U.S.C. § 2; (3) bank robbery resulting in death, 18 U.S.C. § 2113(a) & (e) and 18 U.S.C. § 2; (4) conspiracy to commit robbery

4

**JA393**

affecting interstate commerce, 18 U.S.C. § 1951(a); and (5) murder with a firearm in relation to a crime of violence, 18 U.S.C. § 924(c)(1), (j) and 18 U.S.C. § 2. ECF No. 3.

On March 4, 2008, Lawrence H. Woodward, Jr. and Jon M. Babineau were appointed to represent Runyon.

Two months later, on May 5, 2008, defense counsel for Voss, Draven and Runyon went before the Department of Justice's authorization panel to determine whether any of them would be subject to the death penalty.

On July 17, 2008, the prosecution filed a death notice for Runyon and a notice that death would not be sought against Draven. ECF Nos. 67, 68. The next day, in exchange for a sentence of life in prison without parole, Voss pled guilty to all five counts in the indictment. ECF No. 69.

On February 13, 2009, Babineau was removed from Runyon's case due to a conflict of interest. Stephen Hudgins was then appointed to represent Runyon. ECF No. 161. Counsel Woodward moved for a continuance of the March 13, 2009 trial date, noting the appointment of new counsel and because the case involved "tens of thousands of documents and potentially more than 100 witnesses," new counsel needed time to review and analyze the material and meet with and discuss the case with Runyon. ECF No. 160. The trial date was re-scheduled to begin on May 4, 2009. ECF No. 162.

Counsel Hudgins moved for a further trial continuance and attached as exhibits schedules for himself and Woodward. ECF Nos. 164, 165. Counsel Woodward had a five-day medical malpractice trial, two appellate briefs and a two-week federal trial scheduled in the weeks leading up to and immediately following Runyon's May 4th trial date. Counsel Hudgins was newly appointed to the case and had a "full schedule" including a seven-day mortgage fraud case set to begin two weeks before Runyon's trial. ECF No. 165, p. 2. Runyon's trial was moved to June 30, 2009. ECF No. 171.

A month and a half before the new trial date, counsel requested more time to prepare for the trial. ECF No. 179. The Court did not move the start date for the guilt phase of the trial.

**JA394**

The guilt phase took place June 30-July 17, 2009.[3] Voir dire comprised the first two days. The overwhelming majority of evidence established Draven and Voss's illicit affair, their plans to kill Voss's husband, and the manner in which the $100,000 Navy gratuity death benefit was spent. The case against Runyon consisted of:

(a)  The fact that, from the end of February to March 14, 2007, Runyon and Draven were employed as test subjects for an experimental drug investigation and thereafter maintained periodic contact;

(b)  An un-recorded telephone call between Runyon and Voss on March 24, 2007, when Draven was in jail;

(c)  The fact that Runyon purchased a gun between noon and 2 p.m. on April 29th, the day of the crime, and made a 1:30 p.m. withdrawal from an ATM machine in West Virginia;

(d)  The fact that Runyon allegedly asked for $500 before the killing but about a month later he received a $275 Western Union money order from Draven's brother;

(e)  The fact that Runyon pawned a .357 handgun in September and November 2007;

(f)  Items seized from Runyon's house, car and storage unit;

(g)  Statements of Voss and Draven characterized as referencing Runyon;

(h)  Witness testimony that Runyon talked about killing a military member or an unidentified person for money.

*Runyon*, 707 F.3d at 485-86.

The trial court dismissed the bank robbery count. Tr. 1519, 7/15/09. The jury convicted Runyon of conspiracy to commit murder for hire, carjacking resulting in death, and murder with a firearm in relation to a crime of violence. Tr. 1714, 1721, 7/16/09; Tr. 1725, 1730, 7/17/09; ECF No. 245, and acquitted him of conspiracy to commit robbery. ECF No. 245.

---

[3] The trial commenced 15 months post-indictment; the average time between indictment and trial in a federal capital case is 31.8 months. McNally declaration, Ex. 3.

**JA395**

The eligibility hearing took place on July 22, 2009. The defense presented no evidence against the prosecution's arguments for death eligibility or against the statutory aggravating circumstances. *Runyon*, 707 F.3d at 485. After deliberating one hour, the jury found Runyon intentionally killed the victim. ECF No. 255. Two statutory aggravating circumstances were also found: (1) Runyon "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value;" and (2) he "committed the offense after substantial planning and premeditation to cause the death of a person." *Id.*, pp. 5-6.

The penalty phase took place August 19-27, 2009. The prosecution presented sixteen witnesses. *Runyon*, 707 F.3d at 487. The prosecution also played a videotape of law enforcement officers' interrogation of Runyon during which they referenced Runyon's race and religion. The court of appeals subsequently determined that "the video had no place at this sentencing proceeding," because "such references are legally irrelevant, [and] they violate a defendant's rights to due process and equal protection of the laws." *Runyon*, 707 F.3d at 493-94.

Deliberations began the afternoon of August 26th. During deliberations the jury inquired as follows: "We are seeing a conflict between Jury Instruction No. 26 and the paragraph on the recommendation page. If we are not unanimous on the death penalty, do we have to be unanimous on the other choices?" Tr. 2707, 8/7/09. After a total of eight hours, the jurors returned a split-sentencing verdict: two death sentences and a sentence of life without the possibility of release. ECF No. 291. The jury found the prosecution proved four non-statutory aggravators, that Runyon: "caused injury, harm, and loss to the victim, Cory Allen Voss, and the victim's family and friends"; "utilized education, training, and experience that he received in college courses focused on criminal justice, and as a law enforcement and correctional officer, as an officer of the Kansas National Guard, and as a member of the United States Army"; "engaged in acts of physical abuse toward women"; and, "demonstrated a lack of remorse[.]" *Runyon*, 707 F.3d at 487.

**JA396**

The jurors found two statutory mitigating circumstances and eight of twelve non-statutory mitigators proposed by defense counsel: (1) no serious criminal record; (2) other persons equally culpable will not be punished by death; (3) if not sentenced to death, Runyon will serve a life sentence without the possibility of release; (4) & (5) Runyon's son and mother will suffer emotional harm if Runyon is executed; (6) Runyon served his country in the Army and was honorably discharged; (7) Runyon graduated high school, earned an associate's degree and took college courses to expand his education; (8) Runyon worked all his life; (9) Runyon committed acts of kindness and generosity for his neighbors and community; (10) Runyon grew up, witnessed, and experienced domestic violence and parental conflict until his mother and biological father separated.

The jurors also found the following mitigators of their own accord: (1) Runyon continued to witness and experience domestic violence and parental conflict /abuse from his mother and adoptive father; (2) Runyon's brother will suffer emotional harm if Runyon is executed; (3) Runyon was given the impression that the victim was molesting his own daughter.

As demonstrated below, the convictions and sentences were imposed in violation of the constitution or laws of the United States.

**Procedural History**

Runyon is in federal custody, housed on death row at USP Terre Haute. A jury convicted him, in the United States District Court for the Eastern District of Virginia at Newport News, of conspiracy to commit murder for hire, carjacking resulting in death, and murder with a firearm in relation to a crime of violence. Runyon received two death sentences and one sentence of life imprisonment without the possibility of release.

Judgment was entered on December 4, 2009. A notice of appeal was timely filed on the same day. ECF No. 312.

8

**JA397**

On appeal to the Fourth Circuit, in case number 09-11, Runyon was represented by Teresa

Norris and Seth Farber. The following issues were raised:

(i)     A series of erroneous rulings and improper prosecution arguments licensed jurors to hold against Runyon his invocation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to trial;

(ii)    The district court erroneously permitted the government to rely on improper and prejudicial non-statutory aggravating factors;

(iii)   The government advanced arguments that improperly appealed to jurors' emotions, invited speculation, and presented an incorrect, distorted picture of the jury's role;

(iv)    The district court committed a series of errors in substituting alternate jurors;

(v)     The district court erroneously failed to instruct the jury that it could only impose a death sentence if it found the aggravating factors outweigh the mitigating factors beyond a reasonable doubt;

(vi)    Because Runyon's sentencing hearing was fundamentally flawed and influenced by passion, prejudice, and arbitrary factors, his death sentence must be reversed under the cumulative error doctrine and 18 U.S.C. § 3595;

(vii)   The death penalty is unconstitutional;

(viii)  The murder-for-hire and the carjacking statutes exceed Congress' power under the Commerce Clause and violate the Tenth Amendment;

(ix)    In the alternative, because there was no evidence that Runyon traveled in interstate commerce, the Court should have granted Runyon's motion for acquittal on murder-for-hire;

(x)     Runyon's conviction for using and carrying a firearm during and in relation to a crime of violence must be vacated because he is not guilty of any of the predicate offenses.

The court of appeals affirmed. It found that four errors but determined each was harmless:

(1)     The Court's replacement of a juror for the eligibility phase violated due process because it occurred outside the presence of defense counsel. *Runyon*, 707 F.3d at 516-18. The court applied a plain error standard instead of a harmless error standard because defense counsel failed to object. The plain error standard was not met because the replacement juror was selected in voir dire when all parties were present, and because defense counsel's failure to object and request a continuance indicated the substitution was not prejudicial.

(2)     The jurors' consideration of a 42-minute video interrogation of Runyon in the penalty phase was error because exclusion of the entire video was warranted. *Runyon*, 707 F.3d

**JA398**

at 493-96. The video contained statements capable of inflaming juror's racial, ethnic, or religious prejudices and served to "degrade the administration of justice[,]" *Id.* at 494 (quoting *Battle v. United States*, 209 U.S. 36, 39 (1908)). The video was legally irrelevant, and violated Runyon's rights to due process, equal protection of the laws, and the First Amendment right to freedom of religious beliefs. The references to Runyon's race and religion came directly from the mouths of law enforcement, directly referred to Runyon, were irrelevant, stereotypical and insulting. The court found the error was harmless based on jury instructions, the fact that the jurors nevertheless would have found the lack-of-remorse aggravator because defense counsel never argued against it, and the jurors' finding of the equally-culpable-codefendants mitigator.

(3)     The prosecution presented improper argument regarding: (a) Runyon's exercise of his Sixth Amendment right to a trial by jury, and (b) Runyon's exercise of his Fifth Amendment right against self-incrimination. *Runyon*, 707 F.3d at 507-10. The harmless error finding was based on defense counsel's failure to object, the lack-of-remorse aggravator established by other evidence, and the jurors' finding of the equally-culpable-codefendants mitigator.

(4)     The prosecution presented improper argument when it exhorted the jury to "do your duty" and to "send a message to the community" with the verdict. *Runyon*, 707 F.3d at 514-15. The determination that the error was harmless was based on the fact that the comments were isolated, did not mislead or inflame the jury, and jury instructions minimized the risk of harm.

Runyon filed a petition for writ of certiorari on August 21, 2013. The questions presented were:

(1) Whether, in order to demonstrate that evidentiary errors in a capital sentencing proceeding were harmless, the government must establish that the errors did not affect the verdict of the jury that actually heard the case or whether the government may instead meet its burden by demonstrating that such errors would not have affected a hypothetical, reasonable jury; and

(2) Whether, under the cumulative error doctrine, a reviewing court must reverse if the government cannot establish that preserved errors are harmless beyond a reasonable doubt, or is reversal required only if the errors "so fatally infect[ed] the trial that they violated the trial's fundamental fairness."

After granting the United States eleven extensions, the Supreme Court denied certiorari on October 6, 2014. *United States v. Runyon*, No. 13-254, 135 S.Ct. 46 (2014) (Mem.).

Runyon timely filed an initial motion under 28 U.S.C. § 2255 on October 5, 2015. This pleading is an amended petition as a matter of course under Fed. R. Civ. P. 15(a).

10

**JA399**

<u>**Claims for Relief**</u>

The claims and allegations set forth in all sections of this Amended §2255 Motion are realleged and incorporated by reference in all other sections and claims.

**Claim 1:      The Participation Of Two Dishonest Law Enforcement Officers Tainted Runyon's Trial.**

There were two "dirty cops" involved in this case, each to Runyon's detriment. These former law enforcement agents engaged in multiple criminal acts involving dishonesty before and/or during their involvement in Runyon's case. Because of the pervasive dishonesty of these individuals, neither the Court nor the parties can have confidence that their work product with respect to Runyon's case was truthful, accurate, and complete. The presence of these individuals denied Runyon his right to a fair trial in violation of due process. *Berger v. United States*, 295 U.S. 78 (1935). To the extent trial counsel knew information about these individuals and failed to take action, trial counsel was ineffective. *Strickland v. Washington*, 466 U.S. 668 (1984).

**A.      The United States Failed To Timely Disclose The Participation Of Two "Dirty Cops," Which Tainted Runyon's Trial.**

**1.      Robert Glenn Ford**

The first "dirty cop" was Robert Glenn Ford, a homicide detective with the Norfolk Police Department who retired from public service in 2007—just short of thirty years with the Department. Ford went into practice as a private investigator. Three weeks before this Court appointed Ford to assist Runyon's defense counsel as an investigator, this Court issued a warrant for the arrest of Ford's long-time confidential informant, Marcus Adams, on charges of being a felon in possession of a firearm. Adams entered into a plea agreement, and as part of the cooperation component he was debriefed on November 7, 2008. During that interview, he:

> divulged a scheme in which he acted as the go-between for former homicide detective Robert Glenn Ford, who accepted bribes from criminal defendants in exchange for making false representations to prosecutors and judges that the defendants had assisted him in homicide investigations. As a result of these false statements, the

11

**JA400**

> defendants received reduced sentences or dismissal of their charges. Adams provided intricate details of the scheme, including the names of the defendants, approximate dates and amounts of the bribes. Subsequent investigation by the Federal Bureau of Investigation corroborated the information provided by Adams.

*United States v. Adams,* No. 2:08-cr-103 (E.D. Va.), ECF No. 37, pp. 2-3.

Ford could not employ an identical scheme after he left the police force, but as a private investigator he could have set up a similar scheme to use selectively. If Ford unearthed a potential defense witness and then learned, for example, that the witness wanted to avoid becoming embroiled in the case, Ford was in a position (for compensation) to file a null report stating that the witness could not be found. Or he could file a false report stating that he located the witness, but that person was antagonistic to the client and had no information of value. Ford would get his bribe, the witness would avoid being called for trial, and the attorney who retained Ford (as well as any other investigator who might be working with the attorney) would be none the wiser. The trial would be tainted, but in ways that could not be cured by cross-examination.

On April 15, 2008, this Court authorized Ford's work on Runyon's case. ECF No. 41 (sealed order). Ford investigated and interviewed witnesses, and provided reports to defense counsel, while the United States investigated Ford and mustered evidence to prosecute him for taking bribes and making false statements in his reports to prosecutors and judges during his tenure as a police officer. Shortly after this Court entered judgment against Runyon, the United States charged Ford with making false statements, conspiracy, and multiple counts of extortion.

Runyon's trial counsel relied on Ford to conduct an honest investigation and to produce reports that were reliable. The United States did not inform Runyon's counsel that it had evidence indicating that Ford extorted bribes from witnesses in connection with his prior investigations and submitted reports to prosecutors and judges that contained false statements. It should have disclosed the kind of information contained in the instant claim, including the fact that there was evidence indicating that Ford had engaged in a pattern of criminal conduct involving dishonesty in his prior

12

**JA401**

investigations.[4] This information would have been sufficient for any reasonable defense counsel to question whether they could have confidence in the reliability of Ford's investigations and reports. If the United States had disclosed this information, any reasonable attorney would have recognized the risk that Ford's investigations and reports in Runyon's case might be materially unreliable, would have asked this Court to substitute a different investigator, and would have moved the Court to continue Runyon's case to ensure an untainted reinvestigation. Alternatively, the United States might have informed the Court (rather than defense counsel) that there was evidence of Ford's pattern of criminal conduct involving dishonesty, and the Court could have worked with Runyon's counsel to substitute a different fact investigator and to continue Runyon's case to ensure an untainted investigation.

The government's obligation to promptly notify Runyon that it had evidence of criminal conduct by the defendant's court-appointed investigator was grounded on two different constitutional provisions. First, it was based on Fifth Amendment due process principles concerning the fundamental fairness of trials. *Berger v. United States*, 295 U.S. 78 (1935); *see also United States v. Agurs*, 427 U.S. 97, 110-11 (1976) (although government attorney must prosecute with "earnestness and vigor," he must also "be faithful to his client's overriding interest that 'justice shall be done.'"). As a result of its investigation of Ford, the United States knew or should have known that Runyon was unwittingly using an investigator who had committed criminal acts of dishonesty and who lied in reports to prosecutors and judges. The United States also knew or should have known that if Ford similarly accepted bribes or made false statements to Runyon's counsel, the defense would have been given inaccurate information about the relevant facts, thus depriving Runyon of a fair trial.

---

[4] Runyon recognizes that the investigation of Ford's prior misconduct was highly confidential. We are confident that in the interests of justice, an arrangement could have been devised that would protect the interests of the United States but also would protect the interests of the man who would be going on trial for his life.

13

**JA402**

Second, the government's obligation was based on the Sixth Amendment right to counsel. Although an attorney's own acts or omissions are the most common causes of ineffective assistance under the Sixth Amendment, the acts or omissions of others also can render counsel's representation ineffective. In *Williams v. Martin*, 618 F.2d 1021, 1027 (4th Cir. 1980), for example, the court of appeals held that the trial court's refusal to provide a necessary expert deprived the defendant of the effective assistance of counsel. *See also Strickland*, 466 U.S. at 686 (stating that "[g]overnment violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense[,]" and citing examples).[5] Moreover, if counsel did have information about Ford, trial counsel's failure to take appropriate action was deficient performance. *Strickland*, 466 U.S. at 687.

Because of the government's failure to timely disclose information that was uniquely in its possession, Runyon was completely in the dark and lacked the ability to take any preventative or corrective steps while his case was still in the district court.[6]

### 2. Clifford Dean Posey

The second "dirty cop" was Clifford Dean Posey, a Special Agent of the Bureau of Alcohol, Tobacco, and Firearms. Posey was one of the government agents investigating Cory Voss' death and

---

[5] When the prosecution is aware that defense counsel has a conflict of interest, it has a duty to bring that conflict to the court's attention. *United States v. Tatum*, 943 F.2d 370, 379-80 (4th Cir. 1991). By the same reasoning, when the prosecution is aware that the defendant's court-appointed investigator has engaged in criminal acts involving dishonesty that might render the investigator's work product untrustworthy, it has an analogous duty to bring that fact to the attention of defense counsel or the court. In both cases, the prosecution's duty derives from *Berger*, 295 U.S. at 88, which famously pronounces that "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."

[6] Runyon's mitigation investigator was unaware of the federal investigation into Ford's bribes, dishonesty, and false statements. However, she was aware of Ford being under pressure because of media coverage into his involvement in coercing confessions from two defendants in the "Norfolk Four" case. Cronin declaration, Ex. 4.

14

**JA403**

developing evidence for prosecution. He worked behind the scenes and did not testify at trial. As a result, the United States knows the scope and nature of Posey's assignments on this matter, but that information can only be known by Runyon's collateral counsel through discovery. Posey's name appears on Government trial exhibit 181 as the transcriber of a recorded telephone call. Gov't Tr. Ex. 181, 181B-002. It appears equally briefly on a few unadmitted documents that the United States provided to trial counsel. Runyon believes, but cannot confirm without discovery, that Posey played a substantial role in investigating and preparing the evidence in this matter.

Court records suggest the government was aware of Posey's misconduct, at the latest, on October 12-13, 2010. *United States v. Posey,* No. 3:11-cr-94, (E.D. Va.), ECF No. 14, p. 5. At that time, Runyon's case was on direct appeal. After investigation, the United States brought charges against Posey in Richmond on April 5, 2011. The record shows that starting no later than 2007 (the year of Cory Voss' death), Posey engaged in criminal acts involving dishonesty over a period of three to four years. While working for ATF, he falsified documents relating to firearms in order to embezzle and convert them to his own use. He sold cigarettes that were intended for use in undercover tobacco investigations, and he again submitted false reports to hide his illegal conduct. He engaged in wire fraud using a fake ID, and he made unauthorized charges to his undercover credit card to buy items for personal use. *Id.*

At the same time, Posey was involved in matters related to the death of Cory Voss. In that capacity he may also have engaged in acts of dishonesty. For example, he may have converted firearms or ammunition that was confiscated from Runyon. He may have falsified the transcriptions of recorded conversations and otherwise altered or fabricated evidence. The United States knew or should have known that the work Posey performed in relation to the prosecution of David Runyon might therefore be compromised and unreliable.

15

**JA404**

Posey entered into a plea agreement days after his arrest, and judgment was entered against him on September 21, 2011. *Id.*, ECF No. 38. At that time, Runyon's case was still on direct appeal and he was represented by court-appointed lawyers from South Carolina and New York. Throughout the entire investigation and prosecution of Posey, the Government did not disclose to Runyon's counsel the fact that Posey was being investigated for, nor the fact that he was arrested for, nor the fact that he was convicted of, crimes involving dishonesty.

On information and belief, Posey's participation in the preparation and prosecution of this case resulted in the government's presentation of materially false or unreliable evidence against Runyon. *Brady v. Maryland*, 373 U.S. 83 (1963). Alternatively, if trial counsel knew of Posey's improper conduct, trial counsel was ineffective for failing to investigate and present evidence of the same and Runyon was prejudiced. In either case, Runyon's ability to show materiality or prejudice is dependent on the discovery he has requested.

**Claim 2: The Prosecution Failed To Disclose Impeaching And Exculpatory Evidence In Violation Of The Fifth, Sixth, And Eighth Amendments, United States Constitution.**

The government possessed, but did not disclose, evidence of co-Defendant Draven's violent criminal conduct in the past and as recent as one year before the instant crime that would have added substantial weight to the "equally-culpable-codefendant" mitigator found by the jury and would have altered the sentencing balance. Draven's history of violence against women and children would have also reduced the weight of the "abuse of women" aggravator asserted against Runyon.

Soon after Draven was indicted, the government provided Draven's trial counsel with thousands of pages of documents demonstrating:

- Draven has an extensive juvenile history of violent criminal conduct, including, but not limited to, the sexual assault of numerous children;
- Draven had been placed in a residential facility for child sexual assault;
- Draven had been diagnosed as having conduct disorder, undifferentiated type, a precursor to anti-social personality disorder;

16

**JA405**

- Draven had been diagnosed with Pedophilia.

Such evidence could not have been more important to Runyon's case in mitigation. The "centerpiece" to counsel's case in mitigation was that he was no more culpable than Draven and Voss, both of whom the government deemed unworthy of the punishment of death. *Runyon*, 707 F.3d at 508. "Runyon's counsel had gone to great lengths to demonstrate that the three defendants, despite all being integrally involved in the murder, had received differential treatment, with the government pursuing the death penalty against Runyon but not against Cat or Draven." *Id.* Counsel had specifically requested that his sentencing jury be instructed that it could consider as mitigation that Runyon was no more culpable than the architects of Cory Voss' murder. Much of the evidence trial counsel presented went to the very argument "that Runyon did not deserve death if neither Cat nor Draven was subject to that sentence." *Id.*

Similarly, much of the evidence presented by the government to rebut Runyon's mitigation case focused on Runyon's history of violent conduct. The government pointed to his assaults on various women, going so far as to play a video of what it described as his manipulation of a helpless female victim. Tr. 2611, 8/26/09. Runyon's sentencing jury found that the government had proved the non-statutory aggravating factor of "abuse of women" beyond a reasonable doubt. The weight the jurors assigned to that aggravator would have been reduced had they known that codefendant Draven "sexually assaulted/abused/stalked or otherwise assaulted a number of individuals, including his younger brother and sister." ECF No. 301, p. 5. As the government argued in support of Draven's sentencing, "Certainly a history of violence and sexual assault by a defendant who has been convicted of a conspiracy to commit murder is relevant to the imposition of punishment." *Id.*

Evidence not disclosed to Runyon's counsel includes "sworn testimony" and "source documents" on Draven's violent and deviant and/or predatory sexual proclivities. *Id.*, p. 6. It demonstrates that Runyon's history of violence against women paled in comparison to that of Draven,

17

**JA406**

the man the government deemed unworthy of death. The prosecution urged the death penalty for Runyon based on one misdemeanor conviction for grabbing his wife's arm and poking her nose, one dismissed misdemeanor assault charge, and one unadjudicated act of misdemeanor assault. *See Runyon*, 707 F.3d at 504. Draven's criminal past was far more violent than Runyon's and Draven's victims far more helpless. Draven did not merely grab or poke his victims, he raped them. Under the name "Anthony James Neff," a.k.a, "Andy," Draven sexually abused a developmentally-delayed 15-year-old girl and at least six children under the age of seven. Draven's victims were not merely vulnerable and physically smaller, they were little children; children who were near the age of the Voss children, the children who, under his plan to murder Cory Voss, would have been permanently placed at Draven's fingertips. This information could have transformed the "equally-culpable" mitigating circumstance into a "greater culpability" mitigator if for no other reason than Draven's motive for the crime was to have Voss and her small children to himself.

Using the name "Anthony Exum," Draven stole jewelry from a residence. In response to police questioning he denied any juvenile record. He abused, threatened to kill, stalked, and assaulted these individuals. Under the name "Anthony James Neff," Draven threatened to kill a former girlfriend with a car bomb, threatened to break a man's neck.

Less than one year before the instant crime, Michael Draven beat his girlfriend, slapped her with a knife on her legs and arms and poked the knife at her vagina. She reported that he had previously broken her finger and threatened to kill her and her family members.

> He has stated he will call his uncle Carl and have my whole family killed, burnt to death and he will do me last so then I will truly be alone. He has put a flame on a match + lighter to my skin, arms, face, and hair. He has slapped me in the face, kicked me in the side, held my neck so I could not breathe, held a pillow over my head on multiple occassions [sic]. … He has scratched me with a knife and put it into my body many times. … He said he would cut my head off so I could [see] the insides of my body and pour toxic fluid down it and light a flame so I/you can see my insides shrivel. He said he would hire someone to rape my mother and father. He said he would hire a hit man or himself and put a frozen ice pick up my sister []'s vagina so she could not have children anymore. He has threatened to kill me and cut

18

**JA407**

my body up in pieces so no one could ever find it and then he would run away so no one could find him. … He means well but he is a dangerous person to all who cross him or pass him. He has major anger managment [sic] problems and has been physically abusive to other women in the past. He is dangerous to all human beings alike and can go off at any moment.

Draven's background was a relevant comparison for whether Runyon should be sentenced to death. In its arguments for the death penalty, the prosecution compared Runyon to his two co-defendants and attempted to explain its charging decisions while omitting Draven's history of violence. *Runyon*, 707 F.3d at 507-08, 511-12. At Draven's separate sentencing hearing, the prosecutors asserted Draven's violent history was relevant to a life sentence. ECF No. 301, p.5. They had pre-determined that Draven's violent past did not merit a death sentence. Runyon's counsel could have presented to the jurors the withheld evidence to demonstrate that the prosecution did not seek death against Draven despite his substantial history of violence but sought death for Runyon whose incidents of violence were comparatively minor.

The prosecution introduced against Runyon victim testimony, incident reports, and a protective order application, *see, e.g.,* Gov't Ex. 311, 313, 315, 316, and Runyon could have done the same regarding Draven's violent criminal history had the information been disclosed. This withheld evidence would have substantially strengthened counsel's argument that because the prosecution did not seek death for Draven, Runyon likewise did not deserve death.

Though exculpatory, none of this evidence was provided to Runyon's counsel. The government's failure to provide such evidence thus violated the Fifth, Sixth, and Eighth Amendments, and *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Kyles v. Whitley*, 514 U.S. 419 (1995). When the prosecution withholds from a criminal defendant evidence that is material to his guilt or punishment, it violates his right to due process of law. *Brady*, 373 U.S. at 87. Had Runyon's sentencing jury known that Draven—whom the government decided did not deserve death—had a far more violent past of severely abusing, not only his girlfriends, but the most-

19

**JA408**

vulnerable victims (children and impaired persons) and he carried with him the specter of a far more violent future, there is a reasonable probability that one or more jurors would have refused to sentence Runyon to death. *Cone v. Bell*, 556 U.S. 449, 452 (2009) (vacating death sentence because withheld evidence would have altered "at least one juror's assessment" of appropriate penalty). The evidence the government withheld was therefore material. Accordingly, Runyon is entitled to relief.[7]

This claim is specifically alleged as to all phases of Runyon's trial, including pretrial, guilt, eligibility and selection phases, and there is a reasonable probability that had this evidence been disclosed, Runyon would not have been authorized for death and/or sentenced to death.

To the extent that counsel failed to investigate and present the information about Draven, despite the evidence being withheld by the prosecution, they were ineffective because the information supported the defense.[8] *See* Claims 4 & 6. To the extent that Draven's prurient interest in children motivated the planning of the crime it relates to Claim 4 where Runyon has alleged that counsel failed to advocate for Runyon at the eligibility phase by not presenting evidence and argument removing or reducing the weight of the "substantial planning" statutory aggravating circumstance. Moreover, Draven's history of abusing and terrorizing children, women and men relates to Claim 6 where Runyon has alleged that counsel failed to investigate and present evidence to counter the aggravating circumstances with facts reducing the weight of the aggravators (such as the "substantial planning" and "abuse of women" aggravators) and evidence to substantiate

---

[7] Investigation regarding the government's failure to provide exculpatory information is ongoing and supplemental information will be provided when available.

[8] An alert attorney would have taken notice during trial of the following exchange and investigated further: Randy Fitchett, co-defendant Draven's brother, testified that although his name was listed as the sender he did not send the June 1, 2007 money order made out to Runyon for $275. To challenge Fitchett's credibility, co-defendant Draven's attorney cross-examined Fitchett about the siblings' contentious history. Fitchett accused Draven of raping him and their sister. Tr. 811, 7/8/09. The prosecution objected and Draven's attorney asked no further details about the event. Tr. 812. In response to questioning, Fitchett admitted that Draven denied the rape accusation. Tr. 813.

**JA409**

mitigating circumstances (such as the "equally culpable-codefendant" and "molestation of Voss's daughter") mitigators. Finally, after the Government filed a position on Draven's sentencing which revealed some of Draven's violent history, ECF No. 301, counsel were ineffective for failing to file a motion to set aside Runyon's death sentence or for a new sentencing trial.

**Claim 3:** **Counsel Rendered Ineffective Assistance At The Guilt Phase Of Trial By Failing To Investigate, Present, Highlight, And/Or Argue Evidence Of Innocence.**

David Runyon adamantly asserted his innocence. Hudgins declaration, ¶3, Ex. 5; Woodward declaration, ¶3, Ex. 6. The defense counsel with primary responsibility for guilt-phase preparations was Lawrence Woodward. ECF No. 179 p. 10; Hudgins declaration, ¶1, Ex. 5; Woodward declaration, ¶2, Ex. 6. There was no direct evidence of Runyon's participation. Most of the evidence presented by the prosecution involved the co-defendants, Michael Draven and Cat Voss. Woodward declaration, ¶9, Ex. 6. The guilt-phase theory of the case was reasonable doubt. *Id.* This involved portraying the co-defendants as bad actors and creating doubt regarding David Runyon being the person who shot Cory Voss. *Id.* Trial counsel, however, was ineffective for failing to investigate, present, emphasize, and/or argue evidence that created reasonable doubt or supported Runyon's innocence. *Strickland v. Washington*, 466 U.S. 668 (1984). Such evidence consists of witness testimony, inconsistent and/or irrelevant facts, and unreliable forensic testimony.

**A.** **Chad Costa**

Cory Voss was shot five times. Gov't Tr. Ex. 18, 018-002, Autopsy report pp. 1-2.[9] The prosecution argued that Runyon owned a five-shot handgun and emptied the gun on Cory Voss. Tr.

---

[9] Defense counsel failed to emphasize how the random spray of five gunshots were inconsistent with the prosecution's argument—in support of guilt and a non-statutory aggravator—that Runyon utilized special skills as an expert marksman and training to avoid leaving behind evidence. Tr. 1593, 1595, 1611, 8/19/09. Nor did counsel counter the prosecution's penalty phase closing argument that Runyon's specialized training taught him to aim for "center mass" because that was the most deadly target. Tr. 2611-12, 8/26/09. In fact, soldiers and law enforcement are taught to

21

1593, 1595, 1611-12, 7/16/09. Since defense counsel did not present any witnesses who had known Runyon during the "years" that preceded the murder and Runyon's arrest, the prosecution urged the jury to conclude that there was no evidence about the man who was on trial; except, of course, that he was a cold, calculated killer. Tr. 2610, 8/26/09. In fact, the prosecution elicited testimony that Runyon told people he was a hit man.

Chad Costa met David Runyon in the second half of 2007. Costa declaration, p. 1, Ex. 7. They took approximately three trips to New Jersey to work in drug studies and had a lot of time to talk during the seven-hour drives. *Id.* Costa learned that Runyon was in the Army and had been a police officer for a while, but Runyon didn't like the politics. *Id.* Costa knew Runyon liked to brag and make-up things to impress women so he'd have a chance with them. Costa declaration, p. 1, Ex. 7. Runyon wanted people to think he was a "thug" and bought a hoodie, baggy pants and boots to look like a "thug," but he was so small and thin that he just didn't look the part. *Id.* An example of one of Runyon's boasts was a story about road rage. *Id.* A truck driver cut Runyon off and Runyon was able to pull alongside the driver and have him park alongside the road. *Id.* The driver exited his truck with a crowbar. *Id.* They fought, Runyon took the crowbar from the driver, and was going to kill him but his friends pulled him away from the man. *Id.* Costa didn't believe this story because it appeared to him that Runyon couldn't harm anyone.[10] *Id.* Throughout those long car rides, Runyon never told Costa that he had killed anyone. *Id.*

---

shoot at "center mass" because it is the biggest, not the deadliest, target. Counsel's deficient performance with respect to the ballistics evidence is further discussed below.

[10] Consistent with Costa's assessment of Runyon, Runyon's brother Mark has stated that David was "soft" and "tried to gain acceptance from people. He had little self-worth and tried to impress people in order to feel good about himself. David would act as if he was tough and aggressive but in reality, David was very passive. I felt like this put David in unhealthy situations and I wanted to protect him." Mark Runyon declaration, p. 4, Ex. 27.

22

**JA411**

Costa had seen Runyon with a black, six-shot revolver.[11] *Id.* Costa was certain it held six bullets. *Id.* Two detectives who questioned Costa about Runyon said the gun Costa described was definitely the murder weapon and they wanted to find it. *Id.*

The detectives also told Costa that Runyon had never been a police officer (which was not true). Costa declaration, p. 2, Ex. 7. Costa didn't know anything about the murder and the detectives told him a lot of information about the crime over the course of two hours. *Id.* Costa "learned" that Runyon met a man named Michael Draven at a drug study who, along with his girlfriend Catherina Voss, hired Runyon to commit murder for $250,000. *Id.* The detectives convinced Costa that Runyon committed the murder and they had the evidence they needed for a conviction. *Id.* This influenced Costa's testimony in front of the grand jury and caused him to agree with the prosecutor that Runyon could have committed this crime. *Id.* When Costa said anything positive about Runyon in front of the grand jury the prosecutor gave him a dirty look and changed the subject. *Id.*

Defense counsel had Chad Costa flown-in for the trial but never called him as a witness.[12] ECF No. 220, p. 2; ECF No. 256, p. 2. This failure was prejudicial. Costa's testimony could have created doubt about whether Runyon's handgun was the murder weapon. Costa knew the police were convinced that Runyon's six-shot revolver was the murder weapon which is inconsistent with the victim being shot only five times after the perpetrator emptied the gun. Tr. 1593, 1595, 1611-12, 7/16/09. Costa's testimony that Runyon's handgun held six bullets may have created reasonable doubt about it as the murder. The number and type of bullets is also important because Agent Banks testified Runyon owned a box of .357 ammunition that contained 35 live rounds, ten spent casings, and "five

---

[11] The fact that Runyon's gun was black or was "blued" is undisputed. Counsel failed to point out that the ATM photo, Gov't Tr. Ex.28W, showing a "shine" off the perpetrator's gun, contradicted Runyon's guilt because a "blued" gun reduces glare from light.

[12] Counsel does not remember why witnesses who were subpoenaed and who were present did not testify. Hudgins declaration, ¶9, Ex. 5.

missing bullets." Tr. 1044, 7/9/09. Counsel failed to object to the relevance of this evidence and testimony, including the five missing .357 bullets when the victim was shot with .38 caliber bullets. He also failed to object to the scientific validity of the ballistics testimony. The admission of such unreliable expert testimony tainted the integrity of the trial process and denied Runyon a just and fair trial. *Napue v. Illinois*, 360 U.S. at 271; *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974).

Costa's testimony could have undermined witness testimony that Runyon admitted to killing someone. Costa never witnessed Runyon admit to a killing but he did witness Runyon's attempts to appear like someone he wasn't and Costa heard Runyon brag about being a tough guy. Moreover, Costa was important because the police provided him details of the crime and influenced Costa's opinion about Runyon's involvement which, in turn, influenced Costa's grand jury testimony. This would have supported the contention that police coerced Sarah Baker to testify that Runyon said he killed someone.[13] In fact, Baker alleged the police threatened to permanently separate her from her children if she did not testify against Runyon. Tr. 1146, 7/13/09. Costa could have provided corroboration of Baker's allegation and the jurors could have discounted her testimony altogether. In response to the prosecution's presentation of evidence that Runyon described himself as a "hit man," Costa knew about Runyon's braggadocios nature. This could have provided an alternate explanation for why Runyon would describe himself in that manner. Thus, Costa's testimony would have been consistent with the reasonable doubt defense: Costa's description of Runyon's gun was inconsistent with the murder weapon; his knowledge of Runyon would have added a different interpretation to the prosecution's version of the case; and this could have created reasonable doubt in the mind of at least one juror. Trial counsel was prejudicially ineffective for failing to present Costa's testimony. *Strickland*

---

[13] Investigation regarding Sarah Baker is ongoing and supplemental information will be provided when available.

24

**JA413**

*v. Washington*, 466 U.S. 668 (1984); *see, e.g., Mosley v. Butler*, 762 F.3d 579 (7th Cir. 2014) (counsel ineffective for failing to call witnesses who would have rebutted State's theory of guilt).

### B.    Cat Voss

The prosecution entered into evidence statements and electronic communications of Cat Voss that were not subject to cross-examination. Although her plea agreement required her to testify, ECF No. 69, p. 7, the prosecution did not call her as a witness. Defense counsel also did not call Voss as a witness.[14] The prosecutors told Counsel Woodward that Voss would testify that she hired Runyon and that he and Michael Draven were lying in wait for Cory Voss. Woodward declaration, ¶11, Ex. 6.

In fact, Voss *did not have any personal or independent knowledge* that Runyon was the person who shot Cory Voss. Cat Voss declaration, ¶¶5, 11, 19, Ex. 9. Voss suspects that Draven killed Cory. *Id.*, ¶¶16, 24. When she was speaking with Draven on the telephone just minutes before Cory was killed, Cat did not hear Runyon in the background and suspects that Runyon was not with Draven. *Id.*, ¶16. Furthermore, Draven had been prepared to kill Cory himself.[15] One day when Cory was home, Draven called Cat Voss and said he wanted to come over and kill Cory. *Id.*, ¶24. Cat Voss told him no because her children were also at home.[16] *Id.*

---

[14] Counsel rendered ineffective assistance when they introduced Voss's statement of facts at the penalty phase. It contained prejudicial statements that had not previously been introduced by the prosecution.

[15] Cat Voss identified the handwriting on the map found in Runyon's car as Draven's handwriting. Voss declaration ¶17, Ex. 9. Counsel contemplated a theory that Draven made Runyon the "fall guy." The jurors could have had a reasonable doubt on this basis given Draven's writing on the map, Runyon's eagerness to please other people, *see, e.g.,* Cunningham declaration, p. 37, Ex. 8, and the fact Draven could have accessed Runyon's car when they were housed together for a three-week drug study just prior to the crime.

[16] Investigation of this matter is ongoing and supplemental information will be provided when available.

25

**JA414**

An expression of doubt as to whether Runyon was the triggerman -- from the co-defendant who was crucial to executing the murder plan -- would have raised a reasonable doubt for the jury. Accordingly, counsel's failure to speak with Cat Voss and present her as a witness was prejudicial.

### C.  Scott Linker

Scott Linker, David Runyon's former brother-in-law, describes Runyon as "passive not aggressive." Linker declaration, p. 1, Ex. 13. Had he been asked, Linker would have testified as follows:

> David loved guns. He was a gun enthusiast but not a "gun nut." David was very knowledgeable about guns and he was a responsible gun owner. David respected the power of a gun and did not take it lightly.
>
> David collected and traded guns like some people do baseball cards. It is what he knew and loved. It was common for David to buy a gun, turn around, and sell it quickly. I remember David bought a Taurus, Raging Bull revolver. He sold it to me two days later because he did not like the way it fired. David did the same thing with ammunition.
>
> David was also an expert marksman. We hunted together a lot. The craziest thing I've ever seen is when David shot a deer from 400 yards away. We were on our way to our hunting spot one day when we saw three deer from the roadway. I wanted to drive closer before taking a shot but David insisted I stop the car. David laid across the car and fired two shots: the first one went through the deer's ear and the second one in his head.
>
> It doesn't make sense to me that David committed this crime because the victim was shot five times. To say David would have to shoot anyone more than once (especially from close range) is ludicrous.
>
> David was also a smart guy. He was educated but also had common sense. I can't believe that David would leave items in his car that implicated him in a murder, especially after he knew the police had talked to him about a murder. This defies all common sense and David would never be that stupid.

Linker declaration, p. 2, Ex. 13.

Counsel rendered ineffective assistance by failing to elicit this information because it provided context for Runyon's ownership of guns and ammunition and his gun purchase on the day of the crime, and it established some of the odd facts of the case that create reasonable doubt.

**JA415**

In addition, the prosecution introduced into evidence, without objection, guns and ammunition connected to Runyon that had no relation to this case but were consistent with Runyon's lifestyle, as Linker described. The victim was found with five .38 caliber bullet wounds but the prosecution placed before the jury a shotgun, a rifle, a bag of ammunition containing a shotgun shell, a rifle shell, and a box of .22 ammunition, and the box of .357 ammunition described previously, Gov't Trial Ex. 212, 212A, 213, 237, as well as a photograph of the box of ammunition. Gov't Trial Ex. 236. This evidence is irrelevant to the manner in which the victim was killed but it makes sense in light of Linker's knowledge that Runyon was an avid hunter who enjoyed collecting, trading and selling guns and ammunition. Those exhibits were used by the prosecution to somehow illustrate Runyon's guilt but they were consistent with the alternative explanation provided by Linker. Thus, counsel was ineffective for failing to elicit this information from Linker that would have supported reasonable doubt.

### D.      Rose Wiggins

Rose Wiggins, Cat Voss's mother, was the first witness called by the prosecution. She testified that she received a phone call from her daughter, Cat Voss, around 3:00 a.m. indicating that Cory Voss had not come home from a trip to the credit union. Wiggins testified she offered to search for Cory Voss because Cat Voss indicated her children were sleeping. Wiggins then drove by and around the credit union looking for Cory Voss's truck or a white BMW. Tr. 259-61, 7/6/09. She testified she did not know which vehicle Cory Voss had driven. Wiggins stated she returned home and left sometime later and searched the area around the credit union again and still did not see either vehicle. Tr. 261. Wiggins then went to the Voss home. She testified she never saw the truck or the BMW. Tr.262.

Defense counsel failed to inquire about why Wiggins did not know which vehicle Cory Voss had driven to the credit union and he failed to question the whereabouts of the BMW, the car that Cat Voss usually drove. He also failed to question why Wiggins did not immediately go to the Voss

27

**JA416**

house to watch the sleeping children while Cat Voss searched for her husband. Wiggins did not go to the Voss house until just before 8:00 a.m. when the children had to catch the school bus. Tr. 263.

Wiggins' timeline did not fit the prosecution's theory that the killing occurred in conjunction with an ATM robbery shortly before midnight on April 29, 2001. Tr. 1595-96, 7/16/09; s*ee also*, ECF No.70 p.5 ¶17. Wiggins testified she drove by the crime scene after 3 a.m. and again sometime before 8 a.m. but didn't see Cory Voss's vehicle. Cory Voss was found in his truck at 6:49 a.m. in a parking lot adjacent to the credit union after the vehicle had been spotted at 6:10 a.m. Tr. 268, 271. Moreover, when counsel tried to argue that there was a period of time that did not account for Cory Voss's location, Tr. 1634-35, 7/16/09, the prosecution argued that the *lack of evidence* was proof of guilt and asked the jury to speculate what Runyon was saying to Cory Voss between 11:37 and midnight. Tr. 1657, 7/16/09. Had counsel effectively utilized Wiggins' inconsistent testimony, the jury may have had a reasonable doubt about Cat Voss's whereabouts, the prosecution's timeline, and Runyon's involvement.

### E.    David Runyon's Whereabouts The Day Of The Crime[17]

David Runyon lived in Morgantown, West Virginia. Witnesses and electronic transactions placed Runyon in West Virginia on April 29, 2007, at least until 8:37 p.m. The crime occurred on April 29th at 11:33 p.m. over six hours away in Newport News, Virginia. It would have been impossible for Runyon to drive to Newport News in three hours.

Runyon owned two cell phones. Runyon used one phone and gave the other to his son Davy and his son's babysitter, Paula Dalton, so the three could remain in contact when they were apart. Between noon and 2 p.m. on April 29, 2007, Runyon met with George Koski to purchase a handgun. Tr. 847, 7/8/09. That transaction was friendly and the two men engaged in conversation. Tr. 851,

---

[17] Investigation is ongoing and supplemental information will be provided when available.

856, 7/8/09. Runyon was not in a hurry and he provided Koski with his full name and driver's license. Tr. 854-56, 7/8/09. This encounter encompasses strange acts for an alleged "hitman" who was purchasing a murder weapon the day the murder was to occur.

At 1:30 p.m., Runyon withdrew $80 from an ATM in Morgantown. Gov't Tr. Ex. 65, 065-006. Runyon used his cellphone to call Davy at 1:20 p.m. and 2:08 p.m., Gov't Tr. Ex. 109, 109-014, before and after the ATM transaction. The final cellphone call Runyon placed that day was at 8:37 p.m. and that call was also to Davy.[18] None of the calls made by Runyon on April 29th incurred roaming charges, meaning Runyon was in West Virginia when he placed those calls, including the call at 8:37 p.m. *Id.*

Paula Dalton was called by the prosecution as a witness and defense counsel did not elicit testimony that she never received a phone call on Davy's phone from a caller other than David Runyon. Neither the prosecution nor defense counsel asked Paula Dalton whether Runyon provided her with a different phone number to reach him on April 29, 2007. If asked, Paula Dalton would have testified that the only number she used to contact David Runyon was his other cellphone number and the only calls she received from that Runyon's phone were placed by David Runyon. Because the prosecutor argued that Runyon might have left one of his phones in West Virginia before driving to Newport News to commit the crime, Runyon was prejudiced by counsel's failure to elicit this testimony.

### F.    Cell Tower Testimony Regarding Michael Draven

The prosecutor presented testimony that Draven was moving away from the credit union at the time of the killing. Tr. 1445-48, 1452-53, 7/14/09. To support this theory, the prosecutor

---

[18] The vast majority of calls placed by Runyon between April 18 and May 17, 2007, were to Davy. Gov't. Tr. Ex. 109, 109-014. Notably, no calls were placed to a Virginia phone number during that time period, and specifically April 29-30, a fact that counsel failed to effectively argue.

**JA418**

introduced a map of cell tower locations as an exhibit through Paul Swartz an investigator at the U.S. Attorney's Office. Gov't Tr. Ex. 135. Circles had been drawn around each tower to represent the radius in which the tower allegedly would service a cell phone. *Id.* The prosecutor elicited testimony that the "movement" of Draven's cellphone signal between the towers proved Draven was located within and moving between the radii of the towers. Tr. 1461, 7/14/09.

Defense counsel's failure to challenge the validity of this testimony was prejudicial. Cell-tower-tracking testimony that purports to locate a person's precise location *is not valid.* This is due to a faulty, underlying presumption that a cell phone connects to the closest tower. *See United States v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012). There are a number of factors that determine which tower a phone connects to and whether it remains connected to that tower, or switches towers, during the duration of a call. Those factors include the technical characteristics of the tower, antennas and phone, environmental and geographical features, and indoor or outdoor usage. Aaron Blank*, The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone*, 18 RICH. J. L. & TECH. 3, at *7 (Fall 2011); *see also* Larry E. Daniel, *Cell Phone Tracking Evidence*, Ex. 14. At best, cell tower information indicates that a person is located within twenty linear miles (up to 500 square miles) of any particular cell tower. *See* Judge Herbert B. Dixon, Jr., *Scientific Fact or Junk Science? Tracking a Cell Phone Without GPS*, 53 The Judges Journal 1 (American Bar Association 2014).

Swartz's map noted three cell towers to which Draven's phone connected that are located within twenty miles of the credit union. Gov't Tr. Ex. 135. Draven's cell phone could have connected to any or all of those towers with or without him changing locations. Accordingly, there was *no reliable evidence* definitively proving that Draven was moving away from the credit union at the time of the crime. Draven could have been at the credit union committing the crime himself, as Cat Voss suspected. This information could have created a reasonable doubt about Runyon's involvement. *See*

30

**JA419**

Woodward declaration, ¶9, Ex. 6 (the defense theory "involved portraying the co-defendants as bad actors and creating doubt regarding David Runyon being the person who shot Cory Voss.").

Trial counsel's failure to investigate and challenge forensic evidence was deficient. *Strickland*, *supra*; *see Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007) (ineffectiveness for failure to consult expert). To the extent that any of this information was not available at the time of Runyon's trial, it constitutes newly-discovered, scientific evidence of innocence. The admission of such unreliable expert testimony tainted the integrity of the trial process and denied Runyon a just and fair trial. *Napue v. Illinois*, 360 U.S. at 271; *Donnelly v. DeChristoforo*, 416 U.S. 637, 646 (1974).

### G. Runyon's Shopping List

The prosecution introduced a list of twelve items--written at an unknown time--that was found among Runyon's belongings and characterized it as a checklist for the crime.[19] Gov't Tr. Ex. 217.

Counsel failed to point out that the shopping list does not contain items used in the crime. Most obvious, it does not list a gun. The prosecution, however, argued that Runyon--an allegedly skilled "hit man"--needed to purchase a gun on the day of the crime in order to kill the victim. Tr. 1593, 7/16/09. The list also does not include the mask that the prosecution argued Runyon wore at the time of the crime to hide his face. Tr. 2598, 8/26/09.

Items on the list like the taser, Spyderco knife, tarp, trash bags, black dress socks, gel shoe inserts, and clothing did not have any role in the crime. If anything, the clothing on the list—a black hoody, cap, BDU pants and jungle boots—was consistent with Chad Costa's statement that Runyon bought clothes to look like a "thug" in order to impress people. Costa declaration, p. 4, Ex. 7. Both trial and appellate counsel's failure to counter the prosecution's use of this list as "a checklist of items to be used in the murder," *Runyon*, 707 F.3d at 504, was prejudicial since this exhibit is one more

---

[19] The government did not introduce into evidence any of the items on the undated shopping list.

**JA420**

example of using facts unconnected to the actual crime as "evidence" of Runyon's guilt. Had counsel raised this point, along with the others mentioned herein, the jurors could have reasonably doubted that Runyon was involved in this crime.

### H.       Testimony Regarding The Bullets.

On the day of the crime, Runyon's cellphone records placed him in Morgantown, West Virginia at a time that would have made it impossible for him to travel to Newport News, Virginia and commit the crime by 11:33 that evening. The murder weapon was never found and the only handgun the government could connect to Runyon was a .357 revolver.

John Willmer testified, without objection, for the prosecution as an expert firearm and toolmark examiner. Tr. 353, 7/6/09. Willmer testified about the Certificate of Analysis report prepared by another person (Gov't Trial Ex. 23) on the bullet recovered from the victim's truck (Gov't Trial Ex. 5) and the bullets/fragments recovered from the body (Gov't Trial Ex. 22). Willmer testified quite definitely that his expertise allowed him to match specific bullets to a specific firearm from which they were fired. Tr. 364, 366. He said the bullets were caliber .38 class and they were fired from one firearm. Tr. 362, 366.

The prosecutor carefully asked Willmer whether he could determine the *type* of firearm that discharged the .38 bullets, "I'm not talking about *brand*, but just what *generic types*." Tr. 364, 369. Willmer referred to the certificate of analysis and stated, "that includes .38 special brands of firearms, and also firearms that can fire .357 magnum cartridges, brands of firearms that can fire those[.]" Tr. 369. Counsel was ineffective for failing to elicit the specific information in the certificate of analysis which states that "caliber .357 Magnum revolvers with the brand names Astra and Llama" could have produced the rifling characteristics on the bullets. Gov't. Trial Ex. 23. Runyon, however, owned a Taurus .357; a *brand* that is not associated with the .38 bullets at issue. Defense counsel was ineffective

**JA421**

for failing to challenge the scientific validity of Willmer's testimony[20] and/or for failing to correct the mis-impression, created by the prosecutor's carefully crafted questions, that the .38 bullets could have been fired from Runyon's Taurus .357. The certificate of analysis excludes the Taurus brand of .357 firearms, a fact counsel failed to argue. Gov't Trial Ex. 23.

To the extent counsel was not ineffective for failing to rebut the prosecution's expert evidence, unreliable cell tower-tracking, ballistics testimony, and advances in science reveal that Runyon's convictions and death sentence were based on unreliable evidence, in violation of due process and the Eighth Amendment. "Reliability is ... a due process concern." *White v. Illinois*, 502 U.S. 346, 363-64 (1992). Hence, the Due Process Clause requires that criminal convictions be based on reliable and trustworthy evidence. *See Donnelly v. DeChristoforo*, 416 U.S. at 646; *Thompson v. City of Louisville*, 362 US 199, 204 (1960). The use of exaggerated, inaccurate, or misleading testimony, such as that presented by the prosecution here, deprives a defendant of a fair trial if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue*, 360 U.S. at 271; *see also Mooney v. Holohan*, 294 U.S. 103 (1935); *Pyle v. Kansas*, 317 U.S. 213 (1942); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Giglio v. United States*, 405 U.S. 150 (1972).

Similarly, the Eighth Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion); *see also Godfrey v. Georgia*, 446 U.S. 420, 427-28 (1980); *Mills v. Maryland*, 486 U.S. 367, 383-84 (1988). This need for heightened reliability requires "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a

---

[20] About five months before Runyon's trial, the National Academy of Sciences ("NAS") issued a landmark report regarding the unreliable state of forensic science in this country. See NAT'L ACAD. OF SCI., STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (Feb. 2009). The NAS Report was highly publicized and a reasonable attorney would have known of its contents, especially an attorney preparing for a trial where forensic evidence was going to be introduced.

33

**JA422**

defendant shall live or die," *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (plurality opinion), and invalidates death sentences imposed as a result of the jury's consideration of materially inaccurate evidence. *Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (Eighth Amendment does not permit a death sentence to be imposed by a jury that was allowed to consider materially inaccurate evidence); *Tuggle v. Netherland*, 516 U.S. 10, 14 (1995) (same). The jury's death verdict here was based in significant part on materially inaccurate and unreliable pseudo-scientific evidence. As such, Runyon's death sentence cannot stand. Given new evidence undermining the reliability of the three prosecution experts' testimony, an evidentiary hearing is necessary to determine the precise impact on the scientific evidence at issue.

The above facts establish reasonable doubt that Runyon was the triggerman. The prosecution's circumstantial case was by no means overwhelming and, in certain respects, it contradicted a finding of guilt. At the close of the prosecution's case, the Court dismissed the bank robbery charge. *Runyon*, 707 F.3d at 486. The jury found Runyon not guilty of conspiracy to commit robbery. *Id.* Clearly, the jurors were willing to acquit Runyon.

*Strickland* requires the Court to determine whether trial counsel's deficiencies "alter[ed] the … evidentiary picture." *Strickland,* 466 U.S. at 696. Had counsel presented the information discussed herein, the evidentiary picture would have been dramatically altered because it presents an alternative explanation to the prosecution's case and the evidence raises a reasonable doubt that Runyon was in Newport News the night that the victim was killed. Counsel's deficient performance was prejudicial and undermines confidence in the outcome of the case.[21] *Id.*

---

[21] Investigation into Runyon's innocence is ongoing and supplemental information will be provided when available.

34

**JA423**

**Claim 4:**  **Counsel Abdicated The Responsibility To Advocate For Runyon At The Eligibility Phase When He Failed To Address The Relevant Issue And Did Not Discuss Established Facts That Weighed Against The Statutory Aggravating Circumstance Of Substantial Planning.**

Defense counsel requested that Runyon's capital trial be trifurcated, meaning that if the jury convicts, the decision regarding whether Runyon is eligible for a death sentence should occur in a proceeding separate from the decision whether Runyon should be sentenced to life or death. ECF No. 93 p. 3. Counsel argued that maintaining the presumption of innocence in the context of a capital case is difficult with a death qualified jury and this procedure would protect Runyon's Fifth Amendment right to enter the eligibility phase cloaked in the presumption that he is innocent of the death penalty. ECF No. 93 p. 4. Counsel also argued that a separate phase where the jury deliberates whether the government has met its burden of proving eligibility factors, would prevent that decision from being infected by evidence presented in the selection phase. ECF No. 93 p. 8. The Court granted the request to trifurcate the proceedings. ECF No. 132.

Defense counsel's constitutional obligation was to hold the government to its burden of proof on every element in the case, including death-eligibility. *See also* Claim 11. Counsel had an "overarching duty to advocate the defendant's cause" and "bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688. In short, counsel's role was "to ensure that the adversarial testing process work[ed] to produce a just result." *Strickland*, 466 U.S. at 687. In this case, counsel failed to guard the presumption of innocence or hold the government to its burden when he abdicated the role of advocate at the eligibility phase. Initially, because counsel failed to adequately investigate Runyon's mental health they did not argue he was ineligible for the death penalty in the first instance. *See* Claim 14. Counsel also failed to ensure that the eligibility factors were constitutional. *See* Claim 11. Finally, counsel failed to present any evidence to counter the eligibility factors. *Runyon*, 707 F.3d at 485.

**JA424**

In a three-page argument, counsel told the jurors there were "a couple of things that I would like for you to be considering when you are looking at this eligibility phase." Tr. 1769-70, 7/22/09. Those things were: (1) that the law never requires the death penalty; and, (2) that the jurors were not then-deciding whether Runyon should be sentenced to death. *Id.*, 1770, 1771. Those points failed to address the discrete task at hand, which was the purpose for the trifurcated proceeding. Counsel's argument, which intertwined the eligibility phase with the penalty phase, had the opposite effect. Counsel did not address the factors which the government had to prove and which the jurors would be considering. Counsel did not argue facts that weighed against the "substantial planning" statutory aggravating circumstance. Counsel simply requested that the jurors, when arriving at a decision, look at the evidence "with new eyes," in accordance with the Court's instructions. *Id.*, 1772. Counsel, however, had previously argued against the application of the "substantial planning" statutory aggravator and should have placed this argument before the jury for its consideration. *See Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005) ("[D]efense counsel's job is to counter the [prosecution's] evidence of aggravated culpability with evidence in mitigation.").

Five months before the trial, defense counsel submitted a ten-page letter to the United States Attorney's Office requesting that the death notice be withdrawn. Ex. 15. That letter sets forth established facts demonstrating that the co-defendants, Voss and Draven, engaged in extensive planning of the crime and Runyon was merely a tool.[22] Ex. 15, p. 3 (citing 18 U.S.C. § 3592(c)(9)).

> According to the United States' theory of the alleged conspiracy-for-hire, as set forth in Voss' Statement of Facts incorporated into her guilty plea, as well as statements made by the United States at Voss' sentencing, Voss was without question the mastermind of the scheme to murder her husband, Cory Voss. Voss and Draven together created a plan to kill Cory Voss with or without Mr. Runyon's assistance. The

---

[22] The letter also sets forth the factual basis for objecting to the "substantial planning" aggravator based on the principle that the Due Process Clause prohibits the government from presenting mutually inconsistent theories of the same case against different defendants. *United States v. Fulks*, 683 F.3d 512, 524 (4th Cir. 2012). Counsel were ineffective for failing to make this objection at trial and/or on direct appeal.

36

**JA425**

United States has acknowledged this fact, stating that "[s]ometime in January of 2007 at least three individuals were approached [by Voss and Draven] and asked about murdering Cory." See Tr. of Sentencing for Catherina Voss at p. 5 (Attached as Exhibit A). The United States characterized Mr. Runyon as merely the tool that Voss and Draven ultimately used to execute their murderous plan. Id. The United States repeatedly refers to the murder plan as being Voss' and/or Draven's plan, not Mr. Runyon's plan. In fact, at Voss' sentencing, the United States characterized the plan to kill Cory Voss as almost exclusively the work of Voss in her fit of greed and lust. Id. at 5 lines 10-11, 21; p. 6, lines 21-22.

Even according to the United States it was Voss and Draven not Mr. Runyon that engaged in the extensive planning and premeditation of the type that constitutes the aggravating factor contained in 18 U.S.C. § 3592(c)(9). The United States stated that "[Runyon] certainly seemed perfect for Cat Voss and Michael Draven *to carry out their plan*" before they began to conspire with Runyon in February and March, 2007. Tr. at p. 5, lines 9-12 (emphasis added). Indeed, the United States never alludes to any participation by Mr. Runyon in preparing the plan to kill Cory Voss nor does any of the evidence suggest that Mr. Runyon played such a role in the conspiracy. The evidence suggests at best that Mr. Runyon did as he was told by Voss and Runyon, as the United States concedes when it asserts that "Runyon had been provided the location, had been provided a description of Cory's car, and about the time that he would be there, and David Runyon traveled from West Virginia to meet Cory Voss." Id. at pp. 6-7. Mr. Runyon's role therefore was markedly different from the role of Voss and Draven, who spent months engaged in detailed planning and scheming to murder Cory Voss. Mr. Runyon's role does not rise to the level of the type of substantial planning that § 3594(c)(9) contemplates as justifying application of that statutory aggravator.

As set forth above, Voss and her lover, co-conspirator Draven, concocted the intricate plan for having Cory Voss killed so that they could be together and live lavishly off the proceeds from Cory Voss' life insurance proceeds, which they did with flair beginning almost immediately after they murdered Cory Voss. Voss is the person who set up the bank account at the federal credit union in a remote location as part of her murder plan, so that she could send Cory Voss out in the dead of night to meet his killer, who she and Draven pre-arranged to be waiting at the credit union at the appointed time. Voss is the individual who callously made the deliberate decision that her children's father would be murdered at a specific time, at a specific place, and in a specific way. On the night of the murder, it was Draven who let the shooter know the exact time Cory Voss would arrive at the federal credit union, Cory Voss' exact physical description, and the exact description of the car Cory Voss was driving. Telephone records show that Voss was on the telephone with Cory Voss almost the entire time it took him to drive to the credit union up until approximately two minutes before the hired gunman entered Cory Voss' vehicle.

If not for Voss's and Draven's actions, Cory Voss would never have been at the federal credit union on the night he was murdered.

Ex. 15, pp. 3-4.

37

**JA426**

This argument did not convince the government to withdraw the death authorization, but these were strong arguments that the jury could have considered at the eligibility phase and they could have established a reasonable doubt that Runyon actually engaged in "substantial" planning. At the eligibility hearing, defense counsel failed to mention the "substantial planning" aggravator at all, let alone advocate for Runyon by countering the prosecution's evidence.[23] There is a reasonable probability that presenting an argument like the one above, may have resulted in one less statutory aggravator, and—at the very least—could have reduced the weight assigned to this aggravator by the jurors once they advanced to the penalty phase. Runyon was prejudiced by counsel's failure to do so. Therefore, counsel rendered ineffective assistance due to a failure to challenge the government's case at the eligibility phase.

**Claim 5: Trial Counsel Was Ineffective For Failing To Investigate, Discover, And Present Evidence That David Runyon Was Incompetent To Stand Trial.**

Runyon exhibited signs of severe mental illness and incompetence from the moment he was arrested. There were numerous red flags that suggested Runyon was, through no fault of his own, unable to assist his counsel.

While Runyon was incarcerated at the Portsmouth City Jail, he was "seen by Dr. Kolongo because he believed he has mustard gas in his head (sinus)." Dr. Kolongo reported Runyon was "somewhat grandiose. His thoughts were flighty and rambled on. He verbalized some delusional material." Dr. Kolongo did not make a final diagnosis but believed schizo-affective disorder and bi-polar disorder needed to be ruled out.[24] Portsmouth City Jail records, Ex. 16. Mitigation specialist

---

[23] Nor did counsel address the "pecuniary gain" statutory aggravating circumstance; a circumstance that was supported only by a receipt that indicated Randy Fitchett (Draven's brother) sent $275 to Runyon two months after the crime.

[24] After the jury found Runyon eligible for the death penalty, Dr. Merikangas informed counsel that Runyon "is either in a fantasy world of grandiose wishful thinking, or suffering from delusions." Merikangas report, Attachment p. 2, Ex. 2.

Sheila M. Cronin advised trial counsel that Runyon's family history is significant for major psychiatric illnesses as well as neurological/cognitive/developmental disabilities. Cronin declaration, Ex. 4. For example, Runyon's mother exhibited severe mood swings with angry irrational tirades and probably suffers from "bipolar disorder." *Id.*, ¶8. Runyon's biological father suffered major depression. VA progress note, Ex. 17.

Runyon's grandiose delusions were apparent in conversations with his legal team. He repeatedly compared himself to great historical figures. Cronin declaration ¶7, Ex. 4. Runyon's delusions were apparent in letters he wrote to his legal team. One such letter is a "list of lives I have saved over the years." Cronin declaration, Attachment, Ex. 4. Other letters to the defense team reflect fixed delusional beliefs. This correspondence has been reviewed by Drs. Mirsky, Merikangas and Dudley, all of whom note Runyon suffers from a delusional disorder. See Claim 6.C.3 for full discussion of their findings.

Federal law defines incompetency as follows: "[T]he defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense …." 18 U.S.C. § 4241(d).

Pursuant to 18 U.S.C. § 4241(a), the defense is entitled to "file a motion for a hearing to determine the mental competency of the defendant." Upon the filing of such motion, "[t]he court shall grant the motion … if there is a reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable … to assist properly in his defense." *Id.*

The Fourth Circuit has explained that § 4241 "provides a mechanism to secure a judicial determination of a criminal defendant's competency, thereby protecting the defendant's fair trial rights and the integrity of judicial proceedings." *United States v. Broncheau*, 645 F.3d 676, 682 n.8 (4th Cir.

39

**JA428**

2011). *United States v. White*, 620 F.3d 401, 404 (4th Cir. 2010) (Defendant suffered from delusional disorder, grandiose type, and not competent to stand trial); *United States v. Culp*, 930 F.2d 23 (4th Cir. 1991) (paranoid schizophrenia and delusional behavior were sufficient to establish a mental disease or defect). Consistent with Fourth Circuit case law, Runyon was incompetent to stand trial. At bottom, such an examination would have revealed Runyon's serious mental illness that, in turn, would have supported an argument against death qualification, *see* Claim 14, and/or would have supported mitigating circumstances resulting in a life sentence. *See* Claim 6.

The Supreme Court has affirmed its understanding of competency in *Godinez v. Moran*, 509 U.S. 389, 396 (1993):

> In *Dusky v. United States*, 362 U.S. 402 (1960) (*per curiam*), we held that the standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding" of the proceedings against him." *Accord Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial."

Throughout the trial, Runyon expressed beliefs that the Court, the prosecution and the court reporter were conspiring to commit premeditated prosecutorial misconduct and to commit illegal and immoral acts to attempt his murder. He repeatedly remarked that events were not recorded by the court reporter in order to conceal this conspiracy and misconduct. "[T]he conviction of an accused person while he is legally incompetent violates due process[.]" *Pate v. Robinson*, 383 U.S. 375, 378 (1966). Trial counsel, of course, had a duty to protect Runyon's due process rights. The failure to protect Runyon's right to be competent during trial qualifies as ineffective assistance of counsel and resulted in the denial of his rights guaranteed by the Fifth, Sixth, and Eighth Amendments. *Strickland v. Washington*, *supra*; *Newman v. Harrington*, 726 F.3d 921 (7th Cir. 2013) (IAC for failure to raise the issue of client's competency); *Hummel v. Rosemeyer*, 564 F.3d 290 (3d Cir. 2009) (same).

40

**JA429**

**Claim 6:** **Counsel Rendered Ineffective Assistance By Failing To Investigate And Present Mitigating Evidence Regarding Runyon's Psycho-Social History, Brain Damage And Mental Health.**

In *Strickland v. Washington,* the Supreme Court explained that constitutionally effective counsel "plays a crucial role in the adversarial system," is "necessary to accord defendants the ample opportunity to meet the case of the prosecution," 466 U.S. at 685, and ensures the trial is "a reliable adversarial testing process." *Id.* at 689. In assessing prejudice, the court must assess the totality of the evidence: "Some of the errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id.* at 695-96. Runyon's case is the former – the failure to adequately investigate Runyon's mental health had a pervasive effect because: (a) counsel did not challenge the application of the death penalty as disparate, arbitrary, its cruel and unusual nature based on Runyon's serious mental illness (Claims 13 & 14); (b) counsel did not ensure that Runyon was competent to stand trial (Claim 5); and (c) the jurors did not have an accurate picture of David Runyon, counsel failed to subject the prosecution's case to adversarial testing when available evidence was not presented to counter-balance the aggravating circumstances, *see also* Claim 4, and counsel failed to offer persuasive evidence of traumatic brain damage and mental illness both of which are mitigating factors entitled to great weight. The death penalty was not a foregone conclusion. During deliberations, the jury questioned what would happen if they could not agree on a sentence. Tr. 2707-09, 8/27/09. Had counsel investigated and presented evidence like that which follows there is a reasonable probability that the sentencing outcome would have been different.

**A.** **Counsel Hudgins Appeared In The Case Too Late To Effectively Investigate And Present Mitigation.**

Just four months before the trial began, Stephen Hudgins replaced attorney Jon Babineau, ECF No. 179 pp. 12-13, and assumed Babineau's responsibility for the penalty phase of the case. It was Hudgins who had the most contact with the defense experts and prepared the witnesses for the

41

**JA430**

penalty phase. ECF No. 247 p. 2, n.1; Hudgins declaration, ¶1, Ex. 5; Woodward declaration, ¶¶2, 7, Ex. 6. At the time of Hudgins' appointment, Runyon's counsel had already requested and obtained authorization to hire clinical psychologist Evan Nelson,[25] who had yet to conduct an appropriate examination. *See* Hudgins declaration, ¶4, Ex. 5; *see also* Woodward declaration, ¶6, Ex. 6. Dr. Nelson had, however, informed counsel that neuropsychological deficits are a defining element of Runyon's personality and behavior and he recommended a neuropsychological evaluation of Runyon. ECF No. 153 p. 1. Hudgins scrambled to find appropriate mental health experts.

On April 13, 2009, Hudgins moved to continue the trial date for six months, expressing a "firm belief that to require the defendant to proceed to trial on June 30, 2009, will deprive the defendant of his constitutional right to the effective assistance of counsel[.]" ECF No. 179 p. 9.[26] Counsel cited Supreme Court precedent, circuit court cases, and ABA Guidelines which set forth the obligations and prevailing norms of counsel in capital cases to conduct a thorough penalty phase investigation and asserted that more time was required "to perform the minimally required functions of counsel[.]" *Id.* The defense had yet to obtain medical records for Runyon, his mother, and his biological father, and asserted that "these records are absolutely necessary" before mental health experts "can perform testing and render opinions." *Id.*, p. 12.

---

[25] Counsel had represented that Dr. Nelson would: present a reliable social history of David Runyon and his family. The social history will focus especially on the major influences that have shaped David Runyon's life, including factors that may have contributed to David Runyon's psycho-social development and functioning. ECF No. 135 p. 1.

[26] After Hudgins was appointed on February 20th, Counsel Woodward obtained a continuance of the trial date from March 13th to May 4, 2009. ECF Nos. 160, 162; Hudgins declaration, ¶ 2, Ex. 5. Although Woodward felt he was ready to proceed to trial, Hudgins needed time to become familiar with the case and to prepare the penalty phase defense. Woodward declaration, ¶7, Ex. 6.

In addition, counsel wanted documentation for injuries Runyon sustained in a head-on collision with a drunk driver.[27] Hudgins declaration, ¶5, Ex. 5; Woodward declaration, ¶5, Ex. 6. Runyon was also exposed to grenade blasts in Army training exercises. Hudgins declaration, ¶5, Ex. 5. Counsel knew injuries that affected Runyon's reasoning abilities were important for mitigation. *Id.*

In the continuance motion, counsel recounted the change of counsel in February, and indicated that, regardless, the case could not have gone to trial on the original date because "[t]he mitigation investigation for the penalty phase was not complete and still is not complete at this time." ECF No. 179 p. 13. Accordingly, counsel requested that the trial date be moved to October. Hudgins declaration, ¶2, Ex. 5. In fact, from the date of appointment to the date of trial, Hudgins had 91 working days to investigate and prepare. At least 32 of those days he spent in court on other cases, including a 14-day federal trial. Hudgins declaration, ¶2, Ex.5; Hudgins schedule (with mark-ups), ECF No. 165 pp. 5-7, Ex. 19. Twenty-five additional days were partially spent in court. Ex. 19.

Given counsel's representations regarding the inability to provide effective representation for a June 30th trial date, "and after having considered the numerous legal authorities cited[,]" the prosecution did not object to a six-month extension of the trial date. ECF No. 181 p. 1.

Since counsel requested additional time in order to complete investigation, discovery, and expert testing for only the penalty phase of trial, the Court declined to move the June 30th date for the guilt/innocence phase of trial, but indicated that counsel could renew a continuance motion for the eligibility and penalty phases should the jury convict Runyon. ECF No. 194 pp. 2-4, 9-10 & n.12.

Hudgins secured the appointment of Dr. Mirsky, who conducted a brief examination of Runyon four days before trial began. He informed counsel that there is strong evidence Runyon is

---

[27] Counsel were never going to obtain records from Runyon's Emergency Room visit in 1996, because Lake Martin Community Hospital destroys its records after seven years. Ex. 18, p. 3.

**JA432**

suffering from a neurological disorder and a neurological evaluation was essential. Mirsky letter 7/2/09, Ex. 20. Counsel requested funding for neuropsychiatrist James R. Merikangas. This request was not granted until the jury found Runyon eligible for the death penalty. ECF No. 257.

Counsel's lack of time and single-minded pursuit of medical records to prove Runyon's impairments unduly constrained the investigation of Runyon's mental health. The day before trial began on June 30, 2009, counsel filed another notice regarding mental health experts, but it contained a qualification: "this notice is dependent on defendant's receipt of his and his family's medical records from the United States Government for periods of time when defendant was in the Army and when he and his mother were Army dependents." ECF No. 230 p. 1. Counsel indicated: (1) Dr. Mirsky is a neuropsychologist who will do psychological testing on the defendant if deemed appropriate once the medical records of defendant and his family are received; and (2) Dr. Merikangas is a psychiatrist who will be testifying to factors discovered in defendant's medical records and those of his family and who may interview defendant on issues discovered in the medical records, all as determined to be necessary and appropriate once the medical records are received. ECF No. 230 pp. 1-2.

The jury convicted Runyon on Friday, July 17, 2009, after 4 ½ hours of deliberation. Counsel moved to continue the penalty phase, stating, he "will simply not be ready to present the defendant's case for life at the conclusion of the guilt or innocence phase[.]" ECF No. 240 p. 2 (duplicate filing at ECF No. 247). Counsel asserted that a "mental health examination has uncovered evidence tending to suggest the existence of a significant mental disorder that bears a potentially strong relationship to the defendant's behavior and moral culpability." ECF No. 240 pp. 2-3. Dr. Mirsky's testing revealed deficits that required further neurological testing, ECF No. 242 p. 1, but counsel's motion to fund Dr. Merikangas remained pending. ECF No. 240 p. 3. Counsel also said that they still lacked medical records and the mitigation investigation had not been adequately completed. ECF No. 242 p. 1.

The Court continued the penalty phase for four weeks. ECF No. 254.

44

**JA433**

At the eligibility phase, counsel presented no evidence and a three-page argument. *See* Claim 4, *infra.* The jury determined that Runyon was eligible for the death penalty. Thereafter, the Court granted defense counsel authorization to hire Dr. Merikangas. ECF No. 257.

After learning from counsel that the jury found Runyon death-eligible, Dr. Mirsky responded:

> I am firmly convinced that Mr. Runyon is still suffering from the effects of the two blast injuries he sustained when undergoing training exercises in the ROTC. These were compounded by the effects of the motor vehicle accidents. His impaired attention, seen in the poor Continuous Performance Test scores in my report, is one of the classical symptoms of blast injury and impact injury after a car accident. Other symptoms, such as quickness to anger, and impulsivity, are also well documented in the brain injury literature. The occasional dizziness he shows is also symptomatic of brainstem injury. In some sense, because he suffered the blast injuries while in the ROTC, he can be considered a wounded warri[o]r, and this should be considered in his sentencing.

Hudgins/Mirsky email, 7/22-7/23/09, Ex. 21.

Dr. Merikangas evaluated Runyon on July 29, 2009. Merikangas Report, p. 1, Ex. 2. He noted multiple physical abnormalities consisted with trauma. *Id.*, Attachment p.1. He observed that Runyon "presently is either in a fantasy world of grandiose wishful thinking, or suffering from delusions. He clearly has impaired functioning suggestive of frontal lobe brain impairment." *Id.*, Attachment p.2. Both Dr. Merikangas and Dr. Mirsky "noted deficiencies in defendant's psychological testing and history of injuries which could have caused brain injury accounting for these deficiencies," and Dr. Merikangas requested brain scans. ECF No. 269 pp. 1-2. The earliest the scans could be scheduled was five days before the penalty phase. *Id.*, p. 2. The results were released directly to defense counsel and not shown to Dr. Merikangas or a similar expert.[28]

Although counsel had permission to supplement the defense experts' reports, see ECF No. 269, he failed to do so.

---

[28] We now know the scans revealed "multiple white matter hyperintensities consistent with his [Runyon's] history of head injuries and migraine." Merikangas report, p. 4, Ex. 2.

45

**JA434**

**B.** **Counsel Abandons The Incomplete Mental Health Investigation And Presents Repetitive Lay Person Testimony.**

Although counsel promised the jury he would "put on … mental health information," he did not. Tr. 1770, 7/22/09. Counsel presented twenty-one witnesses; however, neither Dr. Mirsky nor Dr. Merikangas testified and the jury was not informed of Runyon's brain damage and its impact on his behavior and moral culpability.

One-third of the defense's penalty phase evidence, not only in number of witnesses but also in number of transcript pages, was testimony about Runyon's good behavior as a jail inmate, Tr. 2084-92, 8/20/09; Tr. 2199-2242, 8/24/09, and his very low likelihood of serious violence in prison. Tr. 2158, 8/20/09. It was evidence the jury rejected. *See* ECF No. 291, p. 3.

Counsel tried to present some evidence of Runyon's psycho-social history. The prosecution, however, moved to prevent Dr. Cunningham from testifying about developmental factors in Runyon's background because Dr. Cunningham's report did not include this information. Tr. 2079, 8/20/09. The Court sustained the motion after counsel seemingly conceded the issue. *Id.* Counsel were ineffective for not properly directing their expert or preserving this issue for appeal.

Counsel attempted to present family life history through Runyon's adoptive father. The Court commented, however, that the testimony was attenuated and unrelated to the enumerated mitigating factors. Tr. 2399-2401, 8/24/2009. When Runyon's mother, Suk Cha Runyon began to explain her childhood war-time flight from North Korea, the prosecutor objected: "we are going into an area far outside the mitigating factors and far outside preliminary background, where she is starting to give more of her life story." Tr. 2411, 8/24/2009. The Court agreed Suk Cha's background was not needed and questioned what it had to do with Runyon. *Id.* Counsel were ineffective for failing to articulate the relevance or preserve this issue for appeal. As explained below, transgenerational dysfunction is critical to understanding the formative influences on Runyon's character, psychological limitations, and life trajectory. Simply put, history repeats itself and Runyon was unable to escape the patterns in

46

**JA435**

his family history. *See, e.g.*, Cunningham declaration, p. 27, Ex. 8. The remaining penalty phase witnesses spoke briefly about Runyon's childhood and character, his relationships and employment history. *Runyon*, 707 F.3d at 499. They described Runyon as a good friend, a charitable person, a considerate and helpful guest, and a caring father.

At closing, the prosecution argued that Runyon had "a good upbringing" but, "he rejected that, and he walked away from that over five years ago." Tr. 2622, 8/26/09. The prosecution made a number of—what Runyon's appellate counsel later described as—

> "derogatory and superfluous" comments about Runyon's own life, asserting that he "left his wife and children and didn't provide support for them"; "abandoned more gainful attempts at employment, to get employment through these sporadic drug studies that put him into contact with people like Michael Draven"; met his girlfriend "at a strip bar"; and "play[ed] video games" while his girlfriend held down three jobs.

*Runyon*, 707 F.3d at 512.

Defense counsel's argument focused on the inequity of the co-defendants' life sentences and the impact of a death sentence on Runyon's mother, son and friends.[29] Tr. 2640-50, 8/26/09.

> Runyon's counsel had gone to great lengths to demonstrate that the three defendants, despite all being integrally involved in the murder, had received differential treatment, with the government pursuing the death penalty against Runyon but not against Cat or Draven. In particular, the defense introduced Cat's plea agreement and the accompanying statement of facts, which recited her role in the crime in stark detail, and argued vigorously and repeatedly before the jury that Runyon did not deserve death if neither Cat nor Draven was subject to that sentence.

*Runyon*, 707 F.3d at 508.

---

[29] Guilt-phase counsel presented the penalty-phase closing argument. *See* Cronin declaration, ¶15, Ex. 4. Early on in the case, he had remarked about mitigation: "we'll throw a couple of relatives on the stand and that will be enough." *Id.*, ¶12. He displayed an insensitivity to signs of mental illness and thought Runyon's grandiose ideation was funny. *Id.*, ¶7. Counsel failed to recognize that Runyon's conspiracy theories, verbosity, pattern of bouncing from job to job, and series of problem relationships were indicators of brain damage and/or mental illness that required exploration. Guilt-phase counsel's ability to effectively present mitigation was severely impaired by his belief that, in order for mental health evidence to be mitigating, it has to be a mental disease or defect that is not the defendant's fault and, but for it, the defendant would not have committed the crime.

**JA436**

Counsel told the jury, "There is a reason why we bring you evidence sort of from the cradle to the day we are sitting here in court, to the extent we can get it, because the law allows, in fact, requires us, if we can, to let you know as much about Mr. Runyon as we can." Tr. 2652, 8/26/09.

Because counsel did not follow up on his promise to "put on ... mental health information," Tr. 1770, 7/22/09, counsel could not explain the significance of "the fact that he [Runyon] couldn't hold a job or that he would do okay in a job for a little while, and then for whatever reason, be it his own inability to focus or his family situation or his marriage, that he would lose that job?" Tr. 2651, 8/26/2009. Without an explanation, the prosecution's arguments in favor of aggravation could not be counter-balanced. Counsel could not answer the question obvious to all persons in the courtroom:

> So the legitimate question, then, would be, well, what happened? What happened to the person that they described that gave his last $5 bill, instead of going shopping, gave it to the homeless guy or the one that helped the child with some personality disorder[30] that Ms. Provost talked about? And I don't have a glib answer. I don't have, you know, a pat response, where I stand up and say, you know, right here is what caused Mr. Runyon to get involved in this and to be where we are today.
>
> But that's not what your point is.

Tr. 2645, 8/26/09.

The jury deliberated eight hours and sentenced Runyon to death, finding two statutory aggravators and four non-statutory aggravators "outweigh[ed] any mitigating factor or factors."[31] *Runyon*, 707 F.3d at 519; ECF No. 291. The jurors found ten of the fourteen statutory and nonstatutory mitigating circumstances proposed by the defense[32] but also found three mitigating factors that the

---

[30] Phyllis Provost testified that her child was diagnosed with Pervasive Developmental Disorder Not Otherwise Specified (PPDNOS) which is on the autistic spectrum. Tr. 2521, 8/25/2009. This is a mental disorder classified on Axis I by the Diagnostic and Statistical Manual of Mental Disorders, IV-TR, pp. 14, 84 (2000). It is not a personality disorder classified on Axis II.

[31] The statutory aggravators found were: "pecuniary gain" and "substantial planning." 18 U.S.C. §§ 3592(c)(8) & (c)(9). The non-statutory aggravators were (1) "lack of remorse;" (2) "abuse of women;" (3) "specialized training;" and, (4) "victim impact."

[32] The ten mitigators found were: Runyon did not have a serious criminal record; other persons equally culpable in the crime will not be punished by death; Runyon would serve a life without parole

48

defense had not proposed: (1) Runyon "continued to witness and experience domestic violence and parental conflict/abuse from [his] mother and adoptive father;" (2) Runyon's brother "will suffer emotional harm if his brother is executed;" and, (3) that Runyon "was given the impression that Cory Voss was molesting [Voss's] daughter." *Runyon*, 707 F.3d at 487-88. The jurors found over twice as many mitigators as aggravators but it is clear they were unable to assign much weight to the mitigation evidence that was presented. The prosecution had argued to the jurors that "the defendant has tried to make it [mitigation] very much about quantity versus quality[.]" Tr. 2618, 8/26/09.

Dr. Mirsky learned Runyon was sentenced to death after the fact. He wrote counsel, "I wish to make sure that the Court is aware of certain mitigating circumstances that should affect the sentence of your client, Mr. David Runyon." Mirsky letter, 9/18/09, Ex. 22. Dr. Mirsky explained—without having seen Runyon's brain scans[33]—that with blast injuries, such as Runyon experienced in ROTC, "[t]here can be extensive damage to white matter tracts, which serve the vital function of connecting various cortical areas." *Id.* Persons with mild traumatic brain injury (mTBI), such as Runyon,

---

if not sentenced to death; Runyon has worked and has been legally employed all his life; he has committed acts of kindness and generosity for his neighbors and community; Runyon witnessed and experienced domestic violence and parental conflict until his biological father and mother separated; Runyon's son will suffer emotional harm if his dad is executed; Runyon's mother will suffer emotional harm if her son is executed; Runyon was honorably discharged from the U.S. Army and Runyon has a high school diploma, college degree and took further college courses. ECF No. 291, pp. 2-4.

The four rejected mitigators were: Runyon "has demonstrated his ability to make a positive adjustment to incarceration;" Runyon has the respect and support of correctional officers;" Runyon "has had no disciplinary write-ups while incarcerated and has helped other inmates conduct themselves in non-violent or non-aggressive ways; Runyon "does not present a risk of future violence or danger to the public while in prison for the rest of his life;" ECF No. 291, p. 3.

[33] The scans revealed "multiple white matter hyperintensities consistent with his [Runyon's] history of head injuries and migraine." Merikangas report, p. 4, Ex. 2.

49

**JA438**

may have symptoms of abnormal behavior, including poor ability to concentrate, committing impulsive acts, and other indications of poor "cognitive control." They can be symptoms of what is referred to as Post Traumatic Stress Disorder, or PTSD, which has not been ruled out in the case of Mr. Runyon. You will recall that in my test of Mr. Runyon, he performed in the very impaired range on tests of sustained attention. This can be symptomatic of mTBI, as well as PTSD.

*Id.*

### C. A Complete Psycho-Social History And Its Implications Would Have Added Weight to Mitigating Factors, Reduced The Weight Of Aggravating Factors And Informed the Jurors About Runyon's Lesser Moral Culpability.

Mental health mitigation would have: (1) been consistent with the evidence defense counsel presented at the penalty phase; (2) provided context and an explanation for Runyon's life trajectory; (3) countered the aggravating evidence; (4) established substantial statutory and non-statutory mitigating circumstances; and, (5) added substantial weight to the mitigators already found by the jury. In short, mental health mitigation was the missing ingredient for a life sentence.

Counsel were either rendered ineffective by a lack of time to conduct an adequate investigation or counsel failed to effectively investigate and/or ignored red flags suggesting Runyon's brain damage and mental health difficulties.[34] Brain damage substantially affects Runyon's problem-solving abilities. His actions are substantially affected by brain damage, mental illness, and other predisposing factors. This powerful mitigation evidence was easily provable at the time of trial through records, lay witnesses and expert witnesses. The information provided below is not exhaustive but is representative of substantial mitigation that Runyon's jurors never heard.

### 1. Readily-Available Records.

Records illustrated Runyon's compromised mental state and indicated the origins of brain damage and mental illness. Although counsel possessed the records, they failed to conduct a reasonable investigation based on what the contents revealed and the jury did not learn the facts below.

---

[34] Some documents filed by counsel are sealed and their contents are not discussed herein.

50

**JA439**

### 1.1    **Medical records**

David Runyon is 5 feet 3 inches tall and, when he was in the Army, he weighed less than 130 pounds. Army medical records, p. 1, Ex. 23. Medical records document two motor vehicle accidents and associated problems suffered by Runyon. Defense counsel wanted medical records on Runyon's head injuries, in particular, the 1996 car accident. Hudgins declaration, ¶5, Ex. 5. The initial treatment records could not be located and counsel incorrectly believed that Runyon had not followed-up with Army medical providers. *Id.* In 1995, Runyon sought treatment for cysts on his forehead that he reported had been recurring following a car accident where pieces of glass embedded in his face. Army medical records, p. 1, Ex. 23. Runyon said glass remained under his skin. *Id.*

In November 1996, a drunk driver collided head-on with Runyon. He was extracted from his vehicle with the "jaws of life" and taken to an emergency room. Runyon followed up with an Army doctor who noted multiple injuries to Runyon's legs, knee, calf, shoulder, and neck. *Id.*, pp. 2-3. Physical therapy was prescribed and Runyon was restricted from running, jumping, and marching. *Id.*, pp. 3-5. Runyon continued to follow-up with complaints of vertigo, short-term memory loss, headaches, and insomnia. *Id.*, pp. 8, 12.

Two months after the car accident, Runyon was still experiencing short-term memory loss and insomnia. *Id.*, p. 12. He was informed that PTSD and life stressors could be possible etiologies. *Id.* The plan was to "[e]xplore possible symptoms of depression and antidepressant drugs at the next visit." *Id.* Runyon and his wife, Maria, were in counseling and if that did not improve his symptoms the plan was to begin a course of SSRI antidepressants. *Id.* Also, Runyon was finally diagnosed with a knee/ACL sprain. Army medical records, pp. 14, 16, 17, Ex. 23.

A February 1997, memo regarding a telephone consultation states: "INRE: Post Traumatic Stress Syndrome/Needs recommendation/States urgent/1st Sgt. wants paper work ASAP." *Id.*, p. 15.

**JA440**

A doctor noted that, after speaking with Runyon's wife, Maria, and their counselor, he "will recommend/refer patient for further psychiatric evaluation[.]" *Id.*

In August 1997, Runyon complained of ongoing vertigo with long-lasting headaches. *Id.*, p. 19. The doctor's assessment was Positional Vertigo secondary to Vestibular Dysfunction.

The physical examination conducted in conjunction with Runyon's separation from the Army lists: "Poor health. Presently on Meclizine for some kind of positional vertigo. Sleeplessness and constant pain in joints." *Id.*, p. 23. A checklist verifies Runyon's knee and shoulder problems, other symptoms of swollen or painful joints, frequent or severe headache, dizziness or fainting spells, fever, head injury, shortness of breath, frequent trouble sleeping, depression or excessive worry, and loss of memory or amnesia. Physical injuries resulting from the motor vehicle accident, including torn ACL, rotator cuff and calf muscle, were noted. The records end with "Depression diagnosis, Post Traumatic Stress Syndrome." *Id.,* pp. 23-24.

### 1.2     Letters From Runyon

David Runyon wrote counsel to inform them of the 1996 car accident, Ex. 24, and about how he had saved a number of people's lives. Cronin declaration, Attachment, Ex. 4.

### 1.3     Jail Records

Portsmouth Jail records signaled significant mental health issues. In March 2008, Runyon expressed concern about HIV exposure after aiding his cellmate who fell and lacerated his head. Portsmouth Jail record, p. 2, Ex. 16. Runyon's hands "became covered with blood" and he was worried because he had a hang-nail and open cuts on his hand. He also reported losing 30 pounds since December, occasional dizziness, and light-headedness. *Id.*

In August 2008, Runyon reported a sudden onset of runny nose, watery eyes and feeling sick. *Id.*, p. 3. The episode lasted 30 minutes and Runyon was able to cure himself by washing his face. *Id.* He said he was exposed to mustard gas while in the military and the gas was still in his sinuses, causing

52

**JA441**

them to occasionally flare up. *Id.* Personnel assessed this as a possible anxiety attack caused by an old recollection and planned to refer Runyon to the psychiatrist. *Id.* A doctor saw Runyon for the complaint of "mustard gas in his head (sinus)." *Id.*, p. 4. The record notes:

> O: Although he was generally cooperative, he ten[d]ed to be somewhat gran[io]se. His thoughts were flighty & rambled on. He verbalized some delusional material. … Insight & judgment lacking (poor). He is not experiencing any sleep disturbance. However, he did report not sleeping in the last 24 hours & he has night sweats. … He is not overtly depressed or suicidal.
>
> A: Axis I: R/O Schizo-Affective Disorder, R/O Bi-Polar Disorder.

*Id.*

### 1.4    Brain Scans

Brain scans in August 2009 revealed multiple white matter hyperintensities consistent with Runyon's history of head injuries and migraine. Merikangas report, 9/23/15, p. 4, Ex. 2.

### 1.5    Prosecution Expert Reports

Guilt-phase counsel believed the prosecution experts determined that "Runyon did not have any mental or emotional issues that would be mitigating." Woodward declaration, ¶12, Ex. 6. Dr. Merikangas had reported, however, that the government experts "suggested that Mr. Runyon suffered from Migraine-like headaches, Attention Deficit Disorder and Post-Traumatic Stress disorder." Merikangas report, Attachment, p. 1, Ex. 2. The prosecution and defense experts agreed on certain aspects of Runyon's psycho-social history.[35]

### 1.6    David Dombrowski (Biological Father) Medical Records

Runyon's biological father suffers major depression that is managed with medications. A progress note dated June 2009, reads: "he [Dombrowski] is feeling ambivalent about the past decision

---

[35] The reports of Dr. Montalbano, ECF No. 277, and Dr. Patterson, ECF No. 276, are sealed, thus, the contents are not discussed herein. *But see* Memorandum Order, ECF No. 278, p. 4 (sealed).

**JA442**

to not have conflict with his ex-wife [Suk Cha] about access to his children. Now that they are adults, he hears things which cause him to question their parenting." Dombrowski Progress Note, Ex. 17.

### 1.7    Suk Cha Runyon (Biological Mother) Medical Records

Medical records dating back to 1976 indicate chronic complaints of pain for which multiple tests failed to reveal a physical cause. Psychosomatic complaints signal mental illness. There is a record noting, "she had a couple of episodes of coughing up blood when she was pregnant," and this is relevant to Runyon's neonatal development. Suk Cha Runyon medical records, p. 10, Ex. 25. While still married to Runyon's biological father she sought treatment for pain associated with hitting her lower back on the couch; a complaint consistent with domestic violence. *Id.*, p. 2. As early as 1977, symptoms of Suk Cha's mental illness are noted: she is described as "active and loud" and "very talkative;" *id.*, pp. 3, 8, 15, she has incontinence associated with stress, i*d.* p. 5; and, she is diagnosed with moderate depression and anhedonism. *Id.*, pp. 14, 15.

### 2.    Readily-Available Lay Witness Accounts

**Sheila Cronin.** Sheila Cronin conducted a pre-trial psycho-social investigation. "Only a fraction of [Runyon's] social history or other available history of adverse developmental factors, however, was presented in mitigation to Mr. Runyon's sentencing jury." Cunningham declaration, 9/25/15, p. 9 ¶16, Ex. 8. "Even those family and other formative experiences that were referenced were left largely unexplained in terms of their implications for a criminally violent outcome, as the defense did not call a mental health expert to describe the implications of these experiences." *Id.*, ¶18.

Sheila Cronin's global observations about Runyon were:

My observations of Runyon are that he had a calm, soft-spoken demeanor and appeared unhealthy, almost anemic. He over idealized his family life, had impaired reality testing, and exhibited extremely poor judgment. He was markedly grandiose. Runyon often compared himself to great figures in history. I thought these references were sad. Counsel Woodward thought they were funny. Runyon repeatedly talked about how many lives he had saved. After a member of his defense team visited with Runyon in jail, he would write a letter detailing the discussion. It was as if he felt he had not gotten his point across during the visit. Runyon's letters had a rambling quality.

54

**JA443**

Attached to this declaration as Exhibit A is an example of such a letter; it contains a list describing how he saved the lives of seven people. We clearly needed the assistance of mental health experts.

Runyon's mother had a history of severe trauma, was unstable, and likely suffered from bipolar disorder. There were obvious problems with how she raised Runyon. Essentially, she emasculated Runyon. Runyon's adoptive father was emotionally remote and exhibited no affection towards Runyon. His trial testimony could be fairly described as "throwing Runyon under the bus." His demeanor was very cold and he had no compassion for Runyon at all. Runyon spent his childhood and adult life trying to please his parents, make them proud, and earn their approval.

A sad component of Runyon's life is that every time he tried to achieve something, he underachieved or was fired from a job. He had multiple failed career attempts. He also had a series of failed relationships because he chose women who, like his mother, were mentally unstable.

Runyon appeared to perform relatively well in the military until late 1996, when he was involved in a serious head on collision with a drunk driver. I tried to obtain medical records from the civilian hospital where Runyon was transported and treated but was unsuccessful. I did, however, obtain Runyon's military medical records from 1994-1997. The records document that Runyon sought follow-up treatment for effects of the accident. Runyon suffered from vertigo, short-term memory loss, headaches, insomnia, and a personality change. David's ex-wife reported a change in David's personality in that he was less able to cope and deal with frustration; he was much more irritable and short-fused. David's former employer at the Fayetteville Police Department (a position he obtained after his Army discharge) said that David constantly forgot things and had to have instructions repeated. The military records contain diagnoses of Post-Traumatic Stress Syndrome/Disorder, depression and anxiety. I summarized those records for counsel. I also suggested to counsel that neuropsychological testing might clarify if Runyon's symptoms and behavioral changes were related to the closed head injury, PTSD, or both.

Runyon loved his son very much. He also loved Maria's children as if they were his own. Witness accounts were overwhelming consistent regarding Runyon's parenting skills and ability to relate to children. He was universally described as a great father and a person who was loved by children who knew him.

Cronin declaration, ¶¶7-11, Ex. 4.

Cronin further observed that Runyon wrote constantly throughout the trial, to the point of excessiveness or obsessiveness. *Id.*, ¶16.

55

**JA444**

### 2.1     Witnesses Relevant to the "Abuse of Women" Aggravator

**Dr. Mark Cunningham** could have described and explained the importance of transgenerational family dysfunction and distress on Runyon's mental state and behaviors. Cunningham declaration, pp. 12-27, 45-46, Ex. 8. Runyon's mother and biological father were raised in violent households, and they created the same environment for Runyon and his brother, Mark.

> [O]bservation of parental violence is associated with a variety of immediate and long-term psychological symptoms and disorders, lower levels of social competence, increased risk of delinquency, increased risk for domestic violence, and increased risk of violent criminal behavior. (Citation omitted). These perspectives are critically important in understanding David's volatile relationships with his wife, Maria, as well as subsequent girlfriends, including domestic violence charges.

*Id.*, p. 46.

The following witnesses testified at trial but were not asked to relay information that would have provided background and context to counter the "abuse of women" aggravator.

**David Dombrowski**, David Runyon's father, states:

> My father was born November 2, 1914. He grew up without a father. At approximately age 15 he went to prison for murder. My father worked for the mob, more specifically, Anthony "Tony" LaBarbera. My father was an "enforcer" or hit man for LaBarbera. I think the murder that my father went to prison for was a hit for LaBarbera.

> My father was released from prison early because he volunteered for a medical study, while in Boys Town, Nebraska. He was a "test dummy" for a federal study testing treatment for TB. I don't know what effect this had on my father but, when I was in the military, I had a TB test and had a positive reaction. I had to take medication for over a year.
>
> <div align="center">* * *</div>

> My father ruled the family with an iron fist. He was a severe alcoholic and regularly beat my mother. My father was a "functional drunk." He worked during the day but got very drunk at night and on the weekends. I cannot recall a time in my childhood when my father was not an abusive alcoholic. I think my father did not have a positive male role model when he was a child and he really did not know how to love. Instead, he had the role as "enforcer" and "Billy Bad Ass" and he treated his family the same way. When he was drunk, his "evil side" came out.
>
> <div align="center">* * *</div>

<div align="center">56</div>

<div align="center">**JA445**</div>

Our family environment was very violent and very volatile. Every time my father drank there was a high probability he would become violent. I walked on eggshells all the time with a constant feeling of dread about what was to come. I think my mother took the abuse, and maybe even provoked it, to keep my father from abusing me and my brothers and sisters. My mother would tell me not to get involved in their fighting and to stay away.

My father kept my mother isolated and alone, which made it nearly impossible to report the abuse—not that she would have done that anyway. She was completely dependent on him for everything. Even if she did everything the way he wanted it, my father still got drunk and beat her. On top of being physically abusive, my father degraded my mother. There were times when he came home late from the bar and demanded to know why his supper was not waiting on the table for him. Although my mother had his plate of food in the oven or the refrigerator my father would demand to know why it was not on the table, waiting for him. He made my mother sit down in the kitchen and watch him get his plate out and heat it up. He would yell at her saying things like—do you see how I'm doing this, does this look too hard for you? He kept my mother beat down in every way possible.

\* \* \*

I have come to realize that I mirrored my father's bad behavior, including his quick temper and aggressiveness. Around 1991, I admitted to myself that I had a problem. I began seeing a psychiatrist at the VA hospital. It took a while to get my medication regulated but once it was, I benefitted greatly. Currently, I take Prozac and Buspar. I see the psychiatrist every three months for check-ins and medication management. There have been times when I feel better and think I can manage without medication and will stop taking it. My wife can tell immediately if I've skipped a dose. She says I'm like "night and day." Without medication, I am easily frustrated and very quick tempered; with medication, I am easy going and pleasant to be around. I do not know my exact diagnosis but my problems stem from anxiety and depression.

Dombrowski declaration, ¶¶10-11, 17, 21, 22, 30, Ex. 26.

**Mark Runyon**, David Runyon's brother, states:

Our mother was unstable. She had mental breakdowns. The household would feel a buildup of stress and tension and then she just exploded. She would go "postal," screaming and breaking dishes and lost all control. She could destroy a room in 30 seconds. During these breakdowns my father would tell David and I to go to our room and shut the door until he said we could come out.

Our father would work to calm mother down. He often physically restrained her. When she stopped screaming they would go on as if nothing happened. My parents never discussed these breakdowns. My family simply did not talk to each other. David and I were left to deal with it on our own.

57

**JA446**

Our father continually tried to placate and keep our mother happy to prevent her from having one of her breakdowns. He always sided with our mother and we could not count on him to stand up for us.

Mark Runyon declaration, ¶¶14-16, Ex. 27.

**Scott Linker**, David's former brother-in-law, states:

There came a time that David's commanding officers said he could not re-enlist if he remained with Maria because she had caused so much trouble on the base. Maria called the CO's repeatedly and complained about anything she did not like about David. She also wrote bad checks all over the base. This reflected poorly on David and his CO's wanted her gone. It really bothered David that he could not continue his military career.

Eventually, David and Maria moved back to Kansas. My father Fred had a house in Wichita that was broken into apartments. David and Maria lived in one of those apartments.

Because they lived in separate apartments but in the same house, my father observed David and Maria's relationship and David's relationship with Maria's children, Wren and Kendi, and with their son, Davy. My father heard Maria yell at and berate David. One time, Maria called David a "ying yang mother fucker." My father thought that David should leave Maria because of how badly she treated him. My father thought highly of David because he not only treated Wren and Kendi like his own, but also worked hard and tried to care for the children whereas their own mother (Maria) did not.

It bothered me to see how hard David worked when Maria did not contribute to the family in any manner. Their house was filthy dirty. Dirty laundry and food was everywhere. Maria sat home all day, drank alcohol, and smoked cigarettes.

Linker declaration, ¶¶5-8, Ex. 13.

**Maria Runyon**, David Runyon's ex-wife, states:

In July 1994, there was an incident with my sister Teresa Linker. There was bad blood between us because we had both dated David and he was spending all his time with me. Late one night, Teresa called and said she was coming over to pick up a shirt. David knew Teresa was just asking for trouble so he took the shirt outside to give it to Teresa. I watched from the window and thought I saw shoving but was unsure about who touched who. I ran outside and jumped on Teresa. We started shoving and yelling at each other. Teresa got in her car and left. I thought that was the end of it. A couple of weeks later I learned there were warrants for both me and David. Teresa did not show up for court multiple times. I ended up pleading guilty to a lesser charge. I was told someone had to be held responsible because Teresa had a bloody lip. I don't remember Teresa having a bloody nose when she left my house. David was getting ready to go active duty and his charges were dropped.

58

**JA447**

\* \* \*

There were times when David and I fought and became physical with each other. I would say that each of us were to blame for these incidents "50/50." Most of the incidents were a result of my drinking and David trying to calm me down. I was never afraid of David nor did he ever do anything to that made me fear for my life.

In regards to the domestic violence incident on February 7, 2001, I remember that my daughter [Kendi] was sick and I was late getting home because I had to pick up medications. David was upset because he needed the car to go to work. I wanted David to put oil in the car before driving it because it needed oil every few days. David refused. We began fighting over the keys. David grabbed my arm to try to take the keys. At some point, David grabbed me by the neck. I was never scared or worried David was really going to hurt me. I called the police because I was mad that David wanted the car and refused to put oil in it. I did not want to press charges and recanted later because I was not hurt, I was just mad. After this incident, we briefly separated because a restraining order was issued.

David and I separated and got back together a few times. In July 2002, David left me and the kids. Wren was eleven, Kendi was eight and Davy was around five years old. I had no idea where David was or how to get in touch with him. He sent no money. I now realize that David was desperate to get away and he could not handle my drinking. I wish he would've supported the kids but he doesn't hold all the blame for leaving.

Maria Runyon declaration, ¶¶7, 26-28, Ex. 28.

### 2.2    Witnesses Relevant to the Family Violence Mitigating Factors

**Suk Cha Runyon**, David Runyon's mother, could have testified about how she and Runyon were beaten by David Runyon's biological father (David Dombrowski). She could have testified about one episode that is noteworthy because it left Runyon with a crooked smile, in other words, one side of his face droops. When David Runyon was three years old, Dombrowski grabbed David by the wrist and dangled him in the air. Suk Cha ran to stop Dombrowski, jumped on his back, and pulled his hair. Despite this, Dombrowski would not let David go. Instead, he went to David's bedroom, swung him by the wrist, and heaved him across the room. David was rendered unconscious. Cunningham declaration, pp. 21, 30, Ex. 8; Dudley report, p. 8, Ex. 29.

**David Dombrowski**, David Runyon's biological father, states:

David was a sickly child and I attribute that to Suk Cha not getting the prenatal care she needed. Suk Cha did not want to breast feed and David was fed formula. Suk Cha did not know what to do with David. It seemed like her behavior was much deeper than just first-time mom anxiety. She did not bond with David or Mark. She was not emotionally connected to them in any way. She did not know how, and did not try, to soothe David when he cried. She exhibited no maternal nurturing; she was cold as a fish and David and Mark could sense this. I remember walking in the house and seeing Suk Cha holding David while he cried and wondering who was more scared of who? She held David with semi-outstretched arms; not in any sort of close or connective way. Although Suk Cha would hold David while he cried, she did not try to soothe him. I could walk over to David and simply rub his head or kiss him and he would stop crying, but he would resume crying when I walked away. I always felt like the babies knew their mother was afraid and they—even as infants—picked up on that. I think this was a big part of the reason why David cried a lot.

As the children aged, Suk Cha's treatment or discipline of them became excessive and borderline physically abusive. Suk Cha wanted them to act as adults. When David was barely old enough to walk, Suk Cha would yank him up and start spanking him if he touched something on the coffee table. I did not think that it was appropriate to spank children at that age for touching something on a table. Also, Suk Cha's spankings were hard and she hit David several times in a row. It was excessive. Suk Cha would not allow the kids to be kids. She wanted to keep a very, very clean home with all her home decorations displayed in their proper places. I thought that was unrealistic with young children in the house but Suk Cha made it a point to try.

One time when David was two or three years old, Suk Cha instructed David to finish his dinner and he did not want to. Suk Cha force-fed him until he threw up. She pinned David and forced food down his mouth. David was upset and was crying. A combination of the crying and the food being shoved down his throat caused David to throw up. Suk Cha then got mad and spanked him because he threw up. I tried to intercede and console David but Suk Cha became very angry at me.

There were many instances of normal kid behavior that made Suk Cha very irate. On one occasion, Suk Cha put collared shirts on the boys and one of them ran outside to play and came back with his collar messed up. Suk Cha immediately slapped him across the face and fixed the collar. The boys were terrified of her and they would stop, at the drop of a hat, when they heard her voice.

Suk Cha was extremely difficult to live with. Every little occurrence was blown out of proportion. She wanted everything in her control and if things were not exactly how she envisioned them, she quickly became agitated and spun out of control. Any little thing would send Suk Cha over the edge. If she did not like something I said, she picked up a dish and threw it at me. If the David or Mark touched something she wanted left alone, she grabbed their hand and hit it with a ruler until it was almost bleeding. If she tried to open a can and the can opener was not fast enough, she threw

60

**JA449**

it across the room. It made for a miserable home environment and left everyone anxious and walking on eggshells.

Nothing anyone did was ever good enough or pleased Suk Cha. There came a point in time when I did not want to go home. I began staying out late until so I could avoid having to see Suk Cha.

David was the son who tried to keep the peace. He was a "clinger." When Suk Cha and I would argue, David tried to physically hold onto his mother and calm her down - saying things such as "I'm here mommy," "it's okay." David would do anything to get Suk Cha to calm down. When Suk Cha was hitting the children, David would say, "please stop" and "don't hurt us anymore." At times when I came home from work, David would tell me that their mother had been hitting them. If I tried to take up for the kids or confront Suk Cha, it only seemed to make things worse.

Dombrowski declaration, ¶¶36-42, Ex. 26.

**Mark Runyon**, David Runyon's brother, states:

I remember my mother caught me with her cigarettes when I was about twelve years old. She made me smoke an entire pack of cigarettes, hoping I would get sick, but I did not. She then made me eat the cigarettes, still trying to make me sick.

\* \* \*

Our mother was unstable. She had mental breakdowns. The household would feel a buildup of stress and tension and then she just exploded. She would go "postal," screaming and breaking dishes and lost all control. She could destroy a room in 30 seconds. During these breakdowns my father would tell David and I to go to our room and shut the door until he said we could come out.

Our father would work to calm mother down. He often physically restrained her. When she stopped screaming they would go on as if nothing happened. My parents never discussed these breakdowns. My family simply did not talk to each other. David and I were left to deal with it on our own.

Our father continually tried to placate and keep our mother happy to prevent her from having one of her breakdowns. He always sided with our mother and we could not count on him to stand up for us.

Mark Runyon declaration, ¶¶13, 14-16, Ex. 27.

### 2.3   Witnesses to the 1996 Car Accident and Runyon's Personality Change

**Thomas Preston** was a parachute rigger at Fort Benning with Runyon. Preston interview, p. 2, Ex. 30. They were friends, they went hunting together, and their wives socialized together. *Id.*

61

**JA450**

Preston recalled a weekend when Runyon went out of town and didn't return to work on time. *Id.* Preston learned that Runyon had been in a serious car accident and was lucky to be alive. *Id.* pp. 2-3. Preston did not testify at trial.

**Robert and Deborah Seeger** were friends with David and Maria Runyon when both couples were stationed at Fort Benning. R. Seeger declaration, ¶ 8, Ex. 31; D. Seeger declaration, ¶8, Ex.32. They remember David Runyon went out of town to pick up his brother's truck for safe-keeping. *Id.* On the return trip home, a drunk driver collided head-on with Runyon. *Id.* The truck was totaled. *Id.* Robert Seeger picked-up Runyon and brought him back to Fort Benning. R. Seeger declaration, ¶8, Ex. 31. Deborah Seeger remembers Runyon was in a lot of pain afterwards. D. Seeger declaration, ¶8, Ex. 32.

Deborah Seeger noticed that Runyon's behavior changed after the accident: "Before the accident David always tried his best to succeed, look sharp and get the job done. He offered a lot of laughter and smiles for everyone he met. After the accident I noticed that he became angry more easily." *Id.*, ¶9. Runyon would become upset with his wife if dinner was not on the table when he wanted it or if Maria moved something in the house that he believed should be kept in a certain place." *Id.*, ¶10. Runyon became unpredictable and stopped following through on promises. *Id.*

The Seegers were present at Runyon's trial. D. Seeger declaration, ¶¶14-15, Ex. 32. Although deemed to "be essential parts of [the] mitigation case," ECF No. 220 p. 3, they did not testify. Counsel cannot remember why the Seegers were not witnesses. Hudgins declaration, ¶9, Ex. 5.

**Maria Runyon**, David Runyon's ex-wife, did not testify about the car accident and its effects on David Runyon. Maria remembers the car accident; David's physical pain, vertigo, and drastic personality change. After the accident, David became easily frustrated, was easily angered, had less discipline and restraint, did not think things through before he did them, and became paranoid and

62

**JA451**

very vigilant about his surroundings. Maria Runyon declaration, Ex. 28. Maria believes the car accident

"changed David forever." *Id.*, ¶35.

> At one point when we were at Fort Benning, David's brother Mark was serving prison time in Fort Knox. Mark asked David to get Mark's truck and his belongings. When David was driving in Dadeville, Alabama, he was hit head on by a drunk driver. David was trapped in the truck and had to be cut out. I can't remember the name of the person who hit David. This person was required to pay restitution, which he did for a few months and then he just stopped.

> After the wreck, David was in a lot of pain and did not want to take medicine. David's pride often kept him from taking medicine when I knew he was feeling really bad. David did not like to take any medicine - even aspirin. He went out of his way to avoid putting anything unnatural in his body. He rarely drank and never did drugs. He even hated the fact that I smoked.

> As a result of the wreck, David experienced severe vertigo and every time he laid down he felt he would pass out. David went to the emergency room on a couple of different occasions due to the vertigo.

> I think the wreck was a very significant event in our lives because David's personality changed dramatically. He was meaner and easily frustrated. The guy I married had good morals, discipline and restraint and, for the most part, this changed. He was easily angered and quick tempered.

> When and David and I would fight I sometimes called and talked with his CO (commanding officer) about David's behavior. The CO made us attend counseling. Then, David was barred from re-enlisting in the Army.

> After David was discharged from the Army we moved to the metro Atlanta area, around Fayetteville. David worked with the Fayetteville Police Department.

> I think sometimes David did not think things through before he did them. When he was a police officer he helped the apartment manager at our complex with a tenant who owed back rent. David was not on duty and it was not his jurisdiction but he took his badge and service weapon. Those things are bad ideas yet it never occurred to David that he could get in trouble.

> \* \* \*

> David acted paranoid and was very vigilant of his surroundings. If we went to a restaurant he would not sit down unless he could sit with his back to the wall. He did not like the fact that I smoked because he said it put me in contact with "unsavory characters." When I went outside to smoke people sometimes approached me and asked for a cigarette. David did not like this. I remember David saying that you had to "watch your six and twelves."

<div align="center">63</div>

<div align="center">**JA452**</div>

One time I was outside of our house smoking. The house was close to the street and a man came walking down the sidewalk. The man then started walking toward our house. Out of nowhere David appeared and had his gun at his hip. I don't remember if David said anything to the man but he got back on the sidewalk and kept walking. I think the man was probably just going to ask for a cigarette. David describes this episode as saving my life from a would-be rapist.

* * *

When I found out that David was arrested for murder I was surprised to learn that he was involved in drug trials. When I met David he had an aversion to taking medicine. He went to extreme lengths to avoid taking even an aspirin. It was hard to believe David would volunteer for drug trials. David never told me that the reason he went out of town was for drug trials. He told me he was doing some sort of computer work for a hospital.

I was also very surprised that David would even associated with, what he would probably call, "unsavory characters." I can't count the number of times David talked about not hanging around or associating with people with a questionable background or shady characters. I was amazed to hear that David had been associating with the type of people who would be involved in a murder.

Maria Runyon declaration, ¶¶14-20, 23-24. 32-33, Ex. 28.

**Mark Runyon**, David Runyon's brother, did not testify about the car accident. Mark learned about the accident and tried to speak with the drunk driver who totaled Mark's truck when David was driving it back to Georgia. Mark Runyon declaration, ¶26, Ex. 27. Following the accident, David suffered dizzy spells and "saw stars." *Id.*, ¶27. David's personality changed, although Mark attributed the change to David and Maria's high-conflict marriage. *Id.*

David really wanted to continue his military career; he seemed to function well in the military but the issues with Maria kept him from reenlisting. *Id.,* ¶30; *see also* Linker declaration, ¶5, Ex. 13. Maria was a factor in David losing his job as a police officer. *Id.* After he lost that job,

David kept moving around and each place they lived was worse than the last. One of the last times I saw David in Georgia, he and the family were living in a trailer with no running water. David just wasn't together anymore and he stopped being my big brother.

64

**JA453**

When I learned that David had left Maria I believed that the constant stress of his marriage and being the only partner pulling any weight took its toll on David. I think David got to the point that the only way he could better the situation was to leave.

*Id.*, ¶¶31-32.

**Captain Jeffrey Harris**, of the Fayetteville Police Department where Runyon worked after leaving the Army, remembers training Runyon. In Captain Harris's opinion, Runyon had a problem retaining things. Harris Declaration, Ex. 33. Every time the class started to move ahead with the training, Captain Harris would have to go back to the first day because Runyon couldn't retain what he learned from the first day. *Id.* They had to start from scratch just about every day. *Id.* Captain Harris's daughter has a learning disability and Runyon's poor retention reminded him of the challenges his daughter faced. Captain Harris did not testify at trial.

### 2.4    Witnesses Who Knew Runyon In the Time Span Preceding His Arrest.

Defense counsel indicated that Runyon "had absolutely no ties to the local community" in Morgantown, West Virginia, where he lived before his arrest in 2007. ECF No. 179 p. 10. This was incorrect and counsel's failure to identify such character witnesses constitutes deficient performance.

The prosecution emphasized the fact that none of the penalty-phase witnesses called by defense counsel had recent contact with Runyon. Tr. 2610, 2613, 2618, 2619, 8/26/09. The prosecution argued that Runyon had changed; he was not the same person who was described by the testifying character witnesses as a good friend, a charitable person, a considerate and helpful guest, and a caring father. There were, however, witnesses available to testify about Runyon during the years immediately before the crime and Runyon's arrest.

**Chad Costa** met David Runyon in the second half of 2007. Costa declaration, Ex. 7. Counsel had Chad Costa flown-in for the trial but did not call him as a witness. Had Costa testified, the prosecution could not have argued that *the absence of testimony* from persons who knew Runyon during the time period preceding the crime *was evidence* that Runyon was not the person portrayed by the

65

**JA454**

defense witnesses. Indeed Costa's description of Runyon after the crime and during the six months before his arrest is consistent with the description given by people who knew Runyon a few years before the crime occurred.[36] Costa knew how much Runyon's son meant to him. Costa declaration, Ex. 7. Costa also witnessed Runyon try to help women who were facing many challenges, including substance abuse. He would have provided insight into Runyon's inability to escape the predispositions to poor decision-making regarding romantic partners and to a pattern of failed relationships. As explained below, such predispositions arising from hereditary and childhood experiences are important perspectives for a subsequent expert explanation regarding Runyon's psycho-social history and how it relates to mitigation. *See* Cunningham declaration, Ex. 8.

Costa was present at Runyon's trial and deemed to be an essential part of the mitigation case. ECF No. 220 p. 3. However, he did not testify.

**Matt Long** and **Paula Dalton**[37] knew David Runyon from about 2006-2007. Long declaration, ¶2, Ex. 12; P. Dalton declaration, ¶2, Ex.11. They were roommates for a short period and Matt Long and Runyon hunted together. Long declaration, ¶2, Ex. 12; P. Dalton declaration, ¶3, Ex. 11. Long says "David was an all-around good guy" who loved his son. Long declaration, ¶¶2-3, Ex. 12. Paula Dalton describes David as very nice and kind, polite, and "the perfect gentleman" who tried hard to be a good father to his son. P. Dalton declaration, ¶¶4-5, Ex. 11. Matt Long and Paula Dalton helped keep Davy when Runyon was working out of town. Long declaration, ¶3, Ex. 12; P. Dalton declaration, ¶5, Ex. 11. Matt Long says Runyon always helped him when he needed it. Long

---

[36] Persons who knew David in the years leading up to the crime, and who were available to testify, included David Dalton, Sr., Paula Dalton, and Matt Long. D. Dalton declaration, Ex. 10; P. Dalton declaration, Ex. 11; Long declaration, Ex. 12. Investigation regarding this area is ongoing and supplemental information will be provided when available.

[37] The prosecution called Paula Dalton to testify at trial.

declaration, ¶3, Ex. 12. Matt Long never heard Runyon talk about coming into a large amount of money or about being hired to kill someone. *Id.*, ¶4.

**David Dalton**, Paula Dalton's father, hunted and fished with Runyon. D. Dalton declaration, ¶3, Ex.10. Runyon rented a room from David Dalton and his wife. *Id.*, ¶2. David Dalton trusted Runyon and Runyon never talked about coming into a lot of money or being hired to kill anyone. *Id.*, ¶¶3-4. David Dalton also helped watch Davy when Runyon was out of town at a drug study. *Id.*, ¶5. Runyon "made sure his son was taken care of when he went out of town for work." *Id.*

### 2.5 Evidence Relevant To the Juror-Created Mitigator That Runyon Was Led To Believe Cory Voss Was Molesting His Daughter

**Maria Runyon**, David Runyon's ex-wife, could have testified that after Runyon left her and the children behind, the step-children's biological father came back in their lives. Unfortunately, he molested Kendi. Maria Runyon declaration, ¶31, Ex. 28. Kendi testified against her biological father and he was convicted and sent to prison. *Id.*; Fleming DOC record, Ex. 34. This occurred within a year prior to Cory Voss' death and Runyon was aware of what had happened to Kendi.

### 3. Readily-Available Expert Analysis And Opinions

Defense counsel does not remember the results of the brain scans or why Dr. Mirsky and Dr. Merikangas did not testify. Hudgins declaration, ¶6, Ex. 5. Had counsel presented expert testimony, it would have established the statutory mitigating circumstances of "impaired capacity" and "disturbance." 18 U.S.C. §§ 3592(a)(1) & (a)(6). Expert testimony also would have explained that Runyon's impaired mental state and impaired decision-making abilities are not of his own volition which bears directly on Runyon's lesser moral culpability.[38] Finally, expert evidence reveals the type

---

[38] *Compare*, Tr. 2621-22, 2658, 8/26/09 (prosecution argument that Runyon walked away from a good family upbringing, rejected his past life, and made a different choice). The prosecutor argued: "He had the power to take the life or to walk away and save a life, and when he exercised this power, when he chose this course, he made that decision to be treated on his own, to be treated differently. He acted with complete free will in doing so." Tr. 2659, 8/26/09.

67

**JA456**

of brain abnormality and cognitive defects that the Supreme Court has deemed highly relevant to assessing a defendant's moral culpability. *Porter v. McCollum*, 558 U.S. 30, 41, 43 (2009); *see also Sears v. Upton,* 561 U.S. 945, 949 (2010)(describing brain damage as significant mitigating evidence); *Abdul-Kabir v. Quarterman*, 550 U.S. 223, 261-63 (2007) (describing "possible neurological damage" as mitigating evidence); *Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (discussing how organic brain damage is an extreme mental disturbance that significantly impairs cognitive functions and a defendant's mental capacity at the time of the crime).

### 3.1 Allan F. Mirsky, Ph.D., ABPP-CN

Dr. Mirsky conducted neuropsychological evaluations of David Runyon on June 26, 2009, and August 28, 2015. Mirsky report, p. 1, Ex. 35. At trial, Dr. Mirsky could have testified as follows:

> the test results of David Runyon, supported by the relevant scientific literature, indicate the presence of significant damage to the right side of the brain, as well as a psychotic disorder. The numerous affidavits strongly suggest that there was a marked change in his behavior subsequent to a significant head injury. It is entirely possible that the injuries contributed to the development of a psychotic disorder. While the association between cerebral injury and psychosis is complex, traumatic brain injury and the onset of psychosis was early documented in the classic text of Lishman (1998) and has been the subject of considerable research efforts. Review of the family histories of David's relatives suggest strongly that a genetic precursor for psychosis could have been present as well; in effect the psychosis was "released" or expressed by the cumulative effect of the head injuries.

*Id.*, p. 6.

Dr. Mirsky's conclusions are based on Runyon's test results, Runyon's head injuries, and a prior diagnosis of Post-Traumatic Stress Disorder (PTSD). Runyon's test results reveal he has frontal lobe damage, especially of the right ventrolateral prefrontal cortex. *Id.* Runyon's history of head injuries include two incidents of grenades being detonated quite close to him during training exercises while in service. These occurred between 1989 and 1991. Runyon was involved in two serious car accidents with Cognitive sequelae-one in 1990 and the other in 1996. These incidents produced symptoms including brief unconsciousness, vertigo (from which he still suffers occasionally),

68

**JA457**

temporary deafness, numbness, impaired memory, "jumbled thoughts," and according to a report from his estranged wife, marked personality changes including a short temper. *Id.* Dr. Mirsky finds these circumstances consistent with the diagnosis of PTSD, explaining:

> [Runyon's] history resembles that of many injured service members diagnosed with mTBI (mild traumatic brain injury) I have seen at Walter Reed National Military Medical Center. Many of these service members develop PTSD, despite the diagnosis of "mild." These incidents, especially the severe automobile accidents, were never followed up, to my knowledge, with brain imaging studies. Such studies, in a number of cases, especially if the imaging reveals demonstrable brain damage, can change the diagnosis to "moderate brain injury."

*Id.*, p. 2.

Dr. Mirsky examined Runyon four days before trial. He informed counsel, "it is clear from the data that there is strong evidence that he [Runyon] is suffering from a neurological disorder[,]" and it was essential for Runyon to be evaluated by a neurologist. Mirsky letter 7/2/09, Ex. 20. After learning from counsel that the jury had determined Runyon was death-eligible, Dr. Mirsky responded:

> I am firmly convinced that Mr. Runyon is still suffering from the effects of the two blast injuries he sustained when undergoing training exercises in the ROTC. These were compounded by the effects of the motor vehicle accidents. His impaired attention, seen in the poor Continuous Performance Test scores in my report, is one of the classical symptoms of blast injury and impact injury after a car accident. Other symptoms, such as quickness to anger, and impulsivity, are also well documented in the brain injury literature. The occasional dizziness he shows is also symptomatic of brainstem injury. In some sense, because he suffered the blast injuries while in the ROTC, he can be considered a wounded warri[o]r, and this should be considered in his sentencing.

Hudgins/Mirsky email, 7/22-7/23/09, Ex. 21.

About two months later, after hearing nothing, Dr. Mirsky placed a telephone call to counsel to find out the status of the case. He learned that Runyon had been sentenced to death. Counsel told Dr. Mirsky the brain scans "were read as normal." Mirsky letter, 9/18/09, Ex. 22. The scans, which had been released directly to defense counsel, had not been read by Dr. Merikangas or a similar expert.

In response to this news, Dr. Mirsky wrote counsel a letter stating, "I wish to make sure that the Court is aware of certain mitigating circumstances that should affect the sentence of your client,

69

**JA458**

Mr. David Runyon." Mirsky 9/18/09 letter, Ex. 22. Dr. Mirsky explained—without having seen Runyon's brain scans[39]—that with blast injuries, such as Runyon experienced in ROTC, "[t]here can be extensive damage to white matter tracts, which serve the vital function of connecting various cortical areas." *Id.* He also explained to counsel why the reported "normal" reading did not affect his opinion. *Id.* He said persons with mild traumatic brain injury (mTBI), such as Runyon,

> may have symptoms of abnormal behavior, including poor ability to concentrate, committing impulsive acts, and other indications of poor "cognitive control." They can be symptoms of what is referred to as Post Traumatic Stress Disorder, or PTSD, which has not been ruled out in the case of Mr. Runyon. You will recall that in my test of Mr. Runyon, he performed in the very impaired range on tests of sustained attention. This can be symptomatic of mTBI, as well as PTSD.

*Id.*

Dr. Mirsky attached charts to his letter depicting Runyon's "very impaired" performance. *Id.*

Counsel was ineffective for failing to present Dr. Mirsky's testimony. Given that Runyon's military service significantly contributed to his brain damage and deficits in functioning, the jurors could have assigned substantial weight to the "military service" mitigating circumstance. Concomitantly, the "special training" aggravator could not reasonably have been given great weight by the jurors because that same evidence simultaneous established offsetting mitigating evidence in terms of Runyon's honorable military service. *See Porter*, 558 U.S. at 43 ("Our Nation has a long tradition of according leniency to veterans in recognition of their service[.]"); s*ee also, Rompilla*, 545 U.S. at 386 (absent the un-presented mitigating evidence, the jury "could give more relative weight" to aggravation because counsel missed an opportunity to place significant mitigating evidence on life's side of the sentencing scale).

---

[39] The scans revealed "multiple white matter hyperintensities consistent with his [Runyon's] history of head injuries and migraine." Merikangas report, p. 4, Ex. 2.

70

### 3.2    James R. Merikangas, M.D., L.L.C.

Dr. Merikangas conducted neurological examinations of David Runyon on July 29, 2009, after Runyon had been found eligible for the death penalty, and on August 24, 2015.

Fourteen days before the penalty phase, Dr. Merikangas prepared a preliminary report while awaiting results of the brain scans. Merikangas report, 9/23/15, Attachment p. 1, Ex. 2. He informed counsel that the prosecution experts' reports "suggested that Mr. Runyon suffered from Migraine-like headaches, Attention Deficit Disorder and Post-Traumatic Stress Disorder." *Id.* Dr. Merikangas' evaluation revealed that Runyon's "head circumference was abnormally small[,]" and:

> He had multiple scars on his head and face from trauma, including an automobile accident that rendered him unconscious and contributed to his PTSD. His right forehead does not wrinkle with facial expression and his right lip sags from a peripheral nerve injury, which may be congenital or the result of beatings he sustained in childhood. There is a lump on the vertex of his scalp from trauma.

*Id.*

Dr. Merikangas explained that "[b]ecause of his [Runyon's] history of multiple head injuries, beatings in childhood, and his current severe headaches, he requires brain imaging and an EEG." *Id.* Psychiatric evaluations suggested that "at the time of the crime in question he was suffering from the effects of, or withdrawal from, the experimental drugs that he was taking as a paid experimental subject." *Id.* pp.1-2. Dr. Merikangas found that "presently" Runyon "was either in a fantasy world of grandiose wishful thinking, or suffering from delusions." *Id.* p. 2.

Had counsel shown Dr. Merikangas the brain scan results, he would have told counsel that they "revealed multiple white matter hyperintensities … consistent with his history of head injur[i]es and migraine." Merikangas report, 9/23/15, p. 4, Ex. 2. Dr. Merikangas would have testified at trial that Runyon is "a brain damaged individual with migrainous headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process." *Id.* p.1. Runyon sustained brain damage from the age of three when he was thrown across a room by his father and rendered

71

**JA460**

unconscious. *Id.*, p. 4; *Id.*, Attachment p. 1. Runyon's brain damage was exacerbated by a car accident in 1996 that resulted in a personality and mood change and contributed to his Post-Traumatic Stress Disorder. *Id.*, p. 4; *Id.*, Attachment p. 1. Such "brain injury has resulted in impaired executive functioning and decision making." *Id.* Psychological testing also indicates paranoia and delusions. Runyon's history of Post-Traumatic Stress Disorder "may account for some of his disordered mood and cognition." *Id.* "The paranoia and delusions may represent a formal thought disorder, which may be a consequence of his brain injuries, mood disorder, and PTSD." *Id.*

Brain damage, cognitive defects, PTSD, Schizophrenia and other disorders are substantially mitigating but Runyon's jurors were not provided with this information and, therefore, had an inaccurate view of David Runyon. *See Porter*, 558 U.S. at 36 n.4 (discussing the mitigating value of PTSD); *Rompilla*, 545 U.S. at 390 (An investigation of schizophrenia and other disorders "would have destroyed the benign conception of Rompilla's upbringing[.]"). Thus, counsel rendered ineffective assistance by failing to present Dr. Merikangas's testimony.

### 3.3    <u>Mark D. Cunningham, Ph.D., ABPP</u>

In 2009, Dr. Cunningham testified about his prison violence risk assessment of David Runyon. Dr. Cunningham was available to provide an evaluation of adverse factors in Runyon's background and the implications of developmental factors so that the jury would have an informed mechanism for determining their weight and nexus. Cunningham declaration, 9/25/15, p. 50, Ex. 8. Such an evaluation provides an individualized consideration based on the well-established principle that adult outcome is a function of the interaction and balance of predisposing, risk, and protective factors in childhood. *Id.*, p. 10 ¶21. As predisposing and risk factors increase, and protective factors decrease, there is an increasing probability of dysfunction as an adult. *Id.*

The nexus between development and adult behavior is typically neither conscious nor simplistically obvious. *Id.*, ¶22. There is, however, a logical nexus between the adverse developmental

72

**JA461**

factors in Runyon's background and the capital offense, *id.*, as well as statutory and non-statutory mitigating circumstances. This is important because the predispositions to mental illness and certain personality traits arising from hereditary and childhood experiences counters attempts by the prosecution to characterize Runyon's conduct and decision-making ability as "willfully self-selected, rather than acknowledging its origins in his heredity, childhood, and/or family experience." *Id.*, p. 29. It was therefore critical that the jurors were informed about the formative influences in Runyon's history, his character, and his psychological limitations. *Id.*, p. 27. Those formative influences, unknown and/or unexplained to Runyon's jurors, are set forth below.

**(a)** The following have a genetic predisposition/component: Major Depressive Disorder, Anxiety Disorder, Bipolar Disorder, and explosive reactivity and both sides of David Runyon's family have these disorders, or associated traits, in their genetic heritage. Cunningham declaration, 9/25/15, pp. 28, 29, Ex. 8. "Such genetic predispositions coupled with developmental vulnerabilities and childhood maltreatment, increased the risk David would possess traits such as irresponsibility, intermittent callousness, and manipulative behavior." *Id.*, p. 29. This is relevant because the prosecution characterized as aggravation: Runyon's tardiness at work; the alleged abandonment of his child and step-children; and, the self-serving video tape of Virginia Pina where Runyon elicits a recantation of the domestic assault.

**(b)** Suk Cha's inability to bond with Runyon, the biological father's abandonment of Runyon, and the adoptive father's frequent absences and emotional unavailability also "result[ed] in lasting fundamental psychological harm." *Id.*, pp. 35-36. In particular,

> Suk Cha was not maternally bonded to David. [Dombrowski] described David as responding much more readily to Dombrowski's soothing than that of Suk Cha. This suggests that, in spite of Dombrowski's alcoholism and family violence, David had a more secure attachment to him than to Suk Cha. Thus when Dombrowski abandoned him, David not only lost some protection from his mother's punitive volatility, he also lost a primary emotional attachment.

*Id.*, pp. 46-47.

73

**JA462**

The lack of parental/family attachment was reinforced by residential instability that disrupted attachments outside the family unit. *Id.*, p. 47. Runyon's brother explained, "The message was: don't get attached to anything because you will not be here long, people are expendable and everything changes." *Id.*

The lack of attachment provides an explanation for family estrangement which the prosecution capitalized upon, stating that Runyon "walked away from" his "good upbringing" and ceased contact with his parents. *See, e.g.*, Tr. 2619, 2621-23, 2658, 2659, 8/26/09. Even more central to the prosecution's plea for a death sentence were the "lack of remorse" and "victim impact" aggravators. The connection between inadequate attachment and deficits in empathy is an important factor in Runyon's development and provides:

> a context for the deficits in empathy for the victim reflected in David's perpetration of the capital offense. The gravity of disrupted attachment and its implications for later deficiency in the ability of that individual to meaningfully relate to and empathize with others (such as romantic partners), as well as the vulnerability that this fundamental developmental injury has for antisocial conduct and criminal violence are critically important conceptualizations in mitigating his offense.

*Id.*, p. 37.

(c) Runyon "suffered chronic stress in childhood including deficient maternal bonding, paternal alcoholism, observed domestic violence, emotional neglect, physical and emotional abuse, father abandonment, extended absences of adoptive father, recurrent moves, and transcultural relocation." Cunningham declaration, p. 32, Ex. 8. Such trauma can "activate various systems in the brain that actually change neuron response and cognitive pathways. Children that experience on-going high levels of arousal due to trauma will develop systems in their brains that cause them to be constantly hyper-aroused and hypervigilant." *Id.*, p. 32. Alterations in the brain can result in severe problems for children, adolescents, and adults in learning ability, mood, bonding and attachment, problem solving, and increased likelihood of reactivity. *Id.*, p. 32.

74

**JA463**

> [O]bservation of parental violence is associated with a variety of immediate and long-term psychological symptoms and disorders, lower levels of social competence, increased risk of delinquency, increased risk for domestic violence, and increased risk of violent criminal behavior. (Hershorn & Rosenbaum, 1985; Jaffe et al., 1986; Jaffe, Hurley, & Wolfe, 1990). These perspectives are critically important in understanding David's volatile relationships with his wife, Maria, as well as subsequent girlfriends, including domestic violence charges.

*Id.*, p. 46.

In addition, Runyon's experiences with childhood physical abuse and neglect:

> disrupt[ed] not just the subjective experience of childhood, but also the trajectory of development and the psychological structures of middle and later adulthood. The fundamental alterations in the way the child perceives himself, others, and the world around him, as well as potential trauma-based adaptations in brain functioning, likely account for the sustained experience or resurgence of PTSD symptoms, or their character-engrained legacy, into adulthood (see Schwarz & Perry, 1994). The bridge between childhood and adulthood experiences of PTSD is consistent with the diagnosis of this disorder in David when he was in the military.

*Id.*, p. 42.

Traumatic childhood experiences have a lasting effect with "potentially broad adverse effects on personality structure, subsequent vulnerability to psychological/psychiatric disorder, life trajectory, behavior, and relationships." *Id.*, p. 43. The particularized childhood experiences of abuse and neglect – which presumably most jurors have never experienced – affect each individual in a distinct manner thus requiring an expert explanation. *Abdul-Kabir*, 550 U.S. at 261. Accordingly, Runyon's jurors should have been informed of the effects of a traumatic childhood when determining his moral culpability. *See, e.g., Porter*, 558 U.S. at 33 (abusive childhood, trauma from military service, and impaired mental health and mental capacity); *Sears*, 561 U.S. at 948 (parents had a physically abusive relationship and divorced when the defendant was young and the defendant was disciplined with age-inappropriate military-style drills); *Rompilla*, 545 U.S. at 392 (parental alcoholism, parental violence, physical abuse, terrifying home environment, no expressions of parental love, affection or approval).

**(d)** Runyon's history of traumatic brain injury, started at age three (at the hands of his biological father) and culminated at the age of 25 with a head-on motor vehicle collision. Frontal lobe

75

**JA464**

damage can result in "personality changes of reduced initiative, reduced planning ability and foresight, unreliability, rudeness or tactlessness, and irascibility resulting in … difficulty holding employment." Cunningham declaration, p. 33, Ex. 8. These effects of Runyon's brain damage shine a different and mitigating light on the prosecution's arguments in aggravation: that Runyon's tardiness at work was irresponsible; that he "chose" not to complete college and instead "chose" to follow a different path; and, that he failed at every career attempt but placed the blame on his employers. *Id. See also Sears*, 561 U.S. at 946, 949 (cognitive impairments caused by significant frontal lobe damage suffered as a child).

Additionally, persons with frontal lobe damage are impulsive, have poor anticipation, and once they become fixated on a course of action, they seem to forget that any other is possible. *Id.* Frontal lobe damage reduces the ability to plan and to perceive consequences of actions, results in deficiencies of judgment, and imposes difficulty in reprogramming an ongoing chain of behavior. *Id.*, p. 34. Brain damage not only informs Runyon's pattern of moving from job to job and place to place, and pattern of unstable volatile relationships, but it is a critically important mitigating factor as the jury considered David's judgment and decision-making capability, particularly in light of the statutory aggravators of "substantial planning" and "pecuniary gain," *id.*, and the prosecution's argument that Runyon could have changed course and saved Cory Voss at the last minute. Tr. 2621-22, 2659, 8/26/09.

For all these reasons, counsel rendered ineffective assistance for failing to present this testimony from Dr. Cunningham.

### 3.4     Richard G. Dudley, Jr., M.D.

Dr. Dudley evaluated Runyon on September 2nd and 3rd, 2015. Dudley report, p. 2, Ex. 29. In 2009, it would have been evident to him or another experienced psychiatrist that Runyon was suffering a combination of effects from an extremely difficult childhood, brain damage, and multiple major psychiatric disorders prior to and at the time of the crime. *Id.*, pp. 14-15. This would have

76

**JA465**

impaired Runyon's capacity to function at the time of the crime, *id.* p. 14, and there was evidence that

Runyon was extremely distressed leading up to the time of the crime. *Id.*, p. 12. Dr. Dudley finds:

> Specifically, with regard to statutory mitigation, it is my opinion, to within a reasonable degree of medical certainty, that these psychiatric difficulties constitute a severe mental or emotional disturbance. It is also my opinion, to within a reasonable degree of medical certainty, that as a result of these psychiatric difficulties, Mr. Runyon's capacity to conform to the requirements of law was significantly impaired.

*Id.*, p. 15.

Dr. Dudley explains the factors that led to Runyon's compromised mental state, beginning

with an extremely difficult childhood that had an extremely negative impact on Runyon's

development, which then significantly impaired his ability to function. *Id.*, p. 12.

> More specifically, during his earliest years, Mr. Runyon was repeatedly exposed to the physical abuse of his mother by his biological father, which he experienced as so severe that he felt that his father was going to kill his mother. This exposure to domestic violence occurred in the absence of the type of parental nurture and support that might have at least helped to mitigate the impact of this exposure on Mr. Runyon's development.
>
> Such repeated exposure to violence in the absence of parental nurture and support results in the development of psychological trauma-related symptoms such as hypervigilance and overreactivity, and Mr. Runyon reported a long history of such symptoms. When a parental figure repeatedly fails to calm a repeatedly traumatized/frightened child, the child is unable to learn to calm his/her physiological response to frightening situations; this can impact on the development of the child's brain, and as a result, the child becomes physiologically hyper aroused and anxious as well; and Mr. Runyon evidences this difficulty too.

Dudley report, p. 12, Ex. 29.

> In addition to the fact that the absence of parental nurture, support and protection increases the damage caused by repeated exposure to violence during early developmental years, such poor parenting negatively impacts on other aspects of development as well. More specifically, as a result of such poor parenting, children fail to learn how to develop stable relationships, they fail to develop a stable and positive sense of themselves, they fail to learn how to regulate their mood, and they are impulsive. Mr. Runyon evidences all of these psychiatric difficulties too. In addition, there were also other problems that Mr. Runyon endured during his childhood and early adolescent years that also contributed to the development of these same psychiatric difficulties, such as feeling like an outcast in relationship to his peers, not having access to any extended family members who might have offered him at least

**JA466**

some nurture and support, and being so frequently moved that he was unable to develop any other outside support from other adults or his peers.

*Id.*, p. 13.

Added to the psychiatric difficulties caused by his traumatic childhood, Dr. Dudley further notes that, "Runyon's family history of mental illness and the role of genetic transmission in the etiology of these types of mental illness placed him at increased risk for developing such psychiatric difficulties." *Id.*, p. 13. In fact, Runyon's experience is "characterized by an even more severe disturbance of his mood and more clearly defined psychotic symptoms." *Id.*

> Mr. Runyon then noted that even when he was a child he knew that evil spirits can influence this world; he has seen ghost and entities that he was certain were not shadows or reflections of light; and he noted that he knew that what he was seeing was real because of the way they moved and the fact that he could feel their presence. He reported that he was never afraid of any of that; so he never ran, knowing that he could manage any of that; and as an example, he described an incident that occurred when he was a child, where a glass was moving across the table and he simply caught it. Mr. Runyon then went on to note that there have been times when that evil has tried to use others to cause him harm, either intentionally or through their carelessness; he has been able to foresee that and thereby avoid that; and he gave numerous examples of this happening in his life.

*Id.*, p. 9.

Dr. Dudley describes the convergence of many adverse factors: "episodes of depression and episodes of at least hypomania were superimposed upon the above noted difficulties regulating his mood that he had been experiencing since he was a child." *Id.* p. 13. "In addition, clearly delusional thoughts of both the grandiose and the paranoid type were superimposed upon immature psychological defenses that he had been using and thoughts that he had had for some [time] about evil and the possibility that someone was out to get him." Dudley report, p. 13, Ex. 29.

The psychiatric difficulties arising from Runyon's traumatic childhood and genetic pre-disposition to mental illness are further superimposed on traumatic brain injury resulting in trauma-related psychiatric difficulties and cognitive deficits.

78

**JA467**

The possibility that subsequent trauma to his brain contributed to the further increased severity of these difficulties, as suggested by other evaluators, cannot be ruled out.

In addition to being a problem in and of themselves, these additional psychiatric difficulties also interacted with and further complicated his above described trauma-related difficulties and other developmental difficulties. For example, the emergence of paranoid delusions that someone was trying to harm him clearly exacerbated his trauma-related hypervigilance and over reactivity. For example, as his mania and grandiose delusions became more severe, they served as a defense against some of his anxiety and fears, but also caused his behavior to become all the more erratic, unpredictable and impulsive.

As noted above, during his young adult years, Mr. Runyon continued to experience traumatic events. These 'near death experiences' further exacerbated his trauma-related difficulties.

Then furthermore, there is the matter of Mr. Runyon's cognitive deficits, seen clinically and confirmed by neurological and neuropsychological testing. Such cognitive deficits further impaired Mr. Runyon's decision-making capacity beyond the impairments resulting from the distorted perceptions of reality, the impairments in judgment, and the impulsivity associated with his other psychiatric disorders.

*Id.*, p. 14. The existence and synergistic effect of all these factors constitute substantial mitigation that Runyon's jurors never heard.

In addition to expert testimony on adverse factors resulting in brain damage and mental illness which affected Runyon's judgment and decision-making abilities, testimony was required to explain how those same factors "are a major determinate" of Runyon's facial expression and affect. *Id.*

During penalty-phase argument, the prosecution emphasized Runyon's alleged "lack of remorse" as a major aggravating factor. Tr. 2588, 2591, 2593, 2615-17, 2657, 2660, 8/26/09. In particular, the prosecutor argued that Runyon's appearance was proof of remorselessness. "You saw his demeanor when being questioned in the second interview yesterday by Detective Rilee … you can see there, you can see by his demeanor, of his guilt. But you can also see how unaffected he is by the crime that he has committed." Tr. 2616-17, 8/26/09. "He sat stone-faced after being confronted with all this evidence and expressed no remorse, no regret whatsoever." Tr. 2617, 8/26/09.

**JA468**

Dr. Dudley explains, "facial expression is among the most significant components of 'affect', which is the external representation of what a person is thinking and feeling." Dudley report, p. 15, Ex. 29. One cannot make an accurate determination of what a person may be thinking or feeling based solely on facial expression. That determination must be made in the context of other information. *Id.* For example, "a flattening of the affect is likely a symptom of a psychotic process[.]" *Id.* "[A] blunting of the affect may be a symptom of a clinically significant depression[.]" *Id.* "[A]n inappropriate affect could be due to a variety of psychiatric, neuropsychiatric or other medical condition, all of which would have to be considered and explored … before attributing such an inappropriate affect to something else." *Id.* In other words:

> Mr. Runyon's facial expression and affect is among the things for which a mental health professional/expert witness should have been called to assist the jury, given that members of the jury wouldn't be expected to be able to do this on their own.
>
> As noted above, it is my opinion that Mr. Runyon has been suffering from multiple major psychiatric disorders. With many of those disorders, alteration of facial expression and affect is a symptom. Therefore, I, or any other experienced psychiatrist, could have been called to opine that Mr. Runyon's psychiatric disorders are a major determinate of his facial expression. In addition, the nature of the injuries that have caused Mr. Runyon's facial asymmetry are also a major determinate of his facial expression. During the course of my examination of Mr. Runyon, it was clear that as a result of the injuries to his face, he had an extremely limited capacity for facial expression, which significantly impaired his affective expression. Here too, I, or any other experienced psychiatrist, neurologist or other similar professional, could have been called to opine that the injuries to Mr. Runyon's face must be taken into consideration when assessing his facial expression.

*Id.*

Jurors must be able to give *meaningful* effect to the mitigating qualities of evidence of childhood neglect and abandonment, neurological damage, mental illness and a troubled childhood. *Abdul-Kabir*, 550 U.S. at 262. Thus, counsel had an absolute duty to not only present this information, but to present it in a *meaningful* manner. Counsel's failure to do so deprived Runyon of the effective assistance of counsel.

80

**JA469**

**D.     Counsel's Failure To Investigate And Present Mitigating Evidence Undermines Confidence In Runyon's Death Sentence.**

Runyon had a "constitutionally protected right[] to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." *Williams v. Taylor*, 529 U.S. 362, 393 (2000). When assessing the probable effect of unpresented mitigation, the strength of the prosecution's case in aggravation must be considered against the totality of mitigating evidence.

The two statutory aggravating factors found by Runyon's jury during the eligibility phase of his capital sentencing were largely, if not totally, encompassed by the finding of guilt and could not have reasonably been given great weight because jurors had been instructed that the fact of guilt itself was, as a matter of law, insufficient to support a sentence of death. Tr. 1781-85, 7/22/09, hearing on motions. *See also* Claim 11. The "pecuniary gain" aggravating circumstance could not have reasonably been given great weight because the jurors were aware that the only difference in culpability between Runyon and the two co-defendants against whom the prosecution did not seek death was that the former had the financial wherewithal to hire another to carry out their criminal intentions. *See also* Claim 4. Furthermore, it is undisputed that the two co-defendants spent the $100,000 death gratuity benefit in a matter of months while the prosecution could only *suggest* that Runyon received $275 as compensation for the victim's death. In addition, this aggravator could not have been too weighty because the jurors found a mitigating circumstance suggestive of a different motive; that Runyon "was given the impression that Cory Voss was molesting [Voss's] daughter." ECF No. 291, p. 4.

The "substantial planning" aggravating circumstance should have been rebutted not only with the argument that Runyon was simply "a tool" for Catherina Voss, *see supra* Claim 4, but also with evidence of Runyon's brain damage and its effect on his judgment and decision-making abilities. *See, e.g.*, Dudley report pp. 14-15, Ex. 29; Cunningham declaration pp.33-34, Ex. 8.

**JA470**

The non-statutory aggravators also were not entitled to great weight. The only fact differentiating "victim impact" from that in every other case of first-degree murder was that no weight could be attributed to the impact on Cory Voss's surviving spouse as she was the financier, instigator of, and mastermind behind Cory Voss's murder. Furthermore, this aggravator was balanced against two family sympathy mitigators proposed by the defense based on emotional harm to Runyon's mother and son, plus, the jurors' own finding of family sympathy in that Runyon's brother "will suffer emotional harm if his brother is executed" Penalty phase verdict form, ECF No. 291 p. 4.

The "abuse of women" aggravator was not entitled to great weight because it was partially based on uncharged conduct and dismissed charges involving stale events and it did not make Runyon the worst of the worst. The weight of this aggravator could have been reduced with an explanation about Runyon's upbringing where he witnessed and modeled domestic violence between his parents and inherited limited problem-solving abilities and explosive tendencies. Maria Runyon could have provided context and explanation for the charges related to her and her sister, Teresa Linker. Maria Runyon declaration, ¶¶ 7, 26-28, Ex. 28. Draven's substantial history of violence against women and children also would have reduced the weight of this aggravator. *See* Claim 2(A).

The "lack of remorse" aggravator could have been countered by explaining Runyon's facial asymmetry and explaining that mental illnesses "flatten" and "blunt" affect. Dudley report, p. 15, Ex. 29. The "specialized training" was counter-balanced by the jurors' finding that Runyon's military service and education were also mitigating. Penalty phase verdict form, ECF No. 291 p. 4.

Without knowledge of the wealth of existing mitigation specifically individualized to David Runyon that explains exactly who he is, the overwhelming prosecutorial theme heard by the jurors

82

**JA471**

was that Runyon had "a good upbringing" and law-and-order-type careers which he chose to forsake.[40]

This argument, coupled with the defense presentation of only good character witnesses, served to

*heighten* Runyon's moral culpability. The "centerpiece" of the defense was the "equally-culpable-

codefendants" mitigator. *Runyon*, 707 F.3d at 508. This failed to reduce Runyon's moral culpability,

especially when the bar had been set so high, and it failed to address any of Runyon's individual

characteristics. As pointed out by the prosecutor during closing argument:

> And when you look at all of these mitigators, *most of which have nothing to do with the David Runyon who sits before you today*, it deals with *his unrelated past*, it deals with his uncertain future, it cannot match up against the weight of the aggravating factors that deal with the defendant that is sitting in this courtroom today, that deal with the crime that he caused, and the impact on the family.

Tr. 2623, 8/26/09.

Runyon's jurors deliberated twice as long for the penalty-phase as for the guilt-phase. The

jurors demonstrated they were open to the mitigation contained in Runyon's psycho-social history, as

they found on their own that Runyon "continued to witness and experience domestic violence and

parental conflict/abuse from [his] mother and adoptive father." Had counsel presented the available

mitigating evidence set forth above which explains how and why Runyon's past relates to who he was

at the time of the crime, it might well have influenced the jury's appraisal of Runyon's moral culpability.

*Williams*, 529 U.S. at 398. For all these reasons, Runyon was denied the effective assistance of counsel

at the penalty phase of his capital trial.

---

[40] This argument is reminiscent of the racial stereotype regarding Asians and "honor" invoked by the police during Runyon's videotaped interrogation and which the court of appeals found was erroneously admitted.

**Claim 7:** **Runyon's Sixth Amendment Right To Confront The Witnesses Against Him Was Violated When The Prosecution Presented Police And Informant Testimony Of Statements From His Co-Defendant, Michael Draven. Furthermore, His Trial Counsel Were Ineffective When They Failed To Object To The Admission Of This Testimony And Failed To Ask The Court For A Limiting Instruction That They Could Not Be Considered As Evidence of Runyon's Guilt.**

Detective Rilee focused upon Draven and Runyon as suspects in the Voss murder and was gathering evidence upon which to convict them. Detective Rilee interrogated Draven and then, at trial, the prosecution presented Rilee to testify as to the contents of Draven's statements. Tr. 1300-36, 7/13/09. These statements were incriminating to both Draven and to Runyon and the prosecution highlighted those statements in its closing arguments of the guilt phase. Tr. 1600-01, 1603-04, 7/16/09.

The admission of Draven's statements to the police as evidence against Runyon was a violation of his Sixth Amendment right of confrontation. Statements taken by police officers in the course of interrogations are "testimonial" in nature. *Crawford v. Washington*, 541 U.S. 36, 51 (2004). They are testimonial because the circumstances indicate that the "primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Hammon v. Indiana*, 547 U.S. 813, 822 (2006). "Testimonial evidence" is only admissible where the witness is unavailable and the defendant has had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68. Because Draven could not be called as a witness and was thus, unavailable, Runyon never had any opportunity to cross-examine him on his statements to Rilee.

Once Draven's statements were admitted into evidence, defense counsel should have objected and, at least, requested a limiting instruction. Such instructions would have been given had defense counsel asked for them. Tr. 16, 12/8/08, Hearing on Motions. However, no instruction was requested and no instruction was given.

**JA473**

The effectiveness of any such limiting instruction is questionable, even if one had been given. *See Bruton v. United States*, 391 U.S. 123 (1968) (recognizing the difficulty jurors would have in considering one co-defendant's statement against that co-defendant while disregarding it in the other co-defendant's case). Here, where Draven and Runyon were tried together and where the prosecution alleged a joint scheme to commit murder, jurors would have had a difficult time using Draven's statement only against him. However in this case that question is academic since no such instruction was ever sought and none was given.

Runyon was prejudiced because Draven admitted that he was having an intimate affair with Catherina Voss. Tr. 1320, 7/13/09. This was essential to the government's theory that Draven hired Runyon to kill his lover's husband. It also contradicted the statement that Runyon gave to the police. Tr. 1312, 7/13/09. Draven also claimed that he spoke with Runyon when he called the pay phone at the Waffle House near the crime scene. Tr. 1321, 7/13/09. The prosecution highlighted this fact in its closing argument. Tr. 1593, 7/16/09. All of this information came from Draven's statement and was offered for the truth of the matter asserted and was used by the prosecution to support its charges of capital murder against Runyon.

In addition, the United States presented statements made by Draven to a jail-house informant named Edward Fodrey. Fodrey's testimony could only be considered by the jury as evidence against Draven, yet no limiting instruction was given because Runyon's counsel never asked for one. Fodrey's testimony was prejudicial to Runyon because Fodrey said that Draven admitted to hiring some guy to kill Draven's girlfriend's husband. Tr. 1236, 7/13/09. Runyon had no opportunity to cross-examine Draven on this statement.

The admission of hearsay evidence prejudiced Runyon's constitutional right to a fair trial because his Sixth Amendment right to confront the witnesses against him through cross-examination

85

**JA474**

was abridged. Trial counsel were ineffective for failing to make contemporaneous objections and ask for limiting instructions. For these reasons, this a new trial should be granted.

**Claim 8:          Ineffective Assistance of Counsel On Direct Appeal.**

In *Massaro v. United States*, 538 U.S. 500 (2003), the Court resolved a division in the lower courts and held that all claims of ineffective assistance of counsel may be brought for the first time in collateral proceedings under § 2255, regardless whether that claim could have been raised on direct appeal. *Id.* at 508. This rule governs even when the defendant was represented by new counsel on appeal, and even when trial counsel's ineffectiveness was so apparent from the record that it could have been raised on appeal. *Id.* Appellate counsel must be faulted, however, for their failure to appeal other errors that are based in the trial record and thus could have been raised on direct appeal. To the extent there are such claims in this motion, appellate counsel rendered ineffective assistance in failing to timely raise them. Such claims may include, but are not limited to, Claims 7, 11, 12, 13, 14, and 16.

When counsel has filed a brief on appeal, the presumption of effective appellate assistance generally can be overcome only when ignored issues are stronger than those presented. *Smith v. Robbins*, 528 U.S. 259, 288 (2000). That rule may not apply when appellate counsel failed to obtain and review the full trial record and consequently were unaware that a potentially meritorious issue existed. *See generally Johnson v. Johnson*, No. 3:10-cv-502, 2011 WL 2708328, at *6 (E.D. Va. July 12, 2011).

Appellate counsel Norris appropriately compiled a list of trial exhibits and sealed pleadings that were needed for the appeal, including "court record of jury selection/strikes used and Juror Questionnaires for Seated Jurors/Alternates." Teresa Norris declaration, Ex. 36. But appellate counsel did not obtain or attempt to obtain the court record of strikes, nor did they attempt to obtain the questionnaires of potential jurors other than those seated or alternates. As a result, appellate counsel unreasonably lacked the record necessary to investigate *Batson* violations, or to recognize other errors involving jury selection. Appellate counsel were constitutionally deficient in failing to raise claims

86

**JA475**

regarding the selection of jurors or any other claim that required the information in the juror questionnaires.

Appellate counsel were also deficient for failing to raise the denial of Runyon's confrontation rights. See Claim 7, confrontation claim. A review of the transcript would have revealed that there was substantial evidence admitted at Runyon's trial in violation of his confrontation rights. Counsel on appeal were ineffective for failing to raise this claim. *Robbins, supra; Strickland, supra.*

In two respects, the direct appeal in Runyon's case also satisfies the requirement in *Robbins.* First, at least one of the issues that was presented on appeal is weaker than the ignored issues. Runyon alleged on appeal that the murder-for-hire and carjacking indictments were unconstitutional because they exceeded Congress' power under the Commerce Clause and impermissibly intruded on the police power reserved to the states under the Tenth Amendment. The Fourth Circuit did not dismiss this allegation as "frivolous," but it made very clear that the claim was very weak. It said the jurisdictional challenge to the murder-for-hire indictment "fails by a wide margin," and it observed that "all of the circuits to address the question" agree that the statute is constitutional. *Runyon*, 707 F.3d at 489. It also held that "Runyon's constitutional attack on the federal carjacking statute [met] the same fate" because it was contrary to binding and long-standing circuit authority. *Id.* The Fourth Circuit similarly regarded as weak Runyon's boilerplate challenge to the constitutionality of the death penalty in all circumstances. *Id.* at 521 n.7.

Second, it was not necessary for Runyon to delete a claim in order to add an ignored issue. The Fourth Circuit granted Runyon 100 pages for his opening brief; he consumed 99 pages using 14-point Times New Roman font, with the last page containing only six lines of text and a vertical signature block. Switching to 14-point Garamond font would have reduced the length of the opening brief to 93 pages with no change in content. Garamond is a highly readable font that typesetters have used since the 16th Century, and experienced lawyers commonly use that space-efficient font when

**JA476**

faced with a length limitation.[41] In fact, Runyon has used 12-point Garamond throughout this motion to illustrate its properties.

Nor was this a case where extra space would have been superfluous because counsel had said everything they wanted to say within the space allotted. Appellate counsel moved the Fourth Circuit twice for additional space. See CA-ECF Nos. 59 and 61. The first request was granted in part; the second request was denied.

Appellate counsel was ineffective for failing to raise meritorious issues on appeal. This discussion specifically references the *Batson* claim, Claim 16; and the Confrontation Clause claim, Claim 7. Should this Court find any other claims are defaulted for failure to have been raised on appeal, Runyon specifically alleges appellate counsel was ineffective for failing to do so.

**Claim 9:** **Runyon's Conviction Under 18 U.S.C. § 924(c) Is Unconstitutional Because It Was Procured In Violation Of The Due Process Clause, The Equal Protection Clause, And The Fifth, Sixth, and Eighth Amendments Of The Constitution.** *Johnson v. United States*, **135 S. Ct. 2551 (2015).**

**A.** **Introduction**

Runyon was convicted of conspiracy to commit murder for hire, 18 U.S.C. § 1958(a); carjacking resulting in death, 18 U.S.C. § 2119; and murder with a firearm in relation to a crime of violence, 18 U.S.C. § 924(c), (j), and received death for the conspiracy and 924(c) charges. This claim alleges that in light of a Supreme Court opinion, issued after Runyon's conviction became final, Runyon's conviction for the § 924 offense (and its accompanying death sentence) must be vacated. It also alleges that Runyon's death sentence for the conspiracy conviction must be vacated because the evidence and arguments presented at trial with respect to the § 924 offense painted an inappropriate

---

[41] The Fourth Circuit's certificate of compliance for briefs specifies that parties must use "a proportionally spaced typeface (such as Times New Roman)," which must include serifs and must be 14-point or larger, or "a monospaced typeface (such as Courier New)," which must be 12-point or larger. http://www.ca4courts.gov/docs/pdfs/certcomp.pdf. Garamond satisfies all the requirements of the first option.

**JA477**

picture of the conspiracy offense and consequently contributed to the jury's sentencing decision for the conspiracy charge.

Recently, the Supreme Court released its opinion in *United States v. Johnson*, 135 S. Ct. 2551 (2015), which calls in to question whether conspiracy and carjacking may be relied upon to establish the crime of violence element of 924(c). In *Johnson*, the Supreme Court held that the definition of violent felony used in the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), is unconstitutional because it is vague and does not provide adequate notice. *Johnson*, *supra*. The reasoning in *Johnson* applies with equal force to the definition of crime of violence found in 18 U.S.C. § 924(c). This Court should vacate Runyon's 924(c) conviction and remand for a new sentencing hearing. In this case, the jury was instructed that the conspiracy and carjacking charges qualified as crimes of violence supporting the 924(c) charge. Tr. 1703-04, 7/16/09.

### B.     Relevant Statutes

Several statutes attempt to define violent criminal conduct which may support enhanced punishment. In the "General Provisions" section of the criminal code, crime of violence is defined as follows:

>(a)     an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
>(b)     any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C § 16(a), (b).

This same definition, verbatim, is present in 18 U.S.C. § 924(c), the statute supporting Runyon's conviction.

Similarly, the ACCA enhances punishment for defendants who have three prior violent felonies, defined as offenses that:

    (i)       has as an element, the use, attempted use, or threatened use of physical force against the person of another; or

    (ii)      is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B)(i), (ii).

Subsection (i) is often called the "force clause;" subsection (ii), the residual clause. U.S.S.G. 2L1.2 (prior conviction for crime of violence enhances sentence for unlawful reentry).

Closely related definitions are found in the Sentencing Guidelines. U.S.S.G. 4.B1.1 (prior conviction for crime of violence supports career offender determination).

The Fourth Circuit regularly relies on case law interpreting the ACCA to interpret 18 U.S.C. §§ 16(b) as well as 18 U.S.C. § 924(c). *See United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on an ACCA case to interpret the definition of a crime of violence under § 924(c)(3)(B)); *United States v. Aragon*, 983 F.2d 1306, 1314 (4th Cir. 1993) (same).[42]

---

[42]*See also United States v. Keelan*, 786 F.3d 865, 871 n.7 (11th Cir. 2015) (describing the ACCA otherwise clause and § 16(b) "analogous"); *Roberts v. Holder*, 745 F.3d 928, 930-31 (8th Cir. 2014) (using both ACCA cases and § 16(b) cases to define the same "ordinary case" analysis); *United States v. Sanchez-Espinal*, 762 F.3d 425, 432 (5th Cir. 2014) (despite the fact that the ACCA talks of risk of injury and § 16(b) talks of risk of force, "we have previously looked to the ACCA in deciding whether offenses are crimes of violence under § 16(b)").

*See Jimenez-Gonzales v. Mukasey*, 548 F.3d 557, 562 (7th Cir. 2008) (noting that, "[d]espite the slightly different definitions," the Supreme Court's respective analyses of the ACCA and § 16(b) "perfectly mirrored" each other). *See also United States v. Gomez-Leon*, 545 F.3d 777 (9th Cir. 2008); *United States v. Coronado-Cervantes*, 154 F.3d 1242, 1244 (10th Cir. 1998); *United States v. Kirk*, 111 F.3d 390, 394 (5th Cir. 1997); *United States v. Bauer,* 990 F.2d 373, 374 (8th Cir. 1993) (describing the differences between the statutes as "immaterial" and that interpreting U.S.S.G. § 4.1.1, which uses the ACCA language, "is controlled by" a decision that interprets § 16(b)).

90

**JA479**

**C.      The Definition of "Crime of Violence" is Unconstitutional.**

In *Johnson*, the Supreme Court held that the ACCA residual clause is unconstitutionally vague because the process by which courts categorize prior convictions as violent felonies is too "wide-ranging" and "indetermina[te]." 135 S. Ct. at 2557. As a result, the ACCA "both denies fair notice to defendants and invites arbitrary enforcement by judges." *Id.*

The Court began its analysis by explaining that, under *Taylor v. United States*, 495 U.S. 575 (1990), the ACCA requires the categorical approach to determine whether a particular statute qualifies as a violent felony. *Id.* at 2557. Courts must assess whether a crime qualifies as a violent felony "in terms of how the law defines the offense and not in terms of how an individual might have committed it on a particular occasion." *Id.* (quoting *Begay v. United States*, 553 U.S. 137, 141 (2008)).

The Court further clarified that the residual clause "requires a court to picture the kind of conduct that the crime involves 'in the ordinary case,' and to judge whether that abstraction presents a serious potential risk of physical injury." *Id.* (citation omitted). The Court linked the "ordinary case" framework to *James v. United States*, 550 U.S. 192 (2007), in which it held:

> We do not view that approach as requiring that every conceivable factual offense covered by a statute must necessarily present a serious potential risk of injury before the offense can be deemed a violent felony.
> …
> Rather, the proper inquiry is whether the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another."

*Id.* at 208 (citations omitted). "As long as the offense is of a type that, by its nature, presents a serious potential risk of injury to another, it satisfies the requirements of [the ACCA's] residual provision." *Id.* at 209 (emphasis added, brackets supplied).

*Johnson* concluded that the process of determining what is embodied in the "ordinary case" rather than "real-world facts" is fatally flawed, rendering the ACCA unconstitutionally vague. "[G]rave uncertainty" surrounds the method of determining the risk posed by the "judicially imagined 'ordinary

91

**JA480**

case.'" 135 S. Ct. at 2557. "The residual clause offers no reliable way to choose between ... competing accounts of what 'ordinary' ... involves." *Id.* at 2558.

The *Johnson* Court considered and rejected different ways that a court might envision the hypothetical "ordinary case." Specifically, the Court explained that a statistical analysis of reported cases, surveys, expert evidence, Google, and gut instinct are all equally unreliable in determining the "ordinary case." *Id.* at 2557 (quoting *United States v. Mayer*, 560 F.3d 948, 952 (9th Cir. 2009) (Kozinski, J., dissenting from denial of rehearing en banc)). Although earlier ACCA cases relied on statistical analysis and "common sense," *Johnson* concluded that these methods "failed to establish any generally applicable test that prevents the risk comparison required by the residual clause from devolving into guesswork and intuition." *Id.* at 2559 (referring to *Chambers v. United States*, 555 U.S. 122 (2009), and *Sykes v. United States*, 564 U.S ___, 131 S. Ct. 2267 (2011)).

This flaw alone establishes the residual clause's unconstitutional vagueness. The Court, however, explained that a closely related flaw exacerbates the problem. The Court noted that the residual clause lacks a meaningful gauge for determining when the quantum of risk under the "ordinary case" of a particular statute is enough to constitute a "serious potential risk of physical injury." *Johnson*, 135 S. Ct. 2258. Although the level of risk required under the residual clause must be similar to the enumerated offenses (burglary, arson, extortion, or crimes involving use of explosives), *Johnson* rejected the notion that comparing a felony's "ordinary case" to the risk posed by certain enumerated offenses cures the constitutional problem. *Id.*

The enumerated offenses failed to save the ACCA residual clause because, according to the majority, comparing felonies to enumerated offenses similarly requires resorting to "a judicially imagined abstraction." *Id.* Before courts may even start the comparison, they must first determine what the "ordinary" enumerated crime entails. But the "ordinary" enumerated crimes, *Johnson* emphasized, like any other crime, "are far from clear in respect to the degree of risk each poses." *Id.*

92

**JA481**

(quoting *Begay v. United States*, 553 U.S. 137, 143 (2008)). Any attempt to figure out the "ordinary" enumerated offense requires just as much guesswork as figuring out the "ordinary" predicate offense. The Court held that such indeterminacy, unpredictability, and arbitrariness inherent in the "ordinary case" analysis is more than the "Due Process Clause tolerates." *Id.*

Thus, *Johnson* not only invalidated the ACCA residual clause, but it invalidated the "ordinary case" analysis and statutory provisions that compel such an analytical framework. In other words, the only way to apply the residual clause is to use the "ordinary case" analysis, and the "ordinary case" analysis is impossible to apply in a constitutional manner.

**D.      Runyon's Conviction For Murder With A Firearm In Relation To A Crime of Violence Is Unconstitutional.**

Under *Johnson*, the definition of crime of violence set forth in 18 U.S.C. § 924(c) is unconstitutional. To be sure, 18 U.S.C. § 924(e)(2)(B)(ii) and 18 U.S.C. § 924(c)(3)(B) are not identical. But the differences have no impact on the constitutional analysis. Although the risk at issue in the ACCA is a risk of injury, and the risk at issue in Section 924(c) is a risk that force will be used, this difference is immaterial to the due process problem and has no impact on the *Johnson* analysis. The Court's holding did not turn on the type of risk, but rather how a court assesses and quantifies the risk. That inquiry is the same under both the ACCA and § 924(c). Both statutes require courts first to picture the "ordinary case" embodied by a felony, and then decide if it qualifies as a crime of violence by assessing the risk posed by the "ordinary case."

Relying on *James*, the Fourth Circuit has squarely held that the "ordinary case" analysis applies when construing 18 U.S.C. § 16(b). *United States v. Avila*, 770 F.3d 1100, 1107 (4th Cir. 2014). The Fourth Circuit stated:

> [E]very set of conceivable facts covered by first-degree burglary does not have to present a serious risk of injury for it to qualify as a crime of violence. It is sufficient if "the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James*, 550 U.S. at 208, 127 S.Ct.

93

**JA482**

> 1586. As long as an offense is of a type that, by its nature, presents a substantial risk that physical force against the person or property of another may be used, it satisfies the requirements of 18 U.S.C. § 16(b).

*Id.*

*Avila* controls here because § 16(b) and § 924(c)(3)(B) are identical. The residual clause of 924(c), like the ACCA residual clause, thus requires the "ordinary case" analysis to assess the risk involved in a predicate offense, and how risky that ordinary case is. *Avila*, 770 F.3d at 1107; *Ayala*, 601 F.3d at 267. Since this is the identical analytical step that brought down the ACCA residual clause, § 924(c)(3)(B) cannot survive constitutional scrutiny under the due process principles reaffirmed in *Johnson*. Conspiracy and carjacking cannot qualify as crimes of violence under 924(c)'s residual clause.

The government may argue conspiracy and carjacking qualify as crimes of violence under 924(c)'s force clause. This Court should reject that argument. The Supreme Court, interpreting the "violent felony" requirement of the Armed Career Criminal Act, 18 U.S.C. § 924(e), explained that "physical force" means "violent force"—"strong physical force" which is capable "of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).

### 1.   Carjacking Is Not A Crime of Violence.

Carjacking does not meet this requirement because it can be accomplished by putting someone in fear of future injury to his person or property, which does not require the use, attempted use, or threatened use of "violent force." Additionally, because the act of putting someone in fear of injury can be accomplished without an *intentional* threat of physical force, it fails to satisfy the *intentional* mens rea required under the § 924(c)(3)(A) force clause.

The plain language of the carjacking statute provides that the offense can be accomplished by the act of placing another in fear of injury. This action, at best, constitutes a threat of *injury* to another, which squarely does not require the use or threatened use of "violent force." The Fourth Circuit's decision in *United States v. Torres-Miguel,* 701 F.3d 165 (4th Cir. 2012), is directly on point. Indeed, in

94

**JA483**

that case, the Fourth Circuit unequivocally held that the threat of *any physical injury,* even "serious bodily injury or death," does not necessarily require the use of physical force – let alone "violent force."

In *Torres-Miguel,* at issue was the defendant's prior conviction for the California offense of willfully threatening to commit a crime which "will result in death or great bodily injury to another." 701 F.3d at 168 (citing Cal. Penal Code § 422(a)). The specific question in the case was whether the statute had an element equating to a threat of "violent force" under the force clause of U.S.S.G. § 2L1.2–a clause that is identical in all relevant respects to the § 924(c)(3)(A) force clause. *Id.* Despite the "death or great bodily injury" element in the California statute, the Fourth Circuit found that the offense was missing a "violent force" element, and thus, could never qualify as a "crime of violence" under the force clause. *Id.* at 168-69. The Fourth Circuit held that "[a]n offense that *results* in physical injury, but does not involve the use or threatened use of force, simply does not meet the Guidelines definition of crime of violence." *Id.* at 168. The Court, in strong words, proclaimed that "of course, a crime may *result* in death or serious injury without involving *use* of physical force." *Id.* Because "the full range of conduct" covered by the carjacking statute does not require "violent force," it simply cannot qualify as a "crime of violence" under § 924(c)(3)'s force clause. *Torres-Miguel*, 701 F.3d at 171.

Even more, the act of putting someone in fear of injury, as defined under the carjacking statute, does not constitute a "crime of violence" under the force clause because it does not require an *intentional* threat of physical force. In *Garcia v. Gonzales*, 455 F.3d 465, 468 (4th Cir. 2006), the Fourth Circuit firmly held that an offense can only constitute a "crime of violence" under the force clause if it has an element that requires an "*intentional* employment of physical force [or threat of physical force]." *Id.* (emphasis added). The "fear of injury" element under the carjacking statute does not require a defendant to intentionally place another in fear of injury. Therefore, it is missing the intentional mens rea necessary under *Garcia*.

95

**JA484**

Federal cases interpreting the "intimidation" element in the federal bank robbery statute (18 U.S.C. § 2113(a)) are instructive here. Federal bank robbery may be accomplished by "intimidation," which means placing someone in fear of bodily harm – the same action required under the carjacking statute. *See United States v. Woodrup*, 86 F.3d 359, 364 (4th Cir. 1996) ("intimidation" under federal bank robbery statute means "an ordinary person in the [victim's position] reasonably could infer a threat of *bodily harm* from the defendant's acts."); *see also United States v. Pickar*, 616 F.2d 821, 825 (2010) (same); *United States v. Kelley*, 412 F.3d 1240, 1241 (2005) (same); *United States v. Yockel*, 320 F.3d 818, 824 (8th Cir. 2003) (same); *United States v. Higdon*, 832 F.3d 312, 315 (5th Cir. 1987) (same).

"Intimidation" is satisfied under the carjacking statute "whether or not the defendant actually intended the intimidation," as long as "an ordinary person in the [victim's] position reasonably could infer a threat of bodily harm from the defendant's acts." *Woodrup*, 86 F.3d at 36. *See also Yockel*, 320 F.3d at 821 (upholding bank robbery conviction even though there was no evidence that defendant intended to put teller in fear of injury: defendant did not make any sort of physical movement toward the teller and never presented her with a note demanding money, never displayed a weapon of any sort, never claimed to have a weapon, and by all accounts, did not appear to possess a weapon); *Kelley*, 412 F.3d at 1244 ("Whether a particular act constitutes intimidation is viewed objectively, ... and a defendant can be convicted under [federal bank robbery] even if he did not intend for an act to be intimidating."); *United States v. Foppe*, 993 F.2d 1444, 1451 (9th Cir. 1993) (same). In other words, a defendant may be found guilty of carjacking even though he did not intend to put another in fear of injury. It is enough that the victim reasonably fears injury from the defendant's actions – whether or not the defendant actually intended to create that fear. Due to the lack of this intent, the carjacking statute criminalizes conduct that does not require an intentional threat of physical force. Therefore, carjacking squarely fails to qualify as a "crime of violence" under *Garcia*. Because the carjacking

96

**JA485**

"intimidation" element is defined the same as the Hobbs Act robbery "fear of injury" element, it follows that carjacking fails to qualify as a "crime of violence" under *Garcia*.

In sum, carjacking is not a "crime of violence" under the § 924(c)(3)(A) Force Clause for two independent reasons. First, the statute does not require a threat of *violent force*. Second, the statute does not require the *intentional* threat of the same.

### 2. Conspiracy Is Not A Crime of Violence.

Neither does Runyon's conviction for conspiracy qualify under 924(c)'s force provision. Conspiracy requires merely an agreement to act. Tr. 1689, 7/16/09. A mere agreement cannot qualify as physical force. *Torres-Miguel*, *supra*. The Fourth Circuit has held that conspiracy qualifies as a crime of violence under the residual clause. *See United States v. White*, 571 F.3d 365 (4th Cir. 2009); *United States v. Vann,* 620 F.3d 431 (4th Cir. 2010). The *Johnson* opinion itself uses conspiracy as an example of how the courts have "trouble making sense of the residual clause." *Johnson v. United States*, 135 S. Ct. 2551, 2559-60 (2015). Conspiracy cannot support the 924(c) conviction under the force clause nor the residual clause.

### E. Resentencing Is Required Because Runyon Was Sentenced To Death Based On An Unconstitutional Statute.

*Johnson* applies retroactively. It "place[s] particular conduct … beyond the State's power to punish." *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004). *See Price v. United States*, 795 F.3d 731, 734 (7th Cir. 2015) (*Johnson* applies retroactively to cases on collateral review); *see also Pakala v. United States*, 804 F.3d 139, 139-40 (1st Cir. 2015) (same). The Supreme Court recently granted certiorari on the issue of whether *Johnson*, creates a new substantive rule of constitutional law that should be applied retroactively. *Gregory Welch v. United States*, No. 15-6418, certiorari granted, January 8, 2016, to resolve a circuit split over whether Johnson applies retroactively.

97

**JA486**

Remand for new sentencing is appropriate. This was a close case. The jury questioned what would happen if they could not agree on a sentence. Tr. 2707-09, 8/27/09. The jury rejected Count Four, the bank robbery charge. The jury imposed a life sentence for carjacking. Under these circumstances the government cannot meet its burden of demonstrating the *Johnson* error is harmless beyond a reasonable doubt.

In *United States v. Causey*, 185 F.3d 407, 423 (5th Cir. 1999), the Fifth Circuit remanded for resentencing where it dismissed a portion of the capital convictions for lack of evidence, explaining "it is impossible to say" the death sentences "were not influenced by the fact" that defendants had received three eligible convictions, rather than two." *See also United States v. Marquardt*, 786 F.2d 771, 778 (7th Cir. 1986) (excessive number of convictions may prejudice the defendant by "creating the impression of more criminal activity). Further, the trial court's instructions portrayed the § 924(j) murder charge as requiring a high level of culpability. The Court instructed the jury that a conviction under § 924(j) required the jury to find Runyon intended to kill "deliberately and intentionally," or that he acted with "callous and wanton disregard for human life." Tr. 1706, 7/16/09. When the jury was determining the appropriate punishment, the fact that the "murder charge" had been established was likely given great weight. The instructions on the § 924(c), (j) charge repeatedly define murder Tr. 1704, 1705, 1706, 1707, 7/16/09. Clearly, the brunt of the prosecution case for death was premised upon the sole charge that required intentional premeditated murder. After *Johnson*, the key basis for that has been eliminated. Justice demands Runyon receive a new sentencing hearing. *See also Kennedy v. Louisiana*, 554 U.S. 407 (2008) (the Eighth Amendment prohibits the death penalty for a non-homicide crime).

98

**JA487**

**Claim 10:** **The Jury Instructions At The Sentencing Phase Unconstitutionally Lowered the Government's Burden Of Proof In Violation Of The Fifth, Sixth, and Eighth Amendments. *Ring v. Arizona*, 536 U.S. 584 (2003).**

The jury instructions that permitted death upon a finding that aggravating factors "sufficiently outweigh[]" mitigating factors impermissibly lowered the burden of proof in violation of the Fifth, Sixth and Eighth Amendments. *Ring v. Arizona*, 536 U.S. 584 (2003). The Court instructed the jury that it must sentence Runyon to death if it found that aggravating factors sufficiently outweighed mitigating factors:

> In this phase, at the end of your deliberations all 12 jurors must unanimously agree that the aggravating factors sufficiently outweigh any mitigating factors, or in the absence of mitigating factors, that the aggravating factors are themselves sufficient to justify a sentence of death. But if any of you, even a single juror, is not persuaded that the aggravating factors sufficiently outweigh any mitigating factors such that a sentence of death is justified, then the jury may not recommend the death penalty on the verdict form.

> Tr. 2672-73, 2675, 2682-84, 2694, 8/26/09; Tr. 2707, 8/27/09.

This instruction was error. The Fifth, Sixth, and Eighth Amendments require that the jury find each element beyond a reasonable doubt, including the circumstances upon which the death penalty is based. The Court's instruction was plainly inconsistent with this mandate, as it instead directed the jury to apply a "sufficiently outweigh[ed]" standard that lowered the burden of proof.

In *Ring, supra*, the Supreme Court held that the accused has a Sixth Amendment right to have a jury, not merely a judge, find the existence of aggravating circumstances. The Court explained this is so because aggravating circumstances "operate as 'the equivalent of an element of a greater offense,'" and result in greater punishment; therefore, the accused is entitled to the protection of a jury. *Ring*, 536 U.S. at 609 (quoting *Apprendi v New Jersey*, 530 U.S. 466, 494 n.19 (2000)). The reasoning in *Ring* similarly requires the jury to find the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt and further that death is the appropriate punishment. The

99

**JA488**

death sentences should be vacated because they were imposed based on an unconstitutionally low standard.

Runyon acknowledges he raised this issue on direct appeal, *United States v. Runyon*, No. 09-11, Appellant's Brief pp. 89-91 (4th Cir. Feb. 29, 2012), and the appeals court decided against him. *Runyon*, 707 F.3d at 516. However, where the controlling law changes, a prior adjudication may not be dispositive. *Davis v. United States*, 417 U.S. 333, 342 (1974) (where movant unsuccessfully raised issue on direct appeal, and where controlling law changed soon thereafter, the appeals court "erred in holding that the 'law of the case,' as determined in the earlier appeal from the … conviction, precluded him from securing relief under § 2255 on the basis of an intervening change in law"). *See also Sanders v. United States*, 373 U.S. 1, 17 (1963); *Underwood v. United States*, 15 F.3d 16, 18 (2d Cir. 1993).

In *Hurst v. Florida*, 577 U.S. ____, 136 S.Ct. 616 (2016), the Supreme Court struck Florida's capital sentencing scheme, finding it violates the Sixth Amendment because it "does not require the jury to make the critical findings necessary to impose the death penalty." *Hurst*, 136 S.Ct. at 621-22. The State of Florida argued that because the jury found the facts necessary to establish eligibility, the Sixth Amendment was satisfied. The Supreme Court rejected this argument as follows:

> The State fails to appreciate the central and singular role the judge plays under Florida law. … [T]he Florida sentencing statute does not make a defendant eligible for death until 'findings *by the court* that such person shall be punished by death.' Fla. Stat. § 775.082(1)(emphasis added). The trial court *alone* must find 'the facts … [t]hat sufficient aggravating circumstances exist' and '[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances."

*Hurst*, 136 S.Ct. at 622.

The *Hurst* Court recognized the unworkable nature of the distinction between eligibility and selection, and held a judicial finding that aggravators outweighed mitigators is unconstitutional. *Id.*

*Hurst* therefore makes clear that it is a jury function to weigh aggravating and mitigating circumstances because the result determines whether a death sentence is imposed. When the weighing function—whether aggravating circumstances outweigh mitigating circumstances—results

100

**JA489**

in an affirmative finding, that finding constitutes the final element required for a death sentence. *Hurst*, 136 S.Ct. at 623-24 (specific findings authorizing the imposition of the sentence of death be made by the jury). It is beyond question that all elements leading to a greater punishment must be found by a jury. *Ring*, 536 U.S. at 609 (quoting *Apprendi v New Jersey.*, 530 U.S. 466, 494 n.19 (2000)). It is also beyond questions that all elements must be found beyond a reasonable doubt. *Alleyne v. United* States, 570 U.S. ___, 133 S.Ct. 2151, 2156 (2013). Accordingly, a jury must find—beyond a reasonable doubt—that aggravating circumstances outweigh mitigating circumstances in order to impose a death sentence.

The fact that Runyon's jurors made the specific finding that aggravators "sufficiently" outweighed mitigators is not constitutionally sufficient. They were required to make this final finding that determines a death sentence over a life sentence "beyond a reasonable doubt." The jury instructions did not include the required burden of proof and the jurors did not find the final element required for a death sentence beyond a reasonable doubt. The sentence, therefore, should be vacated.

Just as in *Hurst*, here, the jury was instructed to make its ultimate determination to impose death based on whether the aggravating factors "sufficiently outweigh" mitigating factors. Tr. 2672-73, 2675, 2682-84, 2694, 8/26/09; Tr. 2707, 8/27/09. Given the fact that the Sixth Amendment applies to this ultimate, final determination to impose death, the jury should have been required to make its finding beyond a reasonable doubt.

Finally, the *Hurst* Court addressed prior case law holding "the Sixth Amendment does not require that the specific findings authorizing the imposition of the death sentence be made by the jury." *Hurst*, 136 S.Ct. at 623 (quoting *Hildwin*, 490 U.S. 638, 640-41) (discussing holdings in *Hildwin, supra, and Spaziano, supra*). The Court "expressly overruled" its holdings in *Spaziano* and *Hildwin*, noting they were "wrong, and irreconcilable with *Apprendi.*" *Hurst*, 136 S.Ct. at 623. Given that the *Hurst*

101

**JA490**

opinion expressly overruled prior Supreme Court precedent, it does mark a change in the law. Thus, this Court may review Runyon's claim, even though it was previously reviewed on direct appeal. *See Davis v. United States*, 417 U.S. 333, 342 (1974).

**Claim 11: The Death Sentences Are Unconstitutional Because They Are Based On Aggravating Circumstances That Fail To Narrow And/Or That Are Arbitrary And Overbroad.**

To be constitutional, an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify imposition of a more severe sentence on the defendant compared to others convicted of the same crime. *Zant v. Stephens*, 462 U.S. 862, 877 (1983). "[O]ne of the most significant developments in our society's treatment of capital punishment has been the rejection of the common-law practice of inexorably imposing a death sentence upon every person convicted of a specified offense."[43] *Woodson v. North Carolina*, 428 U.S. 280, 301 (1976). *See also Tuilaepa v. California*, 512 U.S. 967, 972 (1994) (A constitutional capital sentencing scheme is accomplished by including an element that "may not apply to every defendant convicted of a murder.").

In Runyon's case, the statutory aggravators mirror the conduct required for conviction rather than adding an element of additional culpability. *See also* Claim 4 (counsel failed to advocate for Runyon at the eligibility stage). The two statutory aggravating circumstances in this case were: (1) Runyon "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value, and (2) Runyon "committed the offense after substantial planning and premeditation to cause the death of a person." ECF 255 pp. 5-6. The aggravators are unconstitutional as applied because they add nothing above what was required for a conviction of conspiracy to commit murder for hire. In convicting Runyon, the jurors found he planned with at least one other person to

---

[43] Runyon's appellate counsel were ineffective for failing to raise this claim where the merits are stronger than the jurisdictional challenges that "failed by a wide margin," *Runyon*, 707 F.3d at 489, and the boilerplate challenge to the constitutionality of the death penalty in all circumstances. *Id.* at 521 n.7. *Robbins*, 528 U.S. 259, 288 (2000). *See* Claim 8.

102

**JA491**

kill the victim for money. The prosecutor argued, Runyon did not know the victim but planned with Draven and Voss to kill him "for greed." Tr.2663, 8/26/09. Draven and Voss clearly planned to kill Voss's husband to collect a Navy gratuity death benefit and life insurance proceeds and fund their new "family." Tr. 214, 7/23/09. Clearly, the same facts that support Runyon's conviction also support the two statutory aggravating circumstances. Yet, the Sixth Amendment does not permit a defendant to be "expose[d] ... to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Apprendi v. New Jersey*, 530 U.S. 466, 483 (2000). The impermissible effect of the statutory aggravating circumstances was to make Runyon automatically eligible for the death penalty upon conviction in violation of the Eighth Amendment.

Even if the statutory aggravating circumstances served a narrowing function, the arbitrary and overbroad non-statutory aggravating circumstances counter-acted any narrowing and rendered imposition of the death sentence inconsistent and irrational.

Although the Constitution and Supreme Court precedents do not require the use of statutory aggravating circumstances, when the statute provides precise and distinct aggravating circumstances, the addition of factors beyond those bounds skews the sentencer's weighing process by "creat[ing] the risk that the jury will treat the defendant as more deserving of the death penalty than he might otherwise be[.]" *Stringer v. Black*, 503 U.S. 222, 235 (1992). Such a risk unconstitutionally conflicts with the "constant theme" of post-*Furman* jurisprudence emphasizing "procedural protections that are intended to ensure that the death penalty will be imposed in a consistent, rational manner." *Barclay v. Florida*, 463 U.S. 939, 960 (Stevens, J., concurring). Since *Furman v. Georgia*, the Supreme Court has required any statute governing imposition of the death penalty to "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). The statute "must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing

103

**JA492**

a sentence of death." *Id.* (quotations and footnotes omitted); *Gregg v. Georgia*, 428 U.S.153, 192 (1976) (opinion of Stewart, Powell & Stevens, JJ.); *id.* at 222 (opinion of White, J., Burger, C.J., & Rehnquist, J.). Deeming it "virtually unthinkable to follow any other course in a legal system . . . operated by following prior precedents and fixed rules of law[,]" *Gregg* noted that "[i]t is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations." 428 U.S. at 193. "No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines." *Id.* at 206-07. Thus, aggravating factors must be narrowly and precisely defined. *Godfrey*, 446 U.S. at 429; *Zant*, 462 U.S. at 877-78 & n.15.

In this case, the non-statutory aggravating factors were arbitrarily determined by the prosecutors, limited only by their imaginations. There was no clear, objective standard that determined the factors which increased Runyon's moral culpability. Thus, there were no procedural protections to ensure that the death penalty was imposed in a consistent and rational manner.

The four non-statutory aggravating factors proposed by the prosecutors and found by Runyon's jury were that Runyon: (1) "caused injury, harm, and loss to the victim … and the victim's family and friends, as shown by the victim's personal characteristics and by the impact of his death upon the victim's family, friends, and coworkers;"[44] (2) "utilized education, training, and experience that he received in college courses focused on criminal justice, and as a law enforcement and correctional officer, as an officer of the Kansas National Guard, and as a member of the United States Army;" (3) "engaged in acts of physical abuse toward women, including, but not limited to, his estranged spouse and former girlfriend;" and (4) "demonstrated a lack of remorse" for the crime. Special Verdict Form – Selection Phase, ECF No. 291. These four factors added improper weight to

---

[44] Every murder case results in victim(s).

104

**JA493**

the aggravation scale in the jury's weighing process resulting in an arbitrary death sentence in violation of the Eighth Amendment. Accordingly, the death sentences should be vacated.

**Claim 12:** **Runyon Was Denied Due Process Of Law, Equal Protection Of The Law, The Right To Be Free Of Cruel And Unusual Punishment, And Effective Assistance Of Counsel Because The Death Penalty Was Disproportionately And Unconstitutionally Applied According To Race, And Trial And Appellate Counsel Made No Objection Based On This Fact.**

The authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty is impermissibly influenced by race, in violation of the Equal Protection Clause of the Fifth Amendment and the Cruel and Unusual Punishment Clause of the Eight Amendment. The Federal Death Penalty Act is administered in a racially biased manner and the government improperly selected the death penalty for Runyon based upon his race. Trial and direct appeal counsel were ineffective for failing to raise this claim.

In *Wayte v. United States*, 470 U.S. 598 (1985), the Supreme Court held that "[i]t is appropriate to judge selective prosecution claims according to ordinary equal protection standards." *Id.* at 608 (footnote omitted). The same applies to Runyon's claims. To succeed on his claims, Runyon must show that the federal prosecutorial policy had both a discriminatory effect and a discriminatory intent. *United States v. Armstrong*, 517 U.S. 456 (1996). Here, the government could have sought the death penalty for Runyon's two white co-defendants but did not, and it chose to seek the death penalty only for him, a member of a minority race. *See Armstrong*, 517 U.S. at 469 (selective prosecution implies that a selection has taken place). Initially, Runyon can show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose."[45] *Batson*, 476 U.S. 79, 94 (1986). With discovery and an evidentiary hearing, Runyon can prove his claim.

---

[45] The burden then shifts to the prosecution to defend its conduct. To do so, the government must offer concrete factual explanations. "[It] cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties." *Batson*, 476 U.S. at 94.

In the time-period before this case, "[the] race of the victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty[.]" Ex. 37, (Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, *Racial Disparities in Federal Death Penalty Prosecutions 1988-1994*, p.7 (March 1994) ("*Racial Disparities*") (quoting U.S. General Accounting Office, *Death Penalty Sentencing* 5 (Feb. 1990)). A separate comprehensive statistical analysis of 403 cases authorized and completed as capital prosecutions by DOJ from 1989 through August 2008 demonstrates the relationship between victim race and sentencing outcomes in federal capital cases. Cohen Bell Declaration, Ex. 38.  A federal defendant charged with killing a white victim is three times more likely to be sentenced to death than a defendant who kills a non-white victim. *Id.* The race of the victim is "highly statistically significant" and the likelihood that the discrepancy occurs by chance is "essentially zero." Although this study focused on the correlation between white female victims and the death penalty, it remains probative in this case where the victim is a white male. In society as a whole, African-Americans account for about half of murder victims. Almost 80% of death row defendants have been executed for killing white victims. *See* Death Penalty Information Center, *Race and the Death Penalty*, *available at:* http://www.deathpenaltyinfo.org/race-and-death-penalty.

Like the victim's race, the race of the defendant directly correlates to the rate of being federally-charged with capital murder. From 1988-1994, the percentage of defendants selected for capital prosecution nationwide who were white was 11% whereas 89% were non-white. (*Racial Disparities*, p. 1, Ex. 37). For example:

> Three-quarters of those convicted of participating in a drug enterprise under the general provisions of § 848 have been white and only about 24% of the defendants have been black. However, of those chosen for death penalty prosecutions under this section, just the opposite is true: 78% of the defendants have been black and only 11% of the defendants have been white. (See Fig.1). Although the number of homicide cases in the pool that the U.S. Attorneys are choosing from is not known (the Justice Department has not responded to Congressional inquiries for that data), the almost exclusive selection of minority defendants for the death penalty, and the sharp contrast between capital and non-capital prosecutions under § 848, indicate a

<div align="center">106</div>

<div align="center">**JA495**</div>

degree of racial bias in the imposition of the federal death penalty that exceeds even pre-Furman patterns.

*Id.* at pp. 2-3, Ex. 37.

From 1995-2000, the federal death penalty was authorized for 159 defendants. U.S. Dep't. of Justice, *The Federal Death Penalty System: A Statistical Survey (1988)-(2000)*, p. 8 (Sept. 12, 2000), *available at* http://www.justice.gov/archive/dag/pubdoc/_dp_survey_final.pdf. Of the 159 death-authorized defendants, 28% were white and 72% were non-white. *Id.* Clearly, the race of the defendant is a significant factor in how the federal death penalty is applied. *Compare Hunter v. Underwood*, 471 U.S. 222, 227 (1985) (finding discriminatory impact from a state law where Blacks were at least 1.7 times as likely to suffer disenfranchisement under the law).

Statistics for the Eastern District of Virginia are not only consistent with nationwide statistics but at an authorization rate of 95% for non-whites, they show an even greater disparity in the application of the death penalty. In this District, to undersigned counsel's knowledge, an overwhelming 42 out of 44 death-authorized cases (95%) are prosecutions of non-white men. The 44 cases comprised of 35 African-American men, five Hispanic men, two white men, and one Asian man (in addition to Runyon). No women have been authorized for the death penalty in the Eastern District of Virginia, including Runyon's co-defendant Voss. From federal cases docketed in this District in 2008, undersigned have identified 12 defendants—including Runyon—who were authorized for the death penalty. *See Federal Capital Prosecutions – race and gender of defendants and victims* (August 2015), *available at:* http://www.capdefnet.org/FDPRC/pubmenu.aspx?menu_id=96&folder_id=5120. Only two of the twelve defendants were white. The impact of both nationwide and district statistics is clearly exemplified in Runyon's case where similarly situated white co-defendants (charged with the same crimes and three aggravating circumstances compared to Runyon's two) were not death-authorized.

107

**JA496**

In *United States v. Bass*, 536 U.S. 862, 863 (2002), the Supreme Court acknowledged nationwide statistics demonstrating that "[t]he United States charges blacks with a death-eligible offense more than twice as often as it charges whites[.]" Although a racially disproportionate pattern of capital charging, standing alone, may be insufficient to demonstrate purposeful discrimination on the basis of race, the numbers here warrant discovery and an evidentiary hearing concerning the government's authorization process and plea bargaining decisions. In a related context, the Supreme Court "has recognized that the direct impact of the challenged official action is frequently probative of why the action was taken, since people 'usually intend the natural consequences of their actions.'" *Williams v. Hansen*, 326 F.3d 569, 585 (4th Cir. 2003) (quoting *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 487 (1997) (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977))). Trial counsel's failure to obtain this type of information and pursue a pre-trial challenge to the government's racially discriminatory actions constitutes ineffective assistance.

In this case, all co-defendants were charged with the same crimes and the same two statutory aggravators, but Voss and Draven were also charged with a third statutory aggravator. Runyon is the only non-white co-defendant and the only co-defendant for whom death was sought. ECF No. 3 pp. 13-14. Runyon's jury found all three co-defendants were equally culpable in the commission of the crime. The majority of the guilt-phase evidence demonstrated the white co-defendants' planning and execution of the crime, the lavish manner in which the two spent the proceeds of the crime, and their coordinated effort to cover-up the crime. Although the white female co-defendant pled guilty and received a life sentence she did not provide additional information regarding the crime nor did she testify against the other two co-defendants during their subsequent joint trial. The white male co-defendant exercised his right to a trial, as did Runyon, but he was not exposed to the death penalty and he did not assist the prosecution against Runyon.

108

**JA497**

The Government possessed evidence showing that the white male co-defendant's prior violent conduct and potential for future violent conduct was more substantial than Runyon's prior violence. *See* Claim 2. Moreover, the white co-defendants enjoyed $100,000 in proceeds of the crime which establishes a weightier "pecuniary gain" aggravating circumstance than was levied against Runyon. The "substantial planning" aggravator is weightier with respect to the two white co-defendants who, according to the prosecution's theory, engaged in an extensive illicit affair, planned the crime for months, searched for a triggerman, chose the location of the crime, lured the victim to the crime scene and directed Runyon's actions. *See* Claim 4 (Eligibility IAC). The "victim impact" aggravator is as strong or stronger against the white co-defendants, especially since the white female co-defendant was the victim's wife and mother of his children and the white male co-defendant was the white female's lover. With regard to the "lack of remorse" aggravator, the white female arranged the crime scene location by opening a bank account, directed her husband to the bank's ATM, and remained on the phone with him as he drove to his death while coordinating his whereabouts with the white male. The white female lied to military and federal officials and law enforcement to receive a pay-out on her husband's death. Both white co-defendants spent those proceeds and engaged in a coordinated cover-up, tampered with witnesses, and "confessed" only after being taken into custody and when arrest was inevitable. The white female co-defendant pled guilty for purposes of escaping the death penalty. The white male co-defendant exercised his right to trial and did not apologize or express remorse. Accordingly the "lack of remorse" aggravator asserted against Runyon because he did not confess to the crime is not stronger for him than the white co-defendants.[46]

In addition to failing to seek death for the two similarly situated, but white, co-defendants, the prosecution introduced evidence and comments that "contaminated the sentencing proceeding

---

[46] Use of Runyon's silence as proof of the "lack of remorse" aggravator violates the Fifth Amendment, *Runyon*, 707 F.3d at 507-09, and it cannot add any weight to the aggravator.

**JA498**

with invidious considerations concerning [Runyon's] ethnicity and religion." *Runyon*, 707 F.3d at 493. A large portion of the prosecution case for death was based on a video recording in which law enforcement commented on Runyon being "an honorable Asian man." *Id.* at 493. The prosecution deliberately introduced Runyon's race and religion into the trial, conveying—what the Fourth Circuit described as—"frankly, stereotyping and insulting notions[.]" *Id.* at 494. The prosecution's closing argument evidenced a further intent to contravene Runyon's constitutional rights. It "infringed [Runyon's] Sixth Amendment rights by impugning his decision to proceed to trial[,]" and violated his Fifth Amendment right against self-incrimination by urging the jurors to penalize him for remaining silent and not articulating remorse. *Id.* at 507-09. The court of appeals' finding that these violations were harmless does not obviate the disturbing fact that the prosecutors intentionally violated multiple constitutional principles and the video injected impermissible racial stereotypes into the case. In addition, as discussed in Claim 16, the prosecution demonstrated a bias against persons of color when peremptory challenges were exercised against 70% of potential African-American jurors.

The discriminatory choices and acts of the prosecution in Runyon's case are probative of discriminatory intent reflected in statistical evidence of racial disparity in the application of the Federal Death Penalty Act, particularly in the Eastern District of Virginia. Runyon has proffered evidence that shows the racial discrepancy present in his case where the prosecution did not seek death against the similarly situated white co-defendants. This showing renders the above statistics all the more probative of discrimination. This Court should vacate Runyon's death sentences.

**Claim 13:** **Runyon's Death Sentence Is Disproportionate And Arbitrary In Violation Of The Fifth And Eighth Amendment And Trial And Appellate Counsel Were Ineffective For Failing To Raise This Issue.**[47]

Given the relative culpability of the co-defendants in this case, Runyon's sentence of death is disproportional in violation of the Fifth and Eighth Amendments based on the arbitrary and inconsistent imposition of the death penalty where two co-defendants with the same or greater culpability did not face exposure to the death penalty.

In *Furman v. Georgia*, 408 U.S. 238 (1972), the Supreme Court established that the Eighth and Fourteenth Amendments do not tolerate the infliction of a death sentence under legal systems that permit the death penalty to be arbitrarily, capriciously and inconsistently imposed. *Id.* at 310. (Stewart, J., concurring). *Furman* established that "[i]f a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Spaziano v. Florida*, 468 U.S. 447, 460 (1984); *see also Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) (*Furman* established that "if a State wishes to authorize capital punishment it has a constitutional responsibility to ... apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty."). The same is true for the federal government.

The Constitution requires some form of meaningful review of death sentences to guard against arbitrary and inconsistent results. *See Jurek v. Texas*, 428 U.S. 262, 276 (1976); *Proffitt v. Florida*, 428 U.S. 242, 258-60 (1976). Accordingly, courts must "carefully scrutinize" sentencing decisions "to minimize the risk that the penalty will be imposed in error or in an arbitrary and capricious manner. There must be a valid penological reason for choosing from among the many criminal defendants the few who are sentenced to death." *Spaziano*, 468 U.S. at 460 n.7; *Zant v. Stephens*, 462 U.S. 862,

---

[47] Investigation is ongoing and supplemental information will be provided when available.

**JA500**

873-80 (1983) ("If a State has determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not."). When determining whether a death sentence is arbitrary, the Supreme Court has directed courts to evaluate a defendant's culpability both individually and in terms of the sentences of co-defendants and accomplices in the same case. *Enmund v. Florida*, 458 U.S. 782, 788, 798 (1982).

The same two statutory aggravators were charged against Voss, Draven and Runyon and a third statutory aggravator was charged against Voss and Draven. ECF No. 3 pp. 13-14. Voss pled guilty but Draven, like Runyon, proceeded to trial. Draven and Voss were instrumental in planning the crime, Draven recruited Runyon for the crime, and Draven and Voss orchestrated the execution of the crime. Afterwards, Draven and Voss—and not Runyon—spent the proceeds of the crime ($100,000). Draven engaged in an orchestrated cover-up with Voss, he and Voss attempted to influence grand jury witnesses, Draven attempted to influence Runyon's statements to police, he and Voss lied to police for months, and Voss lied to military and federal officials and insurance providers in an attempt to receive additional proceeds from her husband's death. *See also* Claim 12.

As discussed in Claim 2, the government also possessed egregious facts regarding Draven's adjudicated and unadjudicated criminal conduct. The facts alleged in support of the "abuse of women" non-statutory aggravator used against Runyon pale in comparison to Draven's criminal history of sexually abusing children and his outstanding charges of second degree assault and deadly weapon with intent to injure resulting from his violent attack on a girlfriend. In particular:

- Draven has an extensive juvenile history of violent criminal conduct, including, but not limited to, the sexual assault of numerous children;
- Draven's history as a sexual predator includes sexual abuse of: a five-year-old girl; two six-year-old boys; his six-year-old brother and his four-year-old sister; a five-year-old child; and, a developmentally delayed 15-year-old girl.
- Draven was placed in a residential facility for child sexual assault;

112

**JA501**

- Draven was diagnosed as having conduct disorder, undifferentiated type, a precursor to anti-social personality disorder;
- Draven was diagnosed as suffering from Pedophilia;
- Draven's charge history consists of second-degree assault, possession of a deadly weapon with intent to injure or intimidate or threaten death or bodily injury; and
- Draven also engaged in acts of intimidation, harassment, and bomb threats.

Draven's criminal past was far more violent than Runyon's and Draven's victims far more helpless. Draven did not merely slap or punch his victims, he raped them. His victims were not merely physically smaller, they were little children; children who were near the age of the Voss children, the children who, under his plan to murder Cory Voss, would have been permanently placed at Draven's fingertips. Notwithstanding this evidence, the Government deemed Draven unworthy of the punishment of death.

Given this, the evidence provides no basis for finding Runyon deserving of death and Draven not. *Both went to trial.* At oral argument before the court of appeals, "questions arose with regard to the government's selection of defendants for capital punishment."[48] *Runyon*, 707 F.3d at 520 n.6. The government distinguished Runyon and the other defendants, stating "that Runyon was the actual triggerman in the murder-for-hire scheme; that he accepted payment for killing someone who was essentially a complete stranger; and that he not only never cooperated with the investigation but sought to thwart it at virtually every turn." *Id.* However, the prosecutor argued to the jury that "Draven is just as liable as if he pulled the trigger." Tr. 1665, 7/16/09. Both Draven and Voss denied paying Runyon. They both indicated that Draven owed Runyon money for a loan. The prosecution could only *suggest* that a $275 money order sent under Draven's brother's name two months after the crime was "payment" for the crime. Furthermore, Runyon cooperated with the police investigation by voluntarily providing a DNA sample and speaking with police on two

---

[48] Appellate counsel rendered ineffective assistance to the extent that they failed to show the prosecution exercised its discretion on some impermissible basis.

113

**JA502**

occasions. The statement that Runyon "sought to thwart" the investigation "at virtually every turn" is unfounded and certainly not proven at trial. The fact that Runyon never confessed to the crime does not constitute uncooperativeness or "thwarting" an investigation. Runyon had an absolute and fundamental right not to incriminate himself and to require the prosecution to prove its case at trial.

Assuming without conceding that Runyon may have pulled the trigger, Draven was actively involved in the murder itself. Draven helped choose the location for the crime and, not only recruited Runyon's participation in Draven and Cat Voss's scheme, Draven attempted to recruit others even before he ever approached Runyon. As evidenced by his cell phone records, Draven was at, or near the scene of the actual murder. In the time that followed the murder, it was Draven that orchestrated the attempted cover-up by: lying to police about his intimate relationship with Cat Voss and the fact that he lived with her; attempting to influence grand jury witnesses; using different phone numbers; and telling Runyon the details of his conversations with police to influence any statement Runyon might make. It cannot be ignored that Draven provided no assistance to the government until he was in police custody. Moreover, the government considered Cat Voss to be the mastermind of the scheme to murder her husband and considered Runyon to be the tool that Voss and Draven used to execute their murderous plan. *See* Claim 4 & Ex. 15 pp. 3-5.

Finally, as discussed in Claim 14, Runyon's serious mental illness and brain damage illustrates his lesser-culpability vis-à-vis the two co-defendants who escaped death-authorization.[49]

Given the disparity and arbitrariness in sentencing between the co-defendants and the clear evidence regarding the role race played in Runyon's death sentence, *see* Claim 12, the death sentences should be vacated.

---

[49] Counsel for all defendants in this case have indicated that Draven was not authorized for death <u>because</u> of his mental health history. A decision that Draven's mental health warranted mercy when Runyon's severe mental illness and brain damage did not, is wholly arbitrary.

**Claim 14:      Runyon's Death Sentence Violates The Eighth Amendment Because He Is Severely Mentally Ill.**

Executing David Runyon, who is severely mentally ill, violates the Eighth Amendment's prohibition against arbitrary, cruel, excessive and unusual punishment. *See Roper v. Simmon*s, 543 U.S. 551, 578 (2005) (persons under 18); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002) (persons with mental retardation); *see also Corcoran v. Stat*e, 774 N.E.2d 495, 502 (Ind. 2002) (Rucker, J., dissenting); *Bryan v. Mullin*, 335 F.3d 1207, 1246-47 (10th Cir. 2003) (Henry, J., concurring in part and dissenting in part); *State v. Nelson*, 173 N.J. 417, 488 (2002) (Zazzali, J., concurring), *State v. Scott*, 748 N.E.2d 11, 19 (Ohio 2001) (Pfeifer, J., dissenting). The prohibition on executing the severely mentally ill is an established norm of international law. *See* http://www.deathpenaltyworldwide.org/mental-illness.cfm (listing and discussing authorities). At the time of Runyon's trial, there was (and still is) a growing consensus that it is unacceptable to impose the death penalty upon severely mentally ill persons.[50] *See generally USA: The execution of mentally ill offenders,* pp. 20-23, Amnesty International Index: AMR 51/003/2006 (Amnesty International Jan. 2006). "[T]here is a profound inconsistency in exempting people with mental retardation from the death penalty while those with serious mental illness remain exposed to it." *Id.* at p.20-21; *see also*, *Double Tragedies*, National Alliance on Mental Illness and Murder Victims' Families for Human Rights (2009), *available at:* http://www.deathpenaltyinfo.org/files/DoubleTragedies.pdf (calling for treatment and prevention instead of execution for such offenders).

As of 2014, Americans oppose the death penalty for people with mental illness by more than a 2-1 margin. *New Nationwide Poll Shows Americans Oppose Death Penalty in Cases where Person has Mental*

---

[50] Runyon's prior counsel rendered ineffective assistance for failing to adequately investigate Runyon's mental health and raise the issue. S*ee* Claims 4, 5 & 6. But for this constitutional error, no reasonable juror would have imposed the death penalty against Runyon. Runyon's severe mental illness renders him categorically ineligible for the death penalty.

115

**JA504**

*Illness By 2-1 Margin*, Prof. Robert Smith, Press Release, Dec. 1, 2014, *available at*: https://drive.google.com/file/d/0B1LFfr8Iqz_7R3dCM2VJbTJiTjVYVDVodjVVSTNJbHgxZWlB /view. In particular, the death penalty is disfavored for veterans like Runyon who suffer from service-related mental health issues. *See Porter v. McCollu*m, 558 U.S. 30, 43-44 (2009) (defense counsel's failure to uncover and present during penalty phase any mitigating evidence regarding defendant's mental health, family background, or military service was deficient); *see also* K. Keys and B. Pelke, *Purple Hearts On Death Row: War Damaged Vets Should Not Be Executed By the State*, AlterNet.org, (Dec. 4, 2009).

In *Atkins*, the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishments prohibits the execution of individuals who suffered from mental retardation. 536 U.S. at 306. The Court explained that the mentally retarded "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Id.* at 318-20. These deficiencies diminish the culpability of individuals to the extent that neither of the justifications advanced by states in support of the death penalty–retribution and deterrence–would be served by permitting their execution. *Id.* In addition, "[m]entally retarded defendants may be less able to give meaningful assistance to their counsel … and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Id.* at 320-21.

In *Roper v. Simmons*, the Supreme Court held that the Eighth Amendment bars the execution of offenders who were juveniles at the time of the crime. 543 U.S. at 578. In reaching this conclusion, the Court noted that youth results in "impetuous and ill-considered actions and decisions" juveniles "are more vulnerable" to negative influences. *Id.* at 569 (internal quotation marks omitted).

Implicit in both opinions is that the death penalty is reserved for only the worst of the worst offenders. "The mentally ill suffer from many of the same limitations that, in Justice Stevens' words [in *Atkins*], do not warrant an exemption from criminal sanctions, but they do diminish their personal

116

**JA505**

culpability." Alan A. Stone, M.D., *Supreme Court Decision Raises Ethical Questions for Psychiatry*, Psychiatric Times, Vol. XIX Issue 9 (Sept. 2002). Mental illness can also cause "impetuous and ill-considered actions" similar to those resulting from youth and it can cause a "flat" or "blunt" affect that may create an impression of remorselessness similar to the mentally retarded. These circumstances exist in this case, where the crime was certainly ill-considered but also, Runyon was unable to assist himself or counsel because he refused to consider a guilty plea in exchange for life. Furthermore, as discussed previously, Runyon's mental illness was inherently disadvantageous because it affected his facial expression and played into the prosecutor's theme of remorselessness. *See* Claim 6.

Finally, Runyon's severe mental illness significantly reduces his moral culpability—placing him outside that class of defendants to whom the death penalty may be constitutionally applied. His mental illness diminishes his capacity to "understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 318-20. Thus, Runyon's death sentence violates every standard of decency and is barred by the Eighth Amendment.

**Claim 15:**      **Selection Of The Grand Jury And/Or The Petit Jury Venire For Runyon's Case Was Tainted, And Trial Counsel Unreasonably Failed To Request And Examine The Jury Selection Records.**

**A.**      **Selection Of The Grand Jury And/Or Petit Jury Venire Jury Was Tainted.**

Runyon alleges that the procedures used to draw the grand jury and/or the petit jury venire were contrary to law in one or more respects, regardless whether the work was done by the Court, by the Court's employees or agents, or by an outside vendor or service provider. A nonexclusive list of errors includes the following: (1) At one or more steps, there was a failure to fully and accurately comply with the procedures described in the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Eastern District of Virginia ("Plan"). (2) At one or more steps, there was a failure to fully and accurately comply with the jury selection provisions of 28 U.S.C.

117

§ 1861 *et seq.* (3) Because of a computer error, inaccurate computer program, misconduct, or other reason, the names on the master jury wheels, the qualified jury wheels, the grand jury list, and/or the venire called for petit jury service in Runyon's case were not drawn at random from their immediate parent list. (4) The names on the master jury wheel, the qualified wheel, the grand jury list, and/or the venire called for petit jury service did not represent a fair cross-section of the community. (5) The composition of the grand jury and/or the petit jury venire did not reflect the composition of the relevant Division (Newport News or Norfolk), including as to race, gender, or age. (6) Nonqualifying individuals participated in the grand jury and/or the petit jury venire, meaning (a) individuals participated whose names were not on the voter registration list, the relevant master jury wheel and/or the qualified jury wheel; (b) individuals participated who did not reside in the relevant Division or District at the time of their service; or (c) individuals participated who did not qualify for any other reason.

The information provided by the Court has been inadequate, thus far, to investigate most of these allegations. Runyon is handicapped by the fact that the Court did not give him "[t]he contents of records or papers used by the jury commission or clerk in connection with the jury selection process" as required by 28 U.S.C. §1867(f). It gave him only a portion of that information. For example, the Court provided statistical breakdowns indicating that it has information about the ethnicity of potential jurors, but did not provide it to counsel. It also provided zip codes as the only geographic information. But census data is not compiled by zip code, and the corresponding census block unit can be identified only by providing a street address. Runyon is continuing to try to investigate the issues above using the tools that were provided to him.

**B.      There Was A Failure To Fully And Accurately Comply With The Jury Selection Plan And The Provisions Of 28 U.S.C. § 1861 *et seq.***

There was a substantial failure to comply with the jury selection procedures in 28 U.S.C. §§1865 and 1866 and the procedures in the Plan for the Random Selection of Grand and Petit Jurors

118

**JA507**

in the United States District Court for the Eastern District of Virginia ("Jury Selection Plan").

Congress has not defined the term "substantial" in this context, but it is generally accepted that "the

alleged violations must be weighed against the underlying principles of the [Jury Selection and Service]

Act." *United States v. Gregory*, 730 F.2d 692, 699 (11th Cir. 1984). "These principles are: (1) the random

selection of jurors; and (2) the determination of disqualifications, excuses, exemptions, and exclusions

on the basis of objective criteria only." *United States v. Candelaria-Silva*, 166 F.3d 19, 33 (1st Cir. 1999);

*see also United States v. Aguero*, 248 F. Supp. 2d 1150 (S.D. Fla. 2003) (violation is substantial if jury

administrators failed to use objective criteria to disqualify, excuse, exempt, or exclude potential jurors).

In *United States v. Calabrese*, 942 F.2d 218 (3d Cir. 1991), the court described the appropriate inquiry:

> For wrongful exclusions, determining whether there has been a substantial violation has both quantitative and qualitative aspects. Quantitatively, a substantial violation generally will not be found if the number of errors is small. Qualitatively, the inquiry is whether there has been a frustration of the Act's underlying principle of exclusions on the basis of objective criteria only.

*Id.* at 227-28 (citation omitted).

Individuals are deemed qualified to serve on a jury unless they come within one of five

statutory criteria in 28 U.S.C. §1865(b), which addresses factors such as citizenship, minimum age,

ability to speak and understand English, mental or physical infirmity, or a prior felony conviction.

Even if qualified, a person may be temporarily excused from service because of hardship or extreme

inconvenience; or excluded from a particular trial because of factors such as an inability to be impartial

in a particular case; or exempted because of factors such as recent prior jury service. 28 U.S.C.

§1866(c), (e). Consistent with 28 U.S.C. §1863, this court's Jury Selection Plan, pp. 5-6, explicitly lists

the permissible factors for disqualification, exemption, or excuse.

To ensure that decisions to exclude individuals from jury service are made only on the basis

of objective criteria, Congress also mandated juror-by-juror record-keeping. On the juror qualification

form, "[t]he clerk shall enter" the basis for disqualification, exemption, or excuse; he also "shall note"

119

**JA508**

if a person did not appear in response to a jury summons. §1865(a). When a person is disqualified, excused, exempt, or excluded, "the jury commission or clerk shall note … the specific reason therefor." §1866(d). *See* Jury Selection Plan, p. 5 (clerk "shall note" the "specific grounds" for exemption, excuse, or exclusion; if a person is unqualified, exempted, or excused, the clerk "shall enter" such determination.

According to the records provided to Runyon's collateral counsel, 423 prospective jurors were called for the petit jury in his case. Of these, 180 were disqualified, excused, exempted or excluded; the remaining 243 completed juror questionnaires. These records also reprint the codes that designate 25 grounds for disqualification, exclusion, or exemption, and they show which codes were applied in Runyon's case: ten (5.6%) of the 180 were over age 70; three (1.7%) were deceased; seven (3.9%) had moved out of the jurisdiction; two (1.1%) were emergency personnel; two (1.1%) had job-related or student reasons; two (1.1%) had to care for small children; one (0.6%) was in the military; and five (2.8%) had recent previous service. This accounts for 32 (17.8%) of the 180.

The remaining excluded jurors—the vast majority—were disqualified, excused, exempted, or excluded for reasons that are not identified, and for which there is no evidence of objective criteria. Quantitatively, the numbers are huge: 94 (52.2%) were excluded because of a "court order," and 54 (30%) for no stated reason. The "court order" category is nearly as uninformative as "no reason given," because the records contain no reason why an order was needed or given. It strains credulity to think that there would be objective criteria for excluding more than half of the 180 potential jurors, using reasons that are not on the Court's expansive list of grounds.[51] The most logical inference is that these individuals were excluded using nonobjective criteria.

---

[51] The court's list includes grounds such as "P.O. Return-No Fwd. Address," "unable to contact," and "no transportation," as well as grounds related to things like medical condition, illness, planned vacation, and financial hardship. None of these grounds were cited for any prospective juror in Runyon's case.

120

**JA509**

Even if there was an explanation for the removals by court order (such as additional information not provided to collateral counsel), that is not the end of the issue. The exclusion of another one-third of the 180 prospective jurors for no stated reason whatsoever is not only alarming but also raises more doubts that these individuals were excluded using objective criteria. In *United States v. Royal*, 174 F.3d 1, 12 (1st Cir. 1999)—a fair cross-section case involving alleged discrimination in the selection of the jury—the court said it was troubled by the fact that ten prospective jurors were excused without a recorded reason. In Runyon's case, the number excused without a recorded reason was more than five times larger.

Quantitatively, the "court order" and "no reason given" categories account for 148 (82.2%) of the potential jurors who were disqualified, excluded, or exempt, without any indication of the reason. This is not the kind of "play in the joints of the jury-selection process [that] is necessary in order to accommodate the practical problems of judicial administration." *Hamling v. United States*, 418 U.S. 87, 138 (1974). Qualitatively, these unexplained exclusions frustrated the Act's underlying principle of exclusions on the basis of objective criteria only.

Moreover, there is a racial component to these exclusions. The group of 423 jurors originally called for this case included two Native Americans; 100% of them were excluded—one by court order and one for no reason. The group of 423 included sixteen Asians—an important population because Runyon is Asian. More than half of them were excluded—five by court order, three for no reason, and one for an unobjectionable reason. No other group was decimated at this level.

Section 1867(d) requires a sworn statement if a party moves to challenge compliance with the section procedures. In an abundance of caution, Runyon's counsel has included such a sworn statement as Exhibit 39.

121

**JA510**

#### C.    A Person Who Did Not Qualify Participated In Runyon's Trial

Juror 84 has two different identities. She may be two separate people, meaning that one of those individuals was not a qualified juror and her participation not only was illegal but tainted the proceedings. There may be a more benign explanation, but it cannot be resolved without additional information.

On the Court's Strike List A (ECF 424, sealed), Juror 84 is identified as S.G. A person who identified herself orally at trial as S.G. also participated in voir dire on the first day, Tr. 6/30/2009, page 36. She was struck during the seating of the jury. In addition, Juror 84's juror number, which the Court assigned to potential jurors in alphabetical order, falls in the middle of the G's, right between Juror 82 and Juror 85. But no person named S.G. completed a juror questionnaire. Moreover, there are 54 people on the Norfolk 2007 Master Wheel who have the same last name as S.G., and 30 of them are also on the Norfolk 2007 Qualified Wheel. But none of them has the same first name as S.G.

The questionnaire marked "Juror 84" was filled out by a person who identified herself as S.R. That name appears on both the Norfolk 2007 Master Wheel and Norfolk 2007 Qualified Wheel (100760415), and that participant number is listed in the materials provided to counsel. But neither the trial transcript, nor the strike list, nor any similar trial record shows actual participation by anyone named S.R. Moreover, the Court called jurors for oral voir dire alphabetically, and the potential jurors whose names were in the second half of the alphabet were not called until the second day, when the alternate jurors were selected.

The jury wheels and juror questionnaire identify S.R. as a white female who lived in Virginia Beach. The information provided by the Court similarly indicates that a person with S.R.'s participant number was a white female. It further shows that the person with S.R.'s participant number was 41 years old when the participant number table was generated, which means she would have been 34 or 35 years old at the time of trial. Neither the strike list nor the trial transcript contains comparable

122

**JA511**

demographic information about S.G., so there is no data about race or age that is available for comparison. Nothing in S.R.'s juror questionnaire connects her to anyone with the same last name as S.G.

It is possible that S.G. and S.R. are the same person, and that she either married or divorced and changed her name. But the pattern here does not fit that scenario because if Juror 84 was just one person, she flip-flopped back and forth, using the name S.R. when she registered to vote, switching to S.G. on whatever source document the Court used to assign juror numbers, switching back to S.R. when she filled out the juror questionnaire, flipping again to S.G. during oral voir dire, and also using the name S.G. on whatever source document the Court used to compile the strike list. But this cannot be determined without additional information.

Based on his examination of the records to date, Runyon does not rule out the possibility that there may be questions about the identity of other members of the venire, but this cannot be determined without additional information.

> **D. Trial Counsel Unreasonably Failed To Request Or Examine Any Jury Selection Records, In Violation Of The Sixth Amendment.**

Under 28 U.S.C. § 1867(f), trial counsel have an essentially unqualified right to inspect and copy the relevant jury lists in order to determine *whether* the venire was drawn in a manner that complied with statutory and constitutional law. *See Test v. United State*s, 420 U.S. 28, 29-30 (1975) (per curiam). There is no burden that counsel must meet. Investigating the records and procedures used for jury selection is a standard component of competent performance by defense counsel in a capital case:

> Counsel should consider, along with potential legal challenges to the procedures for selecting the jury that would be available in any criminal case (particularly those relating to bias on the basis of race or gender), whether any procedures have been instituted for selection of juries in capital cases that present particular legal bases for challenge. Such challenges may include challenges to the selection of the grand jury and grand jury forepersons as well as to the selection of the petit jury venire.

ABA Guideline 10.10.2, *reprinted* at 31 Hofstra L. Rev. 1049.

<div align="center">123</div>

<div align="center">**JA512**</div>

Runyon's counsel unreasonably made no effort to request or examine the jury selection records in Runyon's case. Their failure to do so was a product of unreasonable ignorance or sloppiness, not strategy. If trial counsel had performed competently, there is a reasonable probability of a different, untainted jury and a different result.

**Claim 16:    The Prosecution Engaged In Racial And Gender Discrimination In Its Exercise Of Peremptory Strikes, And Trial Counsel Unreasonably Failed To Object To These Unconstitutional Strikes.**

Of the qualified venire members from which the jury was selected, the prosecution used peremptory strikes to remove 70 percent of the African-Americans who could have served. This was 100 percent of all the strikes exercised against persons of color. The prosecution also discriminated on the basis of gender, by overwhelmingly using its peremptory strikes against women. These discriminatory uses of peremptory strikes violated the Equal Protection Clause of the Fifth Amendment. Defense counsel's failure to object to either or both forms of discrimination violated the Sixth Amendment right to effective assistance of counsel.

**A.     The Relevant Law.**

A defendant has "the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson v. Kentucky*, 476 U.S. 79, 85-86 (1986). Particularly, this means that the "Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." *Id.* at 89. This protection is necessary, because discriminatory exclusions harm not only the rights of defendants, but also the rights of the excluded jurors and the integrity of the criminal justice system as a whole. *Id.* Indeed, because the harm does not inure solely to the defendant, but also to other parties and even the system as a whole, the defendant need not be of the same race as the excluded jurors to state an Equal Protection claim, and has third-party standing to raise it. *Powers v. Ohio*, 499 U.S. 400 (1991). The discriminatory exclusion of potential jurors is so inimical to the

124

**JA513**

administration of justice that the ban on exercising peremptory challenges on such a basis extends to the defendant, *Georgia v. McCollum*, 505 U.S. 42, 54-55 (1992), as well as to civil proceedings, *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 628-29 (1991). *See also Rose v. Mitchell*, 443 U.S. 545, 555-56 (1979) (noting that Constitution bars racial discrimination in grand jury selection procedures, and stating "[d]iscrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice"). As the Court summed up in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994):

> Discrimination in jury selection, whether based on race or gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceedings. . . . The community is harmed by the [striking party's] participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.

*Id.* at 140.

Moreover, intentional discrimination in the exercise of peremptory strikes is "structural error" and is therefore exempt from harmless-error review. *See Batson*, 476 U.S. at 100; *Miller-El v. Dretke (Miller-El II)*, 545 U.S. 231, 251-52 (2005); *Winston v. Boatwright*, 649 F.3d 618, 632-34 (7th Cir. 2011) (recognizing as structural error violations of *Georgia v. McCollum*); *Williams v. Woodford*, 396 F.3d 1059, 1069-70 (9th Cir. 2005) ("A *Batson* violation is structural error for which prejudice is generally presumed"); *Tankleff v. Senkowski*, 135 F.3d 235, 248 (2d Cir. 1998) (quoting *Powers v. Ohio*, 499 U.S. 400 (1991) ("Because the effects of racial discrimination during voir dire 'may persist through the whole course of the trial proceedings,' we hold that a *Batson/Powers* claim is a structural error that is not subject to harmless error review."). The Fourth Circuit has similarly eschewed harmless error analysis of a *Batson* claim, and has noted decisions of other circuits that have done the same. *See United States v. Legrand*, 483 Fed. App'x 771, 777 n.2 (4th Cir. 2012) (unpublished) (citing *Winston, supra; Forrest*

**JA514**

*v. Beloit Corp.*, 424 F.3d 344, 349 (3d Cir. 2005)); *Tankleff, supra; Ford v. Norris*, 67 F.3d 162, 170-71 (8th Cir. 1995); *United States v. Thompson*, 827 F.2d 1254, 1261 (9th Cir. 1987).

The now-familiar test for determining whether the rule set forth in *Batson* has been violated involves three steps: (1) the defendant first has the burden to establish a *prima facie* case of discrimination in the use of the prosecution's peremptory strikes; (2) the burden shifts to the prosecution to offer a race-neutral (or gender-neutral) explanation for its peremptory strikes; and (3) the burden returns to the defendant to establish that any neutral explanations offered are pretextual, and that the prosecution in fact is discriminating on an impermissible basis. *Miller-El II,* 545 U.S. at 267-68. This is not simply a matter of comparing the numbers of jurors of a particular race or gender who have been struck, and even one juror struck for racially discriminatory reasons violates the rule in *Batson* and requires vacation of the conviction. *See also United States v. Clemons*, 843 F.2d 741, 747 (3d Cir. 1988) ("Striking a single black juror could constitute a *prima facie* case even when blacks ultimately sit on the panel and even when valid reasons exist for striking other blacks."). That said, disproportionate numbers of strikes are strong evidence giving rise to a *prima facie* case of racial discrimination. *See, e.g., Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 342 (2003) ("the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason when … [they] used their peremptory strikes to exclude 91% of the eligible African-American venire members … [and] happenstance is unlikely to produce this disparity); *Batson*, 476 U.S. at 93 ("'seriously disproportionate exclusion of Negroes from jury venires ... is itself such an unequal application of the law ... as to show intentional discrimination'") (quoting *Washington v. Davis*, 426 U.S. 229, 241-42 (1976) (internal citation and quotation marks omitted)). *Miller-El II*, 545 U.S. at 240 ("The numbers describing the prosecution's use of peremptories are remarkable.")

**JA515**

1.      **The Prosecution Engaged In Racial Discrimination In Its Exercise Of Peremptory Strikes.**

Of the 243 venire members who completed questionnaires, the Court called 62 members for voir dire on the first day. Runyon refers to this group as the "pseudovenire" because it constituted the total pool of potential jurors who appeared at court and participated in voir dire for seating the jury, and the jury was seated at the end of the first day, solely from this group.[52] Of the 62 individuals in the pseudovenire, 10 were African-American, 1 was Asian, 50 were Caucasian, and 1 offered no response when asked about race on the questionnaire. The pseudovenire was drawn roughly in alphabetical order from the top half of the group of potential jurors that all counsel agreed should be called for questioning. ECF No. 236 (sealed). Ten of these 62 individuals were excluded for cause; none of them were African-American. The Court then announced that it would seat a jury without the voir dire of any additional prospective jurors because the remaining 52 members were sufficient to afford each side the maximum statutory 20 peremptory strikes if it chose to use them, with at least 12 left to seat as jurors. The 52 members consisted of 10 African-Americans, 1 Asian, and 41 Caucasians.

The prosecution proceeded to strike 7 of the 10 African-Americans, even though blacks constituted only 19 percent of the available jurors after exclusions for cause.[53] In other words, it struck 70 percent of the available and qualified black members. The prosecution was responsible for 100 percent of the strikes against African-Americans; the defense struck none. The prevalence of strikes

---

[52] The term "venire" ordinarily refers to the entire group of prospective jurors who are summoned for a trial and from which the jury is selected. In this sense, the venire in Runyon's case could consist of 256 people who were assigned juror numbers. In some cases, courts use the word "venire" to refer to the slightly smaller group of prospective jurors who actually show up at the court and complete a juror questionnaire. Under that definition, the venire in Runyon's case could consist of 243 people.

[53] The 10 identifiable African-Americans in the pseudovenire were potential jurors No. 14, 15, 31, 40, 46, 63, 70, 81, 95, and 116. The 7 African-Americans who were peremptorily struck by the government were Nos. 15, 31, 40, 46, 63, 81, and 116.

127

**JA516**

used against African-Americans was sufficient to state a *prima facie* challenge under *Batson*. *Johnson v. California*, 545 U.S. 162, 170 (2005) ("a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred").

Corroborating this statistical evidence is the fact that at the time of voir dire, the prosecutors intended to put into evidence (and did put into evidence) a racially pejorative videotape that showed police officers interrogating Runyon—who is Asian—and repeatedly invoking his Asian heritage as a reason for him to confess. This inflammatory videotape conveyed "stereotyping and insulting notions about how 'an honorable Asian man' is supposed to act," and the court of appeals was adamant that "the officers' comments referencing Runyon's ethnicity and religion . . . had no place at this sentencing proceeding." *Runyon*, 707 F.3d at 493.[54] On brief, the prosecutors engaged in the same kind of inappropriate racial stereotyping. They argued to the Fourth Circuit that their use of the videotape was "not problematic" because it did not present a *bad* stereotype of Asians; it presented a *good* one that purportedly appealed to "positive aspects of [Runyon's] identity." *Id.* at 493-94. The court of appeals rejected this tone-deaf rationale, holding that the statements on the videotape were designed to inflame racial prejudice and "'degrade the administration of justice.'" *Id.* at 494 (quoting *Battle v. United States*, 209 U.S. 36, 39 (1908)).[55] The prosecutors' intent to use, and their racially stereotyped defense of, the videotape indicate a degree of animosity toward racial minorities that adds weight to Runyon's statistical evidence. In aggregate, this evidence makes a significant showing of intentional discrimination in selection of the jury.

---

[54] The Fourth Circuit's opinion referred to ethnicity, but the United States classifies "Asian" as a race rather than an ethnicity. *See* https:///www.census.gov/topics/population/race/about.html.

[55] Although the court of appeals held that the video was unlawfully admitted in the penalty phase of trial, it concluded that this error was harmless.

**2.      The Prosecution Engaged In Gender Discrimination In Its Exercise Of Peremptory Strikes.**

Independent of their exercise of racially discriminatory strikes, the prosecutors also engaged in a pattern of strikes based on the gender of the prospective jurors. The government is not only barred from exercising peremptory strikes on the basis of race, but also may not exclude potential jurors because of their gender. "[G]ender, like race, is an unconstitutional proxy for juror competence and impartiality." *J.E.B.*, 511 U.S. at 129. Though women were long banned from jury service in the United States because they were considered "to be too fragile and virginal," the Court noted the only interest the state could conceivably have in allowing its officers to use peremptory strikes to ban all persons of a particular gender from a jury was whether "peremptory challenges based on gender stereotypes provide substantial aid to a litigant's effort to secure a fair and impartial jury." *Id.* at 132-36. When confronted with the idea that one gender may be more sympathetic to one side than the other, the Court noted it would "not accept as a defense to gender-based peremptory challenges 'the very stereotype the law condemns.'" *Id.* at 138 (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)). Indeed, "[e]qual opportunity to participate in the fair administration of justice is fundamental to our democratic system," and this ability "reaffirms the promise of equality under the law—that all citizens, regardless of race, ethnicity, or gender, have the chance to take part directly in our democracy." *Id.* at 145-46.

In Runyon's case, the prosecution exercised its peremptory strikes in a manner that discriminated on the basis of gender, by overwhelmingly using them against women. After exclusions for cause, the group of 52 potential jurors was 56 percent women (29 members) and 44 percent men (23 members). The government then used 68 percent of its peremptory strikes (13 of 19) to remove

129

**JA518**

women and less than half that amount—32 percent (6 of 19)—to remove men.[56] This is sufficient to create a *prima facie* case that the government not only was discriminating on the basis of race, but also on the basis of gender in its use of peremptory strikes, in violation of the Equal Protection Clause.

### B. Trial Counsel Unreasonably Failed To Object To The Prosecution's Discriminatory Exercise Of Peremptory Strikes.

Trial counsel failed to object when the prosecution struck 70 percent of the African-American members of the pseudovenire. Counsel also failed to object when the prosecutors used almost 70 percent of their peremptory strikes against women, removing them in a significantly greater proportion than they appeared in the group of qualified potential jurors. Because there was no objection, the prosecution was never called upon to justify these strikes, and the Court never determined whether the strikes were motivated by racial, ethnic, or gender-based stereotypes. The "rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." *Miller-El II*, 545 U.S. at 251-52. Counsel's failure to challenge the government's peremptory strikes under *Batson* constitutes deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984).

Runyon satisfies the *Strickland* performance prong because reasonably competent capital defense counsel would have been aware of the importance of *Batson* and related cases, and the necessity of raising such pertinent objections. Counsel's "passivity in light of an obvious pattern of strikes against minority prospective jurors [can fall] below an objective standard of reasonableness and amount[] to deficient performance." *Drain v. Woods,* 902 F. Supp.2d 1006, 1025-26 (E.D. Mich. 2012; *see Richardson v. Hardy*, 855 F. Supp.2d 809, 823 n.3 (N.D. Ill. 2012) (failure to assert *Batson* claim with an appropriate record "unquestionably fell below a standard of objective reasonableness"); *see also*

---

[56] The 13 females struck by the prosecution were potential jurors No. 7, 15, 18, 28, 31, 40, 46, 52, 63, 73, 81, 97, and 116. The 6 males struck by the prosecution were potential jurors No. 24, 35, 66, 91, 100, and 109.

*Government of the Virgin Islands v. Forte*, 865 F.2d 59 (3d Cir. 1989) (defense counsel's failure to object to prosecutor's use of peremptory challenges to excuse white prospective jurors in prosecution of white male for rape of black female was unreasonable under prevailing professional standards); *State v. Williams*, 679 So.2d 275 (Ala. Crim. App. 1996) (new trial granted where counsel failed to make *Batson* objection even though *prima facie* case of racial discrimination existed). The fact that Runyon's counsel did not object reflects a failure "to make the adversarial testing process work." *Strickland*, 466 U.S. at 690.

Prosecutorial zeal in removing jurors who are believed to be unlikely to return a sentence of death is a well-recognized phenomenon in death penalty cases, so much so that the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (hereinafter "ABA Guidelines") has specifically warned about such practices since at least 2003:

> Bearing in mind that the history of capital punishment in this country is intimately bound up with its history of race relations, counsel should determine whether discrimination is involved in the jury selection process. . . . Death qualification often results in the removal of more prospective jurors who are members of minority groups than those who are white, because minority jurors are more likely to express reservations about the death penalty. Neither race nor gender may form a basis for peremptory challenges, but a recent empirical analysis of capital murder cases supports the conclusion that "discrimination in the use of peremptory challenges on the basis of race and gender . . . is widespread." Counsel should listen closely to the prosecutor's voir dire, challenges for cause and reasons for exercising peremptory challenges, make appropriate objections, and ensure that all information critical to a discrimination claim is preserved on the record.

ABA Guidelines, Guideline 10.10.2 and Commentary, *reprinted in* 31 Hofstra L. Rev. 913, 1053-54 (2003).[57]

As noted previously, a *Batson* violation is structural error. Unlike trial rights, structural rights are "'basic protection[s]' whose precise effects are unmeasurable, but without which a criminal trial

---

[57] The "[p]revailing norms of practice as reflected in American Bar Association standards . . . are guides to determining what is reasonable," though they do not, of course, reflect all reasonable options available to trial counsel. *Strickland*, 466 U.S. at 688 (1984).

cannot reliably serve its function." *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993). Structural error thus has "consequences that are necessarily unquantifiable and indeterminate." *Id.*; *see United States v. González-Huerta*, 403 F.3d 727, 734 (10th Cir. 2005) ("[I]f, as a categorical matter, a court is capable of finding that the error caused prejudice upon reviewing the record, then that class of errors is not structural."). When trial counsel's deficient performance results in a structural error, the prejudice prong of a *Strickland* claim can be presumed. Both the majority and dissent acknowledged this principle in an en banc Fourth Circuit decision. "[T]he prejudice component of the *Strickland* analysis may be presumed if the nature of the deficient performance is that of a structural error." *Bell v. Jarvis*, 236 F.3d 149, 165 (4th Cir. 2000) (en banc majority); "[A]s the majority properly recognizes, when, as here, the deficient performance constitutes structural error 'the prejudice component of the *Strickland* analysis may be presumed.'" *Id.* at 180 (en banc dissent). [58]

Assuming this Court finds that trial counsel's failure to object to the *Batson* violations satisfies the deficient-performance prong of a *Strickland* claim, it should presume that prejudice resulted from trial counsel's failure to safeguard the fundamental fairness of the jury composition. *Bell, supra; see also Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001) (a "fundamental premise of *Batson* is that criminal defendants and excluded jurors alike are denied equal protection of the laws when the trial jury is constructed in a racially discriminatory manner. The remedy for such an equal protection violation is reversal of the conviction without regard to whether we perceive the defendant to be actually innocent or guilty.").

---

[58] In *United States v. King*, 36 F. Supp.2d 705, 710 (E.D. Va. 1999), this Court wrote "that *Batson* errors are not presumptively prejudicial when raised in an ineffective assistance of counsel claim." That conclusion conflicts with the Fourth Circuit's later en banc opinion in *Bell*.

132

**JA521**

**Claim 17:   The Voir Dire Conducted In This Case Violated Runyon's Fifth and Sixth Amendment Rights To A Fair Trial And Impartial Jury, And Trial Counsel Unreasonably Failed To Object.**

**A.   The Voir Dire Was Constitutionally Inadequate.**

Voir dire "plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored" *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Because this function is so important, the Supreme Court has spoken extensively about the imperative of adequate voir dire:

> "[V]oir dire 'is conducted under the supervision of the court, and a great deal must, of necessity, be left to its sound discretion.'" *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (quoting *Connors v. United States*, 158 U.S. 408, 413 (1895)). . . . Even so, part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. *Dennis v. United States*, 339 U.S. 162, 171-72 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950). . . . Hence, "[t]he exercise of [the trial court's] discretion, and the restriction upon inquiries at the request of counsel, [are] subject to the essential demands of fairness." *Aldridge v. United States*, 283 U.S. 308, 310 (1931).

*Morgan v. Illinois*, 504 U.S. 719, 729-30 (1992).

As Runyon noted elsewhere, the jury in his case was selected from a pseudovenire of 62 potential jurors who had completed juror questionnaires and whose names appeared on the upper half of List 1—the list of individuals that all parties agreed should be called for voir dire. ECF Nos. 210 (sealed), 236 (sealed). In Claim S2, Runyon alleges that the questionnaire used in this case contained flaws that precluded the exclusion of prospective jurors without further inquiry, and he incorporates that allegation here by reference. Of particular importance, the prospective jurors were given no guidance before completing their questionnaires about the standards and procedures that would govern their decisions at trial, and they suffered nearly the same lack of information in responding to the Court's oral voir dire questions.

133

The oral voir dire was minimal in comparison to the typical capital trial, and the scope of questioning was remarkably limited.[59] By way of illustration, the Court stated in its introductory voir dire remarks that one of the charges against Runyon was bank robbery, but it did not identify the institution that he was accused of robbing. In questioning the potential jurors, the Court made only one inquiry related to that charge: "Have you or any member of your immediate family that you are aware of been employed by or done business with the Oyster Point Branch of the Langley Federal Credit Union in Newport News?" Tr. 123, 6/30/09. This question is so narrow that it would not elicit a response from potential jurors who were members of the credit union but who transacted business at a different branch—members whose concern about a crime against their member-owned financial cooperative might be a source of bias.[60]

All questions were asked by the Court. They were collective: the court asked yes/no questions, addressing them to the entire group of 62, and it instructed jurors to stand if their answer to a question was yes (or no, depending on the question). In other words, if the court wanted to ask jurors whether there was any reason they could not be impartial, it did not look directly at each individual juror and ask her if there was a reason she could not be impartial; instead, it asked the jurors collectively whether

---

[59] The transcript does not show the time the court was called into session on June 30. The potential jurors entered the courtroom at Tr. 10, and the court conducted voir dire collectively until Tr. 61, at which point it sent the prospective jurors back to the jury room. It then engaged in colloquy with counsel, which included the strikes of some individuals for cause. At 12:20 p.m., the court released most of the prospective jurors for lunch, but it retained 17 who had stood in response to questions that required individual follow-up, such as their knowledge about the case based on press accounts. The court conducted the individual follow-up voir dire from Tr. 71 to Tr. 107. After additional colloquy with counsel, the court conducted further voir dire, again collectively, from Tr. 121 to Tr. 125, and struck some additional jurors for cause. There was another colloquy from Tr. 125 to Tr. 127, and then the jury was picked from Tr. 127 to Tr. 129. After additional colloquy, from Tr. 130 to 135, proceedings concluded at 6:03 p.m.

[60] Langley Federal Credit Union is a large institution. It presently has 19 locations stretching from Williamsburg to Virginia Beach, and more than 225,000 members.

134

**JA523**

there was any reason they could not be impartial, and said that if their answer was "yes," they should stand. The court asked follow-up questions only of those who stood.

By this process, 21 of the 62 potential jurors completed the entire oral voir dire without uttering a word, standing, or otherwise interacting with the judge.[61] This procedure violated Runyon's Fifth and Sixth Amendment rights to a fair trial and impartial jury because silence is one of the known tools by which biased jurors avoid being struck. *See, e.g., Williams v. Netherland*, 181 F. Supp. 2d 604 (E.D. Va. 2002) (vacating death sentence where juror was silent in response to certain voir dire questions, thus concealing the facts that she was previously married to an important prosecution witness, and that the capital prosecutor had been her attorney at the divorce), *aff'd sub nom Williams v. True*, 39 Fed. App'x 830 (4th Cir. 2002); *Consolidated Gas & Equipment Co. of America v. Carver*, 257 F.2d 111 (10th Cir. 1958) (awarding new trial in personal injury case where juror, who had an action pending for similar injuries, remained silent about his circumstance when asked in voir dire).

Juror 124, for example, remained silent when the court asked whether any juror was employed by or had done business with Langley Federal Credit Union. The said nothing, even though her employer clearly came under the credit union's umbrella.[62] By remaining silent during oral voir dire,

---

[61] The 21 prospective jurors who did not answer any questions, either orally or by standing, break down as follows:

Jurors No. 23, 68, 70, and 98 were seated at trial.

Jurors No. 7, 18, 31, 35, 46, 63, 66, 91, 109, and 116 were peremptorily struck by the prosecution.

Jurors No. 32, 34, 51, 78, 117, and 119 were peremptorily struck by the defense.

Juror No. 54 was neither seated nor struck. He was carried over to the following day to participate in the selection of alternate jurors.

[62] The juror's jury questionnaire revealed the name of her employer and the nature of her work. The employer's official internet address automatically redirects to a web site that is marked Copyright © 2016 Langley Federal Credit Union, and describes the juror's employer as an affiliate of the credit union. According to the domain look-up service http://www.whois.com, the credit union is the registrar for the employer's domain.

135

**JA524**

Juror 124 was able to conceal information about her relationship with the credit union and avoid being struck.

When the court's questions all are addressed collectively to a group of more than 60 people, rather than to the individual juror, the opportunity for concealment by silence is especially great. Venire members who are part of such a group, and who do not speak or stand or otherwise call attention to themselves, are the ones least likely to be seen and studied by the trial judge, whose attention will naturally and necessarily be drawn to the potential jurors who *do* speak and *do* stand up. Determinations of bias are supposed to turn largely on the trial judge's assessments of demeanor and credibility, but potential jurors who call no attention to themselves are the least likely to be observed and scrutinized to evaluate their demeanor and credibility. Voir dire is inadequate when it is performed in a manner that allows 34 percent of the jury pool to remain silent, and largely unnoticed, for the entirety of the voir dire. Such voir dire does not protect the integrity of the jury.

Voir dire was inadequate in Runyon's case in other respects. An important and necessary subject of inquiry in any capital case is whether, in the first phase of trial, the potential jurors can make a decision about the defendant's guilt or innocence without considering the sentencing options that might follow. The court did not ask the jurors that question in Runyon's case, although it intended to do so. Instead, it asked:

> THE COURT: Now do you understand that as a juror, however, your first duty is to determine whether defendant is guilty or not guilty without consideration of any possible penalty? Is there anyone who doesn't understand that? If so, please stand.
> (No response.)

Tr. 59, 6/30/09. A careful reading shows that in this question, the court asked the potential jurors only whether they "understood" the law, not whether they could or would comply with that law. To the extent their collective silence can be deemed to be an adequate answer, the potential jurors must be presumed to have answered the question the court actually asked, not the question the court may have wanted to ask.

136

**JA525**

The court made the same error again when it purported to ask four questions required by *Morgan*:

> THE COURT: If your answer is "no" to the following question, please stand.
> THE COURT: Do you understand that the law never requires that a person be sentenced to death?
> (No response.)
> THE COURT: Again if your answer is "no" to any of the following questions, please stand.
> THE COURT: Do you understand that the law never requires a person to be sentenced to death even if they have been convicted of being the triggerman in a murder-for-hire case?
> (No response.)
> THE COURT: Do you understand that the law never requires a person to be sentenced to death even if someone who murders a person by shooting him in the course of a carjacking is so convicted?
> (No response.)
> THE COURT: Do you understand that the law never requires that a person be sentenced to death even if the person is convicted of murdering a person by shooting him in the course of a bank robbery?
> (No response.)

Tr. 123-24, 6/30/09. In each case, the jurors were again asked only whether they "understood" the law, not whether they could or would obey that law.

The court easily could have posed questions that properly asked about compliance as well as understanding. It certainly knew how to do so, and in fact it did so in other instances. For example:

> Is there anyone who doesn't understand that, as indicated, if it is appropriate, in the second stage it would be your duty to listen to further evidence and consider the court's instructions and make a determination whether or not to vote for the death penalty? *Do any of you feel you cannot do that*? If so, please stand.

Tr. 59, 6/30/09 (emphasis added).

Because the questions the court failed to ask were essential to the qualification of an impartial jury for purposes of guilt and/or punishment, Runyon's conviction and sentence were obtained in violation of the constitution and must be vacated.

137

**JA526**

### B.      Trial Counsel Rendered Ineffective Assistance Regarding Voir Dire.

Runyon recognizes that trial counsel filed pretrial motions regarding voir dire, and counsel opposed the court's general procedure for voir dire. But there are additional errors and objections that counsel unreasonably failed to raise, in violation of Runyon's Sixth Amendment right to the effective assistance of counsel.

First, failed to review the juror questionnaires with care for evidence of bias and failed to conduct simple internet research to identify such potential bias.

Second, as noted in Claim S2, trial counsel failed to object to the court's failure to give prospective jurors guidance about the standards and procedures that would govern their decisions at trial, and counsel unreasonably failed to make a similar objection to the court's failure to provide this information prior to the oral voir dire.

Third, trial counsel unreasonably failed to object when the trial court conducted oral voir dire in a manner that permitted 34 percent of the prospective jurors to complete the entire voir dire without responding to any questions, except by remaining silent and remaining still. No one in these circumstances could tell whether a prospective juror's silence meant "no" or meant "I choose not to answer that question." As a result, no one can have confidence that the jurors who were seated without responding to any questions except by silence and stillness were qualified for service. No one can have confidence that the court took cognizance of those prospective jurors at all, much less that it was able to assess their demeanor and credibility.

Fourth, defense counsel unreasonably failed to object to the court's failure to ask five essential questions on voir dire—one question about the ability to be impartial in making a decision about guilt or innocence, and four questions about sentencing that were required by *Morgan*. Trial counsel knew or should have known that the questions posed by the court asked whether the prospective jurors understood the law, but did not ask whether the prospective jurors would comply with the law. To

138

**JA527**

the extent trial counsel themselves may have proposed such questions, they were doubly ineffective. Any speaker of plain English would recognize that when one asks a person whether he "understands" the law, one is not asking whether the person will obey that law.

Because they failed to perform competently in each of the three ways just identified, either separately or together, defense counsel's performance fell below the prevailing professional norms for a capital case. There is a reasonable probability that absent counsel's deficient performance, the result would have been different either as to guilt/innocence or punishment.

> **Claim S2:** **The Trial Court Unlawfully Excluded The Potential Jurors Based Solely On Their Juror Questionnaire Responses Without Voir Dire, And Trial Counsel Unreasonably Failed To Object And Unreasonably Participated.**

Amended Claim S2 was filed under seal by the Clerk on this date, ECF No. 508. Runyon's motion for leave to seal this claim also was filed on this date, ECF No. 507.

139

**JA528**

**Prayer for Relief**

Wherefore, David Runyon respectfully requests the Court:

(a)     direct the United States to answer this Amended § 2255 Motion (2255 Rule 5(a));

(b)     permit Runyon to file a reply to the amended answer (2255 Rule 5(e));

(c)     provide an opportunity for discovery and expansion of the record (2255 Rule 6 & 7);

(d)     conduct an evidentiary hearing on claims involving material factual disputes (2255 Rule 8);

(e)     vacate the criminal judgment entered against him, grant him a new trial and/or vacate, set aside, or correct the sentence imposed; and,

(f)     grant all other appropriate relief.

Respectfully Submitted,

_____/s/_____

Dana Hansen Chavis, *pro hac vice*                Michele J. Brace, VSB No. 36748
Federal Defender Services                         Virginia Capital Representation
 of Eastern Tennessee, Inc.                        Resource Center
800 S. Gay Street, Suite 2400                     2421 Ivy Road, Suite 301
Knoxville, TN 37929                               Charlottesville, VA 22903
Telephone (865) 637-7979                          Telephone (434) 817-2970
Dana_Hansen@fd.org                                Mbrace@mindsort.com


Dated: February 4, 2016

140

**JA529**

<u>Verification</u>

The undersigned, being authorized to sign for the movant, declares under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

Executed on this 4th day of February, 2016.


_____/s/_____
Michele J. Brace
Attorney for David Runyon

<u>Certificate of Service</u>

I hereby certify that on February 4, 2016, I have electronically filed the foregoing Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following.

Brian J. Samuels
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Plaza Three
Newport News, VA 23606
(757) 591-4032
Brian.Samuels@usdoj.gov

Jeffrey A. Zick
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Commons, Suite 300
Newport News, VA 23606
(757) 591-4000
Jeffrey.Zick@usdoj.gov

Lisa Rae McKeel
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Plaza Three
Newport News, VA 23606
(757) 591-4040
Lisa.McKeel@usdoj.gov


_____/S/_____
Michele J. Brace, VSB No. 36748
Virginia Capital Representation
 Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
Phone: (434) 871-2970
Fax (434) 817-2972
mbrace@mindsort.com

*Counsel for Petitioner*
*David Anthony Runyon*

141

**JA530**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Newport News Division

DAVID ANTHONY RUNYON,                )
                                     )
            Petitioner               )      CRIMINAL ACTION NO.: 4:08cr16
                                     )      CIVIL ACTION NO.: 4:15cv108
v.                                   )
                                     )
UNITED STATES OF AMERICA,            )
                                     )
            Respondent.              )

**RESPONSE OF THE UNITED STATES TO DEFENDANT'S
AMENDED MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE**

COMES NOW the United States of America, by and through its attorneys, Dana J. Boente, United States Attorney for the Eastern District of Virginia, and Lisa R. McKeel and Brian J. Samuels, Assistant United States Attorneys, and Jeffrey A. Zick, Special Assistant United States Attorney, and submits this Response of the United States to Petitioner's Amended Motion to Vacate, Set Aside or Correct a Sentence filed by DAVID ANTHONY RUNYON, ("Runyon"), pursuant to Title 28, United States Code, § 2255.

**INTRODUCTION**

On February 4, 2016, Runyon filed an amended motion under 28 U.S.C. §2255 to vacate, set aside, or correct a sentence. ECF 511. Runyon filed this amended motion pursuant to Federal Rule of Civil Procedure 15(a)(1), which allows an amendment as a matter of course 21 days after the filing of a responsive pleading. ECF 502, p. 2. The primary purpose behind Rule 15's amendment is to allow one amendment as a matter of course in response to a responsive pleading. *See* Fed. R. Civ. P. 15(a)(1), Reporter's Comments, 2009 Amendment ("This provision will force the pleader to consider carefully and promptly the wisdom of amending to

1

**JA531**

meet the arguments in the motion . . . . The responsive pleading may point out issues that the original pleader had not considered and persuade the pleader that amendment is wise.")

But Runyon's amended motion adds little substance to his original § 2255 motion. In large measure the amended motion is simply an edited version of the original with little change to the language used in each claim. Moreover, the amended motion fails to answer any of the procedural defenses the United States lodged in its response to the original § 2255 motion. To be sure, Runyon has added arguments to some of his claims and clarified his position on others. To the extent that he has added claims—as opposed to clarifying arguments—Runyon has failed to demonstrate, much less argue, that the added claims relate back the original claims in his § 2255 motion as required by Fed. R. Civ. P. 15(c)(1)(B).

Fourth Circuit law provides that the filing of an amended motion supersedes the original motion. *See Young v. City of Mount Ranier*, 238 F.3d 567, 573 (4th Cir. 2001) ("[A]n amended pleading supersedes the original pleading, rendering the original pleading of no effect.") Because of this, the United States' response here, much like Runyon's amended motion, appears similar to the original response. *See* ECF 497.

## I.      PROCEDURAL HISTORY

On February 13, 2008, a federal grand jury returned a five-count indictment charging defendant David Runyon, and co-defendants Michael Draven and Catherina Voss, with Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a) (Count 1); Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2 (Count 2); Bank Robbery Resulting in Death, in violation of 18 U.S.C. §§ 2113(a),(e) and 2 (Count 3); Conspiracy to Commit Robbery Affecting Commerce, in violation of 18 U.S.C. § 1951(a) (Count 4); and Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(j)

**JA532**

(Count 5). ECF 3. The indictment also provided the notice of special findings for the death penalty pursuant to 18 U.S.C. §§ 3591, 3592. *Id.*

On July 17, 2008, the government filed its notice of intent to seek a death sentence. ECF 67. On August 28, 2008 and September 2, 2008, defendant filed numerous pretrial motions, which were denied. ECF 77–92. Defendant's objections to proposed non-statutory aggravating factors were filed on May 8, 2009, and denied by the court on June 17, 2009. ECF 195 and 217.

The trial of Runyon and Draven began on June 30, 2009, and the guilt phase continued until July 17, 2009, involving over 50 witnesses and over 300 exhibits. On July 15, 2009, the district court dismissed Count 3 pursuant to Rule 29. On July 17, 2009, the jury found both defendants guilty on Counts 1, 2 and 5, and not guilty on Count 4. ECF 245. The eligibility phase was held on July 22, 2009. No evidence was presented and following argument the jury found Runyon intentionally killed Cory Voss. ECF 255. The jury also found the United States had proven the two noticed statutory aggravating factors. *Id.* at pgs. 5–6.

The selection phase of trial began on August 19, 2009. On August 21, 2009, Runyon submitted mitigating factors. ECF 285. The jury returned its verdict on August 27, 2009, and found four additional non-statutory aggravating factors, two statutory mitigating factors, and a number of non-statutory mitigating factors. ECF 291. The jury recommended death on Counts 1 and 5 and life imprisonment on Count 2. *Id.* at p. 5. On September 30, 2009, Runyon filed a motion to set aside the verdict, challenging certain victim-impact evidence. ECF 297. The court denied Runyon's motion on October 27, 2009. ECF 299. Runyon was sentenced to death and filed a timely notice of appeal. ECF 312.

**JA533**

Voss pled guilty to the indictment and was sentenced to life in prison on Counts 1, 2, 3 and 5, and 20 years in prison on Count 4. ECF 69, 127. Draven was sentenced to life in prison on Counts 1, 2 and 5, (ECF 304), and his convictions have been affirmed on direct appeal. *United States v. Draven*, 417 F. App'x 362 (4th Cir. 2011).

On February 25, 2013, Runyon's conviction and sentence were affirmed on direct appeal. *United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013). On October 6, 2014, Runyon's petition for a writ of certiorari was denied. *Runyon v. United States*, No. 13-254 (Oct. 6, 2014). On October 5, 2015, pursuant to 28 U.S.C. § 2255, Runyon filed a motion to vacate, set aside, or correct his sentence and the next day the court ordered the government to respond. ECF 478, 479. The United States filed its response to Runyon's § 2255 motion on January 11, 2016. ECF 497. On February 4, 2016, Runyon filed an amended § 2255 motion, adding little to his original motion. ECF 511.

## II.    <u>STATEMENT OF FACTS</u>

Defendant David Runyon, a contract killer, murdered Cory Allen Voss, a young Naval officer, in Newport News, Virginia. Runyon was hired for a few hundred dollars by Cory's wife and her lover so that they could collect life insurance proceeds from Cory's death. Runyon shot Cory five times and left him to bleed to death in his truck after arranging the murder to look like a late night robbery. An experienced former police and Army officer, Runyon put his training to use to carry out the murder and conceal who was responsible. He showed no remorse afterwards, as he and his co-defendants strived mightily and desperately to conceal their roles in the crime and obtain the life insurance payout.

**JA534**

A.      The Guilt Phase

1.      The Murder of Cory Voss on April 29, 2007

In the morning hours of April 30, 2007, Newport News Police responded to a report of a subject sleeping in a truck in a parking lot and found Cory Voss dead inside the vehicle.  Trial Transcript ("TT"), p. 268.  He had been shot multiple times. Cory's wife, co-defendant Catherina Voss, told detectives that Cory had left the house the night before to get some money from Langley Federal Credit Union (LFCU).  The last images of Cory alive were captured by the video surveillance system attached to the ATM at LFCU on April 29, 2007.  TT, pgs. 398 – 410; Gov't. Ex., (hereinafter "GX") 28 - 28GG.  The images showed Cory driving up to the ATM, attempting to make a transaction, someone entering his vehicle and then Cory driving away from the ATM.  TT, pgs. 406-407. Approximately four minutes later, Cory returned and attempted another cash withdrawal through the ATM. TT, p. 408.  Financial records from LFCU confirmed Voss opened an account in her name nine days before the murder with a $5.00 deposit.  TT, pgs. 443-446; GX 31-31F.   On April 29, 2007, Cory attempted three withdrawals, but each transaction was denied for insufficient funds. TT, pgs. 459-461; GX 31GG – II.

2.      The Defendants Who Planned the Murder

Draven and Catherina Voss began having an affair while Cory was deployed on board the USS Elrod.  TT, pgs. 481, 483.  To free themselves of Cory, and to collect insurance and other benefits from his death, Draven and Voss decided to have Cory murdered and hired Runyon as a contract killer.  During interviews with detectives, both Runyon and Draven acknowledged they met through a medical research company where they participated in drug-studies.  TT, pgs. 1310, 1314.  Other than income Runyon and Draven received from participating in these studies, none of the three defendants had regular employment.  TT, pgs. 481, 483, 711, 717.  Runyon had no

5

**JA535**

bank account, did not pay utilities, and the only financial records found for him were for two reloadable credit cards.  TT, pgs. 713, 714.  Following Cory's murder on April 29, 2007, Voss received approximately $133,000 in death gratuity, Social Security payments and Navy housing allowance.  TT, pgs. 949, 950.  Within three months, she had spent the money on trips, jewelry, household items, debt payments, and payments to Draven.  TT, pgs. 951, 952. She also sought a $400,000 military life insurance policy held by Cory.

### 3.     Runyon's Purchase of Firearm

On the day of the murder, Runyon, a West Virginia resident, purchased a .357 handgun from George Koski in West Virginia sometime between the hours of noon and 2:00 p.m.  Koski also gave Runyon some ammunition with the firearm.  TT, pgs. 843-851; GX 103-103B.  This firearm was later pawned in West Virginia by a friend of Runyon's, in October and November 2007.  TT, pgs. 1190-1195.

### 4.     Crime Scene Evidence

An autopsy confirmed that Cory died as a result of three separate gunshot wounds to his chest and abdomen fired, most likely, from less than two or three feet away.  TT, pgs. 319-329; GX 18.  The jacketed, hollow-point bullets that killed Cory were fired from the same firearm and were characteristic of .38 class—a .38 caliber revolver or a .357 magnum firearm.  TT, pgs. 359-366; GX 5, 22, 23.  The firearm was not recovered.  TT, pgs. 367, 368.

### 5.     Search Warrants

In December 2007, search warrants were executed in West Virginia for Runyon's residence, vehicle and storage unit.  Agents recovered a map of Newport News, Virginia in the center console of Runyon's vehicle.  TT, pgs. 1025-1030, 1324-1326; GX 214.  The map contained the following written words: "Langley Federal Credit Union, '97 gray Ford Ranger,

FL hubcap missing, tailgate down, J. Morris Boulevard, Cory." TT, p. 1027; GX 214. Found with the map was a photograph of Voss and Draven, with their names, addresses and social security numbers written on the back. TT, p. 1028; GX 215. Items recovered from Runyon's residence included papers referencing the credit union and phone numbers belonging to Voss, Draven and Runyon. TT, pgs. 1035, 1036. In Runyon's former residence, agents recovered a box of Winchester .357 magnum, hollowpoint bullets with five missing from the box. TT, p. 1044; GX 236, 237. Agents also found notebook paper with a list of items including tarp, trash bag, taser, Spyderco knife, black hoodie sweatshirt, black BDU pants, boots and gloves. TT, p. 1034; GX 217. A separate notebook page made reference to the time it would take to travel to Virginia and the location of LFCU. TT, p. 1035; GX 217.

### 6. Payments to Runyon

A Western Union money order, dated June 1, 2007, showed that Randy Fitchett, Draven's brother, sent Runyon $275.00. TT, p. 804; GX 293. Fitchett denied sending the money order, but recalled that Draven took him to a grocery store, saying that he needed a money order to pay a debt to a friend. TT, pgs. 804-805.

### 7. Phone Calls and Emails

The United States introduced various phone calls and emails between Voss, Draven, and Runyon, establishing their relationship, the murder-for-hire-scheme and its cover-up. GX 159-173A. Prior to the murder, Draven was incarcerated on unrelated charges in the Newport News jail. During that incarceration, he made 36 outgoing calls, portions of which were played for the jury. GX 159-173A. In one recorded call on March 29, 2007, Draven and Voss discussed Runyon's request for more money—namely, $500 up front—and their fear that Runyon had

7

**JA537**

turned on them.  TT, pgs. 890-893; GX 168, 168A.  During the investigation, Voss, Draven, and Runyon communicated via email and phone calls.  In one email, dated May 5, 2007, Brownells.com sent Runyon information related to the purchase of a .38 /.357 pistol stainless bore brush, which was billed to a different name at Runyon's address in West Virginia.  TT, pgs. 1463-1464; GX 156.

The emails showed a pattern of Draven and Runyon getting their stories straight about their relationships and their alibis.  TT, pgs. 1066-1109. Importantly, Draven emailed Runyon on December 7, 2007 about not meeting each other at a Waffle House, money owed, the grand jury and Runyon's talking to Voss on the phone.  TT, pgs. 1102-1103; GX 143A.  During the course of a wiretap authorized on the phones of Draven, Voss and Runyon, the defendants conspired with one another and others to obstruct justice and tamper with witnesses.  TT, pgs. 1354-1491; GX 174-205B.  In one call on December 8, 2007, Draven was upset after his interview with detectives and told Runyon the questions he was asked and how he answered them.  TT, p. 1403; GX 197, 197B.  Runyon responded to Draven that he'd "hang tough to the bitter end."  *Id.*

Finally, phone records introduced at trial revealed regular calls to telephones associated with Runyon, Draven and Voss before and after the murder. GX 104-110, 136.  Analysis performed on these records revealed multiple calls between Draven and Runyon leading up to and on the night of the murder.  TT, pgs. 1414-1417; GX 136.  Following the murder, calls with Draven and Runyon continued for months.  Several calls occurred just before and after the time that the Western Union wire transfer was sent to Runyon in West Virginia.  TT, pgs. 1422-1423; GX 136, 293.  Cell tower analysis was also introduced, showing activity that occurred the day leading up to the murder of Cory Voss.  TT, pgs. 1435-1465; GX 134, 135, 135A.  Toll records revealed a number of calls between Draven and Voss in the hours preceding the murder and calls

8

**JA538**

between Draven and pay telephones off of Jefferson Avenue (close to LFCU) beginning at 10:12 pm.  TT, p. 1445.  Calls continued indicating that Draven's cell phone had changed location, traveling toward the direction of the pay telephones, past the LFCU, and then back past LFCU towards the residence of Draven. TT, pgs. 1452-1454.

> 8.      Runyon's Statements

On December 3, 2007, Runyon was interviewed in West Virginia by detectives with the Newport News Police Department.  TT, pgs. 1309-1314.  Runyon admitted knowing Draven and that the two met at a drug study.  TT, p. 1310.  He denied that he owned any firearms.  TT, p. 1314.  When asked where he was on April 29 and 30, he could not provide a location to validate his whereabouts on those two days.  TT, pgs. 1312-1313.

Following execution of the search warrants in West Virginia on December 11, 2007, Runyon was interviewed a second time. This interview was voluntary; however, Runyon was advised of his *Miranda* rights, waived those rights and agreed to be interviewed at the Morgantown Police Department.  TT, pgs. 1322-1323. He again denied that he owned firearms despite the fact that firearms were found in his vehicle.  TT, p. 1323.  When confronted with the map and photograph found in his vehicle, Runyon appeared overwhelmed and did not immediately answer the detectives' questions.   TT, pgs. 1324-1325. While he eventually admitted that the handwriting on the map of Hampton Roads was his, he denied that he wrote on the back of the photograph.  *Id.*  This interview was videotaped.

Evidence was introduced that Runyon confessed and bragged to several people that he killed Cory Voss.  Runyon told his girlfriend Sarah Baker that he murdered Cory with a firearm. TT, pgs. 1135-1137. He told her that he was supposed to get a big sum of money from the insurance, but was never paid.  *Id.*  Runyon told Virginia Pina, an ex-girlfriend, that he killed

someone for money.  TT, p. 1857.  After his arrest Runyon confessed to two other inmates that he murdered Cory Voss - he told Jamal Knowles that he killed a Navy guy with a .38 and the firearm was in a pawn shop in West Virginia.  TT, pgs. 1208-1209.  He told Knowles that $600.00 was wired to him and that he was going to get the rest of the money from the insurance claim "on the guys life."  TT., p. 1209.  Runyon told Theodore Schlossman that he drove from West Virginia to Newport News and killed a military man, but got paid only "chump change." TT, pgs. 1219-1222.

### B.      The Eligibilty Phase

Before the eligibility phase started, the court excused juror Robin Foreman after learning her mother had passed away the previous night and replaced her with an alternate juror. TT, pgs. 1748, 1751-1753.  No additional evidence beyond that introduced during the guilt phase was presented on the gateway eligibility factors, and after hearing argument and receiving jury instructions, the jury found that defendant was over the age of 18, possessed the threshold intent and satisfied both statutory aggravating factors.  TT, pgs. 1797-1799.

### C.      The Penalty Selection Phase

#### 1.      Non-Statutory Aggravating Factors

Before trial, the government filed a notice outlining four non-statutory aggravating factors: Runyon (1) harmed the victim's family and friends; (2) used his education and training to kill Cory Voss; (3) engaged in acts of physical abuse towards women; and (4) demonstrated a lack of remorse.  ECF 67, p. 3.

**JA540**

a.      Physical Abuse

Runyon had a history of physically abusing women, including a conviction for simple battery and other charges for domestic assault as well as protective orders against him.  TT, pgs. 1824-1825, 1865-1868, GX 311, 313, 314A, 314B, 316.

b.      Education and Training

Several witnesses testified to Runyon's specialized military education and training over a twenty-year period that included training in firearms, police tactics, close-quarter situations, crime-scene processing and other forensic techniques.  Runyon served as a military officer, police officer and corrections officer at various times and received hundreds of hours of documented training. Runyon also received extensive firearms training.  TT, pgs. 1911-1914; GX 322, 323.

c.      Victim Impact

1.      Navy Co-Workers

Cory Voss began his naval career as an enlisted sailor and worked to receive a commission as a Naval Officer.  TT, p. 1997.  His co-worker, Jennifer Kime, met Cory in January 2006.  TT, p. 1990.  They became friends and she described Cory as "excellent" in his job as communications officer aboard the USS Elrod.  TT, p. 1996.  Cory's shipmates were shocked and upset to learn of his death. TT, p. 2004.  Jeremy Chayer, a lieutenant in the Navy, was friends with Cory and worked with him in the operations department.  TT, pgs. 2006–07.  Chayer testified that everyone aboard the Elrod "from the captain all the way down to the new seaman recruit . . loved [Cory]."  TT, p. 2009.  Chayer provided the Navy with photographs of Cory during his time on board the ship.  The photos were used in a video that was produced by the Navy and played at Cory's memorial service and at trial.  TT, pgs. 2014–15; GX 327.  A

11

**JA541**

second video, recovered during a search of Voss' home was also played at trial. TT, p. 2018; GX 328. The video was approximately nine minutes and contained music and pictures of Cory with his friends and family.

### 2. Friends and Family

Cory's friend, Erin Skiba, socialized with Cory. TT, p. 2043. She described him as an "excellent father," who was "always with his children." *Id.* Cory's mother, Barbara Wilson, spoke of "Allen's" (her name for Cory) childhood growing up in Illinois. TT, pgs. 2046–47. She described the effect Cory's death had on her, on her son and daughter, as well as on her grandchildren. She read a prepared statement describing her loss, "my son was murdered for the insurance money." TT, pgs. 2052–55. Cory's sister, Kristen Smith, summarized the impact Cory's death had on her life, "there is no more time for us. I miss him so much, and I'm so angry that he was taken away. . . I'm sad for me, and I'm sad and I'm so mad for his children, because their father was taken away." TT, p. 2062. Rose Wiggins took custody of Cory's two children after the murder. TT, p. 2069. Wiggins testified that both children suffered from depression and had been in counseling since Cory's death. TT, p. 2068. Both children offered victim impact statements that were read at trial. TT, p. 2070; GX 369, 370.

### d. Lack of Remorse

Evidence of Runyon's lack of remorse had been provided during the guilt phase through phone calls and emails showing Runyon and Draven trying to get their stories straight for police and Runyon's effort to get money. After his arrest, Runyon bragged to Schlossman that he was "a hired gun," "a hit man." TT, p. 2545. Runyon also admitted to Sarah Baker and Virginia Pina that he had "killed somebody" and did it for money. TT, pgs. 1135–37, 1857.

12

**JA542**

### 2.      Defense Mitigation Case

In mitigation, the defense called 21 witnesses over two days who testified to Runyon's conduct in jail, his character, friendships and employment, as well as his ability to adjust to prison should he receive a life sentence.  TT, pgs. 2126-2527.  After the mitigation testimony, the plea agreement and statement of facts for Catherina Voss were admitted into evidence. Runyon Ex. 4 and 7.

### 3.      Rebuttal Evidence

The United States offered two witnesses in rebuttal to Runyon's mitigation evidence. Detective Larry Rilee described interviews of the two co-defendants, contrasted with a videotaped interview of Runyon.  GX 330.  During Det. Rilee's testimony at the guilt phase of trial, counsel asked about the December 11, 2007 interview of Runyon, "during this interview you all talked to him for some more time about this, confronted him with some things.  He never admitted being involved in the murder."  TT, p. 1353.  Det. Rilee answered, "No, he didn't." *Id.* Counsel asked, "He denied it?" Det. Rilee responded, "That's correct."  *Id.*  Once Runyon requested an attorney, the interview was terminated.  *Id.*  No prior suppression challenge was made to the video interrogation.  In the penalty phase of trial, however, counsel objected to the introduction of the videotaped interview.  TT, pgs. 2529-2531. The court overruled the objection and the videotape, showing Runyon's demeanor and reaction when confronted with evidence of the crime, was played for the jury.  TT, pgs. 2536, 2549–50; GX 330.  The court gave a specific instruction to the jury that the tape was offered for the "limited purpose of demonstration of remorse in regard to the alleged non-statutory aggravating factor to this effect, and for relevant culpability in regard to the alleged statutory mitigating factor to this effect."  TT, p. 2668.  The jury was also instructed, "the defendant did not testify during the penalty phase.  You may not

13

**JA543**

attach any significance to this fact or even discuss it in the course of your deliberations." TT, pgs. 2685, 2686.

The government also offered the testimony of Theodore Schlossman concerning an incident that happened in the jail while Runyon awaited trial. Runyon learned that Schlossman was on the witness list when they were housed together and Schlossman was assaulted. TT, p. 2542. During the assault Runyon commented "don't black his eyes, don't punch him in his face. Hit him in his head and in his body." TT, p. 2543. He did not want him to go to court "bruised up." *Id.* Schlossman did not report the incident to officers in the jail. TT, p. 2544.

### 4. Jury Deliberation

The jury exited the courtroom to begin deliberations at 4:30 p.m. on August 26, 2009. TT, p. 2696. At 5:30 p.m. the jury notified the court that it would like to be excused for the evening, TT, p. 2697, and the court dismissed the jury until 9:30 a.m. the next day. TT, p. 2698. The jury returned its verdict at 6:00 p.m., recommending a sentence of death for Counts 1 and 5, and a sentence of life imprisonment for Count 2. The Court confirmed this verdict by polling each individual juror. TT, pgs. 2715–16.

## III. LEGAL STANDARDS

Collateral relief under 28 U.S.C. § 2255 is strictly circumscribed. The grounds for relief under § 2255 are narrower than those for relief on direct appeal. With very limited exceptions, relief may not be based on (1) an error that is not of jurisdictional or constitutional dimension, (2) a procedurally defaulted ground, (3) a claim previously raised and rejected on direct appeal, (4) a "new rule" as defined by *Teague v. Lane*, 489 U.S. 288 (1989), or (5) an error that did not have a substantial and injurious effect or influence in determining the jury's verdict.

**JA544**

A.      Cognizable Claims

While § 2255 provides a comprehensive remedy, not every alleged error can be corrected on collateral review. *United States v. Foote*, 784 F.3d 931, 932 (4th Cir. 2015). Only those errors presenting a "fundamental defect which inherently results in a complete miscarriage of justice" are cognizable. *Davis v. United States*, 417 U.S. 333, 346 (1974). This standard is only satisfied when a court is presented with "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Foote*, 784 F.3d at 936 (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962).

B.      Time Barred Claims

Statutory law imposes a one-year period of limitations in which federal prisoners may file motions to vacate, set aside or correct his sentence. 28 U.S.C. §2255(f); *United States v. Segers*, 271 F.3d 181, 184 (4th Cir. 2001). The limitations period begins on the date the Supreme Court denies a defendant's petition for writ of certiorari from direct appeal, regardless of whether the defendant seeks rehearing. *Segers*, 271 F.3d at 184.

C.      Procedurally Defaulted Claims

A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the movant omitted to appropriately raise on appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982). The procedural default doctrine is adhered to by the courts to conserve judicial resources and respect the law's important interest in the finality of judgments. *Massaro v. United States*, 538 U.S. 500, 504 (2003). This doctrine applies even in death penalty cases. *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). An exception lies for claims of ineffective assistance of counsel, which should be raised

in a collateral attack rather than a direct appeal. *United States v. Williams*, 977 F.2d 866, 871 (4th Cir. 1992).

Apart from claims of ineffective assistance of counsel, courts may consider otherwise procedurally defaulted claims in two instances. First, they may consider defaulted claims when a movant demonstrates that the constitutional error "has probably resulted in the conviction of one who is actually innocent." *Bousley v. United States*, 523 U.S. 614, 623–24 (1998). Second, courts may consider defaulted claims if the petitioner establishes cause and prejudice. *United States v. Mikalajunas*, 186 F.3d 490, 492–93 (4th Cir. 1999). "Cause" exists only in those cases in which a factor external to the defense prevented counsel from raising a claim at the appropriate juncture. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The standard for prejudice is that the alleged error that led to the issue not being raised worked to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error." *Frady*, 456 U.S. at 170.

D.    Claims Previously Adjudicated on Direct Appeal

Generally, a claim raised and rejected on direct appeal cannot be relitigated in a § 2255 motion. *Withrow v. Williams*, 507 U.S. 680, 720–21 (1993) (Scalia, J., concurring) (collecting cases); *Boeckenhaupt v. United States*, 537 U.S. 1182 (4th Cir. 1976). The only notable exception to this bar is when there has been an intervening change in the law, usually a new judicial decision narrowly construing the statute of conviction. *Davis v. United States*, 417 U.S. 333 (1974).

E.    New Rule of Criminal Procedure

Collateral relief is further limited to claims based on established law. *Teague v. Lane*, 489 U.S. 288, 310 (1989). When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending direct review. As to convictions that are already final, however,

the rule applies only in limited circumstances." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted). Generally, new procedural rules do not apply retroactively, while new substantive doctrines—those that alter the range of punishable conduct or the class of punishable people—do. *Id*. at 351–52. A court employs a three-step analysis to ascertain whether a new rule of criminal procedure applies. *Beard v. Banks*, 542 U.S. 406, 411 (2004). First, it determines when the judgment became final. *Id*. Second, it decides whether the pertinent rule of law was "new" at the time of finality by deciding whether a "court considering the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the Constitution." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (internal quotations omitted). Third, the court considers if a new rule is of "watershed" magnitude, and therefore applicable under an exception to *Teague*. *Id*. at 167. The exception is reserved for genuine "bedrock" rules that are essential to basic fairness. *Id*.

F.      Harmless Error

Even assuming a § 2255 motion demonstrates error, a movant's claims are subject to harmless error review. *United States v. Smith*, 723 F.3d 510, 517 (4th Cir. 2013). Thus, absent a showing that the case involves one of a rare group of structural errors that effect the framework of the trial and require reversal without showing prejudice, a § 2255 movant cannot obtain relief without establishing that an identified legal error "had substantial and injurious effect or influence in determining the jury's verdict." *Id*. (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see also Neder v. United States*, 527 U.S. 1, 8 (1999) (collecting structural error cases).

**JA547**

G.       Claims of Ineffective Assistance of Counsel

Although the doctrine of procedural default generally bars claims not previously raised, a freestanding claim of ineffective assistance of counsel may properly be asserted for the first time in a § 2255 petition. *United States v. DeFusco*, 949 F.2d 114, 120-21 (4th Cir. 1991). To succeed on an ineffective assistance of counsel claim, a petitioner must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner's failure to satisfy either prong of the *Strickland* test renders it unnecessary for a reviewing court to consider the other element. *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004). First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. To show that defense counsel's performance was objectively unreasonable, the petitioner must articulate specific acts or omissions whereby counsel's performance fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. When reviewing the propriety of these alleged acts or omissions, courts must give substantial deference to defense counsel's strategic judgments. *Id.* at 689-90.

Second, the petitioner must show that he was prejudiced by counsel's deficient performance, in that it is "reasonably likely" that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Harrington v. Richter*, 131 S. Ct. 770, 791-92 (2011) (citing *Strickland*, 466 U.S. at 696). "The likelihood of a different result must be substantial, not just conceivable." *Id*. (citing *Strickland*, 466 U.S. at 693). The burden is on the petitioner to affirmatively prove prejudice. *Strickland*, 466 U.S. at 693. A petitioner's failure to satisfy either prong of the *Strickland* test renders it unnecessary for a reviewing court to consider the other element. *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004).

18

**JA548**

The Supreme Court has repeatedly stated that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight," so that the conduct can be evaluated "from counsel's perspective at the time" and in light of all the circumstances. *Bell v. Cone,* 535 U.S. 685, 698 (2002) (quoting *Strickland,* 466 U.S. at 689). The requirement that counsel's performance be scrutinized deferentially is based on the recognition that it is "all too tempting" for a convicted defendant to "second-guess counsel's assistance" and "all too easy" for a court to find an act or omission "unreasonable" because it was "unsuccessful." *Strickland,* 466 U.S. at 689. Accordingly, courts "must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance." *Bell v. Cone,* 535 U.S. at 702 (quoting *Strickland,* 466 U.S. at 689).

H.      Limitations Bar to Amended Claims

The Rules Governing Section 2255 Proceedings do not specify a procedure for amending motions. Courts, therefore, have typically applied the Federal Rule of Civil Procedure 15 to the amendment of a §2255 motion. *United States v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000). Rule 15(a)(1) provides, "A party may amend a pleading once as a matter of course within (A) 21 days after serving it, or (B) . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."

When proposed claims in an amendment are barred by the statute of limitations, Rule 15(c) provides for the relation back of amendments to the original pleading under certain circumstances. Relation back is permitted when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(2).

19

**JA549**

## IV.   ARGUMENT

The defendant has raised numerous claims against his trial and appellate counsel, as well as multiple constitutional claims.  At trial Runyon was represented by capital qualified counsel, Lawrence H. Woodward, Jr., and Stephen A. Hudgins.  On appeal Runyon was represented by attorneys Teresa Norris and Seth C. Farber.  The Government will address each of the claims below:

**Claim 1:**   **Runyon fails to establish prejudice from the participation of Robert Glenn Ford and Clifford Posey.**

Runyon claims that two purported dishonest law enforcement officers were involved in the investigation of the case against him, and that the United States failed to disclose this fact to his trial counsel.  Although Runyon concludes that this prejudiced both his representation and the evidence presented against him, he cannot point to any action on the part of either individual that prejudiced him in anyway.  Rather, he summarily concludes that neither the Court nor the parties can have confidence in the work product of either investigator due to their post-trial convictions.

### A.   Procedural Default

At a threshold level, Runyon failed to raise this claim in the course of his direct appeal, thus, he is procedurally defaulted from doing so now.  *Bousley*, 523 U.S. at 622.  Runyon fails to demonstrate cause for his procedural default or actual prejudice.  *Frady*, 456 U.S. at 170.  Procedural default notwithstanding, Runyon's claim lacks merit and he is entitled to no relief.

### B.   Merits

#### 1.   Robert Glenn Ford

Runyon claims that his own investigator, Robert Glenn Ford, who subsequent to Runyon's trial was charged and tried of certain criminal offenses, was tainted such that the results of Ford's investigative efforts in Runyon's case were not reliable.  Ford was charged in a

**JA550**

sealed indictment on May 7, 2010. (Docket No. 2:10cr83, ECF No. 1). This was some six months after Runyon was sentenced and nearly a year after his trial had occurred.

Runyon suggests that Ford did not conduct an honest investigation or produce accurate reports based on the later proven facts that Ford had been involved in separate criminal conduct. Specifically, he speculates that Ford could have submitted false reports here in exchange for bribes. Other than speculation, Runyon points to no evidence to support his assertion that Ford conducted an improper investigation. Runyon identifies no witness reports that were fabricated or unreliable in any way. Ford did not testify at trial and no witness testified based on interactions with him.

Furthermore, the factual record compiled by Runyon belies his claims. Attorney Lawrence Woodward indicated that "Mr. Ford and Ms. Cronin [a mitigation investigator] worked very hard and did a good job investigating the case and David's background." Pet. Ex. 6, ¶ 4. Attorney Stephen Hudgins indicated that though he relied on Ford and investigator Shelia Cronin's interview reports to inform him of the witnesses' knowledge of Runyon, he interviewed the witnesses before the penalty phase began. Pet. Ex. 5, ¶ 8. Cronin stated that she often provided Ford with a list of questions to ask and she and Ford kept Runyon's counsel apprised of the witnesses the two interviewed. Pet. Ex. 4, ¶ 3. It further appears that it was known by Runyon's defense team that Ford had come under scrutiny for certain matters related to his prior performance as a police officer. Pet. Ex. 4, ¶ 4. But even years later, neither trial counsel nor Ford's co-investigator have raised any questions concerning the reliability of reports Ford submitted or tasks he performed.[1]

---

[1] It appears that trial counsel were not even made aware that this claim would be raised. Pet. Ex. 6, ¶ 17.

Runyon must do more than attempt to link Ford's efforts in his case to Ford's unrelated criminal activity. This separate activity was related to Ford accepting bribes fabricating reports in exchange for bribes that state *defendants* had assisted in investigations in order to obtain reduced sentences. Runyon speculates that this separate pattern of conduct could have conceivably impacted his investigation or trial. But it is just speculation. In order to win habeas relief, Runyon must set forth specific facts in support of each ground for relief. *Roane*, 378 F.3d at 400–01. Conclusory and unsupported statements are insufficient for habeas relief. *Id.*

Moreover, the United States was under no duty to advise Runyon's counsel (who later represented Ford and advocated for his acquittal at his trial on the matter) that Ford was under investigation, particularly when he had not yet been charged. Although no favorable evidence has been identified stemming from Ford's impeachment related behavior, generally, impeachment evidence for those who do not testify lacks relevance and materiality for disclosure purposes. *See United States v. Sanchez*, 118 F.3d 192, 197 (4th Cir. 1997). Runyon's trial counsel identified no investigative actions that would have been done differently or adverse impact that the participation of Ford had on the investigation or defense of Runyon's case. In short, there is no evidence that would permit a finding that Runyon was denied the effective assistance of counsel based on Ford's involvement as his investigator.

2.      Clifford Dean Posey

Runyon next claims that Clifford Dean Posey, a former Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives was a second "dirty cop" that engaged in acts that resulted in the presentation of false or unreliable evidence against Runyon. As with the claim related to Ford, Runyon identifies no prejudice beyond speculation.

**JA552**

As Runyon recognizes, Posey was not indicted until April 2011. (Docket No. 3:11cr94). The Statement of Facts filed in Posey's criminal case makes apparent that his misconduct was not identified until October 2010, well over a year after Runyon's trial had concluded. ECF 14. Thus, there was nothing for the government to even turn over at the time of trial. Additionally, the government had no continuing duty to disclose any of the post-trial information. *See Dist. Atty's Office v. Osborne*, 129 S. Ct. 2308, 2319-20 (2009); *see also United States v. Jones*, 399 F.3d 640, 646-47 (6th Cir. 2005) (holding that evidence that did not exist at the time of trial was not *Brady* material).

Moreover, Runyon identifies no impact whatsoever stemming from the minor involvement of Posey. Runyon's claim that "he believes, but cannot yet confirm, that Posey played a substantial role in investigating and preparing the evidence in this matter," (ECF 511, p.15), is false and without any support. Full discovery, including interview and investigative reports and search warrant affidavits were produced. Posey prepared neither of these types of documents. Posey did not testify at trial or before the grand jury. The record reveals that Posey apparently assisted in transcribing a recorded telephone call as part of the Title III wiretap that was in operation during the investigation. As Runyon was provided with the full audio of all telephone calls and stipulated that the accompanying transcriptions were authentic, he can show no prejudice from Posey's involvement in this aspect of the investigation. ECF 239. There is, thus, no merit to his claim that Posey performed work that was materially false or unreliable. Moreover, like the argument Runyon makes against Ford, his claim here is based solely on speculation. For the foregoing reasons, Runyon is entitled to no relief on this claim.

Claim 2:    **The United States did not violate the defendant's constitutional rights by failing to disclose the background of co-defendant Draven.**

Runyon contends that the United States violated his rights under *Brady v. Maryland*, 373

U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972) and *Kyles v. Whitley*, 514 U.S. 419 (1995), by failing to provide him co-defendant Draven's background and mitigation evidence prior to trial. This claim has been procedurally defaulted, as the claim could have been raised at trial and on appeal. In the alternative, the information that the defendant claims should have been disclosed to him was not discoverable. Specifically, the information on Draven's background, criminal history as a juvenile and his mental health assessments, was given in discovery by the United States to Draven after indictment, but before the Attorney General's decision to authorize seeking the death penalty against Draven. This information was not material to Draven's guilt or innocence, but was material to Draven on the issue of punishment. Accordingly, the information was not material to Runyon regarding his guilt or innocence nor was it material to his punishment. As Runyon notes in his motion, the centerpiece of his case during the punishment phase that he presented to the jury, was that equally culpable defendants, Draven and Voss, would not receive the death penalty. The jury found that Runyon proved this mitigating factor. ECF 291.

### A.    Procedural Default

Because Runyon did not raise this issue at sentencing, or on direct appeal, he must demonstrate "cause" excusing his procedural default, and "actual prejudice" resulting from the errors of which he complains. *Frady*, 456 U.S. at 168. Runyon fails to make any argument demonstrating cause and prejudice for his default of this claim. This claim should be denied on this basis alone.

### B.    Draven's Background Evidence

Runyon asserts that the United States should have disclosed co-defendant Draven's background evidence to him because it was material to Runyon's defense on guilt or innocence

**JA554**

and also material to his sentencing. In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that when the government withholds material evidence on the issue of guilt or punishment, it violates the due process rights of the defendant. The Supreme Court defined "material" in *United States v. Bagley*, 473 U.S. 667, 682 (1985) as "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

The documents Runyon claims should have been disclosed to him involve the personal background of co-defendant Draven. Runyon argues, in essence, that Draven was more deserving of the death penalty than Runyon because his background was so much worse. He posits that had Draven's background been presented to the jury, there is a reasonable probability that the jury may not have convicted Runyon and sentenced him to death. But Runyon fails to show how this evidence would be admissible at trial on the issue of guilt or innocence or in the punishment phase. Rather, he makes a conclusory statement that this evidence would have persuaded the jury. *See Roane*, 378 F.3d at 400–01 (conclusory statements insufficient for habeas relief).

The facts remain that Runyon was hired by Draven and Voss to kill Cory Voss, a young Naval officer, so as to obtain insurance proceeds. Runyon traveled from West Virginia to Newport News, Virginia and shot Cory Voss at least five times at close range in Cory's vehicle. Neither Draven, nor Voss pulled the trigger to kill Cory in such brutal manner. The evidence against Runyon was overwhelming—Runyon planned the murder in advance, purchased the firearm the day of the murder and drove to the location of the murder with a map of Hampton and Newport News, Virginia. The map, found in Runyon's vehicle in West Virginia, had the

25

**JA555**

name of the bank, the description of Cory's vehicle, Cory's name and the exit to take off the interstate to get to the bank. Also found in Runyon's vehicle was a picture of co-defendants Voss and Draven. Runyon fails to explain how the evidence of Draven's background would be admissible at trial on guilt or innocence and further absolves him of guilt. Likewise, Runyon fails to explain how evidence of Draven's background would be admissible at the punishment phase so as to persuade a jury that he should not be given the death penalty for the murder of Cory Voss. Contrary to Runyon's assertion, this evidence was not exculpatory nor was it impeachment evidence. Ultimately, this evidence was not material within the meaning of *Brady*. This case is distinguishable from *Cone v. Bell*, 556 U.S. 449 (2009). In *Cone*, the evidence suppressed by prosecutors included witness statements and police reports that corroborated the defense that he committed the crimes because of his drug addiction. Here, the evidence not turned over to Runyon was the background of Draven's youth. Accordingly, this evidence was not material to Runyon on the issue of guilt or innocence nor on the issue of punishment for his role in the crime.

Assuming this evidence was discoverable to Runyon, it would have been cumulative and any error here would be harmless. Runyon did present mitigation evidence that equally culpable defendants, Draven and Voss, would not receive the death penalty. The jury found this mitigating factor in Runyon's favor. ECF 291.

**Claim 3**: <u>**Runyon's trial counsel were not ineffective for failing to investigate and present evidence of innocence at the guilt phase of trial.**</u>

Runyon argues that he is innocent of being a contract killer hired to murder Cory Voss. He argues that his trial counsels were ineffective and failed to present evidence of his innocence pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). As stated above, in order to prevail on an ineffective assistance claim, a criminal defendant must show both (1) that counsel's

26

representation was deficient, and (2) that the defendant was prejudiced by counsel's performance. *Id*. at 693. Although a defendant must prove both prongs, a reviewing court need not examine or even address both prongs if a defendant makes an insufficient showing on one. *Id*. at 697.

Runyon argues that had trial counsel presented or highlighted certain evidence, then the jurors could have reasonably doubted that Runyon was involved in the carjacking and murder of Cory Voss. Runyon is wrong—he cannot demonstrate that trial counsels' performance was deficient.

### 1.   Chad Costa

Costa, a friend of the defendant's, did not testify at trial on the issue of guilt or innocence. Runyon now accuses his trial counsel of a deficient performance for failing to call Costa as a witness to elicit Runyon's statements during car trips together after the murder of Voss. He further argues that but for this error, the outcome of the trial would have been different. This claim lacks merit.

The testimony that Runyon says Costa would provide is inadmissible hearsay. According to his declaration, ECF 511-7 at ¶ 2, Costa met Runyon sometime in "the second half of 2007". Costa and Runyon took three car trips together and they talked. Trial counsel did not call Costa because they understood the rules of evidence. Trial counsel could not have presented, through Costa, the defendants statements. It is important to note, that Runyon in his petition, states that Costa knew him *before* the crime, however according to Costa's declaration, this is false. Numerous arguments are premised on this notion as to why Costa's testimony was crucial. Runyon murdered Cory Voss on April 29, 2007. He did not meet Costa until *after* the murder, sometime "in the second half of 2007." Accordingly, the arguments that have been put forth that

counsel was deficient lack merit.

Likewise, Runyon speculates that Costa's purported testimony about his recollection of Runyon's gun being a six-shot revolver would not have changed the outcome of this case. Given the ballistics evidence from the recovered bullets and the overwhelming evidence demonstrating Runyon's guilt, Costa's recollection of a gun he may have seen would have had no effect on the verdict.

As for the allegations that Costa's testimony would have cast doubt about the reliability of the police investigation, the defendant fails to state with specificity how the police investigation was unreliable. Certainly, the defense at trial made this very argument. So, Costa's testimony would add nothing. Likewise, Costa's opinions on Runyon's braggadocios nature and his poor decision making regarding romantic partners adds nothing to whether he murdered Cory Voss and was irrelevant.

Accordingly, trial counsels were not deficient in their performance. To establish counsel's representation was deficient, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Since the testimony offered by Costa was inadmissible for various reasons, the defendant has not made a showing of deficient performance and thus the Court need look no further to the second prong of *Strickland.* Even if the testimony was admissible, for the reasons stated above Runyon suffered no prejudice.

 2. Cat Voss

Runyon accuses trial counsel of failing to call co-defendant Cat Voss to testify on his behalf that she doubted Runyon was the triggerman. Despite the fact that Voss pled guilty to having her husband murdered by a hit man and signed a statement of facts, ECF 69, 70; Defense

Trial Ex. 4 and 7, admitted August 25, 2009, (penalty phase), she now, eight years later, knows very little about what happened to her husband according to her declaration.  ECF 511-9.  Apparently, she is now recanting her signed statement of facts and Runyon now seeks to rely on her testimony.  It is doubtful that in July of 2009, Cat Voss would have taken the witness stand to testify for Runyon after having pled guilty in light of Runyon's defense that one of the other co-defendants was responsible for the murder of Cory Voss.  Cat Voss was represented by counsel and it is likewise doubtful that her attorneys would have let her testify to what she now declares under oath.  Voss risked her plea agreement of life imprisonment instead of the death penalty with the United States should she have testified falsely in contravention of her Statement of Facts.  Pet. Ex 4, ¶¶ 5 and 13 and ECF 69.  For Runyon to now suggest that her testimony would have raised reasonable doubt is speculative.  It is just as likely the jury would not believe a word she said since she would have been impeached by the statement of facts she signed.  Runyon has failed to show that counsels' failure to call Cat Voss as a witness at trial was deficient.  Trial counsel made a tactical decision to use the documents instead of Cat Voss' testimony to argue that she, as an equally culpable defendant, did not receive the death penalty.  Trial counsel was successful in this endeavor, as the jury found this mitigating factor for Runyon.  Any error here is thus harmless.  *Brecht*, 507 U.S. at 637.

### 3.  Scott Linker

Runyon argues that had Linker been called as a witness during the guilt phase, his testimony would have created reasonable doubt.  In addition, Runyon argues that his trial counsel were ineffective for failing to object to the admission of guns and ammunition found in Runyon's possession.  Neither of these arguments have merit.

29

**JA559**

According to Linker's declaration, ECF 511-13, Runyon loved guns, traded and collected them, was an expert marksman and he doesn't think that Runyon killed Cory Voss. All of this testimony is irrelevant and thus inadmissible at the guilt phase of trial. Certainly, none of the proposed testimony goes to the guilt or innocence of Runyon. Runyon argues that this testimony puts in context the gun purchase the day of the murder and therefore supplied reasonable doubt. This testimony does not put into context the sale of the gun on the day of the murder. Linker's testimony easily could have the opposite effect—that Runyon's love of guns and that he was an excellent marksman make him a good candidate to be a hit man or contract killer. Counsel was not deficient in their performance at trial for failing to call Linker. Nor has Runyon demonstrated any prejudice for this purported error. Linker's testimony would not have changed the outcome of Runyon's case. *Strickland*, 466 U.S. at 694, 696.

Trial counsels' performance was likewise not deficient for failing to object to evidence of other guns and ammunition found in Runyon's possession. Runyon fails to explain how this evidence was irrelevant. Moreover, his contention that trial counsel failed to argue that this evidence

### 4. Rose Wiggins

Runyon argues that his counsel was deficient for failing to "effectively utilize" Wiggins's testimony to create doubt as to his involvement in the murder. He contends that Wiggins's testimony was inconsistent with the United States' timeline of the murder. This claim lacks merit.

Rose Wiggins, Cory Voss' mother-in-law, "drove by the scene" and did not see Cory's truck at 3:00 a.m. TT, pg. 259. She offered to look for Cory because her daughter, Cat Voss, was home with her sleeping children. *Id.* at 260. Wiggins testified that she looked for both

Cory's truck and the family BMW that Cat Voss normally drove. *Id*. Wiggins did not see either vehicle when she drove by the Langley Federal Credit Union bank. *Id*. at 261. Later that morning, Wiggins drove through the bank parking lot to look for Cory on her way to Cat Voss's home. *Id*. at 261–62. She did not see either Voss vehicle. *Id*. at 262.

Runyon contends that his trial counsel was prejudicially ineffective for failing to ask Wiggins why she did not know which vehicle Voss was driving, the whereabouts of the Voss BMW, and question why Wiggins did not immediately go to the Voss home while Cat Voss searched for Cory. Runyon claims that the answers to these questions would have created reasonable doubt as to his involvement in the conspiracy and murder.

Trial counsel was not deficient in his questioning of Wiggins and Runyon cannot demonstrate prejudice from counsel's failure to ask the above questions. Wiggins testified that she looked for both vehicles when she drove by the bank. She also testified that she offered to search for Cory because Cat Voss was home with her sleeping children. The jury heard the fact that Wiggins did not see Cory's vehicle when she twice went to the bank. Trial counsel used this testimony to argue that there was doubt as to Cory Voss's location and that someone else could have entered his vehicle prior to its return to the ATM the second time. TT pgs. 1634–35.

Moreover, Runyon fails to demonstrate how his trial counsel could have used Wiggins's testimony to demonstrate he was not involved in the murder. There is nothing in the record that indicates Wiggins was involved in the substantial planning of the murder or that she knew Runyon. Runyon's claim is speculative and he cannot demonstrate prejudice.

### 5. Runyon's Whereabouts On The Day of the Murder

Runyon fails to make a clear argument on counsel's deficiencies except to write, "defense counsel did not elicit testimony that she (Paula Dalton) never received a phone call on Davy's

phone from a caller other than David Runyon." Presumably, Runyon's claim is that trial counsel failed to ask a question of the government's witness Paula Dalton. Runyon next states, in a conclusory manner, that he was prejudiced by this failure to ask Dalton this question. Runyon fails to show by asking this one question or even a series of questions that trial counsel was deficient. Moreover, he must prove prejudice by demonstrating there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Bacon v. Lee,* 225 F.3d 470, 478 (4th Cir.2000), *cert. denied,* 532 U.S. 950 (2001) (citing *Strickland,* 466 U.S. at 694). In order to do so, the petitioner must show a "probability sufficient to undermine confidence in the outcome." *Roane,* 378 F.3d at 405 (citing *Strickland,* 466 U.S. at 694). Government witness Paul Swartz testified regarding the phone calls made to and from Runyon, Cat Voss and Draven. What is important at trial is not when Runyon may or may not have spoken with Dalton, but when the co-conspirators spoke to each other. TT, pgs. 1378-1464. Trial counsel cross-examined Paul Swartz on the phone analysis presented at trial. TT, pgs. 1476-1488. Runyon fails to adequately explain how he was prejudiced. His claim fails as counsel was not deficient in his performance at trial.

6. Cell Tower Testimony by Paul Swartz regarding Draven

Runyon argues that trial counsel was deficient in failing to challenge the testimony of Paul Swartz regarding cell tower analysis of co-defendant Draven. Importantly, Runyon is wrong when he states "Three cell towers are located within twenty miles of the credit union." ECF 511, pg. 30. Specifically, Paul Swartz testified, "No, there are more nTelos cellular towers than what are represented on that map." TT, pg. 1469. Runyon again makes a conclusory statement that trial counsel were deficient in their investigation of this matter. He proffers no specific argument or evidence that trial counsel could use to challenge Swartz's testimony. The

32

**JA562**

evidence Runyon presents for this proposition are articles written by persons that have not been represented to be experts. One of those articles (ECF 511-14) has not been published.

The use of cell phone location records has been widely accepted by numerous federal courts. *See United States v. Eady*, No. 2:12-cr-00415-DCN-3, 2013 WL 4680527, at *4 (D. S.C. Aug. 30, 2013) (collecting cases). Runyon's reliance on *United States v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012), is misplaced. In that case, the court found testimony related to a theory known as "granulization"—a theory that estimates the range of cell sectors—was unreliable and thus inadmissible. *Id*. at 956–57. Here, Swartz did not testify to any inadmissible theory regarding cell sector location. Runyon fails to demonstrate any deficient performance by his trial counsel.

At trial, Runyon's defense was that someone else was responsible for killing Cory Voss. To that end, his trial counsel used the evidence presented on cell phone location to bolster the defense theory. For example, Swartz testified that Draven's location was unknown between 11:11 p.m. and 11:45 p.m. on the night of the murder based on the cell phone location records, TT, pgs. 1477–78, and argued that the evidence lacked any demonstration that Runyon's phone was in Newport News during the time of the murder. TT, pgs. 1636–53. Trial counsel was not deficient in their performance nor was there any prejudice, as their theory of the case was presented to the jury.

### 7. Runyon's Shopping List

Runyon argues that his trial counsel failed to *highlight* that the checklist of items found in Runyon's belongings in his bedroom were not items used in the crime. GX 217, TT, pgs. 1034–1035. Runyon is wrong. Trial counsel brought up the fact during his cross-examination of ATF Special Agent William Banks that some of the items were not recovered. TT, pgs. 1050–1052.

**JA563**

Accordingly, Runyon's trial counsel were not deficient in their performance.  Furthermore, trial counsel was correct NOT to highlight this exhibit in closing argument.  This damaging piece of evidence also had written on it the following word and numbers; "6.25 hours", "380 miles", "LANGLEY FED. CREDIT UNION", "Exit 252", "Jefferson", "1742 Jefferson Ave", "11742 Jefferson", "873–3944".  It is important to note that evidence was adduced at trial to verify the information on this US trial Exhibit 217. Jefferson Avenue is the street that one would have to travel to get to Langley Federal Credit Union.  TT, pgs. 271–273. 11742 Jefferson Avenue is the address of Langley Federal Credit Union. TT, p. 397.   It takes roughly six hours to get from Morgantown, West Virginia to Newport News, Virginia.  TT, p. 1030.  To be sure, a competent counsel would not ask the jury to look at this document again.  Runyon's argument that his trial and appellate counsel were deficient in their failure to highlight this evidence is absurd.

### 8.   Testimony Regarding the Bullets

Runyon adds an argument to his original § 2255 motion contending that his trial counsel were ineffective for failing to challenge the expert scientific evidence that was presented.  In a conclusory fashion, Runyon argues that "new evidence undermining the reliability of the three prosecution experts' testimony," requires an evidentiary hearing.  ECF 511, pg. 34.  But, other than a citation to the full National Academy of Sciences 2009 report on the state of forensic evidence, Runyon does not proffer any new evidence that calls into question the expert testimony in his trial.  He only argues that his trial counsel were ineffective for failing to challenge the cell tower and ballistics evidence.

The amended claim that counsel failed to investigate and challenge the ballistics evidence is untimely since it was not filed within the one-year period required by 28 U.S.C. §§ 2255(f)(1) and(f)(3).  Runyon does not demonstrate, much less argue, that this claim relates back to any of

his previous claims. The timeliness of this claim notwithstanding, Runyon fails to demonstrate that the claim has merit.

Runyon contends that the ballistics evidence and testimony of John Willmer were unreliable. Specifically, he claims his trial counsel were ineffective for failing to challenge the scientific validity of Willmer's testimony and failing to correct the "mis-impression" that the bullets found in this case could have been fired from Runyon's Taurus .357.

Willmer, a forensic firearms and toolmark expert, testified that a microscopic analysis of the bullets recovered from the victim's truck and the bullet jacket and lead fragments recovered from the victim's body, demonstrated that the bullets were fired from the same firearm. TT, pgs. 361–62; GX 23.[2] The bullets were found to be characteristic of .38 class bullets, encompassing a couple of calibers together. TT, pg. 362. The analysis also found that "the bullets are characteristic of being revolver ammunition components, and the predominate ammunition component in that caliber is .38 special and .357 magnum revolvers that would be typical of firing this particular bullet with the rifling specifications that it has." *Id*. Because only the bullets were recovered, there was no way to determine whether the ammunition came from .38 special or .357 magnum cartridges, but the ammunition could be used for both the .38 and .357 firearms. *Id*. at 363–64. Finally, Willmer testified that that the list of firearms that could have fired the bullets in GX 23 was not all inclusive—there could be other firearms not listed that could have fired the bullets in this case. *Id*. at 369–70.

The gravamen of Runyon's claim is that trial counsel was ineffective for failing to challenge Willmer's testimony as exaggerated, inaccurate or misleading. First, there was nothing unreliable in the scientific validity of Willmer's testimony. Runyon offers no study or

---

[2] In addition to his independent examination of the bullets and bullet jacket, Willmer relied on the analysis completed by another forensic expert. *See* TT, pgs. 359–60; GX 23.

evidence that rebuts the validity of the analysis that Willmer or other experts performed on the bullets. Second, there was nothing misleading about Willmer's analysis or testimony. Runyon contends that the list of firearms that could have fired the bullets only named Astra and Llama brand firearms. ECF 511, pg. 32. But Willmer testified that the list was not all-inclusive. TT, pg. 370. Moreover, the list in GX 23 does include the Taurus brand firearm as producing the general rifling characteristics like those present on the recovered bullets.

Given this evidence, it was reasonable for trial counsel to forgo a more forceful challenge to the ballistics evidence. Runyon offers no credible theory challenging Willmer's testimony. In addition, even without the ballistics evidence, the evidence of guilt against Runyon was overwhelming. *See Runyon*, 707 F.3d at 521 ("There is simply no question that Runyon fired five bullets into the body of an innocent naval officer—at close range and in cold blood.") Runyon fails to demonstrate that trial counsel fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 690. Likewise, Runyon fails to show prejudice resulting from counsel's alleged error. Given the mountain of evidence demonstrating guilt, Runyon cannot show a reasonable likelihood that the result of his trial would have been different had trial counsel more fully challenged the ballistics evidence. This claim should be denied.

<div align="center">

**Claim 4:**      <u>**Trial Counsel did not provide ineffective assistance to Runyon by failing to advocate on his behalf at the eligibility phase of the trial.**</u>

</div>

Runyon claims that trial counsel failed to advocate for him at the eligibility phase by failing to address the relevant issue, and otherwise failing to discuss established facts that weighed against the aggravating factor of substantial planning. As with his other claims, Runyon cannot establish that his counsel provided less than adequate representation in his argument. Moreover, the evidence of Runyon's eligibility for the death penalty was overwhelming, such

<div align="center">

36

**JA566**

</div>

that he cannot establish that the outcome would have been different even had trial counsel advocated in a different manner.

As Runyon indicates and as outlined above, the guilt and sentencing proceedings were trifurcated, such that the eligibility and penalty phases were separated into two distinct proceedings. A defendant is not eligible for a death sentence unless certain statutory criteria are satisfied. First, the government must prove beyond a reasonable doubt that the defendant was more than 18 years old at the time of the murder and that the defendant acted with any one of four mental states specified in the FDPA. *See* 18 U.S.C. § 3591(a)(2)(A)-(D). Second, the government must prove beyond a reasonable doubt the existence of at least one statutory aggravating factor. *See* 18 U.S.C. § 3592(c)(1)-(16). In the wake of *Ring v. Arizona*, 536 U.S. 584 (2002), all of these eligibility factors operate as the functional equivalent of elements of the offense and are treated as such. *United States v. Barnette*, 390 F.3d 775, 784 (4th Cir. 2004) ("the *Ring* Court made clear that when a statute requires the finding of an aggravating factor as a condition to imposition of the death penalty, the aggravating factor requirement functions as an element of the offense"), *vacated and remanded on other grounds*, 546 S. Ct. 803 (2005).

In this case, the gateway factors (also known as "threshold findings") consisted of the following:

(a).   The defendant was more than 18 years of age at the time of the murder. Section 3591(a);

(b).   The defendant, DAVID ANTHONY RUNYON, intentionally killed Cory Allen Voss. Section 3591(a)(2)(A);

(c).   The defendant, DAVID ANTHONY RUNYON, intentionally inflicted serious bodily injury that resulted in the death of Cory Allen Voss. Section 3591(a)(2)(B);

(d).   The defendant, DAVID ANTHONY RUNYON, intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal

force would be used in connection with a person, other than one of the participants in the offense, and Cory Allen Voss died as a direct result of the act. Section 3591(a)(2)(C);

(e).    The defendant, DAVID ANTHONY RUNYON, intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Cory Allen Voss died as a direct result of the act. Section 3591(a)(2)(D).

The statutory aggravating factors consisted of the following:

(a).    The defendant, DAVID ANTHONY RUNYON, committed the offenses described in Counts One, Two, Three, and Five, as consideration for the receipt, or in the expectation of the receipt, of anything of value. Section 3592(c)(8).

(b).    The defendant, DAVID ANTHONY RUNYON, committed the offenses described in Counts One, Two, Three, and Five, after substantial planning and premeditation to cause the death of a person. Section 3592(c)(9).

Thus, for Runyon to be eligible for a death sentence, the jury had to find: (1) the defendant was more than 18 years old at the time that he killed Cory Voss; (2) at least one gateway factor; and (3) at least one statutory aggravating factor.

The United States had no additional evidence to present at the eligibility phase—all of the evidence that made Runyon eligible to be considered for the death penalty had been introduced at the guilt phase. That evidence clearly established, as was required for the jury to find at the eligibility phase, that Runyon had deliberately shot and killed Cory Voss, and that he did so with the expectation of being paid after substantial planning had occurred.[3]

Runyon does not contest that the evidence was clear that he was over 18 and that he committed the offense in expectation of pecuniary gain.[4] This intent finding and one statutory

---

[3] Oddly, in his argument in Claim 6, Runyon states that the jury could not have given much weight to the aggravating factors of pecuniary gain and substantial planning because such factors were inherent in the charged crime of murder for hire. In that claim, at least, Runyon does not even challenge that these aggravating factors were not present.

[4] Runyon does make reference that counsel did not address the pecuniary gain aggravating circumstance in the eligibility phase. ECF 511, pg. 38 n. 23. Even assuming Runyon's footnote

aggravating factor alone would have been enough to render him eligible to face the death penalty. In arguing, however, that his trial counsel failed to discuss facts related to the substantial planning aggravating factor, Runyon relies not on the trial evidence, but on a letter sent to the United States in advance of trial requesting that the death penalty be withdrawn. ECF 511–15. This letter related to the relationship between Voss, Runyon and Draven and could be perhaps taken as an argument that the three were equally culpable—an argument that trial counsel successfully advanced at the penalty phase as a mitigating factor. It had little to do with the evidence introduced during trial that showed the substantial efforts by all three defendants to plan this murder.

Trial counsel did, in fact, urge the jury to look at the evidence anew and indicated that the guilty verdict could not be determinative in deciding whether Runyon was eligible for death. TT, p. 1772. Counsel stressed to the jury that a death sentence is never required and explained that this eligibility phase was a separate proceeding. Contrary to Runyon's current claims, however, his trial counsel made a strategic decision to avoid alienating the jury by openly contesting what was otherwise very obvious and apparent in the jury's determination of guilt. Counsel Woodward indicated that the theory of defense at the eligibility phase was to avoid alienating jurors. ECF 511–6, ¶ 10. Counsel recognized that Runyon was clearly eligible for the death penalty. After arguing that the evidence did not support his convictions, Runyon's trial counsel made the strategic decision to not make the same arguments to a jury that had already rejected them in finding Runyon guilty of the murder of Cory Voss. What counsel did do was start the foundation for its penalty phase argument. By arguing that the death penalty is never

---

constitutes an argument that counsel was ineffective, it fails because conclusory allegations without more do not warrant habeas relief. *See United States v. Dyess*, 730 F.3d 354, 359–60 (4th Cir. 2013).

required, Runyon's trial counsel was later able to argue that it was not required for someone like Runyon because he was not the worst of the worst.

Furthermore, notwithstanding any argument that counsel failed to make, the evidence of substantial planning and premeditation was overwhelming. In its argument at the eligibility phase, the United States reviewed the evidence on which the jury could determine that the substantial planning aggravating factor had been proven beyond a reasonable doubt. Such planning was inherent in the jury's determination that Runyon and Draven were guilty of Conspiracy to Commit Murder for Hire Resulting in Death. This conspiracy began months prior to the actual murder; Runyon and Draven met in February and March 2007 at Parexel drug studies in Baltimore, Maryland; phone calls between Runyon, Draven and Voss occurred in March-April 2007, including an 88 minute call between Runyon and Voss; days before the murder Voss opened an LFCU bank account with a secluded drive through ATM; the murder occurred right in the middle of a Runyon drug study where he was supposed to be out of town; a list of items was seized from Runyon's residence with the address of LFCU; a week before the murder, Runyon makes plans to buy a gun from George Koski; the planned use of pay phones on the day of the murder; the six-hour drive from West Virginia to Newport News; the fact that after the murder Runyon purchased a bore brush to scope out the .357 firearm; the map of the murder location found in Runyon's vehicle; the effort to make the crime look like a random act of violence by trying to get Cory to make ATM withdrawals. TT, pgs. 1763-1767.

In addition to instructing the jury that the government had to prove each aggravating factor beyond a reasonable doubt, the Court instructed the jury with respect to the substantial planning aggravating factor as follows:

> The government has alleged that the defendant killed Cory Allen Voss after substantial planning and premeditation. Again, the government must prove these factors to your

40

**JA570**

unanimous satisfaction and beyond a reasonable doubt. The words "substantial planning and premeditation" should be given their ordinary everyday meaning.

"Planning" means mentally formulating a method for doing something or achieving some end. "Premeditation" means thinking or deliberating about something and deciding whether to do it beforehand.

"Substantial planning and premeditation" means a considerable or significant amount of planning and premeditation. The fact that the killing occurred does not satisfy this requirement. However, the government need not prove that the defendant planned or deliberated for any particular period of time before killing the victim.

TT, pgs. 1787-1788.

Clearly, the evidence presented at trial overwhelmingly supported this aggravating factor. The jury found it beyond a reasonable doubt on all three counts of conviction.  ECF 255.  Thus, in view of the extensive amount of evidence of planning in this crime, and the standard the government had to meet, Runyon cannot show a reasonable probability that the jury's decision would have been different in the eligibility phase had his trial counsel adopted a more adversarial posture.

**Claim 5:      Trial counsel was not ineffective for failing to raise a claim that Runyon was not competent to stand trial.**

Runyon next alleges that his trial counsel was ineffective for failing to investigate, discover, and present evidence that Runyon was incompetent to stand trial.  Specifically, Runyon asserts that trial counsel should have filed a motion for a hearing to determine his mental competency, pursuant to 18 U.S.C. §4241(a).  Runyon's claim fails under *Strickland v. Washington*, 466 U.S. 668 (1984) and should be denied.[5]

---

[5] Both Claims 5 and 6 relate to Runyon's mental health and what steps trial counsel took to investigate before trial and the sentencing phase.  In its response to Claim 6, the United States sets forth a more comprehensive recitation of the actions taken by counsel with respect to a mental health mitigation investigation.  Many of these actions also address Runyon's claim that his counsel failed in not seeking a competency evaluation.

As stated above, to prevail on a claim of ineffective assistance, the petitioner must satisfy the two-pronged test set forth in *Strickland*. First, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Bacon v. Lee*, 225 F.3d 470, 489 (4th Cir. 2000), *cert. denied*, 532 U.S. 950 (2001) (quoting *Strickland*, 466 U.S. at 688 (1984)). Petitioner's counsel is entitled to a "strong presumption" that his or her strategy and tactics at trial fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The objectiveness of counsel's assistance should be based on his or her perspective at the time of the alleged error, under a "highly deferential" standard. *Id.*

Second, Petitioner must prove prejudice by demonstrating there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* at 694. A petitioner's failure to show either of the two prongs makes it unnecessary for the court to consider the remaining requirement. *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004), *cert. denied*, 546 U.S. 810 (2005) (citing *Williams v. Kelly*, 816 F.2d 939, 946-47 (4th Cir. 1987)).

The burden is on Petitioner to "identify acts or omissions of counsel" that are alleged to be unreasonable. *Strickland*, 466 U.S. at 690. A reviewing court must then determine whether "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland* does not require lawyers to pursue frivolous legal avenues that have no merit in order to build a record that would fend off future claims of ineffective assistance. An attorney is not required to advance frivolous claims and may in fact commit an ethical violation by doing so. *See Virginia Rules of Professional Conduct* R 3.1 (an attorney may not assert a frivolous claim or issue).

None of these situations is present in the instant case.  Counsel's conduct during the trial satisfied the "highly deferential" standard of attorney conduct.  *Roane*, 378 F.3d at 404-05 (citing *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *Strickland*, 466 U.S. at 689).

> A.   Counsel's representation did not fall below an objective standard of reasonableness because counsel investigated petitioner's mental status.

In *Wood v. Zahradnick*, the court stated that "counsel has an affirmative obligation to make further inquiry" where she has facts known and available that raise a reasonable doubt as to a defendant's mental condition.  430 F. Supp. 107, 111 (E.D. Va. 1977), *aff'd* 578 F.2d 980 (4th Cir. 1978).  In that case, where a man raped and robbed a 67-year old woman for no apparent reason, the "crime itself was of such a bizarre nature as to call into question the petitioner's mental condition."  *Id.*  Defense counsel did not even take the first step of requesting a mental examination.  *Id.* at 112.  Thus, the court indicated that counsel's assistance was not "vigorous" enough.  *Id.*  Similarly, in *Becton v. Barnett*, the court stated that "a lawyer is not entitled to rely on his own belief about a defendant's mental condition, but instead must make a reasonable investigation."  920 F.2d 1190, 1193 (4th Cir. 1990).  In that case, the defendant also committed a bizarre and senseless crime, but the record was "devoid of any investigation" into defendant's mental health.  *Id.*  Thus, the court concluded that counsel did not make a reasonable investigation. *See id.*

By extension, no finding of ineffectiveness will lie for failing to challenge a defendant's competence, if the record does not show that a reasonable attorney would have been on notice of a need to assess competence.  *See Foster v. Ward*, 182 F.3d 1177, 1186 (10th Cir. 1999); *United States v. Rivas*, 862 F. Supp. 208, 212 (N.D. Ill. 1994).  Here, Runyon's crime was not so bizarre as to immediately put counsel on notice that the defendant's mental condition was questionable. *See Wood*, 420 F. Supp at 111.  Prior to trial, no mental health professional that evaluated

43

**JA573**

Runyon raised an issue as to his competence. Furthermore, Runyon had regularly participated in drug studies, the records of which were made available to counsel in discovery. The various medical screenings Runyon underwent in connection with these studies suggested no issues with regard to his competence. *See infra* Response to Claim 6.

Nevertheless, Runyon's counsel did make a full examination for any identifiable mental health issues. Attorney Hudgins looked for "an injury in Runyon's past that affected his reasoning ability." Pet. Ex. 5, ¶ 5. He also filed preliminary reports from Dr. Merikangas and Dr. Mirsky with the court. Pet. Ex. 5, ¶ 6. He even removed a mental health expert because he did not believe that that expert's opinions were favorable to the defense. Pet. Ex. 5, ¶ 4. Attorney Woodward recalled efforts to seek Runyon's military medical records and evidence of a serious car accident, but recalls that they could not verify that the car accident happened either through files or from speaking with Runyon's family. Pet. Ex. 6, ¶ 5. He also recalled that the defense "retained mental health experts to replace Dr. Nelson" and that "[t]hese experts evaluated Mr. Runyon." Pet. Ex. 6, ¶ 13. Unlike counsel in *Wood* and *Becton*, Mr. Woodward and Mr. Hudgins reasonably investigated Runyon's mental health.

The fact that counsel chose not to file a motion for a hearing to determine Runyon's mental competency is not *per se* evidence that they acted unreasonably, where the record shows that they reasonably investigated and considered the possibility that the defendant might have mental health issues, and there was nothing demonstrating that Runyon did not understand the charges against him or that he was unable to assist in his defense. Runyon fails to present any evidence that trial counsels' representation fell outside of the wide range of reasonable professional assistance. Counsel was not required to advance claims that they believed were frivolous. Additionally, as set forth below in response to Claim 6, the information available to

counsel indicated that Runyon possessed above average intelligence and had no indication of mental illness.

        B.  <u>Runyon provides no evidence that there is reasonable probability that, but for a lack of a 18 u.s.c. § 4241 hearing, the trial result would be different.</u>

In *Becton*, the court ruled that the defendant was probably prejudiced, in part because the record showed that "counsel put forth no evidence at all in Becton's behalf." *Becton*, 920 F.2d at 1194. The court lamented that, "[h]ad counsel investigated Becton's mental capacity, he . . . may have been able to prove that Becton was not competent to stand trial." *Id.* In *Mann v. United States*, 66 F.Supp.3d 728, 739 (E.D. Va. 2014), the court ruled that, given "numerous indicators of petitioner's competence," the  petitioner could not "demonstrate a reasonable probability that he would have been declared incompetent to stand trial had Counsel moved for a hearing pursuant to 18 U.S.C. § 4241 to determine petitioner's competence . . ."  In that case, some indicators that the petitioner was competent included that "petitioner's crime was not bizarre . . . petitioner [did] [not] exhibit withdrawal symptoms . . . or unresponsiveness to Counsel's questions in the preparation of his case." *Id.* at 738.

In the instant case, Runyon's contracted murder of Cory Voss for expected payment, although cruel and calculating, could hardly be classified as bizarre. It was driven by greed on the part of Runyon and planned to appear as a random act of violence with no physical evidence left behind.  Runyon provides no evidence that he exhibited withdrawal symptoms throughout the trial, nor does he provide evidence that he was unresponsive to Counsel's questions. Runyon relies on his disordered thoughts and "somewhat grandiose" statements as the only evidence that the Court would rule that he was unfit to stand trial. *See* ECF 511, at 38–39. But neither the declarations from his counsel, the various statements and testimony from friends and family that averred to his intelligence, nor Court's own interactions with Runyon support any indication that

**JA575**

a competency exam was required. Runyon had a history of attending various institutions, completing assignments in the military and had worked in various law enforcement capacities — in none of these settings, the records of which were fully available, was any issue raised as to his competency. In fact, as set forth below in response to Claim 6, Runyon was found by all who examined him to be an individual of above average intelligence with a high verbal IQ.

Runyon references *United States v. White* and *United States v. Culp* as examples of cases where delusional and grandiose thinking were grounds to find a defendant incompetent. ECF 511, at 40. A closer look at these cases, however, shows that the proof of incompetence is not comparable to the proof of alleged incompetence in the present case. In *White*, the defendant's doctors found her not competent to stand trial in their preliminary psychological evaluations. *United States v. White*, 620 F.3d 401, 405 (4th Cir. 2010). In the present case, there is no evidence that any of the doctors, either on the side of the defense or the prosecution, stated that Runyon was not competent to stand trial in any of what appears to be numerous evaluations. Additionally, in *White*, the defendant believed that she had cured AIDS and breast cancer. *Id.* at 406. This clear delusion seems far more clearly indicative of a mental health issue than Runyon's mere comparisons of himself to great historical figures. Similarly, in *Culp*, the defendant was diagnosed with paranoid schizophrenia and an independent psychiatrist appointed by the court stated that "he became very psychotic without medication." *United States v. Culp*, 1991 U.S. App. LEXIS 5715 at *3 (4th Cir. N.C. Apr. 9, 1991). The fact that Petitioner might "suffer from delusions" or "grandiose wishful thinking" does not equate him to a paranoid schizophrenic.

Lastly, Petitioner also relies on the standard in *Dusky v. United States* as evidence that he would have been deemed incompetent to stand trial. *See* ECF 511, at 40. The Fourth Circuit has

**JA576**

ruled, however, that "reliance on *Dusky* is misplaced in the context of an ineffective assistance of counsel case." *Becton*, 920 F.2d at 1193. Petitioner has failed to provide any evidence that a reasonable probability exists that the outcome of his case would have been different but for counsel's alleged unreasonably ineffective assistance.

Furthermore, as more fully discussed below, the evidence available at the time of trial precludes Runyon from establishing that he was prejudiced by his attorneys' failure to challenge his competence. Given Runyon's demeanor and ability to effectively assist his lawyers with such matters as composing examination and choosing witnesses, he cannot show that he "was unable to consult with trial counsel with a reasonable degree of rational understanding or that he lacked a rational and factual comprehension of the proceedings." *Walker v. Gibson*, 228 F.3d 1217, 1231 (10th Cir. 2000) (internal quotes omitted), *abrogated on other grounds in Neill v. Gibson*, 278 F.3d 1044, 1057 n.5 (10th Cir. 2001). Because Runyon cannot show any reasonable likelihood that the outcome of his trial was affected by his attorneys' omission of any challenge to his competence, he cannot show prejudicial ineffectiveness. *Id.* In short, Runyon's claim fails both prongs of *Strickland* and should be denied.

**Claim 6**:    **Trial counsel was not ineffective in failing to investigate and present mental health mitigation evidence.**

In this claim, Runyon primarily contends that his trial counsel provided ineffective assistance in the penalty phase of his sentencing by: (1) failing to subject the prosecution's case to adversarial testing when evidence was not presented to counter the aggravating factors; and (2) failing to offer evidence of traumatic brain damage and mental illness.[6] He claims that his counsel's inadequacy had a pervasive effect because counsel also failed to challenge the application of the death penalty and failed to ensure Runyon's competence at trial—challenges

---

[6] Other than grammatical, sentence structure and word choice edits, this claim remains unchanged from the original § 2255 motion.

he raises in Claims 13, 14 and 5. In making this claim, Runyon faults his trial counsel for not pursuing a strategy largely based on mental health related or psychosocial evidence that would have been duplicative of evidence already presented at sentencing, or was uncovered after his sentencing and of undetermined weight and admissibility at the penalty phase. There is no objective evidence, however, that this proposed strategy offered any greater promise than defense counsel's chosen course at Runyon's sentencing.

In this case, trial counsel's mitigation strategy at sentencing focused on: (1) the conspirators (Voss and Draven) that were equally culpable in the offense, but were not subject to the death penalty; (2) that Runyon had done decent things in his past and was of good character such that he was not the "worst of the worst;" and (3) that Runyon would not be a risk of future violence in prison. The jury accepted the first two approaches, but rejected the third, in part, based on the paucity of information offered by the testifying deputies contrasted with the evidence of a jail assault orchestrated by Runyon and also based on a complete rejection of Dr. Cunningham's testimony (upon whom Runyon now relies heavily). Defense counsel's approach led to most or all of the jury finding eight of the thirteen mitigating factors proffered and offering three of their own additional mitigators. The mental health evidence proffered in the Petition was either considered by counsel or not available at the time of the sentencing hearing. Moreover, the information that *was* available indicated that Runyon did not suffer from any mental health issues that would have been of useful mitigation value when balanced against his counsel's chosen strategy at the sentencing hearing.

The fact that defense counsel did not prevail in avoiding a death sentence does not transform its chosen mitigation strategy into ineffective assistance. *See Strickland*, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction

48

**JA578**

or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."); *Lovitt v. True*, 403 F.3d 171, 179 (4th Cir. 2005) (noting that, to pursue a particular theory at sentencing, though it may ultimately fail, often "reflects not incompetence, but rather a sound strategic choice.")  For the following reasons, Runyon cannot meet his burden on either prong of the *Strickland* test.

> I.      Legal Standards

This claim is governed by the highly deferential standard announced in *Strickland v. Washington*.   As stated above, Runyon must demonstrate that his trial counsel performed deficiently and that he suffered prejudice as a result of counsel's alleged error.  In evaluating an ineffective assistance claim, particularly this claim, this Court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  *Strickland*, 466 U.S. at 690.  In doing so, *Strickland* requires reviewing courts to be "highly deferential" to attorneys' strategic choices to avoid the "distorting effects of hindsight."  *Strickland*, 466 U.S. at 689.  "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."  *Id.* 688-89; *see also Lovitt*, 403 F.3d at 179 (4th Cir. 2005) ("In many cases, counsel's decision not to pursue a particular approach at sentencing reflects not incompetence, but rather a sound strategic choice.")

"*Strickland* does not require defense counsel 'to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.'"  *Gray v. Branker*, 529 F.3d 220, 229 (4th Cir. 2008) (quoting *Wiggins v. Smith*, 539

U.S. 510, 533 (2003)).  Counsel has a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see Wiggins*, 539 U.S. at 533.  Even when the record fails to explain all of trial counsels' decision making, Runyon "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Bell v. Cone*, 535 U.S. 685, 698 (2002)

Runyon's counsel, of course, had a duty to conduct a reasonable investigation. *Strickland*, 466 U.S. at 691. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. A showing that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987).  "A reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998) (citing *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995)). The duty to investigate depends upon the facts known to the attorney. *Wiggins v. Smith*, 539 U.S. 510, 527 (2003); *see Hedrick v. True*, 443 F.3d 342, 350 (4th Cir. 2006).  The reasonableness of the investigation is determined by the information conveyed to counsel by his client, as well as other information in his possession, recognizing "the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Chandler v. United States*, 218 F.3d 1305, 1318 & n.22 (11th Cir. 2000) (internal quotation omitted).  Where counsel did not know of facts that would alert him to the need to conduct a particular investigation, a failure to

50

**JA580**

investigate does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003); *see Bacon v. Lee*, 224 F.3d 470, 481 (4th Cir. 2000).

"Counsel's 'strategic choices made after thorough investigation . . . are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Gray*, 529 F.3d at 229 (quoting *Strickland*, 466 U.S. at 690-91). Investigations into mitigating evidence should involve efforts to "discover all reasonably available mitigating evidence." *Wiggins*, 539. U.S. at 524.

In this case, as will be recounted herein, counsel did just that—employing mental health experts, attempting to find records, obtaining additional tests. Clearly, counsel considered and made all reasonably available inquiry into Runyon's mental health condition. Contrary to other reported cases where counsel ignored red flags and failed to investigate mental health evidence (*Gray*, 529 F.3d at 229; *Rompilla v. Beard*, 545 U.S. 374 (2005)) counsel actively investigated an area of mitigation that did not result in any significant evidence of mental impairment.

Additionally, "[n]o *per se* rule requires the presentment of such evidence at trial. In fact, there are many strategically valid reasons why defense counsel may decide not to offer mental health mitigation testimony: it may not be persuasive; it may appear to be a "flight into theory" without proper grounding in the facts of the case." *Meyer v. Branker*, 506 F.3d 358, 372 (4th Cir. 2007) ("No *per se* rule requires the presentment of [mental health mitigation] evidence at trial.").

In terms of *Strickland's* second prong, Runyon must show a reasonable probability that counsel's deficient performance prejudiced the outcome of the case. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Id.* In a case involving failure to investigate mitigation evidence, prejudice occurs when "the likelihood of a different result if the [missing] evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (quoting *Strickland*, 466 U.S. at 694).

  II.  <u>Trial counsel was not ineffective for failing to investigate mental health.</u>

   A.  <u>Trial counsel conducted a thorough mental health investigation.</u>

Runyon claims that attorney Stephen Hudgins appeared too late in the case to effectively investigate mitigation and also claims that Hudgins abandoned the investigation following the guilt phase. The record belies these claims. Hudgins was not starting a mitigation investigation anew. He was building upon the substantial work done by attorney Babineau, as recognized by the Court in its orders related to the requests for a continuance. Hudgins effectively built on this work, finding new experts, arranging for Runyon to be examined, and continuing to try and find medical records in advance of the sentencing phase. This effort continued beyond the guilt and eligibility phases through to the penalty phase.

The record, including the exhibits presented by Runyon in the Petition, reveals that counsel took reasonable steps to investigate and discover evidence regarding Runyon's mental health condition. There were no signs from Runyon that would have alerted his counsel at the time of sentencing to a contrast with the various expert reports that he had no mental disease. Trial counsel cannot be held accountable for relying on experts after providing them sufficient evidence. *See Bell v. Thompson*, 545 U.S. 794, 810 (2005). Thus, "[t]his is not a case in which the defendants attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have

**JA582**

obtained[.]" *Van Hook*, 558 U.S. 4, 11 (2009). As set forth herein, the information at hand at the time of the sentencing hearing did not reveal of mitigation defense based on mental health.

The procedural record of the case reveals the various documented steps that counsel took to examine Runyon's mental health. Shortly after the indictment of Runyon, the government filed a motion regarding mental health evidence, to which Runyon responded. ECF 46, 52. This motion came for a hearing before the court on May 30, 2008. Thereafter, on June 16, 2008, the Court entered orders, agreed to by counsel for all three defendants, setting forth a comprehensive scheme for mental health testing and the notice to be provided by the parties. ECF 66, 67.

The order required the defendants to provide written notice not later than 90 days prior to the commencement of jury selection that a particular defendant intended to introduce expert mental health evidence at the penalty phase. The order also indicated that a defendant's failure to provide the required notice could result in the forfeiture of the right to present mental health testimony at trial.

On December 12, 2008, approximately three months prior to the initial trial date of March 13, 2009, and prior to the substitution of attorney Hudgins for attorney Babineau, Runyon filed the required notice and indicated that two mental health experts, Dr. Evan Nelson, a licensed clinical psychologist and Dr. Mark Cunningham, also a licensed clinical psychologist, might be used by the defense at trial. ECF 135. In this December 12, 2008 notice, Runyon also referred to an unnamed neuropsychologist for which Runyon sought Court approval. No mention was made of the need for a psychiatrist or a neurologist. It is apparent that Dr. Nelson did examine Runyon and the result was not favorable, however, no report was ever provided and no indication was made as to the length or number of sessions Runyon had with him.

**JA583**

Based on Runyon's notice, the United States retained its own mental health experts and proceeded to have these experts examine Runyon in February 2009. All of Runyon's background materials in the possession of the government, relating to Runyon's employment and education, were also provided to the government's experts. The reports of these examinations were then filed, under seal, with the Court prior to jury selection in accordance with the June 13, 2008 order. The government also caused the raw data from the examinations of its experts to be sent to Runyon's then designated experts.

On February 13, 2009, following a motion into a potential conflict of interest, attorney Babineau withdrew from the case. ECF 151, 154 and 155. On February 20, 2009, the Court appointed attorney Hudgins as Runyon's second attorney. ECF 161. Runyon moved to continue the trial date and, on March 13, 2009, the Court held a hearing on this motion. In the course of that hearing, attorney Lawrence Woodward represented that "Mr. Hudgins has been working assiduously going through the file with me and has met with the client since he got appointed," but that additional time was needed so he could get fully prepared. Mot. Hearing Tr., p. 7. All counsel had initially agreed on a trial date in September 2009. Though Woodward expressed concern about moving the date to June 2009, in part due to Hudgins' recent entry, the Court reviewed that Babineau had spent extensive time with the case prior to his withdrawal. Hudgins did indicate that he wanted to be sure he had adequate time to be prepared. The Court took counsels' views into consideration and set the trial date for June 30, 2009.

On April 8, 2009, Runyon filed a notice for additional mental health experts—neuropsychologist, Dr. Scott Bender, and a psychiatrist, Dr. Seymour Halleck. ECF 177. Runyon claimed that Dr. Bender would do psychological testing on the defendant, if deemed appropriate, once medical records of Runyon and his family were received for the time that

**JA584**

Runyon was in the Army and he and his mother were Army dependents.  The notice further advised that Dr. Halleck would review the defendant's medical records and conduct an interview of the defendant.  This notice for Dr. Halleck was the first indication that the defendant intended to utilize a psychiatrist.  Thus, after being appointed to the case for just six weeks, Hudgins had taken steps to preserve and investigate a possible mental health defense.

Thereafter, on April 13, 2009, Runyon filed a motion to continue the trial date. ECF No. 179.  In a 17-page pleading, attorney Hudgins addressed various issues related to the capital investigation.   Defense counsel was clearly aware of his duty to conduct a thorough investigation.  Hudgins requested a six-month extension to complete the investigation.  Hudgins also explained various issues with the mitigation investigation, revealing certain challenges, but also Hudgins' familiarity with the progress to date.  Hudgins expressed concern over the lack of medical records for Runyon and his mother.  ECF 179, p. 12.

In its response to the motion to continue, the government noted that it had provided voluminous background materials to Runyon's counsel, including school, employment and military records. ECF 181.   The pre-indictment investigation conducted by the government did not reveal a background of abuse or hospitalization of the defendant, which appeared to serve as the justification for obtaining certain types of records. *Id.*

On May 7, 2009, the Court denied the motion to continue.  ECF 194.   The Court recognized that arguments in favor of a continuance focused on the penalty phase, not the guilt/innocence phase.  The Court noted that previous counsel, attorney Babineau, had been paid "for considerable legal services, in addition to significant payments having been made for various investigative and expert services on behalf of Runyon relating to the penalty phases of the proceedings."   ECF 194, at note 4, 5.   The Court found the request of an additional six

55
**JA585**

months to be unsupported by the record of legal and investigative services claimed to have been rendered and reimbursed after Court review.   The Court denied the motion to continue, but indicated it would consider whether to continue any penalty phase hearings following the conclusion of the guilt/innocence phase.

On June 8, 2009, Runyon filed an *ex parte* Supplemental Motion for Psychiatrist and to Change the Designation of the Neuropsychologist Expert Previously approved by the Court. ECF 204.  The motion referenced continuing difficulty in obtaining medical records from the military.  The record is clear that counsel continuously attempted to obtain these records.  Even without the benefit of these records, and considering the nearness of the trial date, counsel took the effort to obtain additional mental health experts.

On June 29, 2009, one day prior to the start of jury selection, Runyon filed another notice for two replacement experts—Dr. Allan Mirsky, a neuropsychologist, and Dr. James Merikangas, a psychiatrist.  ECF 230.  Runyon again claimed that both doctors would do testing and interviews of the defendant based upon the receipt of medical records.   The government understood that Dr. Mirsky was intended to substitute for Dr. Bender and that Dr. Merikangas was intended to substitute for Dr. Halleck.  On June 29 and 30, the government filed, under seal, the reports of its own retained experts—Dr. Raymond Patterson and Dr. Paul Montalbano.  ECF 276, 277.

On July 17, 2009, following the close of evidence in the guilt/innocence phase, Runyon filed a Supplemental Motion to Continue Capital Sentencing Hearing, as well as sealed exhibits in support of this motion.  ECF 240, 241.  Attorney Hudgins requested at least 90 additional days to prepare for any penalty phase.  In support of this request, Hudgins asserted that: (1) a recent medical exam uncovered evidence suggesting the existence of a significant mental disorder that

bore a potentially strong relationship to defendant's behavior; and (2) that additional medical records had to be gathered and collateral investigation of the defendant's social and family history had to conducted. Hudgins also filed a Statement of Counsel, which provided additional details as to the status of the mental health investigation. ECF 242. Specifically, the Statement of Counsel noted that Runyon had been evaluated by neuropsychologist Dr. Mirsky and that such evaluation revealed a need for neurological testing and evaluation by a neurologist. Counsel noted that Dr. Merikangas, a psychiatrist, was also a neurologist that could perform both functions. Counsel noted that needed testing could be performed immediately.

On July 17, 2009, the jury returned its verdict. In conformance with the June 13, 2008, order regarding mental health related evidence, the Court directed that Runyon confirm or disavow his intent to use mental health evidence at the penalty phase by July 20, 2009. Thereafter, expert reports would be exchanged. On July 20, 2009, the sealed reports of Drs. Mirsky and Cunningham were filed with the Court. ECF 246. Also on July 20, 2009, Runyon renewed his recently filed motion to continue the penalty phase and filed a Notice of Intent to Introduce Mental Health Testimony. ECF 247, 248. The Notice advised that Runyon would rely on testimony from Dr. Cunningham, Dr. Mirsky and possibly Dr. Merikangas. Notably, the above-referenced filings were all made *prior* to the defendant's receipt of the reports of the government's experts. The government received these reports on July 21, 2009. ECF 250. Runyon received the reports of the government's experts on July 22, 2009. ECF 252.

The reports of Drs. Montalbano and Patterson, ECF 276 and 277, are certainly relevant both to the claimed mental issues Runyon currently faces and to trial counsel's decision not to proceed with a mental health defense beyond that offered by Dr. Cunningham (which was not based on an examination of Runyon). Had Runyon opened the door to a mental health defense,

57

**JA587**

the rebuttal mental health information offered by Drs. Montalbano and Patterson would have contrasted not only with that information, but also with other proposed mitigating factors that Runyon had offered, including that he had worked and been legally employed (Mitigator No. 2); committed acts of kindness and generosity (Mitigator No. 3); had demonstrated an ability to make a positive adjustment to incarceration, had the respect and support of correctional officers and did not present a risk of future violence (Mitigator No's. 6 – 8); served as a member of the U.S. Army and was honorably discharged (Mitigator No. 11); and took steps to further his education (Mitigator No. 12). ECF 285.

Dr. Montalbano conducted a forensic psychological evaluation of Runyon. ECF 277. His comprehensive 31 page report contained a detailed summary of records reviewed and sources of information, including consultation with Dr. Patterson and interviews and testing of Runyon for over 13 hours in February 2009. The report reviews psychosocial history, educational and occupational history, substance abuse history and medical and mental health history. The reports of prior car accidents and possible concussions are included.

Dr. Montalbano noted that Runyon displayed high average intellectual functioning and no significant evidence of any major mental disorders. Dr. Montalbano did note impairment associated with personality dysfunction and that the traits of such dysfunction predated a claimed car accident in 1996. Dr. Montalbano did discuss the reported car accident, but noted that the results of cognitive testing did not reveal significant cognitive impairment and there was no decline in general intelligence since the time of the claimed automobile accident. Intelligence testing at the time prior to trial revealed Runyon's full scale score to be in the 86th percentile, equating to a qualitative description of "high average." Of note, Runyon flatly denied any

involvement in the alleged offense to Dr. Montalbano. He disagreed with any strategy to absolve him of responsibility or culpability for his actions.

Dr. Patterson produced a similarly extensive twenty-four page report dated June 24, 2009. ECF 276. This report also summarized the various sources of information and records reviewed by Dr. Patterson, as well as summaries of the offense, Runyon's background and psychosocial history. The report contains a description and results of a February 4, 2009 psychiatric exam performed on Runyon by Dr. Patterson. Runyon did report various concussive accidents to Dr. Patterson, but denied any ongoing treatment or that he suffered from any mental illness. As with Dr. Montalbano, Runyon denied any participation in the murder of Cory Voss. Runyon, in fact, distinguished the amount of planning involved in the crime with any prior episodes of short-term memory loss that he related to his prior accident.

Dr. Patterson reported that Runyon was properly oriented and his recall and attention span, ability to abstract and perception of reality were adequate. Dr. Patterson concluded that Runyon did not suffer from any serious mental illness, mental disorder, or brain pathology and no mitigating or aggravating mental health factors existed. Dr. Patterson further opined that Runyon met the criteria for a personality disorder with narcissistic features. In terms of the self-reported history of concussions and short term memory problems, Dr. Patterson concluded that these issues did not represent serious or severe impairments suggestive of significant brain damage or dysfunction.

Both Drs. Montalbano and Patterson noted that Runyon had a history of not taking responsibility for his mistakes or misbehavior and that features of externalizing responsibilities are characteristic of narcissistic disorders. Runyon also displayed a sense of entitlement and deserving of special consideration, related to his sense of honor.

**JA589**

In terms of defense expert reports released at this time, Dr. Cunningham's report, dated February 5, 2009, was directed toward a capital violence risk assessment for Runyon. ECF 246. Dr. Cunningham opined that capital juries are prone to make inferences regarding future violence risk based on "perceived remorse" and "perceived personality pathology." Thus, testimony from two government experts that Runyon failed to accept responsibility for his actions and had a personality disorder could very well have conflicted with Dr. Cunningham's conclusion that Runyon presented a very low risk of future violence.

Runyon's additional experts were not definite or consistent in determining that a mental health issue existed prior to sentencing. Their reports were preliminary in nature and expressed a reliance on forthcoming brain testing, which would reveal no abnormalities. Dr. Mirsky's June 26, 2009, six-page report revealed that a neuropsychological evaluation was performed on June 26, 2009. ECF 246. The report contained information concerning alleged incidents of close proximity grenade detonations and car accidents in 1990 and 1996. Dr. Mirsky's report indicated that Runyon had superior cognitive skills and otherwise normal performance and the majority of tests administered by Dr. Mirsky noted normal to exceptional performance by Runyon. Dr. Mirsky did note certain scores consistent with what he termed mild, diffuse brain damage—linked to problems persisting in attention demanding activity for sustained intervals. Such results did not occur in the post-sentencing testing done by Dr. Mirsky. *See* ECF 511–35.

On July 2, 2009, Dr. Mirsky sent Hudgins a letter indicating that Runyon needed to be evaluated by a neurologist. ECF 511–20. Hudgins arranged for that to be done through Dr. Merikangas. On July 22, 2009, the eligibility phase commenced and the jury determined that the defendant was eligible for consideration of the death penalty. ECF 255. Also on July 22, 2009, the Court issued an order granting the defendant's motion to continue the penalty phase for

approximately one month, until August 19, 2009.  ECF 254.  The Court also authorized the appointment of Dr. Merikangas and it was understood that Dr. Merikangas could start the evaluation immediately.  TT, p. 1800.  Additional deadlines were established for the receipt of Dr. Merikangas' report and any response or rebuttal by the United States.  TT, p. 1801.

On the same day as the verdict in the eligibility phase was returned, attorney Hudgins sent an email to Dr. Mirsky regarding the schedule of the next phase of the sentencing proceedings.  ECF 511–21.  Dr. Mirsky responded to Hudgins, reiterating the information in his prior report and claiming that "because he suffered the blast injuries while in the ROTC, he can be considered a wounded warrier [sic], and this should be considered in his sentencing."  *Id.*

On August 6, 2009, the United States was provided with a page and a half report by Dr. Merikangas, who conducted a neurological and psychiatric evaluation of the defendant.  ECF 263.  Although Dr. Merikangas did indicate that he was awaiting results of an MRI and a PET scan, he opined that his psychiatric evaluation suggested that the defendant was suffering from the effects of, or withdrawal from experimental drugs and that the defendant is either in a fantasy world of "grandiose wishful thinking, or suffering from delusions."  No discussion of the psychiatric evaluation was provided and there was no basis provided for this opinion reached by Dr. Merikangas, who had been appointed as both a neurologist and a psychiatrist. Counsel for the United States made repeated inquiries for any underlying data that would support this psychiatric conclusion and received none.  ECF  273.  Dr. Merikangas indicated that a full report would follow results of brain imaging, however, the United States never received any such report.  In conclusive fashion, Dr. Merikangas stated that Runyon "clearly has impaired executive functioning suggestive of frontal lobe brain impairment."  Similarly, Dr. Mirsky, in his report received by the United States after the conclusion of the guilt phase, indicated that he awaited

not only neurological test results, but the results of psychological tests administered by Dr. Montalbano, the psychologist retained by the United States. These results were provided to Dr. Mirsky prior to August 6, 2009; however, Dr. Mirsky did not supplement his report by that date.[7]

On August 10, 2009, Runyon filed a Motion to Allow Defendant to Supplement his Mental Health Reports. ECF 269. Defendant contended that both Drs. Merikangas and Mirsky noted "deficiencies in defendant's psychological testing and history of injuries which could have caused brain injury account for these deficiencies." ECF 269, ¶ 1. Also on August 10, 2009, Runyon filed a motion to take the testimony of Dr. Cunningham out of order. ECF 270. The Court granted this motion on August 13, 2009. ECF 272. On August 14, 2009, Runyon filed a motion to release the test results of the MRI and PET scan directly to counsel so that providing these materials to the defense expert could be expedited. ECF. 274. This motion was granted the same day. ECF 275. On August 17, 2009, the Court issued a sealed order on Runyon's motion to supplement his mental health reports. ECF 278.

The parties also litigated the issue of the scope of Dr. Cunningham's testimony prior to the onset of the penalty phase. ECF 267, 283. This litigation resulted in rulings from the Court that limited the scope of Dr. Cunningham's testimony. TT, pgs. 2076 – 2083. Dr. Cunningham testified on behalf of Runyon as a board certified clinical and forensic psychologist. His testimony took a number of hours and spanned over 100 pages of transcript. TT, pgs. 2084 – 2192.

One of counsel's chosen mitigation strategies, shown through the testimony of Dr. Cunningham and that of various deputies at the Portsmouth City Jail where Runyon was housed

---

[7] It was clear that both Drs. Mirsky and Merikangas awaited the results of neurological testing before finalizing their reports. The results of this testing, accomplished before the sentencing proceeding, revealed no abnormalities in the brain scans. Pet. Br. at Ex. 22. Counsel cannot be faulted for not investigating further once these normal results were obtained.

prior to trial, was to put forward positive prisoner evidence, i.e., that Runyon would be a low risk of violence were he to receive a sentence of life imprisonment. Dr. Cunningham based this on the defendant's age, educational background (indicating that inmates who have at least a GED have better adjustments in prison, TT, p. 2132, and work history (gainful employment have a positive nonviolent adjustment). *Id.* at 2134. Dr. Cunningham ultimately testified that the Runyon had a very low risk or serious violence in prison. *Id.* at 2158. Dr. Cunningham did not testify as to his review of any mental health reports that had been done by other experts.

B. <u>Trial counsel presented a mitigation case that countered the aggravating factors and did not include mental health mitigation of dubious value.</u>

Beyond the record establishing the investigative efforts counsel took and what related reports and evidence counsel had at the time of the sentencing hearing, the declarations submitted by Runyon's trial counsel affirm that an adequate mental health investigation was performed, as well as counsel's chosen mitigation strategy. In his attached declaration to Runyon's Petition, attorney Hudgins claims that Runyon's thinking was very rigid—he adamantly asserted his innocence and would not plead guilty. ECF 511–5, at ¶ 3. Hudgins recounted that Dr. Evan Nelson had been hired prior to his appointment. Dr. Nelson's opinions were not favorable to the defense and Hudgins decided a different expert was needed. *Id.* at ¶ 4. Hudgins thereafter obtained Drs. Merikangas and Mirsky. *Id.* Hudgins further recounts that he was looking for an injury in Runyon's past that affected his reasoning ability. *Id.* at ¶ 5. Although Hudgins attempted to obtain medical reports documenting the claimed injuries, he was apparently not able to obtain such records. *Id.* Hudgins' declaration further reveals that he worked with the mental health evidence in the interim between the eligibility and penalty phases

and filed preliminary reports of Dr. Merikangas and Dr. Mirsky.  Dr. Merikangas requested brain scans and the record is clear that Hudgins obtained such scans.  *Id.* at ¶ 6.[8]

In his declaration, attorney Woodward also confirmed that Runyon would not agree to plead guilty.  ECF 511–6, at ¶ 3.  Woodward indicated that the claimed car accident could not be verified and that Runyon's family did not know anything about it.  *Id.* at ¶ 5.  Additionally, military medical records were sought in the pretrial investigation.  *Id.*  Woodward also attested that prior attorney Babineau indicated that Dr. Nelson's report was not helpful and that the defense team decided not to use him.  *Id.* at ¶ 6.  Woodward also recalled that Drs. Patterson and Montalbano expressed the strong opinions that Runyon did not have any mental or emotional issues that would be mitigating.  *Id.* at ¶ 12.  Woodward indicated that the defense did retain mental health experts to replace Dr. Nelson and these experts evaluated Runyon.  *Id.*

Woodward's view was that the strongest arguments at closing were that it was not fair for Runyon to be sentenced to death when two equally culpable co-defendants were receiving life sentences and that family sympathy weighed in Runyon's favor.  *Id.* at ¶ 13.[9]  These two approaches, when combined with positive prisoner evidence that required the jury to find that Runyon would not be violent in prison, were the three-legged mitigation strategy chosen by Runyon's trial counsel for the penalty phase.  This was certainly reasonable in view of the lack of indication that Runyon was suffering from any mitigating mental illness.  Woodward and Hudgins were faced with three unfavorable expert reports—one performed by Dr. Nelson, a defense expert.  The report of Dr. Cunningham was based on factors that did not relate to mental

---

[8] Although Hudgins indicates that he does not recall the results of such scans, the correspondence between Hudgins and Dr. Mirksy post-sentencing indicates that the scans revealed no abnormalities.  (ECF 511–22).

[9] Significantly, Woodward (and presumably Hudgins as well) were not advised as to the nature of the claims prior to making their declarations.  (ECF 511–6, at ¶ 17).  Thus, neither counsel was permitted to fully explain the mental health investigative steps taken or their chosen mitigation strategy in the view of the counterveiling reports from various experts.

**JA594**

health and may have been adversely impacted by its inclusion. The reports of the other two experts were not consistent or complete and relied on pending brain scans that were read as normal. Pet. Ex. 22. Finally, the accidents claimed by Runyon as a basis for his head trauma could not be verified by family members or any medical records. Thus, counsel had no basis for undertake additional investigation. *See Bacon*, 224 F.3d at 481.

Investigator Shelia Cronin's observations of Runyon that he "often compared himself to great figures in history" and that he repeatedly "talked about how many lives he had saved" were consistent with the narcissistic personality features described by Drs. Patterson and Montalbano, which counsel certainly could have considered to be an untenable defense. ECF 511–4, at ¶ 7. Cronin also agreed that she did not obtain medical records from the civilian hospital where Runyon was treated after his auto accident. *Id.* at ¶ 10. Cronin did obtain Runyon's military medical records, although no timing is provided. *Id.*

In addition to the declarations of Woodward, Hudgins and Cronin, Runyon also offers the February 10, 2009, letter from attorney Babineau to the United States, requesting that the notice of intent to seek the death penalty be withdrawn. ECF 511–15. Counsel reveals that Runyon was evaluated by a forensic psychologist and that "he was raised in an atmosphere of physical violence and emotional oppression, resulting in an adult individual who lacks the tools necessary to navigate society successfully." ECF 511–2, p. 2. Thus, these developmental factors were both known and put forward by counsel for Runyon. Although attorney Babineau was involved in the mitigation investigation for over a year prior to his substitution, no declaration was submitted from him. Thus, Runyon presents a somewhat incomplete picture of the efforts taken by his counsel. He cannot rely upon an incomplete picture in claiming that counsel's performance was similarly incomplete. That Runyon's counsel chose a strategy based on

different factors than currently highlighted by Runyon does not establish that counsel failed to consider such factors or that such factors would have resulted in a different outcome.  "Counsel's 'strategic choices made after thorough investigation . . . are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'"  *Gray*, 529 F.3d at 229 (quoting *Strickland*, 466 U.S. at 690-91).

In view of this available information, counsel elected to pursue a mitigation strategy based not on dubious mental health information, but on the positive aspects of Runyon's character.    Most of the mitigating factors focused on Runyon's work and educational history, his positive relationships with his parents and children.  To this end, the mitigators proposed by Runyon were designed to address certain aggravating factors that had been put forward by the government.

For example, Runyon addressed the aggravating factor relating to his military and law enforcement service by showing his accomplishments in those fields and submitting mitigating factors based on his military service and education, which the jury found had been established.  ECF 291, p. 4.  Runyon called William Banks and Larry Eaglebear to testify as to Runyon's military background.  TT, pgs. 2239-2274.  Defense counsel attempted to show that Runyon had performed well in the military through the earning of various awards and testimony concerning his accomplishments.  *Id.* at 2247–2253.  One recommendation for award, dated August 25, 1997, that followed various claimed accidents and head injuries, stated that "Private First Class Runyon performed magnificently as a parachute packer by packing over 5,000 malfunction-free personal parachutes while assigned to the parachute pack platoon.  His skills and attention to detail allowed over one thousand basic, airborne, jumpmaster, pathfinder, and ranger students to

safely complete their qualifying jumps." *Id*. at 2253;  Defense Trial Ex. 2E, admitted August 25, 2009, (penalty phase).

Various witnesses testified along with this strategy that Runyon was a good father and did other kind and generous acts, including working with a special needs child.  TT, pgs. 2267, 2281, 2320, 2490, 2512, 2516, 2521.  This served to establish mitigating factors and counter the aggravating factors related to Runyon's abuse of women, his lack of remorse and even the victim impact testimony related to Cory Voss.  Runyon called some eight witnesses to discuss his positive attributes.  One of the last witnesses described Runyon as having the characteristics of "patience" and that "[i]t was just he was helpful.  He wanted to do what he could for you.  He went over and above.  It was like he was living – it was like he was living his life in gratitude. He was a joy to have around. Quiet. Gentle. Fun. Generous. Kind." *Id*. at 2524.  His son even authored a letter attesting to the great times he had with Runyon and asking the jury to spare his life. *Id*. at 2516.   Various family witnesses also testified as to Runyon's family upbringing – including his mother, biological and adoptive fathers and his brother and former wife.

Thus, Runyon's counsel made a clear decision to present him as a family man of character in the hope that this would counter the aggravating evidence presented concerning his background.  In their opening to the penalty phase, counsel highlighted Runyon's 13-year old son. *Id*. at 1817.  Counsel raised the question repeatedly as to whether Runyon's background – his military experience, his regular work history, his minimal criminal history, made him the worst of the worst such that the death penalty would be appropriate. *Id*. at 1818–1820.  A significant portion of the mitigation case was also spent on his positive adjustment to incarceration.

**JA597**

In closing during the penalty phase, counsel for Runyon relied on the impact of the sentencing on his family and his son. *Id*. at 2640. Counsel discussed that Runyon had various friends who cared for him, that described his positive qualities, including how well he interacted with children. *Id*. at 2643–2645. Counsel for Runyon minimized problems with Runyon's employment – the same problems they now seek to highlight – claiming that being late to work should not result in a death sentence. *Id*. at 2650–2651. Counsel stated: "But again when you think about the magnitude of what you are being asked to do, what does that really have to do with anything, the fact that he couldn't hold a job or that would do okay in a job for a little while, and then for whatever reason, be it his own inability to focus or his family situation or his marriage, that he would lose that job? I would submit to you that that is not something that you should consider at all. That has no bearing on distinguishing a person who receives a death sentence from someone who would not." *Id*. at 2651. Their theory of defense was that Runyon was a decent person who deserved mercy, not that he killed Cory Voss because of some mental illness or that any such problems with family or problems with focus should be considered in determining whether Runyon deserved the death penalty.

III.    Runyon's counsel did not fail to locate available evidence.

Runyon claims that his counsel failed to locate or focus on a series of items that would have compelled a more in-depth mental health mitigation defense. His claim in this regard is largely predicated on information that either was presented already, or was not in the possession of counsel. Hudgins and Cronin confirmed that sought after medical records could not be obtained, despite their continuing efforts and the record confirms this fact.

There is no indication that Runyon's trial counsel failed to take efforts to obtain the medical records that could have been provided to his medical experts and the experts for the

**JA598**

government. There are no records supporting that Runyon experienced "blast injuries" while undergoing military training as he claims. Although submitted military records reveal that Runyon reported an automobile accident in November 1996, there are no civilian medical records that reveal the extent of his injuries. No head trauma or long term effects are revealed in the military medical records. ECF 511–23. Runyon reported that army medical personnel refused to talk to him about head pain and refused to do an MRI scan. ECF 511–24. This reported accident, on which Runyon bases his claim of head trauma, was certainly known at the time of trial. Both Patterson and Montalbano found no permanent mental health effect from this accident. ECF 276, 277. Runyon does not link current lay opinion testimony to any mitigation other than the fact of the accident. Again, brain scans at the time of sentencing were read as normal. ECF 511–22.

Runyon does not address the fact that the medical records from various drug testing companies, including Kendall International, Bristol Myers-Squibb and Parexel, that were all produced in the course of discovery revealed no abnormalities. Runyon reported no history of headaches, head trauma, delusions or any symptoms of psychological or neurological distress. Entry, exit and duration exams confirmed this reporting. Runyon had done various drugs tests for a period of years so his record was more developed that that of an average defendant.

The various employment records introduced into evidence similarly did not reveal any mental health issues. Runyon's application to become a Georgia police officer included a physician's affidavit indicating he was free from physical, emotional or mental conditions. This affidavit post-dated the reported 1996 car accident. GX 320.

Runyon relies on his letters that contain grandiose claims of life saving conduct, but this

69

**JA599**

information was already contained in prosecution expert reports and the claim of saving lives contributed to an impression of Runyon as suffering from a personality disorder with narcissistic features.  Runyon also introduces various jail medical records, which predated the prosecution expert reports and are similarly unavailing.  No mental health interventions occurred and, in fact, Runyon presented several deputies that testified on his behalf at the penalty phase as to his good behavior.  ECF 511–16.

The information as to Runyon's family background that he claims was not found was contained in some form in either the prior testimony of these family members or the reports of Drs. Montalbano and Patterson.  Much of the information concerning the abusive behavior of family members was already presented at trial and the jury found that Runyon had been exposed to domestic violence.  ECF 291.  Various witnesses did testify to Runyon experiencing family violence and such information was already presented as a mitigating factor.  The jury found various mitigating factors related to the violence Runyon experienced.  ECF 291.  Eleven jurors found that Runyon witnessed and experienced domestic violence and parental conflict until his mother and biological father separated.   Jurors added that Runyon continued to witness and experience domestic violence and parental conflict and abuse from his mother and adoptive father.  Thus, the jury was presented with this information about Runyon's background.

Runyon's current attempts to add to this are cumulative.  In terms of the backgrounds of individual family members, Runyon's counsel attempted to have his mother describe her background, but as this was not relevant to mitigators pertaining to Runyon, the Court rightly sustained the government's objection in this regard.  TT, pgs. 2412–2413.

Runyon also concludes that if his counsel had presented expert testimony, it would have established the statutory mitigating circumstances of "impaired capacity" and "disturbance."

Runyon is incorrect (1) that such mitigating circumstances would have been established and (2) that expert testimony at the time would have done so. A review of the available reports reveals expressly to the contrary—that Runyon was of above average intelligence. Moreover, such reports would have run contrary to the mitigation strategy chosen by Runyon's counsel.

The prosecution expert reports do contain repeated statements from Runyon in terms of his belief in his innocence, his views on women and various high-minded views of himself, the introduction of which certainly would have been at odds with the portrait that Runyon tried to paint through the testimony of his family and friends. Runyon was administered intelligence testing prior to joining the military and Dr. Montalbano noted no significant decline in intelligence when the pre-military scores were compared with the 2009 scores. ECF 277.

Dr. Nelson was the mental health expert that was retained to present a social history of Runyon. Specifically, the notice regarding Nelson stated "The social history will focus especially on the major influences that have shaped David Runyon's life, including factors that may have contributed to David Runyon's psycho-social development and functioning." ECF 135. By all accounts, however, the results of Dr. Nelson's review were not favorable to Runyon.

Both reports of Drs. Mirsky and Merikangas were preliminary in nature and neither expert produced any updated report until well after trial, even though the brain scans requested had been performed. Counsel for Runyon, thus, was left with the prosecution expert reports and the very brief and preliminary reports of Drs. Mirsky and Merikangas, which were not further developed even after counsel requested and obtained permission to have neurological testing done and the results released to the defense experts. As these reports hinged on brain scans that proved to be normal, Runyon's counsel cannot be faulted for not continuing to investigate a mitigation issue.

**JA601**

In his June 2009 report, Mirsky identified no deficits in functioning that would bear on mitigation in the face of the reports that counsel had received from the other experts.  ECF 246.  Mirsky's 2009 testing noted that Runyon had a Verbal IQ of 135 (very superior); that he had superior vocabulary, very superior memory for digit strings; very good visual motor coordination; superior conceptual skill; very good understanding of concepts and social practices and good general knowledge.  The results revealed fast scores of visual-spatial tasks, a normal score on test of ability to focus and superior verbal memory subtest scores.  Although Runyon reportedly did not perform well at tests of attention or concentration or manual dexterity, there is no explanation as to how these findings were proper mitigation factors.  Similarly, there is little doubt that the jury would have given these much weight given that the jury found the defendant had purposefully planned to kill and then killed Cory Voss.  Dr. Mirsky's 2009 conclusion noted "superior to very superior cognitive skills" a "high verbal IQ", strong performances on memory and ability to focus.  Dr. Mirsky only noted that the poor scores on sustained attention and manual dexterity would indicate that Runyon was unable to persist in any attention-demanding activity for a sustained interval and may explain uneven employment work history.

The more recent reports of the experts that rely on information and affidavits not available at the time of trial do not call into question the competence of Runyon's trial counsel in declining to pursue a mental health defense based on information available at the time.

Dr. Mirsky performed a second evaluation of Runyon on August 28, 2015, some six years past his sentencing.  ECF 511–35.  Much of the information in the seven-page report is a repeat of the June 26, 2009 report.  Although brain imaging scans were done in August 2009, the 2015 report does not refer to these and it is clear these were read as normal.  ECF 511–22.  In the Continuous Performance Test, which in 2009 Dr. Mirsky previously found to be consistent with

**JA602**

mild brain damage, Runyon improved to 100% correct.  Despite the recorded improvements, Dr. Mirsky now adds a diagnosis of psychosis, possibly schizophrenia, to the prior diagnosis of brain damage and suggests that prior brain injuries contributed to an underlying psychotic disorder.

As discussed, evidence that Runyon was schizophrenic would have sharply contrasted with the portrait that the defense tried to portray at the sentencing hearing and on which the mitigating factors were based.  If anything, Runyon appeared to improve many of his prior test scores that Dr. Mirsky found lacking and suggestive of brain disorder.  These inconsistent reports over six years with varying diagnoses could have only caused the jury to doubt the legitimacy of the diagnoses.  It does not appear that Dr. Mirsky administered the Purdue Pegboard test in 2015, the 2009 score on which he indicated was consistent with mild diffuse brain damage.

Dr. Merikangas provided a four-page declaration dated September 25, 2015, that claims he would have testified at trial in 2009 that Runyon was a brain damaged individual with migranious headaches and a disorder of executive functioning with symptoms suggestive of a psychotic thought process.  ECF 511–2.  Dr. Merikangas does not reveal the basis for such opinion, particularly in contrast to his brief August 5, 2009 letter to counsel stating that Runyon was suffering from sort of delusions caused by his drug testing medication.  Since that time, Dr. Merikangas reviewed additional information, including trial testimony and medical records.  There is a reference to Even Nelson, Ph.D., whose notes or opinions were not provided to the government.  In short, Dr. Merikangas' position has not appreciably changed since his initial report.  ECF 263.

Dr. Cunningham provided an additional report as an exhibit to the Petition, now claiming that various developmental factors impacted Runyon's moral culpability.  ECF 511–8.  Dr. Cunningham did testify at trial and the jury rejected his testimony, finding that Runyon failed to

establish that he was not a risk of violent behavior. ECF 291. Moreover, many of the factors Dr. Cunningham now relies on—including Runyon's upbringing and family influences—were presented by family witnesses at trial. Dr. Cunningham's review of records consist of materials that were not available to Runyon's counsel at the time of his sentencing or the trial testimony transcript (in which case, the jury heard from these witnesses and were in the position as they noted, to express their own mitigators). ECF 511–8, ¶ 8.

Furthermore, Dr. Cunningham essentially attempts to usurp the function of the jury by opining that damaging or impairing factors reduced Runyon's moral culpability. But this is not the role of any expert—to opine on whether Runyon is morally culpable such that his free will was diminished. The jury already found that Runyon intentionally killed Cory Voss. The jury also made findings on mitigation related to Runyon's upbringing and the abuse he witnessed and experienced. Furthermore, Cunningham's proffered testimony that Runyon's moral culpability was lessened by developmental factors contrasts with (1) the fact that Runyon repeatedly denied any participation in the murder of Cory Voss and (2) the violence risk assessment on which Dr. Cunningham did testify.

The jury specifically found Runyon to be culpable in the manner that Dr. Cunningham resists: it found that Runyon intentionally killed Cory Allen Voss, that he did so for money, that he did so after substantial planning. This is why the jury sentenced him to death. It is difficult to imagine a murder that does not involve such a heightened degree of choice and planning. Additionally, Runyon does not establish that Cunningham's developmental report would have been admissible.

Finally, Runyon also attaches a report of a Dr. Dudley, based on an examination conducted in 2015, which indicates that Runyon had a difficult childhood and was exposed to

74

**JA604**

physical abuse. ECF 511–29. Such information was presented at the sentencing phase and associated mitigators were found by the jury. ECF 291. Rather than link Runyon's purported problems to the car accident and brain damage, as did the other examining experts, Dr. Dudley links Runyon's problems to his childhood, history of family mental disorders. Dr. Dudley offers his opinion that Runyon is suffering from various ailments—PTSD, borderline personality disorder, schizoaffective disorder, bipolar type and neurocognitive disorder. ECF 511–29, p. 14. He indicates that given enough time and adequate records, these diagnoses would have been apparent prior to trial.

But other experts who had access to these same records offered different conclusions. ECF 276, 277. These diagnoses also fail to take into account that Runyon repeatedly denied any involvement in the crime so it is reasonable that his counsel would decline to offer evidence seemed designed to explain behavior that he denied committing. A jury convicted Runyon of the cold-blooded murder of Cory Allen Voss. Dr. Dudley's opinion (even if available) that Runyon suffered from a mental/emotional disturbance and his ability to conform to the requirements of the law is certainly at odds with this. These opinions were also contrary to the many character witnesses called by his counsel.

Runyon's trial counsel did not fail to find information related to his mental health or psychosocial history. To the extent it was mitigating, such information was put before the jury. But counsel made the strategic decision not to proceed with mental health evidence that could have contrasted with his chosen mitigation strategy. The evidence of personality disorder observed by Drs. Patterson and Montalbano would have been aggravating evidence against Runyon. A decision not proceed with this approach was the result of "reasonable professional judgments." *Strickland*, 466 U.S. at 691; *Wiggins*, 539 U.S. at 534.

75

**JA605**

IV.  Runyon cannot establish a reasonable probability that the outcome would have been different had his counsel introduced available mental health evidence.

Finally, Runyon can establish no prejudice from the claimed errors of counsel. Each category of evidence that Runyon faults trial counsel for not adducing carries sharp aggravating factors with its mitigating thrust. Such evidence functions as a "two-edged sword." *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989); *see also Vasquez v. Thaler*, 389 F. App'x 419, 429 (5th Cir. 2010) ("The Supreme Court has held that evidence of mental impairment can be both mitigating and aggravating[.]"). Considering this danger, even with the diagnoses proffered by Runyon, the Court must consider whether a reasonable attorney put that information before a jury. *See Harrington v. Richter*, 131 S. Ct. 770, 789 (2011) (finding no error when counsel failed to uncover evidence because it would "be reasonable to conclude that a competent attorney might elect not to use it"). Much of the evidence Runyon faults his counsel for not presenting would have been double-edged in terms of mental health and/or duplicative of that already provided by various friends and relatives. Additionally, such evidence would likely have been contrary to the various mitigators focused on Runyon having a low risk of future violence and making a positive adjustment to incarceration.

Although Runyon now submits that such mitigation would have turned the tide in his favor, he cannot discount the substantial evidence in aggravation presented as a result of this calculated and cruel crime. These aggravators revealed a calculated crime, made possible by years of law enforcement and military experience that was born out of a desire for money.

In terms of the non-statutory aggravating factors, the victim impact evidence in the form of evidence from Cory Voss' parents, siblings, children and fellow service members was powerful. Also, the fact that Runyon used the training he received as a military service member

76

**JA606**

and law enforcement professional carried significant weight.  His history of abuse of women and his manipulation of Virginia Pina in trying to get her to recant her allegations of abuse displayed a character inconsistent with that testified to by his friends and family.  Finally, the lack of remorse demonstrated not only by his interrogation video, but by his statements to others and in the course of various emails and phone conversations revealed his culpable mental state while committing this crime. When a person kills someone coolly, calmly, and without any concern or care, this is morally aggravating and informative about the mental state at the time of crime. Runyon fails to show how the mental health evidence he has uncovered would have impacted these non-statutory aggravating factors, which the jury found beyond a reasonable doubt.

Furthermore, evidence concerning Runyon's mental health may have discounted the mitigating factors concerning Runyon's prior acts of kindness and generosity; his prior work, military and educational experience, and the impression that Cory Voss was molesting his daughter.  Thus, five out of the eleven found factors could have been affected.  Any such mental health evidence would have also made clear that Runyon denied any participation in the plot to kill Cory Voss.  Even crediting the evidence presented now would not have mitigated his crime. Runyon relies on indications that he lacked impulse control or had PTSD stemming from various head injuries.  There is no tie in to how this mitigates Runyon's participation as a contract killer that planned the execution of Cory Voss and then schemed to avoid apprehension.  The behavior was criminal, not clinical.

Runyon summarily concludes that mental health mitigation made the difference between a life sentence and that imposed by the jury.  There is no merit to this contention.  The aggravators found by the jury related to the degree of planning and skill employed by Runyon— a documented and trained military service member, police officer and corrections employee.

**JA607**

This was a planned and purposeful murder.  Runyon was contacted well in advance, planned his trip, what equipment he would bring, the firearm he would use, and further planned the concealment of the evidence after the crime.  Runyon had consistently denied guilt.  A strategy that attempted to somehow attribute his participation in a crime he never admitted to mental health would have run the risk of further offending the jury.

Defense counsel fully and adequately investigated Runyon's mental health background and it was not error for counsel to forgo available information to this end in favor of a strategy that highlighted the positive attributes of Runyon's character.  Moreover, he cannot establish a reasonable probability that had mental health evidence played a larger role at sentencing, the outcome would have been different.  It is clear that the jury viewed Runyon as a calculating, remorseless killer.  While the jury did find and consider certain positive attributes of Runyon's character, Runyon has not shown how a mental health defense that would have opened the door to even greater rebuttal showing him to be a more dangerous individual would have resulted in a different sentence.

**Claim 7:** **Runyon's Sixth Amendment rights were not violated by the presentation of statements from co-defendant Draven and his trial counsel did not fail to object to the admission of such statements.**

Runyon claims that his Sixth Amendment right to confront witnesses was violated when the government presented statements of co-defendant Draven in its case-in-chief.[10]  As a corollary to this claim, Runyon claims that his trial counsel were ineffective in failing to object to the admission of such testimony and in failing to ask the Court for an appropriate limiting instruction.  These related claims are without merit and afford Runyon no relief.

As a threshold matter, Runyon did not raise this claim in his appeal, thus, he is procedurally defaulted from doing so barring a showing of cause and prejudice, which he has not

---

[10] Runyon's claim here is unchanged from the claim filed in his original § 2255 motion.

made.  Moreover, as set forth below, Runyon is incorrect that his counsel failed to object to the admission of such statements, as these very statements to which he now objects were the subject of pre-trial motions raised by his trial counsel.

A.   The statements of Draven did not violate Runyon's Sixth Amendment right to confront witnesses against him.

Runyon focuses on the pre-arrest, non-custodial statements that co-defendant Draven made to law enforcement, during the course of the conspiracy that continued through the investigation of the murder of Cory Voss.  The defendant claims that the introduction of such statements was in violation of *Crawford v. Washington*, 541 U.S. 36, 51 (2004).  The defendant also claims that his trial counsel failed to object to such statements.

The government offered Draven's pre-arrest statements made to law enforcement during the course of the investigation into the murder of Cory Voss under two complementing theories: (1) that such statements were made prior to arrest and in furtherance of the conspiracy; and/or (2) that such statements were not offered for the truth of the matter asserted.  The proof at trial established that an object of the conspiracy was for the conspirators to obtain the proceeds of the life insurance policy on Cory Voss.  It was a part of the conspiracy that the defendants used various methods to conceal the conspiracy and to insure the conspiracy's continuing success including obstructing justice, creating false alibis and providing false information to law enforcement.

Prior to indictment and while the investigation was ongoing, all three defendants made statements to law enforcement officers during the course of the investigation.  Draven, was interviewed three times. On two of those occasions, the interviews were non-custodial and prior to arrest. The final interview was custodial and post-arrest.  The pre-arrest statements that

**JA609**

Draven provided during the course of the investigation to law enforcement officers consisted of lies, sprinkled with some truths to try and persuasively obstruct the investigation.

In *Crawford v. Washington*, 541 U.S. 36 (2003), the Supreme Court ruled that testimonial statements of witnesses absent from trial are admissible only where the declarant is unavailable, and the defendant has had a prior opportunity to cross-examine the witness. 541 U.S. at 59. The Court also stated that co-conspirators statements made in furtherance of the conspiracy were not testimonial; "Most of the hearsay exceptions covered statements that by their nature were not testimonial- for example, business records or statements in furtherance of a conspiracy." 541 U.S. at 56. Further, the Court stated that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U.S. at 59 n. 9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).

Contrary to Runyon's claims then and now, the admission at trial of Draven's pre-arrest statements to law enforcement did not implicate *Bruton* or *Crawford.* These statements were made during the course of the conspiracy and were, thus, properly admissible under Rule 801 (d)(2)(E) of the Federal Rules of Evidence . *See United States v. Shores*, 33 F.3d 438 (4th Cir. 1994) ( "We have held, however, that the *Bruton* rule does not apply if the nontestifying co-defendant's statement is admissible against the defendant under the co-conspirator exception to the hearsay rule set forth in Federal Rule of Evidence 801 (d)(2)(E).") (citing *Folston V. Allsbrook*, 691 F.2d 184, 187 (4th Cir. 1982), *cert. denied*, 461 U.S. 939 (1983)); *see also Crawford*, 541 at 56 ( "Most of the hearsay exceptions covered statements that by their nature were not testimonial- for example, business records or statements in furtherance of a conspiracy.".) Accordingly, the statements made by Draven during the course of the investigation were admissible and did not implicate *Bruton* or *Crawford* as they were made for

the purpose of accomplishing the object of the conspiracy, that is, obtaining the life insurance proceeds of Cory Voss.

Moreover, many of the statements made by all the defendants to law enforcement officers were not offered for the truth of the matter asserted, but to show defendants' efforts to mislead law enforcement and the nature of the relationships and activities of the defendants. As such, these statements did not implicate the Confrontation Clause. *Crawford*, 541 U.S. at 59 n. 9; *see also United States v. Williams*, 445 F.3d 724, 736 (4th Cir. 2006); *United States v. Stewart*, 433 F.3d 273, (2d Cir. 2006); *United States v. Postal*, 589 F.2d 862, 888 (5th Cir. 1979) (finding that nonhearsay statements survive *Bruton*).

Runyon, thus, confuses statements that are excluded under *Crawford* and the *Bruton* rule with statements made by non-testifying co-conspirators in furtherance of the conspiracy, which are admissible against all conspirators under Fed. R. Evid. 801(d)(2)(E). As Draven made these pre-arrest statements during the course and in furtherance of the conspiracy, *Bruton* is inapplicable, and the statements are fully admissible against the three defendants. *See United States v. Brooks*, 957 F.2d 1138, 1146 (4th Cir. 1992).

Even if *Bruton* did apply to these statements, Draven's express references to Runyon in the course of the pre-arrest did not violate *Bruton* because the references could not fairly be understood to incriminate Runyon. *See United States v. Locklear*, 24 F.3d 641, 646 (4th Cir. 1994) (observing that co-defendant's redacted statement could not fairly be understood to incriminate defendant Locklear, where in redacted statement co-defendant admitted "that he was familiar with the Locklear brothers and that he had known them all his life"). In fact, Draven was attempting to clear Runyon from suspicion the same way he was attempting to clear himself. Additionally, the fact that Draven admitted to having an affair with Voss did not directly

incriminate Runyon and, thus, raises no confrontation problem. Runyon identifies no specific pre-arrest statements from Draven that directly incriminated him beyond the admission that Draven had an affair with Voss or that Draven spoke with Runyon at a payphone. But this latter statement by Draven was not incriminating in and of itself—it only became incriminating when linked to other evidence. *See United States v. Lighty*, 616 F.3d 321, 376 (4th Cir. 2010).

> B. <u>Runyon's counsel did object to the admission of Draven's statements in the course of pre-trial motions.</u>

Contrary to Runyon's claim, his trial counsel *did* object to the admission of co-defendant Draven's statements. Following the filing of a pre-trial motion objecting to the admission of the above-referenced statements, the matter was argued at a pretrial motions hearing on December 8, 2008. The pre-arrest statements of both Draven and Voss were discussed and counsel rightly conceded that *Bruton* and *Crawford* were not implicated if the pre-arrest statements at issue were made in furtherance of the conspiracy. Mot. Hearing Tr., Dec. 8, 2008, pgs. 8-9. Following such argument, the Court determined that such statements were admissible as statements in furtherance of the conspiracy. *Id.* at p. 15. The Court further indicated that it would issue a limiting instruction if such an instruction proved necessary. *Id.* at p. 16. The government agreed not to use and did not use Draven's post-arrest statements in its case-in-chief at trial.

During the course of trial, the government also filed a motion *in limine* to limit the defense from offering self-serving hearsay through the pre-arrest statements of the conspirators. ECF 238. The Court denied this motion, thus, allowing the defendants the ability to elicit any portion of the pre-arrest statements in cross examination that was to the defendant's advantage. TT, pgs. 1293-1297. Thus, Runyon was, in fact, permitted to use the pre-arrest statements to his own advantage at trial.

**JA612**

Prior to the testimony about Draven claiming he spoke to Runyon at a pay phone near the Waffle House, Detective Rilee testified that Runyon stated that he had visited Draven once in the spring of 2007 on his way to Florida and that they met at a Waffle House. TT, pgs. 1311, 1313. Thus, the pay phone testimony from Draven linked to the prior admission from Runyon concerning a claimed innocent purpose for the meeting while Runyon was on a fishing trip. Following this interview with Runyon, law enforcement went back to interview Draven again. Draven denied that Runyon had ever visited him in Newport News, but claimed that he met him at a Waffle House in D.C. TT, pgs. 1315-1316. After being confronted with evidence of his relationship with Cat Voss, Draven acknowledged that he did have a relationship with her. TT, p. 1320.

No prejudice accrued to Runyon from these statements as they did not directly incriminate him. The evidence of such relationship was pervasive throughout the trial and this admission in no way prejudiced Runyon any more than all of the other evidence of the affair did. When confronted with a six-minute call to the Waffle House payphone, Draven admitted that he spoke to Runyon. TT, p. 1321. Following this testimony, counsel for Draven and Runyon then elicited various denials and explanations from both Draven and Runyon. TT, pgs. 1328-1353. Specifically, counsel for Runyon elicited that in the first interview of Draven, there was no mention of Runyon. TT, p. 1341. Thus, counsel for Runyon utilized these pre-arrest statements of Draven to try and show an absence of relationship between the conspirators.

Finally, it was not an error for trial counsel to decline to request a limiting instruction that would have likely served to draw additional attention to the statements of Draven that trial counsel in fact made use of. Runyon does not offer any such suggested limiting instruction in making this claim.

83

**JA613**

C.       The testimony of Edward Fodrey did not infringe upon Runyon's Sixth Amendment rights.

Runyon also claims that trial testimony by witness Edward Fodrey, regarding statements made by Draven, infringed upon Runyon's *Bruton* rights due to Runyon's inability to cross-examine Draven concerning the statements.  But Fodrey made no mention of Runyon in the course of his testimony that would arise to a Confrontation Clause violation.  Fodrey testified to admissions made by Draven while the two were incarcerated at Western Tidewater Regional Jail.  TT, p. 1233.  Fodrey testified that Draven told him "that he hired some other guy" that was "a friend of his, and - - that he found on the internet."  TT, pgs. 1236-1237.  There was no indication that this "guy" or "friend" was a redacted reference to Runyon absent other linking evidence.   Draven deal with various individuals on the internet and had reached out to others (including Charles Smith and Lawrence Ford) about the murder plot.  In fact, Fodrey testified that Draven tried to contact a number of people through the internet.  *Id*.

Thus, Even if the testimony of Fodrey contained a redacted reference to Runyon, there is no confrontation problem when a confession is redacted to eliminate any reference to the existence of  the defendant, *Richardson v Marsh*, 481 U.S. 200, 211 (1987) or "if the defendant′s name is replaced by a symbol or neutral pronoun." *United States v Vogt*, 910 F.2d 1184, 1191-1192 (4th Cir. 1990).  The Fourth Circuit allows redacted statements that generally refer to another co-defendant  through symbols or neutral pronouns or phrases such as "another person" or "another individual" which do not facially implicate the defendant.  *United States v Akinkoye*, 185 F.3d192,198 (4th Cir.1999).  As there was no direct reference to Runyon, no *Bruton* error occurred.  *See Lighty*, 616 F.3d at 376 (indicating that if a proffered statement of one non-testifying co-defendant becomes incriminating against another by virtue of an inference from

other evidence at trial, the Confrontation Clause may not be offended if those statements are redacted).

**Claim 8:** **Appellate counsel was not constitutionally ineffective for failing to raise a *Batson* challenge or Confrontation Clause challenge on direct appeal.**

Runyon contends that he received ineffective assistance of counsel during his direct appeal. Specifically, he argues that his appellate counsel (1) failed to investigate and raise a *Batson*[11] challenge (*see* Claim 16), (2) failed to raise a Confrontation Clause challenge (*see* Claim 7), and (3) failed to use a smaller font in the opening brief which purportedly would have allowed more space in which to add claims in the opening brief. *See Petitioner Brief* at 78–80. In his amended motion, Runyon adds claims of ineffective assistance of appellate counsel for claims 7, 11, 12, 13, 14, and 16.[12] These added claims are time-barred and they do not relate back to Runyon's original claim of ineffective assistance of appellate counsel. As explained below, Runyon fails to show either constitutionally deficient performance or prejudice resulting therefrom. Accordingly, he is not entitled to substantive relief or an evidentiary hearing or discovery on his claims.

A. Legal Principles

1. Statute of Limitations

Claims made in a § 2255 motion must be made within the one-year period required by 28 U.S.C. § 2255(f)(1) and (f)(3). Specifically, § 2255(f) provides:

The limitation period shall run from the latest of—

(1) the date on which the judgment of conviction becomes final;

---

[11] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[12] These added claims are made in a conclusory sentence without any additional argument.

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

The one-year limitations period began on the date the Supreme Court denied Runyon's petition for writ of certiorari. *See United States v. Segers*, 271 F.3d 181, 184 (4th Cir. 2001). The Supreme Court denied Runyon's petition for writ of certiorari on October 6, 2014. *Runyon v. United States*, No. 13–254 (Oct. 6, 2014). Runyon filed his § 2255 motion on October 5, 2015. The additional claims of ineffective assistance of appellate counsel were not included in his timely original motion. They are thus now time-barred. Runyon fails to dispute, much less argue, that his claims are not untimely.

When claims in an amended pleading are barred by the statute of limitations, Fed. R. Civ. P. 15(c) "provides for the relation back of amendments to the original pleading under certain circumstances." *United States v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000). Claims "relate back" when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth . . . in the original pleading." Fed. R. Civ. P. 15(c)(2). Again, Runyon fails to address whether the claims of ineffective assistance of appellate counsel he raises here relate back to his contention in Claim 8.

These claims do not relate back to his claims of ineffective assistance of appellate counsel originally raised in Claim 8. In Claim 8, Runyon alleges that his appellate counsel were ineffective for failing to raise a *Batson* challenge, a Confrontation Clause claim, and for failing to use a smaller font in the appellate brief. ECF 478, pgs. 78–80. None of the added claims

86

**JA616**

relate to any issue that was raised originally in Claim 8.  The claims are thus newly added and cannot be deemed timely.  Moreover, even if the claims were timely, for the reasons stated in the United States' response to claims 7, 11, 12, 13, 14, and 16, Runyon is not entitled to relief on the merits.

2.       Runyon is not entitled to relief on the merits.

The statute of limitation bar notwithstanding, Runyon fails to demonstrate he is entitled to relief on the merits.  To show that counsel was ineffective on direct appeal, a defendant must show that counsel omitted issues that were clearly stronger than those presented.  It is insufficient to show that counsel merely failed to raise a nonfrivolous issue.  Counsel is more likely to be effective on appeal when he focuses on quality instead of quantity.  As to prejudice, the defendant must show that there is a reasonable probability that, but for counsel's error, he would have prevailed on appeal.  *See Smith v. Robbins*, 528 U.S. 259, 285, 288 (2000); *Jones v. Barnes*, 463 U.S. 745, 753 (1983); *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008), (quoting *Strickland*, 466 U.S. at 689).  In order to prevail, the defendant must show: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) he suffered actual prejudice.  *Strickland*, 466 U.S. at 687.  A defendant alleging ineffective assistance of counsel must satisfy both prongs of the *Strickland* test to prevail.  *See United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004).  Where a court finds that "the defendant makes an insufficient showing on one" of the prongs, consideration of the other is unnecessary.  *Merzbacher v. Shearin*, 406 F.3d 356, 365–66 (4th Cir. 2013) (citing *Strickland*, 466 U.S. at 697).

In applying *Strickland* to claims of ineffective assistance of appellate counsel, the Fourth Circuit affords appellate counsel the "presumption that he decided which issues were most likely to afford relief on appeal." *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1989).   Effective

**JA617**

assistance of appellate counsel does not require the presentation of all issues on appeal that may have merit, *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000), and the court "must accord [] counsel the presumption that he decided which issues were most likely to afford relief on appeal," *id*. internal quotation marks omitted).

In *Evitts v. Lucey*, 469 U.S. 387 (1985), the Supreme Court held that due process of law requires that a defendant receive effective assistance of appellate counsel on direct appeal. Claims for ineffective assistance of appellate counsel, like those for trial counsel, are properly analyzed under the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984); *Smith v. Murray,* 477 U.S. 527, 535–36 (1986) (applying *Strickland* to claim of attorney error on appeal). The Supreme Court, however, also has held that appellate counsel has no constitutional duty to raise every nonfrivolous issue on appeal if counsel, as a matter of professional judgment, decides not to raise such issue on appeal. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). The *Barnes* Court determined that appellate counsel must be allowed to exercise reasonable professional judgment in selecting those issues most promising for review. *Id*. at 752-53. The *Barnes* Court specifically stated that "[a] brief that raises every colorable issue runs the risk of burying good arguments...." *Id.* The professional judgment of appellate counsel includes the determination of which colorable claims to raise—counsel is not ineffective for failing to raise every colorable claim. *Id*. at 753–54; *see also Smith v. Robbins*, 528 U.S. 259, 288 (2000) (noting difficulty of proving claim of ineffective assistance of appellate counsel). Runyon has failed to set forth any issue which if it had been appealed would have resulted in any different outcome in his case, and has therefore failed to show prejudice as required under the second prong of the *Strickland*. *See Griffin v. Aiken*, 775 F.2d 1226, 1235-36 (4th Cir. 1985).

B.    Runyon cannot meet his burden under *Strickland v. Washington.*

1.    Ineffective Assistance of Counsel for failing to raise *Batson* claim (Claim 16)[13].

Runyon contends that his appellate counsel were constitutionally ineffective for failing to raise a *Batson* challenge on direct appeal.  He argues that appellate counsel were ineffective for failing to obtain the court record of juror strikes and copies of questionnaires of potential jurors in order to investigate *Batson* violations.  *See Petitioner Brief* at 85.  Runyon cannot show there is a reasonable probability that, but for counsel's unprofessional errors, the result of his trial would have been different.

As set forth in the Government's response to Claim 16, Runyon cannot show that appellate counsel's oversight to raise this claim on appeal amounted to constitutional ineffectiveness on the part of his appellate counsel because he cannot show deficient performance or prejudice stemming from their alleged failure to press any *Batson* claim.  For the reasons set forth in the Government's response to Claim 16—that the alleged *Batson* challenge lacks any merit—Runyon fails to establish that his appellate counsel's failure to raise a *Batson* claim was deficient or that he suffered actual prejudice.  Runyon fails to proffer any evidence of discriminatory intent on behalf of the United States, and any Batson claim would have lacked merit.  Where an objection to evidence would have been futile, counsel is not constitutionally ineffective for failing to make it.  *See Harris v. United States,* 204 F.3d 681, 683 (6th Cir.2000).  Failure to raise a futile constitutional challenge did not violate Runyon's Sixth Amendment right to effective assistance.  *See Higgs v. United States*, 711 F. Supp. 2d 479, 506 (D. Md. 2010).

---

[13] Claim 16, the substantive *Batson* challenge, is procedurally defaulted because Runyon failed to raise the claim below or on direct appeal.  The Government's position in Claim 16 is that the claim has no merit in any event.

2.     Ineffective Assistance of Counsel for failing to raise a Confrontation ClauseClaim

Runyon contends that his appellate counsel were ineffective for failing to raise a Confrontation Clause challenge—the same challenge he raises in Claim 7 of his amended § 2255 motion. *See* ECF 511, pgs. 84–86. For the reasons stated in the Government's response to Claim 7, incorporated herein by reference, Runyon fails to show that his appellate counsel performed deficiently or that he suffered actual prejudice.

As stated in response to Claim 7, the statements made by co-defendant Draven that were admitted at trial did not implicate *Bruton* or *Crawford* and were properly admissible under Fed. R. Evid. 801(d)(2)(E). The Confrontation Clause issue Runyon alleges has no merit. As such, appellate counsel was not ineffective for failing to raise this issue on direct appeal. *See*, *e.g., Gray v. Greer,* 800 F.2d 644, 646 (7th Cir. 1986) ("Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome"). Runyon fails to demonstrate that he would have prevailed on this issue on direct appeal.

3.     Appellate counsel was not constitutionally ineffective for failing to use a different font in the opening brief on appeal.

Runyon argues that his appellate counsel were ineffective for failing to switch to a 14-point Garamond font in the opening brief on appeal. He contends that use of this font would have added space for approximately seven additional pages in which appellate counsel could have used for raising additional issues. As stated above, however, the additional issues Runyon suggests have no merit, therefore the use of a different font does not demonstrate he would have prevailed on appeal. Runyon fails to show actual prejudice and is not entitled to relief.

**JA620**

**Claim 9:**  **Runyon's conviction under 18 u.s.c. § 924(j) is not affected by the Supreme Court's decision in *Johnson v. United States***

Runyon claims that in view of the Supreme Court's recent decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015), that his conviction on Count Five for Murder in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(j), is unconstitutional, because the predicate convictions underlying the Section 924(j) charge are not crimes of violence.  Runyon also attacks his sentence of death on Count One for Conspiracy to Commit Murder for Hire Resulting in Death, in violation of 18 U.S.C. § 1958(a), claiming that the evidence and arguments presented with respect to the Section 924(j) conviction painted an inappropriate picture of the conspiracy offense and contributed to the jury's sentencing decision on that charge.  As a threshold matter, Runyon has waived and/or procedurally defaulted in raising this claim.  In addition, relief here is barred under the non-retroactivity doctrine under *Teague*.  Even should the Court reach this claim on its merits, however, it is clear that Runyon is entitled to no relief.

At a threshold level, this claim should be dismissed as procedurally defaulted.  Runyon failed to raise this claim at any earlier stage of litigation and has failed to show "cause" and "prejudice" to excuse his default.  *Frady*, 456 U.S. at 170; *Coleman v. Thompson*, 501 U.S. 722, 753 (1991).  In addition, even if *Johnson* applied here, Runyon would not be entitled to relief because his case is on collateral review.  *Teague*, 489 U.S. at 310.  Runyon's convictions and sentences were final as of October 6, 2014—prior to *Johnson*.  Moreover, the Supreme Court recently granted certiorari review in *Welch v. United States*, 15–6418 (cert. grant Jan. 8, 2014).  Runyon is not entitled to relief.

Count Five of the indictment charged Runyon with Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. § 924(j).  The jury convicted the defendant of this charge and recommended the death penalty at the sentencing phase.  Section 924(j) requires that

the defendant cause the death of a person through the use a firearm during and in relation to a predicate crime of violence.  In this case, the predicate crimes of violence at issue were Conspiracy to Commit Murder for Hire Resulting in Death,  in violation of 18 U.S.C. § 1958(a), as charged in Count One, and Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2, as charged in Count Two.  In addition to the Section 924(j) conviction, the jury also convicted the defendant of both predicate crimes of violence.  Due to the additional element for both underlying crimes that death resulted, both predicate crimes were also eligible for the death penalty and the jury recommended the death penalty on Count One and a sentence of life imprisonment on Count Two.  18 U.S.C. §§ 1958(a), 2119.

Section 924(j) itself provides for an enhanced penalty for a violation of Section 924(c) when a defendant causes a death through the use of a firearm.  18 U.S.C. § 924(j).  If the killing is a murder, the maximum penalty is death.  Id.  Thus, to be convicted of a Section 924(j) charge, a defendant must commit a murder, using a firearm, in the course of a Section 924(c) violation.

Section 924(c)(3) defines "crime of violence" as an offense that is a felony and:

(A)     has an element the use, attempted use, or threatened use of physical force against the  person or property of another, or

(B)     that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

Subsection (A) is often referred to as the "force clause;" with subsection (B) referred to as the "residual clause."   Relying on Johnson, which interpreted provisions of the similarly worded Armed Career Criminal Act (ACCA – Section 924(e)(2)(B)), Runyon first contends that the definition of "crime of violence" as contained in the residual clause is unconstitutional.  Of course, as set forth below, should the Court determine that the predicate crimes meet the crime of violence definition under the "force clause," the Court need not entertain this challenge to the

**JA622**

under the rubric of the residual clause.  But the government submits that Johnson did not invalidate the residual clause.

    I.      <u>The Residual Clause of Section 924(c)(3)(B) survives Johnson.</u>

Runyon contends that the residual clause cannot survive constitutional scrutiny because it requires the "ordinary case" analysis to assess the risk involved in a predicate offense—an analysis that the Supreme Court determined was unconstitutionally vague in Johnson.  In Johnson, the Supreme Court held that ACCA's residual clause, i.e., the provision that defines a "violent felony" to include an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another," 18 U.S.C. § 924(e)(2)(B)(ii), is vague and "violates the Constitution's guarantee of due process."  *See Johnson*, 135 S. Ct. at 2563.  But a combination of factors not present in § 924(c)(3)(B) "conspired" to convince the Court in Johnson to find ACCA's residual clause vague.  135 S. Ct. at 2557.

The Court determined that the ACCA's residual clause "leaves grave uncertainty about how to estimate the risk posed by a crime."  *Id.* at 2557.  The Court also found that ACCA "leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony."  *Id.* at 2558.  In particular, the Court held that ACCA's structure "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes."  *Id.*  This approach was problematic because the degree of risk posed by the enumerated crimes was "'far from clear.'"  *Id.*  The Court was also concerned that the risk assessment was tied to considering risk in an "ordinary case," but without accounting for "real-world facts or statutory elements."  *Id.*  Additionally, the Court stressed that it had repeatedly attempted to craft a principled standard for the residual clause but had failed to do so, which further supported its vagueness.  *Id.*

<div align="center">93</div>

<div align="center">**JA623**</div>

Importantly, *Johnson* concluded that "the uncertainties in [ACCA's] residual clause may be tolerable in isolation," but their presence together led the Court to its holding.  Id. at 2560. But unlike the ACCA's residual clause, § 924(c)(3)(B) contains no confusing list of enumerated offenses; it has been limited to a narrow risk of force during the commission of the offense; and the Supreme Court never has disagreed about its proper construction.

A.     The ordinary-case analysis does not itself invalidate § 924(c)(3)(B).

Runyon insists that the key to what makes § 924(c)(3)(B) impossibly vague is its reliance on courts evaluating the "ordinary case" of an offense.  *See, e.g., Avila*, 770 F.3d at 1107 (analyzing "ordinary case" under 18 U.S.C. § 16(b)); *United States v. Keelan*, 786 F.3d 865, 871 (11th Cir. 2015) (collecting cases).  The Ninth Circuit's opinion in *Dimaya v. Lynch*, 803 F.3d 1110, 1114–20 (9th Cir. 2015), invalidating § 16(b), also made this point central to its analysis.

But what Runyon and *Dimaya* fail to address is that courts at every sentencing must evaluate where a defendant's conduct falls on the spectrum of ways of committing the offense—and hence how a defendant's case compares to a norm.  Congress has commanded such an analysis under 18 U.S.C. § 3553(a) and in particular under § 3553(a)(6).  The Supreme Court has never suggested that there is a valid constitutional challenge to such statutory rules or the courts' application of them.  An inquiry about the risk that force will be used is not an unusual aspect of assessing the gravity of a crime.  And § 924(c)(3)(B) requires federal courts to evaluate federal offenses, a topic familiar to the judges who must apply the legal standard.  The problem also cannot be eliminated by claiming that § 3553(a)(6) simply asks courts to compare individual cases.  Rather, § 3553(a)(6) has long been applied using the general, abstract, and national standards—such as the U.S. Sentencing Guidelines. See, e.g., *Gall v. United States*, 552 U.S. 38, 54 (2007) ("Since the District Judge correctly calculated and carefully reviewed the Guideline

94

**JA624**

range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities."). Indeed, the Fourth Circuit has repeatedly cautioned against drawing comparisons from a handful of cases because of the dangers that each case has its own unique characteristics, making them dissimilar. *See*, *e.g*., *United States v. Chandia*, 675 F.3d 329, 342 (4th Cir. 2012) (citing *United States v. Abu Ali*, 528 F.3d 210, 267 (4th Cir. 2008)). General standards and assessments of the ordinary case are indispensable.

Runyon does not contest, and *Johnson* requires finding, that the force clause of § 924(c)(3)(A) is constitutionally permissible. Thus, on Runyon's view, the force clause would be suddenly transformed into an unconstitutional provision if it were redrafted as follows: "An offense is a crime of violence if it is a felony and its elements involve the use of force, attempted use of force, threatened use of force, or substantial risk that force will be used." This straightforward inquiry is not difficult to apply to robbery offenses or other potential predicates for § 924(c) and encompasses the type of analysis that courts frequently perform.

B.      The Supreme Court has not "repeatedly" failed to construe § 924(c)(3)(B) in a workable way.

*Johnson* emphasized its own "repeated" inability to develop a "principled and objective standard" for ACCA. 135 S. Ct. at 2558. This concern, absent here, further animated the Court's decision to find ACCA vague. *See id.* at 2559 (noting that Johnson was the Supreme Court's "fifth [case] about the meaning of the [ACCA] residual clause"); *see also Sykes v. United States*, 131 S. Ct. 2267, 2287 (2011) (Scalia, J., dissenting) (stating that the Court's repeated failure in addressing ACCA is "[w]hat sets ACCA apart" and "confirms" its vagueness). *Johnson* concluded that its ACCA decisions had been a "failed enterprise." 135 S. Ct. at 2560.

But the Court has rendered only one significant § 16(b) decision, which occurred over ten years ago and caused no controversy among the Justices. *See Leocal*, 543 U.S. at 1. In *Leocal,* a

unanimous Court expressed no uncertainty and had no difficulty in adopting an interpretive framework that identified one offense (burglary) as the "classic example" of a § 16(b) qualifying offense, and another (DUI) that was not. *Id*. at 10.  The Court's analysis belies a claim that § 924(c)(3)(B) is too uncertain to be readily applied.

C.  <u>Runyon has not shown the same degree of confusion by lower courts about Section 924(c)(3)(B) as about ACCA.</u>

*Johnson* also observed that there were numerous lower court splits about "the nature of the inquiry" that a court should conduct under ACCA.  *Johnson,* 135 S. Ct. at 2560.  Significantly, the disagreements "went beyond matters of degree."  *Id.*  Runyon has not shown anywhere near the same level of confusion among lower courts about § 924(c)(3)(B) (or § 16(b)).

Moreover, "That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense."  *United States v. Petrillo*, 332 U.S. 1, 5 (1947); see also Johnson, 135 S. Ct. at 2560 ("even clear laws produce close cases").

D.  <u>The enumerated offenses in ACCA are absent.</u>

Section 924(c)(3)(B)'s structure differs from the ACCA because it does not contain an introductory list of enumerated crimes followed by an "otherwise" provision that *Johnson* treated as qualified by the predicate offenses.  The presence of the enumerated list of offenses in ACCA was a determinative factor in *Johnson*.  The enumerated list had troubled members of the Court since *James*.  *See, e.g., James*, 550 U.S. at 215-16, 230 n.7 (Scalia, J., dissenting).  And in *Begay v. United States*, even the majority was concerned that "the examples are . . . far from clear with respect to the degree of risk each poses."  553 U.S. 137, 143 (2008).

<div align="center">96</div>

<div align="center">**JA626**</div>

The continuing confusion over how to interpret the list, in conjunction with the residual clause, ultimately convinced the Court in *Johnson* of the ACCA's residual clause's vagueness and pervaded the Court's analysis. For example, the Court attributed part of the "uncertainty about how much risk it takes for a crime to qualify" to the residual clause's structure, which "forces courts to interpret 'serious potential risk' in light of the four enumerated crimes— burglary, arson, extortion, and crimes involving the use of explosives." *Johnson*, 135 S. Ct. at 2558. The Court again referred to the enumerated crimes in explaining why its decisions in *Begay* and *Sykes* did "not succeed in bringing clarity to the meaning of the residual clause." *Id.* at 2559 (*Begay's* test, which turned on the similarity of a crime to the enumerated offenses, failed because "the enumerated crimes are not much more similar to one another in kind than in degree of risk posed"); *id.* ("common sense" used in *Sykes* was not reliable criterion because "[c]ommon sense has not even produced a consistent conception of the degree of risk posed by each of the four enumerated crimes"). And, critically, the Court distinguished other statutes requiring risk-based assessments in part because they do not "link[] a phrase such as 'substantial risk' to a confusing list of examples." *Id.* at 2561. Section 924(c)(3)(B), like the statutes the Court distinguished in *Johnson*, contains no "confusing list" to cloud its analysis.

Moreover, § 924(c)(3)(B) contains language identical to many other federal and state statutes. *See, e.g.,* 18 U.S.C. § 16(b); 18 U.S.C. § 3142(f)(1)(A) and (g)(1) (bail statute); 18 U.S.C. § 521(d)(3)(C) (enhanced sentence for criminal gang members); 18 U.S.C. § 3663A(c)(1)(A) (mandatory restitution); 18 U.S.C. § 5032 (juvenile transfer statute); R.I. Gen. Laws 1956, § 21-28-4.07.2(a); Utah Code Ann. § 76-9-802(5)(b)(i). Thus, while the Supreme Court believed that striking ACCA's residual clause would have little effect on other risk-based

statutes, *see Johnson*, 135 S. Ct. at 2561, a decision striking § 924(c)(3)(B) would significantly affect other federal and state laws.

E.   Section 924(c)(3)(B) does not go beyond the elements of the offense to consider potential extra-offense conduct.

Another uncertainty about the ACCA that the Supreme Court identified in *Johnson*, but that is absent from § 924(c)(3)(B), is the necessity for courts to go "beyond evaluating the chances that the physical acts that make up the crime injure someone" and to evaluate the risk for injury even "after" completion of the offense. *Id.* at 2557; see *also id*. at 2559 (noting that "remote" physical injury could qualify under ACCA, but that the clause does not indicate "how remote is too remote"). ACCA's inquiry into whether a crime "involves conduct" that presents too much risk of injury goes beyond the offense elements. *Id*. at 2557. The consideration of post-offense conduct was therefore part of ACCA's indeterminate "wide-ranging inquiry." *Id.*

By contrast, and as discussed above, § 924(c)(3)(B) is significantly narrower. As the Supreme Court expressly observed in *Leocal,* unlike the ACCA residual clause, where the "substantial risk" inquiry relates "to the possible effect of a person's conduct," § 16(b) (and Section 924(c)(3)(B)) address "the use of force" "'in the course of committing the offense.'" 543 U.S. at 10 & n.7 (quoting 18 U.S.C. § 16(b)). See also *Fuertes,* 2015 WL 4910113, at *9. This narrower approach means that the assessment is confined to the risks that arise during the commission of the offense. *Leocal,* 543 U.S. at 7 (court must "look to the elements and the nature of the offense of conviction"). Unlike the ACCA, § 924(c)(3)(B) does not go beyond "the physical acts that make up the crime." *Johnson*, 135 S. Ct. at 2557. Further, § 924(c)(3)(B) looks at the risk of the "use of force" rather than the much broader "risk of injury."

F.    Section 924(c)(3)(B) is materially narrower than ACCA.

Under *Leocal*, an aggravated felony for purposes of § 16(b) (and, by extension, a "crime of violence" for purposes of § 924(c)(3)(B)) is limited to "offenses that naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense." *Leocal,* 543 U.S. at 10; *see also United States v. Taylor*, 814 F.3d 340, 376–77 (6th Cir. 2016) (finding the Johnson analysis inapplicable because § 924(c)(3)(B) is distinctly narrower than ACCA residual clause).  To qualify as a predicate offense under this framework, the offense must proscribe conduct that (1) naturally involves a disregard of a substantial risk of force against another, and (2) the risk of force must arise during the course of committing (3) an active, violent offense.  Id. at 10-11; *see also United States v. Lanier*, 520 U.S. 259, 266 (1997) (clarity may be provided by judicial gloss on an otherwise uncertain statute). *See also Fuertes*, 2015 WL 4910113, at *9.

Under § 924(c)(3)(B) (and § 16(b)), the ordinary case is defined by the elements of the offense, and a court does not, as in ACCA, consider risks that arise only after the physical acts constituting the crime have been completed.  The court asks whether the offense elements would "naturally involve a person acting in disregard of the risk that physical force might be used against another in committing an offense."  *Leocal,* 543 U.S. at 11.  The analysis is non-speculative and consistent with *Johnson*.  If the risk of the use of force is naturally present in the elements of the offense, it qualifies as a crime of violence under § 924(c)(3)(B) (or § 16(b)). This alleviates *Johnson's* concern about ACCA's far ranging inquiry.

There is nothing vague or speculative about asking whether an offense "naturally" involves a risk of the use of force during its commission.  The phrase "by its nature" in § 924(c)(3)(B) simply triggers application of the categorical approach, which looks at offense

**JA629**

elements. See *United States v. Aragon*, 983 F.2d 1306, 1312 (4th Cir. 1993). Furthermore, the Supreme Court has long examined the "nature" of predicate offenses in applying enhancements. *See, e.g., Moncrieffe v. Holder*, 133 S. Ct. 1678, 1684 (2013). As for the degree of risk necessary, courts have made clear that the need for a "substantial" risk is not vague. *Aragon*, 983 F.2d at 1313-15 (easily applying "substantial risk" standard).

Acts of Congress enjoy a strong presumption of validity. *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). A court's duty is to construe, rather than to condemn, a statute. *See Skilling v. United States*, 561 U.S. 358, 403 (2010). The Supreme Court was convinced by "[n]ine years' experience," and by multiple prior decisions, that ACCA's residual clause was not susceptible to principled construction. *Johnson,* 135 S. Ct. at 2560. Section 924(c)(3)(B) does not possess the "sum" of factors that led Johnson to its conclusion. *Id.*

G.   Runyon cannot present a vagueness challenge because § 924(c)(3)(B) is not unconstitutionally vague as applied to him.

Under the vagueness doctrine, "'[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *United States v. Jaensch*, 665 F.3d 83, 89 (4th Cir. 2011) (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010)); see also, e.g., *United States v. Williams*, 553 U.S. 285, 304 (2008); *United States v. McDonnell*, 792 F.3d 478, 509 (4th Cir. 2015).

*Johnson* indicated that a law need not be vague in all its applications to be unconstitutional, but the Court did not decide whether a party must first show a law is vague *as applied* to him before he may make a facial challenge. 135 S. Ct. at 2560-61. Nor did *Johnson* overrule the Supreme Court's numerous cases requiring a court to analyze a vagueness challenge outside of the First Amendment context on the facts of the particular case before it. *See, e.g.,*

100

**JA630**

*Chapman v. United States*, 500 U.S. 453, 467 (1991); *United States v. Powell*, 423 U.S. 87, 92 (1975); *United States v. Mazurie*, 419 U.S. 544, 550 (1975).

Further, while *Johnson* did reject that a provision cannot be facially vague merely because "some conduct clearly falls within the provision's grasp," 135 S. Ct. at 2561, the Court did not hold that any possibility of a vague application requires finding a statute void for vagueness. Rather, it concluded that the residual clause was void for vagueness because of its inherent inability to produce "evenhanded, predictable, or consistent" applications. *Id.* at 2563. The provision was "a judicial morass that defies systemic solution, a black hole of confusion and uncertainty that frustrates any effort to import some sense of order and direction." *Id.* at 2562 (internal quotation marks omitted). But "there are other statutes that by their terms or as authoritatively construed apply without question to certain activities, but whose application to other behavior is uncertain." *Smith v. Goguen*, 415 U.S. 566, 577-78 (1974). For those statutes, the general rule is that a vagueness challenge is not available to one who violates the "hard core" of the statute. *Id.* Facial vagueness challenges should therefore be reserved for statutes that "simply ha[ve] no core," "in the sense that no standard of conduct is specified at all." *Id.* (citation and quotation marks omitted).

The Sixth Circuit recently rejected an identical vagueness challenge to § 924(c)(3)(B) in *Taylor*, 814 F.3d at 375–79. Citing many of the above reasons that *Johnson* does not affect § 924(c)(3)(B), the court found that § 924(c)(3)(B) is considerably narrower than the statute invalidated in *Johnson*, and much of the analysis in *Johnson* is not applicable to § 924(c)(3)(B). *Id.*

Section 924(c)(3)(B) is clearly not a statute that "simply has no core." *See Leocal*, 543 U.S. at 10 (describing burglary as a "classic example" of a crime that satisfies § 16(b) because,

101

**JA631**

"by its nature, [it] involves a substantial risk that the burglar will use force against a victim in completing the crime").

Runyon was charged with and convicted of murdering Cory Voss with a firearm in relation to the crimes of conspiracy to commit murder for hire and carjacking - conduct which even he cannot not deny falls within the "core" of § 924(c)(3)(B) and "involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  Cf. *United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) ("Here, the indictment charges a pattern of violent racketeering activities, including murder, kidnapping, and robbery.  It is hard to imagine a conspiracy which, by its nature, poses more of a risk that physical force will be used against persons or property.").  Both of the predicate crimes had as additional elements that death resulted in the course of the crime – not only was there a risk, for Runyon to be convicted on these crimes, the use of force was a certainty.  Thus, his vagueness challenge must fail.

> II.    Carjacking Resulting in Death and Conspiracy to Commit Murder for Hire Resulting in Death are both Crimes of Violence under the Force Clause of Section 924(c)(3)(A).

Although acknowledging that Johnson did not invalidate the "force clause" contained in Section 924(c)(3)(A), Runyon contends that neither predicate crime properly qualifies as a crimes of violence under the "force clause."  Runyon asserts that the "physical force" required under the force clause is a "violent force" or "strong physical force" capable of causing physical injury to another person.

> A.    Carjacking is a Crime of Violence.

Runyon contends that carjacking does not meet the requirements of the force clause because it can be accomplished by putting someone in fear of future injury, which does not

102

**JA632**

require the use (actual, attempted or threatened) of "violent force."  Additionally, Runyon claims that because the act of putting someone in fear of injury can be done without an intentional threat of physical force, it fails to satisfy the intentional *mens rea* required by the force clause.

Runyon overlooks that he was convicted of the crime of Carjacking Resulting in Death – which required the jury to find the specific element that death resulted from the carjacking.  It can hardly be said that this charge does not require force under any definition.  Moreover, the carjacking statute, Section 2119, contains the specific *mens rea* that a defendant act with the "intent to cause death or serious bodily harm."  18 U.S.C. § 2119.  Thus, for the defendant to violate the statute, the jury had to determine that he took a motor vehicle, with the intent to cause death or serious bodily harm, and that death resulted.  The Fourth Circuit has held, "[u]nder the definitional requirements of § 924(c)(3), the carjacking statute is a crime of violence." *United States v. Johnson*, 32 F.3d 82, 85 (4th Cir. 1994).  *Cf. United States v. Seay*, 553 F.3d 732, 737-38 (4th Cir. 2009) (state statute that required proof that "the conduct must *objectively* cause distress by placing the person in fear of bodily harm" satisfied U.S.S.G. § 4B1.2(a)(1)'s standard of threatened use of physical force).

Runyon argues, however, that carjacking does not qualify under the elements clause of § 924(c)(3)(A) because it can be accomplished by 'fear of injury' which does not require the use, attempted use, or threatened use of 'violent force,'" which is the level of "physical force" required pursuant to *Johnson v. United States*, 559 U.S. 133 (2010).   In *Johnson*, the Court held that the phrase "physical force," for the purposes of ACCA's elements clause (which is similar to § 924(c)(3)(A)) means violent force, "that is, force capable of causing physical pain or injury to another person."  Id. at 140.  Despite Runyon's argument to the contrary, however, carjacking

(even absent the additional element of death resulting) is a crime of violence under the elements clause of § 924(c)(3)(A).

An offense is committed under the carjacking statute when the defendant "takes a motor vehicle . . . from the person or presence of another . . . by force and violence or by intimidation, or attempts to do so." 18 U.S.C. § 2119. "To obtain a conviction for carjacking, the government must prove that the defendant, (1) with intent to cause death or serious bodily harm, (2) took a motor vehicle, (3) that had been transported, shipped, or received in interstate or foreign commerce, (4) from the person or presence of another (5) by force and violence or by intimidation." *United States v. Fekete*, 535 F.3d 471 (6th Cir. 2008). Satisfying these requirements of the carjacking statute "encompasses 'the use, attempted use, or threatened use of physical force….'" *United States v. Moore*, 43 F.3d 568, 572-73 (11th Cir. 1995); see also *United States v. Mohammed*, 27 F.3d 815, 819 (2d Cir. 1994). Thus, carjacking is a crime of violence and appropriately qualifies as a predicate crime under § 924(c)(3)(A).

Additionally, the carjacking statute need not contain a "stand-alone" "threatening physical force" element in order for this court to conclude that such an element is encompassed within the elements of the offense. See *United States v. Anderson,* 695 F.3d 390, 401 (6th Cir. 2012) (element of force present where offense required proof of serious physical injury; "stand-alone physical force element" not required). Simply put, "[t]he term 'crime of violence' as Congress defined it in 18 U.S.C. § 924(c)(3) clearly includes carjacking. 'Tak[ing] or attempt[ing] to take by force and violence or by intimidation,' 18 U.S.C. § 2119, encompasses 'the use, attempted use, or threatened use of physical force....'" *Moore*, 43 F.3d at 572-73; *see also United States v. Brown*, 200 F.3d 700, 706 (10th Cir. 1999) ("The … offense of carjacking

is always a crime of violence because § 2119 requires taking or attempting to take a vehicle by force and violence or by intimidation….").

Runyon's argument depends on claiming that the "fear of injury" standard fails to satisfy § 924(c)(3)(A)'s requirement of a threatened use of "physical force." In his view, a carjacking victim could be intimidated through means that would not constitute force. In making this argument, he relies on *United States v. Torres-Miguel*, 701 F.3d 165 (4th Cir. 2012), a case that neither examined carjacking offenses or Section 924(c)(3). According to Runyon, *Torres-Miguel* establishes that some degree of violent force is required to establish a "crime of violence," such that a fear of future injury could not suffice. If a bank robber entered a bank, donned a gas mask, and threatened to kill everyone inside using poison gas, the robber's threat to gas everyone to death would not constitute a threatened use of the necessary physical force, according to the defendant. But Runyon reads too much into *Torres-Miguel* and fails to take into account later Supreme Court precedent in *United States v. Castleman*, 134 S. Ct. 1405, 14-14-15 (2014).

    B.    The Fourth Circuit has already rejected Runyon's narrow reading of "physical force" under federal robbery statutes.

Runyon is simply mistaken that the act of putting another in fear of injury fails to satisfy "physical force" under § 924(c)(3)(A) and in relying on interpretations of the intimidation element in the federal bank robbery statute (18 U.S.C. § 2113(a)). Applying § 924(c)(3)(A), the Fourth Circuit has previously held, "Armed bank robbery is unquestionably a crime of violence, because it 'has as an element the use, attempted use, or threatened use of physical force against the person or property of another.'" *United States v. Adkins*, 937 F.2d 947, 950 n.2 (4th Cir. 1991) (quoting § 924(c)(3)(A) and citing *United States v. Shavers*, 820 F.2d 1375 (4th Cir. 1987)).

C.      Defendant's reading of "physical force" cannot be squared with the Supreme Court's definitions of "physical force."

Runyon's argument also fails because the Supreme Court has defined physical force as "force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010).  In measuring the degree of force needed to count as "physical force" for a violent felony, *Johnson* drew the line at force that is sufficient to cause injury.  Poisoning and other means of killing a person satisfy that standard.  Notably, in keeping with both *Johnson* and Fourth Circuit precedent holding that robbery is a crime of violence, the Fourth Circuit explained that "[t]he test in this circuit for intimidation under § 2113(a) is whether 'an ordinary person in the teller's position reasonably could infer a threat of bodily harm from the defendant's acts.'"  *Woodrup*, 86 F.3d at 363 (*quoting Wagstaff*, 865 F.2d at 627; *Higdon*, 832 F.2d at 315).  Moreover, the Supreme Court stated that a permissible definition of "physical force" is "[f]orce consisting in a physical act, esp. a violent act directed against a robbery victim."  *Johnson*, 559 U.S. at 139 (quoting Black's Law Dictionary 717 (9th ed. 2009)).  It makes little sense to accept that "physical force" may be defined by the force used to accomplish robbery but then hold that robbery fails to satisfy the definition of physical force.

In *Castleman*, the Supreme Court rejected a Runyon's argument about Leocal and uses of force just like the one adopted in *Torres-Miguel*:

> [T]he knowing or intentional application of force is a "use" of force.  Castleman is correct that under Leocal v. Ashcroft, 543 U.S. 1 (2004), the word "use" "conveys the idea that the thing used (here, 'physical force') has been made the user's instrument."  Brief for Respondent 37.  But he errs in arguing that although "[p]oison may have 'forceful physical properties' as a matter of organic chemistry, . . . no one would say that a poisoner 'employs' force or 'carries out a purpose by means of force' when he or she sprinkles poison in a victim's drink," ibid.  The "use of force" in Castleman's example is not the act of "sprinkl[ing]" the poison; it is the act of employing poison knowingly as a device to cause physical harm.  That the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter.  Under Castleman's logic, after all, one could say

106

**JA636**

that pulling the trigger on a gun is not a "use of force" because it is the bullet, not the trigger, that actually strikes the victim. *Leocal* held that the "use" of force must entail "a higher degree of intent than negligent or merely accidental conduct," 543 U.S., at 9; it did not hold that the word "use" somehow alters the meaning of "force."

Castleman, 134 S. Ct. at 1414-15.

*Castleman* said it was not addressing whether knowingly or intentionally causing bodily injury counts as "physical force" under the definition used in the Armed Career Criminal Act. 134 S. Ct. at 1414-15. But, again, the Supreme Court's 2010 *Johnson* opinion defined physical force as "force capable of causing physical pain or injury to another person." *Johnson*, 559 U.S. at 140. *Johnson* also endorsed a definition of physical force as "[f]orce consisting in a physical act, esp. a violent act directed against a robbery victim." *Johnson*, 559 U.S. at 139. And the author of Johnson, Justice Scalia, concurred in *Castleman*, reaffirming what *Johnson* said about the ACCA. 134 S. Ct. at 1416-17.

D.  <u>Defendant's reading of *Torres-Miguel* would improperly treat it as overruling the Fourth Circuit's prior precedent and would cause § 924(c)(3) to cover no federal criminal offense.</u>

The Fourth Circuit's cases like *Adkins* preclude adopting a reading of "physical force" that excludes first-degree murder and carjacking. Courts interpret statutory language "not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014) (quoting *Maracich v. Spears*, 133 S. Ct. 2191, 2209 (2013)). These "tools of divining meaning—not to mention common sense, which is a fortunate (though not inevitable) side benefit of construing statutory terms fairly" support that federal robbery offenses that can be accomplished through "intimidation" or "fear of injury" satisfy § 924(c)(3)(A). *Id.* *Cf. United States v. Washington*, 743 F.3d 938, 943 (4th Cir. 2014) ("In the time since circuit courts first interpreted [18 U.S.C.] § 2423(a) . . . Congress has

amended the statute numerous times but has never changed it to require the result [the defendant] urges here."). *Abbott*, 562 U.S. at 23 (noting numerous amendments that "expanded the reach or increased the severity of § 924(c)").

Taken collectively, Runyon's theories result in virtually no federal criminal offenses falling within § 924(c)(3)(A). That is true because federal criminal offenses routinely encompass means of causing serious bodily harm that are broader than defendant's interpretation of "physical force." Indeed, even a statute that seemingly tracks the language of § 924(c)(3)(A)— such as 18 U.S.C. § 1512(a)(2)—turns out to rely on a broader definition of "physical force" than defendant's. See 18 U.S.C. § 1515(a)(2) (defining "physical force" as "physical action against another . . . includ[ing] confinement"). Runyon's reading of "physical force" not only leaves § 924(c)(3)(A) with little application, *Castleman*, 134 S. Ct. at 1434, his reading essentially destroys the provision. And courts "cannot interpret federal statutes to negate their own stated purposes." *King v. Burwell*, 135 S. Ct. 2480, 2493 (2015) (*quoting New York State Dept. of Social Servs. v. Dublino*, 413 U.S. 405, 419-20 (1973)). In Leocal, the Supreme Court observed that "we cannot forget that we ultimately are determining the meaning of the term "crime of violence." 543 U.S. at 383. First-degree murder and carjacking are crimes of violence, and they have as elements the use, attempted use, and threatened use of physical force.

Both *Leocal* and *Garcia* dealt with offenses that had a *mens rea* of recklessness or negligence, but carjacking is not such an offense. A defendant cannot be guilty of carjacking— taking a vehicle from a person against that person's will—through a recklessness or negligence mens rea. Runyon's theory both misunderstands the *mens rea* for carjacking and misconstrues *Leocal* and *Garcia*. As to the mens rea, in analyzing bank robbery under § 2113(a), the Supreme Court has explained that "we read subsection (a) as requiring proof of general intent—that is,

108

**JA638**

that the defendant possessed knowledge with respect to the actus reus of the crime (here, the taking of property of another by force and violence or intimidation.).” *Carter v. United States*, 530 U.S. 255, 267 (2000). Although a defendant need not intend to intimidate the person from whom the defendant is taking property against that victim's will, the defendant must know (a) that he is taking property against the victim's will and (b) that the defendant's actions in accomplishing that involve force or are objectively intimidating. See, e.g., United States v. *Bradshaw*, 580 F.3d 1129, 1132-33 (10th Cir. 2009) (citing Carter and noting that the “jury could infer that [the defendant] acted with a knowing intent to intimidate”). This *mens rea* exceeds negligence and recklessness and hence satisfies *Leocal and Garcia.*

E.    Conspiracy to Commit Murder for Hire Resulting in Death is a Crime of Violence.

Runyon also contends that a conspiracy to commit murder for hire is not a crime of violence because it is the agreement that is the crime. As carjacking is clearly a crime of violence under the force clause and was a predicate for the Section 924(j) charge, there is no reason for the Court to reach this claim. Should the Court do so, however, the conspiracy charge at issue does constitute a crime of violence.

In contending that a conspiracy charge cannot constitute a crime of violence under the force clause, Runyon overlooks the clear fact that his conviction under 18 U.S.C. § 1958(a) expressly required the jury to find that death resulted from the agreement. It was the finding of this additional element – that death resulted - that increased the maximum penalty to death and even made him eligible for the death penalty on Count One. 18 U.S.C. § 1958(a). A conviction of conspiracy to commit murder for hire resulting in death does meet the requirements of the force clause because the elements require a resulting death, which arises from the use of physical force being set in motion to cause that death. In this vein, the charge is not an inchoate crime

109
**JA639**

because the object of the conspiracy must occur for a defendant to be subject to the enhanced penalty.

Other courts have determined that a conspiracy to commit murder for hire constitutes a crime of violence for purposes of Section 924(c). See *United States v. Walker*, 596 Fed. Appx. 302, 313, cert. denied 135 S. Ct. 2393 (June 1, 2015). As the Fourth Circuit opined in *United States v. Laskin*, 926 F.2d 372, 379 (4th Cir. 1991) in finding that a violation of related Section 1952A constituted a crime of violence, "[o]ne can hardly conceive of a more cold-blooded violent act than murder-for-hire." Although acknowledging that the Fourth Circuit has determined conspiracy to be a crime of violence under the residual clause, *United States v. White,* 571 F.3d 365 (4th Cir. 2009), Runyon claims that under Johnson, this finding is invalidated. For the reasons already set forth, it continues to qualify as a crime of violence under the residual clause. But the additional element of death resulting also meets the requirements of the force clause.

F.      The sentence of death on Count One was not improperly tainted by the sentence on Count Five.

Runyon concludes that the death sentence he received on Count One must also be vacated because the evidence and arguments presented at trial with respect to the Section 924(j) offense "painted an in inappropriate picture of the conspiracy offense and contributed to the jury's sentencing decision for the conspiracy charge." *See* ECF 478, pgs. 80-81.

Runyon asserts, with no authority, that a new sentencing is required. Though Runyon's categorical approach to reviewing the Section 924(j) conviction requires a review of the statute and not the underlying facts, he submits that those same underlying facts should be considered in granting a new sentence because this was a "close case" and the jury questioned the result if it could not agree on a sentence. But the jury found that the government had proven all

110

**JA640**

aggravating factors alleged beyond a reasonable doubt and many of the aggravating factors related to the planning, pecuniary gain and training that Runyon had to commit this murder for hire.  In short, the Conspiracy to Commit Murder for Hire charge was, if anything, a murder crime of the highest culpability.

Runyon wrongly claims, however, that the Section 924(j) conviction required a higher level of culpability than that of the Conspiracy to Commit Murder for Hire conviction.  He offers no authority for this claim and it is without merit.  The two predicate offenses behind the Section 924(j) conviction were death eligible offenses that, even by Runyon's argument, were properly before the jury.  The Section 924(j) count did not result in the jury determining that additional criminal activity took place because the predicate offenses in Counts One and Two contained the same activity as did the predicate crimes of violence for the Section 924(j) charge.

With respect to the Count One conviction, the jury also had to determine that the defendant intended to murder Cory Voss.  Moreover, prior to the case proceeding to the penalty phase, the jury had to first determine that the defendant did, in fact, intend to murder Cory Voss in order for the defendant to be eligible for the death penalty.  The jury made this finding with respect to both Counts One and Two along with finding the aggravating factor of substantial planning.  ECF No. 255.  With these findings firmly in place with respect to Counts One and Two prior to the penalty phase, there is no merit to the claim that the Section 924(j) conviction on Count Five required an enhanced culpability that somehow impacted the jury's sentencing decision.

111

**JA641**

**Claim 10 :**  **<u>Runyon is barred from relitigating whether the jury instructions</u>**
**<u>impermissibly lowered the burden of proof regarding the weighing of</u>**
**<u>aggravating factors.</u>**

Runyon claims that the jury instructions given in his case that permitted a finding that aggravating factors "sufficiently outweigh" mitigating factors impermissibly lowered the burden of proof in violation of his Fifth, Sixth, and Eighth Amendment rights. *See* ECF 478, pgs. 97–99. He concedes, as he must, that this claim was raised and rejected in his direct appeal. *See United States v. Runyon*, 707 F.3d 475, 515–16 (4th Cir. 2013). He argues, however, that any bar to relitigating his claim does not apply because the claim is related to the issue presented in *Hurst v. Florida*, 136 S. Ct. 616 (2016), a case in which the Supreme Court recently decided that Florida's death penalty scheme violates *Ring v. Arizona*, 536 U.S. 584 (2003). But the decision in *Hurst* does not affect the issue Runyon raises here, and no exception to the relitigation bar applies. Further, this claim is barred under the non-retroactivity doctrine.

A.     <u>Legal Principles</u>

Issues raised on direct appeal may not be raised in a collateral attack, such as a Section 2255 motion. *Boeckenhaupt v. United States*, 537 F.2d 1182 (4th Cir. 1976). A federal prisoner generally cannot raise on collateral review a claim that was previously decided on direct review. *See Withrow v. Williams*, 507 U.S. 680, 720-21 (1993) (Scalia, J., concurring) (collecting cases); *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000); *United States v. Perez*, 129 F.3d 255, 260 (2d Cir. 1997); *Argencourt v. United States*, 78 F.3d 14, 16 n.1 (1st Cir. 1996); *Olmstead v. United States*, 55 F.3d 316, 319 (7th Cir. 1995); *Thompson v. United States*, 7 F.3d 1377, 1378-79 (8th Cir. 1993) (per curiam); *Cabrera v.United States*, 972 F.2d 23, 25 (2d Cir. 1992); *United States v. DeRewal*, 10 F.3d 100, 105 n.4 (3d Cir. 1993); *Kastenbaum v. United States*, 588 F.2d 138, 139 (5th Cir. 1979) (per curiam); *Oliver v. United States*, 90 F.3d 177, 180

(6th Cir. 1996). This rule extends the law-of-the-case doctrine to the federal-prisoner habeas context. The law-of-the-case doctrine is discretionary and subject to override based on the existence of exceptional circumstances. *See United States v. U.S. Smelting Refining & Mining Co.*, 339 U.S. 186, 199 (1950). An exercise of that discretion is rarely warranted. *See, e.g., United States v. McGee*, 201 F.3d 1022, 1023 (8th Cir. 2000) (per curiam); *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999). Typically, only an intervening change in the law—usually a new decision narrowly construing the statute of conviction—forms the basis form the basis for an order permitting relitigation, *See, e.g., Jones*, 178 F.3d at 796; *Davis v. United States*, 417 U.S. 333 (1974).

Collateral relief is further limited to claims based on established law. *Teague* at, 489 U.S. at 310 (1989). When the Supreme Court announces a new rule of law, it "applies to all criminal cases still pending direct review. As to convictions that are already final, however, the rule applies only in limited circumstances." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004) (citation omitted). Generally, new procedural rules do not apply retroactively, while new substantive doctrines—those that alter the range of punishable conduct or the class of punishable people—do. *Id*. at 351–52.

B.       Argument

Runyon attempts to circumvent the relitigation bar by claiming that *Hurst v. Florida*, represents a change in the law. But *Hurst* is not helpful to Runyon for two reasons: (1) the Supreme Court's decision in *Hurst* does not represent a change in the law with respect to the issue Runyon raised on direct appeal, and (2) even if *Hurst* did represent a change in the law, relief here is barred under *Teague*.

The issue the Supreme Court decided in *Hurst* was whether Florida's death sentencing scheme violated the Sixth Amendment or Eighth Amendment in light of *Ring v. Arizona*, 536 U.S. 584 (2002). *Hurst*, 136 S. Ct. at 621. Florida's sentencing scheme allowed a jury to recommend a death sentence, but required a judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing a death sentence. *Id*. at 620. The Supreme Court found that Florida's sentencing scheme violated the Sixth Amendment and its *Ring* decision because Florida did not allow a jury to make the critical findings necessary to impose death. *Id*. at 622.

Runyon's claim is not affected by the decision in *Hurst*. Here, Runyon does not allege that the critical decision necessary to impose death was taken from the jury. To the contrary, the claim raised here challenges whether the jury needed to find that the aggravating factors outweighed the mitigating factors beyond a reasonable doubt. But, as the Fourth Circuit found, the plain language of the FDPA provides that the jury must determine "whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death." *Runyon*, 707 F.3d at 516. Moreover, other courts have found that the reasonable doubt standard does not apply to the weighing of aggravating and mitigating factors, "reasoning that that process constitutes not a factual determination, but a complex moral judgment." *Id*.; *United States v. Gabrion*, 719 F.3d 511, 533 (6th Cir. 2013) (en banc) (citing cases). Runyon is barred from relitigating this claim.

Finally, even if *Hurst* did represent a change in the law, Runyon would not be entitled to relief because his conviction and sentence was final on October 6, 2014, and new rules do not apply to cases on collateral review. *Teague*, 489 U.S. at 310. Further, neither of the *Teague* exceptions to non-retroactivity apply here. For these reasons, this claim should be dismissed.

<div align="center">

114

**JA644**

</div>

**Claim 11:** <u>**Runyon is procedurally barred from raising a claim that the aggravating factors fail to narrow, or are vague and overbroad; the claim lacks merit in any event.**</u>

In Claim 11, Runyon contends his death sentences are unconstitutional because they are based on aggravating factors that fail to narrow the class of death eligible defendants, and are arbitrary and overbroad.  ECF 478 at 99–101.[14]  Specifically, he argues that the aggravating factors in his case—pecuniary gain and substantial planning and premeditation—are unconstitutional because they mirror the conduct required for conviction.  In addition, Runyon claims that the non-statutory aggravating factors presented at trial are arbitrary and overbroad.

A.     <u>Statutory Aggravating Factors</u>

Runyon's claim that the statutory aggravating factors are unconstitutional is procedurally barred.  *Bousley v. United States*, 523 U.S. 614, 622 (1998).  This claim was not raised in his direct appeal and Runyon fails to demonstrate cause for his procedural default or actual prejudice.  The cause and prejudice standard requires Runyon to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error.  *Frady*, 456 U.S. at 170; *Coleman v. Thompson*, 501 U.S. 722, 753 (1991).

This claim is also barred by the non-retroactivity doctrine.  *See Teague v. Lane*, 489 U.S. 288, 310 (1989).  As of October 6, 2014, when Runyon's convictions and death sentence became final, existing precedent did not dictate a grant of relief on Runyon's claim.  There is no precedent or statute prohibiting the use of aggravating factors that mirror the offense elements as violative of the Eighth Amendment.  *See United States v. Coonce*, No. 10-3029-01-CR-S-GAF,

---

[14] Other than different paragraph breaks, the content of this claim is unchanged from the original motion.

2014 WL 1018081, at *5–6 (W.D. Mo. March 14, 2014); *United States v. Sablan*, 2013 WL 5423621, at *7 (E.D. Cal. Sep. 26, 2013). Runyon's reliance on *Apprendi v. New Jersey*, 530 U.S. 466, 483 (2000), to argue a Sixth Amendment violation is misplaced. *Apprendi* held that the Sixth Amendment required a jury to determine any fact that increases the penalty for a crime beyond the prescribed statutory maximum. *Id*. at 490. Here, the jury determined the aggravating factors beyond a reasonable doubt and the Sixth Amendment does not prohibit aggravating factors that mirror the elements of the offense.

Procedural default and non-retroactivity notwithstanding, Runyon's claim regarding the statutory aggravating factors lacks merit. An element of an underlying offense may be presented as an aggravating factor when the class of defendants eligible for the death penalty are narrowed at the guilt stage, as opposed to the penalty phase. *Lowenfield v. Phelps,* 484 U.S. 231, 246 (1988). Thus, "the aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)." *Tuilaepa,* 512 U.S. at 972 (citing *Lowenfield,* 484 U.S. at 244–46). The presentation of aggravating factors assists the jury in the penalty phase in its role of making "an individualized determination on the basis of the character of the individual and the circumstances of the crime" to decide which defendants eligible for the death penalty "will actually be sentenced to death." *Zant v. Stephens,* 462 U.S. 862, 878–79 (1983). The use of special findings that mirror offense elements therefore is permissible.

Moreover, the intent factors that were proven beyond a reasonable doubt under the procedural structure of the FDPA serve to narrow the class of eligible defendants. *See* 18 U.S.C. § 3591(a)(2)(A–D). The fact that two statutory aggravating factors mirror elements of the offenses Runyon was convicted of does not violate any constitutional principle. The jury is entitled to consider the circumstances of the offense in making the individualized determination

116

**JA646**

of "whether a defendant eligible for the death penalty should in fact receive that sentence." *Tuilaepa*, 512 U.S. at 972. This claim should be denied.

        B.        <u>Nonstatutory Aggravating Factors</u>

Runyon also claims that the non-statutory aggravating factors were vague and overbroad and asks that his death sentence be vacated. Runyon did challenge the non-statutory aggravating factors on direct appeal. *Runyon*, 707 F.3d at 491–507. As noted, issues raised on direct appeal may not be raised in a collateral attack such as a Section 2255 motion. *Withrow*, 507 U.S. at 720–21. Runyon fails to cite any intervening change in the law excusing this re-litigation bar. This claim is thus barred from consideration here.

Even if the re-litigation bar does not apply, Runyon's claim lacks merit. Runyon's trial counsel did raise claims challenging statutory and non-statutory aggravating factors prior to trial. ECF 91, pgs. 61–62 and ECF 195. Specifically, in ECF 91, Runyon argued that the aggravating factors listed in the FDPA fail to narrow the class of persons eligible for the death penalty from the entire category of persons convicted of crimes involving "intentional" killings. *Id*. at 61. He argued, like here, that the aggravating factors were indistinguishable from the elements of the offenses. *Id*. at 62. In addition, Runyon challenged the non-statutory aggravating factors by claiming they were overbroad, vague, and that the government's "unconstrained ability to allege various non-statutory aggravators injects impermissible randomness into the process." *Id*. at 68. *See also* ECF No. 195 (challenging the specific non-statutory aggravating factors alleged by the Government). This Court denied Runyon's claims that the statutory aggravating factors failed to narrow the class of persons eligible for the death penalty, and that the non-statutory aggravating factors were arbitrary. ECF 143 at 5–6, and ECF 217. Moreover, the Fourth Circuit thoroughly analyzed Runyon's constitutional challenge to the non-statutory aggravating factors and denied

<div align="center">117</div>

<div align="center">**JA647**</div>

the claims. *Runyon*, 707 F.3d at 491–507. There has been no intervening change in the law since this Court or the Fourth Circuit denied Runyon's challenge to the aggravating factors. Indeed, Runyon fails to cite any law in support of his contention that the non-statutory aggravating factors were not rational or contributed to an arbitrary death sentence. For the reasons stated in this Court's pretrial orders and the Fourth Circuit's opinion, this claim should be denied.

### Claim 12: Trial counsel was not ineffective in failing to raise a selective prosecution claim.

Runyon next contends that the Government's process in which it determines whether to seek the death penalty is influenced by race, in violation of the Fifth and Eighth Amendments to the United States Constitution. Specifically, he claims that his trial and appellate counsel were ineffective for failing to raise this claim below. He also requests discovery and an evidentiary hearing. *See Petitioner Brief* at 103.

In order to prevail, Runyon must show: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) he suffered actual prejudice. *Strickland*, 466 U.S. at 687. Runyon must satisfy both prongs of the *Strickland* test in order to prevail. *Roane*, 378 F.3d at 404. Where a court finds that "the defendant makes an insufficient showing on one" of the prongs, consideration of the other is unnecessary. *Merzbacher*, 406 F.3d at 365–66 (quoting *Strickland*, 466 U.S. at 697).

Runyon cannot demonstrate that his counsel performed deficiently or that there is "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. He fails to demonstrate a credible showing of discriminatory effect or discriminatory purpose, he necessarily cannot meet his burden in showing that counsel was ineffective for failing to raise this claim. Moreover, because

118

**JA648**

he has proffered no evidence that meets the rigorous burden establishing a selective prosecution claim, he cannot demonstrate prejudice under *Strickland*. Any selective prosecution claim would have been denied. This claim should be denied.

To demonstrate the existence of prejudicial ineffectiveness, Runyon must establish "a reasonable probability that but for" his counsel's failure to raise this claim, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687. The selective prosecution claim Runyon presents here would not have changed the outcome of his case.

A person raising a selective prosecution claim, as Runyon does here, must establish: (1) the federal prosecutorial policy had a discriminatory effect and (2) it was motivated by a discriminatory purpose. *See United States v. Armstrong*, 517 U.S. 456, 465 (1996); *see also United States v. Venable*, 666 F.3d 893, 900 (4th Cir. 2012). This requires a defendant to establish that "similarly situated individuals of a different race were not prosecuted," *Armstrong*, 517 U.S. at 469–70, and that the decision to prosecute was invidious or in bad faith. *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996).

The standard of proof for a selective prosecution claim is a "demanding" one, *Armstrong*, 517 U.S. at 463, because a claimant is requesting the judiciary to exercise power over a "special province" of the executive branch, *id*. at 464, and judicial review of prosecutorial decisions could "chill law enforcement by subjecting the prosecutor's motives and decision making to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy." *Id*. at 465.

Runyon proffers little, if any, evidence to support his claim here. He cites to a study done by Lauren C. Bell, Ph.D., a report by a subcommittee of the Judiciary Committee from 1994, and a survey of death penalty cases from 1988 to 2000 taken by the Department of Justice. Other

119

**JA649**

than a bald assertion that the Government process is racially influenced, he makes no argument that similarly situated individuals of a different race were not prosecuted, nor does he demonstrate that there is a racially disproportionate pattern of capital charging.   Trial and appellate counsel was not ineffective for failing to raise this claim because the claim lacks merit. Runyon cannot show that he suffered actual prejudice from the failure to raise this claim.

Moreover, conclusory and unsupported statements are insufficient for habeas relief. *United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004).   Thus, "vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court."   *United States v. Dyess*, 730 F.3d 354, 359–60 (4th Cir. 2013) (quoting *United States v. Thomas,* 221 F.3d 430, 437 (3d Cir. 2000)); s*ee also Jones v. Gomez,* 66 F.3d 19, 204 (9th Cir. 1995) (noting "conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief") (internal quotation marks omitted); *Andiarena v. United States,* 967 F.2d 715, 719 (1st Cir. 1992) (holding claim that included "wholly conclusory" "abstract allegation" was "properly subject to summary dismissal").

Runyon is not entitled to discovery on this claim.   The same justifications supporting the "rigorous standard" to prove a selective prosecution claim also require a correspondingly "rigorous standard" to obtain discovery in aid of such a claim.   *Id*. at 468; *Olvis*, 97 F.3d at 743. To obtain discovery on a selective prosecution claim, a defendant must show "some evidence of both discriminatory effect and discriminatory intent."   *United States v. Bass*, 536 U.S. 862, 863 (2002) (citing *Armstrong*, 517 U.S. at 465).   *Armstrong's* "some evidence tending to show" standard is not to be treated lightly.   *See Olvis*, 97 F.3d at 743.   Given the heavy burden that discovery can impose on the government, the showing necessary to obtain discovery for a selective prosecution claim must "itself be a significant barrier to the litigation of insubstantial

claims." *Id*. (quoting *Armstrong*, 517 U.S. at 464 (noting that a significant barrier to discovery is necessary because discovery "imposes many of the costs present when the government must respond to a prima facie case of selective prosecution")).[15]

A defendant cannot satisfy the discriminatory effect prong by providing statistical evidence that simply shows that the challenged government action tends to affect one particular group. *James*, 257 F.3d at 1179. Rather, the proffered statistics must address the critical issue of whether the particular group was treated differently than a similarly situated group. *Id*. (rejecting statistical studies); *Armstrong*, 517 U.S. at 470 (rejecting statistical studies that failed to identify similarly-situated persons of other races who were treated differently); *Olvis*, 97 F.3d at 745–46.

In *Bass*, a federal capital defendant moved to dismiss the notice of intent to seek the death penalty on the grounds that the government was seeking the death penalty against him because he was black. 536 U.S. 862–63. In the alternative, like defendant here, Bass sought discovery as to the Government's charging practices. The district court granted the motion for discovery, and dismissed the notice of intent when the Government refused to obey the discovery order. *Id*. at 863. The Sixth Circuit affirmed the district court, finding a DOJ study, Department statements, and other statistical evidence met the *Armstrong* requirements of demonstrating both a discriminatory effect and discriminatory purpose. *United States v. Bass*, 266 F.3d 532, 536 (6th Cir. 2001). The Supreme Court, in a *per curiam* opinion, reversed, holding that the defendant had failed to show evidence of discriminatory effect. 536 U.S. at 863–64. The Court stated:

---

[15] *See also United States v. Wilson*, 262 F.3d 305, 315–16 (4th Cir. 2001) ("Because of th[e] necessary presumption of prosecutorial regularity, a presumption of vindictive prosecution, or any other type of selective prosecution, must be supported by a showing sufficiently strong to overcome the presumption of prosecutorial regularity. Indeed, even before a court allows a defendant to have discovery on the government's prosecutorial decisions, the defendant must overcome a significant barrier by advancing objective evidence tending to show the existence of prosecutorial misconduct. The standard is a rigorous one.") (relying on *Armstrong*)).

> Even assuming that the *Armstrong* requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decision-makers in respondent's case), raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*.

536 U.S. at 864. The Court held that "[t]he Sixth Circuit's decision is contrary to *Armstrong* and threatens the performance of a 'core executive constitutional function.'" *Id.* Thus, the Court established that the framework set forth for adjudicating selective prosecution claims in *Armstrong* controls.

In order to meet the rigorous standard for discovery set forth in *Armstrong* and *Bass*, Runyon must be able to point to instances where the Government elected not to seek the death penalty against Caucasian men who had committed offenses similar to Runyon's. He must also be able to show that these men had similar personal backgrounds or social histories, similar criminal records, and similar motivations for killing their victims. *See Taylor*, 608 F. Supp.2d at 1266 (indicating defendants are similarly situated when their circumstances present "no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions").

Runyon fails to make any argument that the Government elected not to seek the death penalty against similarly situated defendants. He attempts to meet this rigorous standard by citing only to a study conducted by Lauren C. Bell, Ph.D.,[16] and "statistics" kept by the Federal Death Penalty Resource Counsel. *See Petitioner Brief* at 95.

The Bell study and the citation to other statistics, however, represent the same types of broad statistical analyses that were rejected in *Bass* and numerous other federal capital cases.

---

[16] Runyon has provided a declaration from Dr. Bell. This is the same declaration referencing the same study that has been advanced by other capital defendants and rejected as insufficient to support a claim of selective prosecution and request for discovery by federal courts in *United States v. Montgomery*, No. 2:11-cr-20044-JPM-1, 2014 WL 1453527, at *8 (W.D.Tenn. April 14, 2014); *United States v. Sablan*, No. 1:08-CR-00259-PMP, 2014 WL 172533, at *1 (E.D.Cal. January 15,2014); *Lecco*, 2009 WL 3347108, at *4–6.

<div align="center">

122

**JA652**

</div>

*See Bass*, 536 U.S. at 864; *Taylor*, 608 F.Supp.2d at 1266-67; *United States v. Lecco*, No. 2:05-00107-01, 2009 WL 3347108, at \*4, \*6 (S.D.WV. October 15, 2009). These studies do nothing to inform this Court about the actual decision makers in defendant's case here. Moreover, they do not explore how any of the cited cases truly involve similarly-situated defendants beyond merely showing the race and gender of defendants and victims and bare sketches of the charges in the cases.

The focus of Dr. Bell's study was the outcome of capital cases, not the charging decisions in capital cases. Thus, her study is not applicable to defendant's future selective prosecution claim in this case. Moreover, her study actually seems to indicate that the Government does ***not*** seek the death penalty in cases involving white female victims at a higher rate than other types of victims. Dr. Bell's affidavit indicates that in 397 authorized cases submitted for analysis, only 76 involved white female victims. Further, Dr. Bell's study looks only at "raw statistics." There is no analysis of the cases beyond the mere race of the victims to determine if the cases involved "similarly situated" defendants. Accordingly, this evidence is also insufficient to support Runyon's claim or his request for discovery.

Moreover, the procedure used to determine in which cases capital punishment will be sought demonstrates the absence of discriminatory intent. Decisions to seek the death penalty within the federal system are made pursuant to a particular protocol which was promulgated by the Department of Justice ("DOJ") shortly after the enactment of the Federal Death Penalty Act and now appears in Title 9, Section 10, of the United States Attorneys' Manual ("USAM"). Under the protocol, a U.S. Attorney must initially decide whether to charge a defendant in her district with a capital-eligible offense. Once a defendant is charged with such an offense, the U.S. Attorney must make a detailed submission to DOJ that includes a recommendation for or

123

**JA653**

against seeking the death penalty. *See* USAM § 9–10.040. The submission is reviewed by the Attorney General's Review Committee on Capital Cases, which makes its own recommendation, but not before providing defense counsel an opportunity to make a submission and to present to the Committee the reasons why the death penalty should not be sought. *Id*. at § 9–10.120. The Attorney General then makes the final decision whether to seek or not to seek capital punishment, based on standards that track the factors a jury is required to consider under the FDPA. *See id*. at §§ 9–10.120, 9–10.130. The protocol provides that bias for or against an individual based upon characteristics such as race or ethnic origin may play no role in the decision whether to seek the death penalty. *Id*. § 9–10.030. In fact, in most cases, DOJ's decision-makers are not aware of the race of the defendant or victim.

In sum, Runyon's evidence does not examine the nature and circumstances of the particular defendants who may be similarly situated or the nature of the crimes of which they were accused. *See Lecco*, 2009 WL 3347108, at *6. The statistics also do nothing to examine the backgrounds of the defendants or the victims—the crucial type of information that is used to determine if the Government is justified in seeking the death penalty in a certain case. Further, Runyon does nothing to explain why these studies or statistics could possibly support a selective prosecution claim. We are left with endless questions of who in the various data sets is similarly situated, what aggravating factors motivated the decision to seek the death penalty, and what mitigating factors or other prosecutorial considerations may have militated against seeking the death penalty in those cases. Accordingly, Runyon fails to proffer any evidence, let alone some evidence, demonstrating that this claim would have been successful. Trial counsel was not ineffective for failing to raise this claim.

**Claim 13:** <u>**Runyon's sentence of death was neither disproportionate or**</u>
<u>**arbitrary.**</u>

Runyon claims that his death sentences are disproportionate and arbitrary based on his belief that his co-defendant Michael Draven is more deserving of death. Based on the disparity in sentencing between Runyon and Draven, and the purported "clear evidence" that race played a role in Runyon's sentencing, Runyon asks this Court to vacate his sentences. In addition, Runyon has added untimely claims of ineffective assistance of trial and appellate counsel for failing to raise this claim.

A. <u>Runyon's claim is procedurally defaulted.</u>

Runyon could have raised on direct appeal the challenge he raises here, and because he did not, his claim is procedurally defaulted. *See Massaro v. United States*, 538 U.S. 500, 504 (2003). A collateral attack under § 2255 may not substitute for an appeal. *Bousley v. United States*, 523 U.S. 614, 622 (1998). Claims that could have been but were not raised on direct appeal are procedurally barred from review under § 2255, unless the defendant demonstrates "cause" for his default and "actual prejudice" or demonstrates actual innocence. *Id*. The cause and prejudice standard requires Runyon to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error. *Frady*, 456 U.S. at 170; *Coleman v. Thompson*, 501 U.S. 722, 753 (1991). This is a "significantly higher hurdle" than the plain error standard required to overcome the default. *United States v. Olano*, 507 U.S. 725 (1983); *Frady*, 456 U.S. at 166. If Runyon cannot show cause and prejudice, he cannot have his claim considered unless he can satisfy the actual innocence exception. *Bousley*, 523 U.S. at 623.

**JA655**

Runyon has not presented any argument establishing cause for failing to raise this claim on appeal, nor has he raised any argument demonstrating actual prejudice or actual innocence. He cannot show that a factor external to the defense prevented trial counsel from raising his present constitutional claim. Further, he cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 347 (1992)). This claim should be denied as procedurally defaulted.

B.      Runyon's claim is also barred by Teague non-retroactivity.

Runyon's claim is also barred by the non-retroactivity doctrine. Under *Teague v. Lane*, 489 U.S. 288 (1989), and its progeny, a defendant may not rely on a "new" rule of "procedure" in seeking to overturn his conviction on collateral review. *See Teague*, 489 U.S. at 310. Here, the constitutional rule Runyon proposes, comparative proportionality review between sentences received by similarly charged defendants, is clearly not one dictated by precedent existing as of October 6, 2014—the date Runyon's convictions became final—and indeed is without support in existing precedent. Further, neither of the two *Teague* exceptions to non-retroactivity applies. Accordingly, Runyon's claim is barred for this additional reason.

C.      Procedural default notwithstanding, this claim has no merit.

Finally, Runyon's claims fail on their merits. Runyon argues that his death sentence is arbitrary because the Government selected to seek death against him and not his co-defendant Draven. Specifically, he claims that the evidence demonstrates that Draven, not Runyon, was more worthy of a death sentence. But Runyon provides no evidence demonstrating that the Government unlawfully or discriminatorily exercised its prosecutorial discretion. Moreover, to the extent that Runyon's claim is one of proportionality review, his claim fails because the

126

**JA656**

Constitution does not require comparative proportionality review of sentences received by defendants convicted of the same crime. This claim should be denied.

Runyon's claim is nothing more than a claim for proportionality review. But the Eighth Amendment does not require comparative proportionality review between sentences received by similarly situated defendants. *Pulley v. Harris*, 465 U.S. 37, 50–51 (1984); *United States v. Higgs*, 353 F.3d 281, 321 (4th Cir. 2003). A defendant therefore may not "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *McCleskey v. Kemp*, 481 U.S. 279, 306–07 (1987) (emphasis in original). Runyon's claim fails on its merit.

To the extent Runyon claims the Government unlawfully exercised its discretion in noticing death against Runyon and not Draven, the claim likewise fails. "[O]ur constitutional system leaves it to the discretion of the Executive Branch to decide who will face prosecution." *United States v. Passaro*, 577 F.3d 207, 219 (4th Cir. 2009) (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996). This discretion includes the decision whether to seek the death penalty. *See McClesky v. Kemp*, 481 U.S. 279, 296–97 (1987). "Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id*. at 297.

Runyon fails to proffer "clear proof" that the Government exercised its discretion on some impermissible basis. Draven's background is not relevant to the discretionary decision to seek the death penalty against Runyon. Indeed, the Fourth Circuit found that the "prosecution exercised its discretion on the basis of a number of distinctions between Runyon and the other defendants . . . ." *Runyon*, 707 F.3d at 520, n.6. Finally, this Claim is much like the selective

127

**JA657**

prosecution claim Runyon argues in Claim 12. For the above reasons, and those argued in Claim 12, this claim should be denied.

D.    <u>Runyon's additional IAC claims are untimely.</u>

Runyon added separate claims of ineffective assistance of both trial and appellate counsel to this claim. These claims are different in nature than the claim raised in the original § 2255 motion, nor do the new claims arise "out of the conduct, transaction, or occurrence set forth . . . in the original pleading." Fed. R. Civ. P. 15(c)(2). The original claim is a constitutional attack on Runyon's death sentence, not a specific challenge to counsels' performance. There is no "common core of operative facts uniting the original and newly asserted claims." *Mayle v. Felix*, 545 U.S. 644, 659 (2005). They are wholly different claims that are not related. *See e.g., United States v. Lynn*, No. 3:08-CR-82, 2014 WL 3858543, at \*\*10–11 (E.D. Va Aug. 5, 2014)(finding additional ineffective assistance of counsel claims different from original claims not timely and not related back under Rule 15).

Even assuming these additional new claims are timely and related back, Runyon cannot demonstrate prejudice for counsels' failure to raise this claim. As stated above, the claim has no merit and Runyon has failed to demonstrate that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 696.

**Claim 14:**    **<u>Runyon's sentence does not violate the Eighth Amendment as there is no precedent to shield mentally ill individuals from the death penalty.</u>**

Runyon contends that his death sentence violates the Eighth Amendment because he is severely mentally ill. (Doc. 478 at 105–07.) Relying on *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Roper v. Simmons*, 543 U.S. 551 (2005), Runyon argues that this Court should promulgate a new constitutional rule barring the execution of individuals displaying severe mental illness at the time of their capital offense. He reasons that such persons are less morally culpable because

the mental illness diminishes their capacity to "understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *See* ECF, pg. 117 (quoting *Atkins*, 536 U.S. at 318–20).

This claim fails for several reasons. First, the claim is procedurally defaulted and Runyon does not attempt to proffer any argument demonstrating cause and prejudice for his default. Second, this claim is *Teague*-barred. Third, the claim fails on its merits. The Supreme Court has not established a *per se* exemption to capital prosecution for the mentally ill.

A.  Runyon's claim is procedurally defaulted.

As stated above, the procedural default doctrine generally bars § 2255 review of claims that could have been, but were not, presented at an earlier stage of the litigation unless the defendant shows "cause" and "prejudice" to excuse the default. *Frady*, 456 U.S. at 170. The cause and prejudice standard requires Runyon to show not only that some objective factor external to the defense impeded his effort to raise the issue as required by each relevant procedural rule, but also that the error alleged worked against his actual and substantial disadvantage, infecting his entire trial with error. *Id.*; *Coleman*, 501 U.S. at 753.

Here, Runyon does not attempt to make any showing that a factor external to the defense prevented trial counsel from raising this claim. Further, he cannot show "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup*, 513 U.S. at 323 (quoting *Sawyer*, 505 U.S. at 336, 347).

**JA659**

B.       Runyon's claim is also barred by Teague non-retroactivity.

Runyon's claim is also barred by the non-retroactivity doctrine.  *See infra* Claim 12.

*Teague*, and its progeny, bar defendants from relying on a "new" rule of procedure in seeking to

overturn their convictions on collateral review.  489 U.S. at 310.  The rule Runyon posits here

was not dictated by precedent at the time his conviction became final, thus it is a "new" rule

under *Teague*.  Indeed, the constitutional rule Runyon proposes is without support in existing

precedent.    Further,  neither  of  the  two  *Teague*  exceptions  to  non-retroactivity  applies.

Accordingly, Runyon's claim is barred for this additional reason.

C.       Runyon's constitutional claim is without merit in any event.

1.   There is no national consensus in favor of a blanket exemption to capital
     punishment for the mentally ill.

At the outset, it is clear and undisputed that the Supreme Court has not recognized mental

illness as a *per se* bar to execution.  *See Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014)

(holding neither *Roper* nor *Atkins* created a new rule of constitutional law making the execution

of mentally ill persons unconstitutional); *Franklin v. Bradshaw*, 695 F.3d 439, 455 (6th Cir.

2012) (noting absence of case law extending *Atkins* to prohibit the execution of those with

mental illnesses); *Baird v. Davis*, 388 F.3d 1110, 1114 (7th Cir. 2004) (recognizing Supreme

Court's exemptions from execution for the mentally retarded and minors, but that "it has not yet

ruled out the execution of persons who kill under a mental illness").[17]   Indeed, in *Atkins*, the

Supreme Court expressly limited its holding to the mentally retarded.  *Atkins*, 536 U.S. at 320

("[Offenders who are not mentally retarded] are unprotected by the exemption and will continue

to face the threat of execution.").

_____

[17] Albeit in a much different context, it is worth noting that the Supreme Court has recognized
that the differences between the mentally retarded and the mentally ill permit states to treat them
differently.  *See Heller v. Doe*, 509 U.S. 312, 321-22 (1993).

Nor do the "evolving standards of decency" command that the Supreme Court's reasoning in *Atkins* or *Roper* should be extended to insulate from capital punishment those with mental illness. *See Thacker v. Workman*, Case No. 06-CV-0028, 2010 WL 3466707, *23-24 (N.D. Okla. Sept. 2, 2010) (declining the petitioner's "invitation to extend the Supreme Court's prohibition on executions of mentally retarded persons and minors to person with mental health issues based on 'evolving standards of decency'"). Indeed, Runyon points to no "objective indicia of society's standards," *Atkins*, 536 U.S. at 312, indicating that modern sensibilities favor such a prohibition on subjecting the mentally ill to capital prosecution. *See id.* ("Proportionality review under those evolving standards should be informed by objective factors to the maximum possible extent." (internal quotations omitted)); *Roper*, 543 U.S. at 563 (holding same).

The clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures. *Atkins*, 536 U.S. at 312. For example, at the time *Atkins* was handed down, the Court tallied that 14 states prohibited the death penalty outright, 18 states plus the federal government prohibited imposition of the death penalty upon mentally retarded individuals, and three more states had similar bills pending. *Id.* at 315; *see also id.* ("It is not so much the number of these States that is significant, but the consistency of the direction of change."). Here, however, Runyon has not cited and the Government has not found a single legislative act prohibiting the imposition of capital punishment upon individuals who displayed mental illness at the time they committed a capital offense, other than, of course, those who satisfy the time-tested defense of insanity.

Likewise, several state high courts have refused to recognize a constitutional bar to imposing capital punishment upon mentally ill individuals. In fact, the wave of post-*Atkins* authority from state courts demonstrates that the national consensus is *against* an absolute bar to

capital punishment for the mentally ill.  *See People v. Hajek*, 324 P.3d 88, 173-74 (Cal. 2014) (holding serious mental illness does not necessarily negate moral responsibility for killing and declining "to say that executing a mentally ill murderer would not serve societal goals of retribution and deterrence" ); *State v. Dunlap*, 313 P.3d 1, 35-36 (Idaho 2013) (joining several state and federal courts "in holding that a defendant's mental illness does not prevent imposition of a capital sentence"); *Malone v. State*, 293 P.3d 198, 216 (Okla. Crim. App. 2013) ("We expressly reject that the *Atkins* rule or rationale applies to the mentally ill."); *Mays v. State*, 318 S.W.3d 368, 379 (Tex. Crim. App. 2010) (holding prohibition under *Atkins* against execution of mentally retarded as cruel and unusual punishment did not extend to a mentally ill defendant); *Dotch v. State*, 67 So.3d 936, 1006 (Ala. 2010) ("Under constitutional guidelines, in order to be exempt from the imposition of the death penalty, a defendant must meet the definition of mentally retarded or the definition of legal insanity . . . and this Court will not extend or expand the constitutional prohibitions against the application of the death penalty in this case.") (citations omitted); *State v. Hancock*, 840 N.E.2d 1032, 1059-60 (Ohio 2006) (holding Eighth Amendment's prohibition against execution of mentally retarded persons did not extend to mentally ill defendant; rather, mental illness was mitigating factor that jury could consider); *Diaz v. State*, 945 So.2d 1136, 1152 (Fla. 2006) (holding that even if petitioner could prove he suffered from mental illness, this fact "would not automatically exempt him from execution as there is no per se 'mental illness' bar to execution"), *abrogated in part on other grounds by Darling v. State*, 45 So.3d 444 (Fla. 2010);[18] *People v. Runge*, 917 N.E.2d 940, 985-86 (Ill. 2009) (declining to extend *Atkins* or *Roper*, and holding that even a finding of "guilty but

---

[18] The Florida and Indiana Supreme Courts have also rejected equal protection challenges to the imposition of the death penalty upon mentally ill persons because such persons are not similarly situated to persons with mental retardation or persons aged younger than 18 at the time of their crimes.  *See Carroll v. State*, 114 So.3d 883 (Fla. 2013); *Matheny v. State*, 833 N.E.2d 454 (Ind. 2005).

mentally ill" does not preclude imposition of the death penalty); *State v. Johnson*, 207 S.W.3d 24, 51 (Mo. 2006) (noting that "federal and state courts have refused to extend *Atkins* to mental illness situations"); *Baird v. State*, 831 N.E.2d 109, 115-16 (Ind. 2005) (holding neither evolving standards of decency, changes in legal landscape, nor development of statewide consensus since petitioner was sentenced to death indicated that death sentence had come to constitute cruel and unusual punishment for persons with mental illness); *Lewis v. State*, 620 S.E.2d 778, 786 (Ga. 2005) (stating defendant failed to "cite any authority that establishes a constitutional prohibition on convicting and sentencing to death a defendant who is competent but mentally ill," and declining to extend the holding of *Atkins*).

Recognizing there is no national consensus in favor of abolishing the death penalty for mentally ill offenders, this Court's inquiry on the merits should stop here. While the Supreme Court has stated that it must also bring its independent judgment to bear on the question of the acceptability of the death penalty under the Eighth Amendment, *Atkins*, 536 U.S. at 312, the Court has never expressed its independent judgment regarding the propriety of imposing capital punishment upon the mentally ill. Thus, this Court would exercise an extraordinary and unprecedented assumption of power to do so in this case. Instead, this Court should leave to Congress the duty of creating new laws. *Atkins*, 536 U.S. at 324 (Rehnquist, C.J., dissenting) (stating it is undeniable that "the democratic branches of government and individual sentencing juries are, by design, better suited than courts to evaluat[e] and giv[e] effect to the complex societal and moral considerations that inform the selection of publicly acceptable criminal punishments").

2.   The rationale underlying *Atkins* and *Roper* does not apply to the mentally ill.

Even ignoring the legal deficiencies of Runyon's claim, he has not set forth a sufficient basis for this Court to "disagree with the judgment reached by the citizenry and its legislators," *Atkins*, 536 U.S. at 313, as well as the several courts cited above, who have refused to establish a categorical bar to the imposition of capital punishment upon mentally ill individuals who do not meet the criteria of an insanity defense.

In *Atkins* and *Roper*, the Supreme Court held that the justifications for the death penalty (retribution and deterrence) did not apply to the mentally retarded or juveniles because they were generally less morally culpable and less susceptible to deterrence.  *See id.* at 319-20; *Roper*, 543 U.S. at 569-70.  The *Atkins* Court also stated that the reduced mental capacity of the mentally retarded impermissibly enhanced the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.  *Id.* at 320-21 (citing concerns with false confessions, the inability of mentally retarded defendants to assist counsel in presentation of mitigation, that mentally retarded defendants make poor witnesses, that their demeanor may create an impression of lack of remorse, and that evidence of mental retardation may also enhance the likelihood that the jury will find future dangerousness as an aggravating factor).

The Court's rationale underlying its decisions in *Atkins* and *Roper* does not come to bear in the present context.  The justifications for capital punishment, to wit: retribution and deterrence, apply with full force to mentally ill persons who do not meet insanity standards. Short of the legally insane, legislatures, courts, and the general public have not recognized the mentally ill to be "categorically less culpable than the average criminal."  *See Atkins*, 536 U.S. at 316.  Nor have they recognized the mentally ill to lack the capacity to be deterred.  The facts of this case certainly bear on these points.  Assuming Runyon displayed any form of mental illness

**JA664**

at the time of the murder, its manner of execution, as found by the jury, required substantial planning and premeditation, and was not impulsive or the product of some diminished ability to understand or process the situation. Rather, the murder of Cory Voss required planning and deliberate conduct. This is precisely the type of conduct and thinking that deserves the ultimate punishment and that is intended to be deterred with the federal death penalty.

What is more, classifying a person as mentally ill for the purpose of providing a blanket exemption to capital punishment is fundamentally different from classifying juveniles or the mentally retarded. A person is either under the age of 18 or he is not. He is either mentally retarded or he is not. Mental illness, on the other hand, is subject to varying types and degrees of illness. Even if mental illness is present, there must also be a question of how that illness affected the offender's ability to understand the wrongfulness of his actions or to conform his conduct to the law. Further, mental illness is, in most instances, treatable through medications and/or counseling therapy.

The differences between mentally ill and non-mentally ill offenders, unlike the differences between juvenile and adult offenders, are not "too marked and well understood" to allow a mentally ill person to be sentenced to death despite purportedly reduced culpability. *Roper*, 543 U.S. at 572-73. Further, given the need for individualization in capital sentencing, it would be arbitrary and unnecessary to adopt a categorical rule barring imposition of the death penalty upon the mentally ill. This Court should not agree to establish this new and ill-defined category of murderers who would receive a blanket exemption from capital punishment without regard to the individualized balance between aggravation and mitigation in a specific case. *See Hancock*, 840 N.E.2d at 1059-60. To do so would, in a great number of cases, turn over the

135

**JA665**

determination of the appropriateness of capital punishment to mental health professionals of varying qualifications and biases, and leave the sound judgment of juries as an afterthought.

### 3. Other remedies are available.

None of this is to say that individuals with severe mental illness are without recourse. Congress has clearly defined and federal courts have for years applied a defense for the legally insane. It is an affirmative defense . . . that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. 18 U.S.C. § 17(a). Mental disease or defect does not otherwise constitute a defense. *Id*. The defendant bears the burden of proving the defense of insanity by clear and convincing evidence. 18 U.S.C. § 17(b). Should a capital defendant satisfy the elements of the insanity defense, he/she may not only avoid capital punishment, but criminal responsibility altogether. *See* 18 U.S.C. § 4242. Thus, it is wholly unnecessary to hold a separate pretrial hearing to determine whether a capital defendant is mentally fit for capital prosecution.[19]

In sum, neither *Atkins*, nor *Roper* shield mentally ill individuals from capital punishment. Nor does the Constitution or any statute.

---

[19] In a slightly different context, the Supreme Court has held that the Eighth Amendment prohibits the government from carrying out a sentence of death upon a prisoner who is insane. *Ford v. Wainwright*, 477 U.S. 399, 409-10 (1986). *See also* 18 U.S.C. § 3596(c) ("A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person."). This prohibition applies despite a prisoner's earlier competency to be held responsible for committing a crime and to be tried for it. *Panetti v. Quarterman*, 551 U.S. 930, 934 (2007). Lower federal courts, however, have refused to extend this rule to mentally ill individuals who do not satisfy the rather strict competency to be executed standard set forth in *Ford*. *See*, *e.g.*, *Ferguson v. Sec'ty, Fla. Dept. of Corrections*, 716 F.3d 1315 (11th Cir. 2013); *Green v. Thaler*, 2012 WL 4800431 (5th Cir. 2012); *Bedford v Bobby*, 645 F.3d 372 (6th Cir. 2011).

**Claim 15:**   **The selection of the grand jury/or petit jury was not tainted, and trial counsel did not unreasonably fail to request and examine the jury selection records.**

A.   <u>Selection of the grand and petit juries were not tainted.</u>

The defendant assigns numerous errors without specificity regarding the selection of the grand and petit juries. Although the defendant has amended his claim, he has not added a substantive argument. This claim is procedurally defaulted. The defendant could have made this claim at trial and on appeal, but failed to do so. The defendant must demonstrate "cause" for his double procedural default and "actual prejudice" resulting from the error. *Frady,* 456 U.S. at 167-68. The defendant has failed to address cause for his default and what prejudice he suffered.

Procedural default notwithstanding, Runyon fails to articulate any argument, much less any evidence, that supports his claim that he is entitled to relief. He claims that he has not received the evidence necessary to substantiate his claim. The United States disagrees. This claim should be denied.

B.   <u>The trial court did not substantially fail to comply with the Jury Selection Plan and the provisions of Title 28 U.S.C. §1861 *et. seq.*</u>

The defendant argues next that the trial court failed to substantially comply with the Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Eastern District of Virginia (hereafter the Plan) and the provisions of the Jury Selection and Service Act of 1968, Title 28 U.S.C. §1861 *et. seq.* (hereafter the Act.) As this claim is being made for the first time since the February 2008 indictment, almost eight years after the fact, this claim is procedurally defaulted (see above) and untimely pursuant to the Act. Nonetheless, the trial court did not substantially fail to comply with the EDVA Jury Selection Plan and the statute, thus Runyon is not entitled to a new trial.

**JA667**

1.  Timeliness

This claim is untimely. It is important to note that the defendant is not making a Sixth Amendment claim, but rather a statutory and Plan violation claim.[20] Title 28 U.S.C. § 1867, provides a criminal defendant or the United States, upon timely motion, a remedy if a trial court fails to *substantially* comply with the jury selection process as outlined in Title 28, U.S.C. § 1861 *et. seq.;* "(a) In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of due diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury." The defendant has not made a timely motion. In *United States v. Curry*, 993 F.2d 43, 44 (4th Cir. 1993), the Fourth Circuit held that a defendant who was denied the master grand jury list prior to trial does not in and of itself require a reversal, but may lead to a new trial if he could demonstrate, *upon a timely motion*, a violation of the act which prejudiced him. This case is distinguishable from *Curry*, where the defendant had made a request prior to his trial for the master grand jury list and the trial court denied the request. Here, such a request was never made until just prior to the filing of the habeas petition.

Other circuits have addressed the timeliness requirement of a statutory violation. The Fifth Circuit addressed the issue in *United States v. Beardon*, 659 F.2d 590, 597 (5th Cir. Unit B 1981), *cert denied* 456 U.S. 936 (1982). There, some of the defendants involved in the case filed timely motions before trial, while others did not. On appeal, the court held that the defendant's motions that were untimely filed in the trial court, were not cognizable on appeal, "[T]he timeliness and sworn statement requirement of the Act provide that the motion to dismiss must

---

[20] A Sixth Amendment violation claim may avoid the strict timeliness requirements of a statutory claim. See *United States v. Grisham*, 63 F.3d 1074, 1077 (11th Cir. 1995), *cert denied* 516 U.S.1084 (1996).

state the 'facts' and 'grounds' on which the motion rests. 28 U.S.C.A. §§1867(a), (d). The purpose of these requirements is to allow the court to quickly assess the merits of the motion and to determine whether an evidentiary hearing is warranted." The Eleventh Circuit concurred holding in *United States v. Paradies*, 98 F3d. 1266, 1277 (11th Cir. 1996) that the timeliness of filing a challenge "is to be strictly construed, and failure to comply precisely with its terms forecloses a challenge under the Act. (*quoting United States v. Beardon*, 659 F.2d at 595). The court stated further, "once voir dire begins, Jury Selection Act challenges are barred, even where the grounds for the challenge are discovered only later." *Paradies*, 98 F3d. at 1278. Accordingly, the Court should deny this claim as untimely filed.

### 2. Declaration of Defense Counsel under 28 U.S.C. § 1867 (d)

Counsel for Runyon, Ms. Brace, filed a Declaration, Exhibit 39, ECF 511-39, pursuant to Title 28 U.S.C. § 1867 (d) which states in pertinent part, "Upon motion filed under subsection (a), (b), or (c), of this section, containing a sworn statement of facts which, if true, would constitute failure to comply with the provisions of this title…." Such a declaration is a prerequsite to a claim under the Act. The United States submits, however, that this Declaration has failed to state facts which, if true, constitute any violation of the Act. Runyon has failed to articulate any facts of a violation of the Act, much less a substantial failure by the Court. *See Paradies*, 98 F3d. at 1278-1279.

### 3. "Substantial Failure"

The defendant next claims that the Court substantially failed to comply with the Act because it failed to make notations regarding the disqualifications, excuses, exemptions, and exclusions of some potential jurors. Even assuming that this claim is cognizable in a habeas petition, the defendant's claim fails because the Court did not substantially fail to comply with

139

**JA669**

the Act.

Pursuant to Title 28, U.S.C. §1866(d) and the EDVA Plan, the clerk must note the specific reasons for any disqualification, excusal, exemption or exclusion. Specifically, the defendant claims that the Court failed to specify a reason for the disqualification, excusal, exemptions and exclusions of "148 jurors" (94 under the category "court order" plus 54 where no reason was given).[21] The defendant then posits that because these reasons are not specifically noted there has been a substantial violation of the act that requires reversal of his conviction and a new trial. The defendant cites no case law to support this proposition.

The Court provided counsel, pursuant to Memorandum Orders, ECF 475 and 481, a sealed packet containing a Memorandum dated October 5, 2015 from Amanda Woodall, the Jury Clerk for Norfolk and Newport News Divisions with supporting documents. The Memorandum contained attachments with a statistical breakdown of the Grand Jury (3), a statistical breakdown of the petit jury (4) and the list of reasons for disqualification, etc. (5). The defendant's argument does not concern the Grand Jury, but the petit jury. While the first page of section (4) of the Memorandum entitled "Source List/Race and Gender Report for Entire Pool" that was provided to counsel shows a total number of jurors called at 425, both the United States and the defense actually counted 423 jurors from section (4) of the attachments to the Memorandum. Two hundred forty three (243) jurors filled out a questionnaire, which leaves 180 jurors. Of those 180 jurors, 127 jurors were disqualified/exempted etc., which leaves 53 jurors that were not accounted in the raw numbers of section (5) of the Memorandum.

"A Jury Selection Act violation is substantial only if it frustrates the Act's two basic goals: '(1) random selection of juror's names; and (2) use of objective criteria for determination

---

[21] The United States actually counts 96 jurors that were excused under the category "court order" and that left 53 jurors that were not accounted for in a category of disqualification/ exemption.

of disqualifications, excuses, exemptions, and exclusions'". *Paradies*, 98 F3d. at 1277, *quoting*

*United States v. Gregory*, 730 F.2d 692, 699 (11th Cir. 1984), *cert denied*, 469 U.S. 1208 (1985)

and *United States v. Carmichael*, 685 F.2d 903, 911 (4th Cir. 1982).  The remedy for a substantial

violation is that the court stay the proceedings or dismiss the indictment, whichever is

appropriate pursuant to Title 28, U.S.C. §1867(d). The United States submits that the Court may

very well have had reasons for these disqualifications, excuses, exemptions, and exclusions that

have not been provided to counsel at this point.[22] But even if this evidence no longer exists, there

has not been a substantial failure by the Court to comply with the Act. The defendant's mere

argument and speculation do not give rise to a substantial failure. Runyon has not produced any

specific evidence that the court failed to use objective criteria for any removals. At most, there

has been a technical violation of the Act and those types of violations are generally not deemed

substantial.  *See Carmichael*, 685 F.2d at 911, *United States v. Meredith*, 824 F.2d 1418, 1424

(4th Cir. 1987), *Gregory*, 730 F.2d at 700 and *Paradies*, 98 F3d. at 1280.  Specifically, the

defendant's argument regarding the number of jurors that he says were excused without notation,

148, fails. First, the exemption category "court order" is a specific category of exemptions.

Accordingly, the defendant's argument that it is not a category is without merit. That leaves 53

jurors unaccounted for in the raw numbers of section (5) of the Memorandum. (Despite the

differences in the United States and defendant's calculation of the numbers, there are slightly

over 50 jurors that the Court's documents do not list a code for disqualification or exemption.)

The defendant concludes that these jurors were excluded using nonobjective criteria, which must

somehow be discriminatory. There is absolutely no evidence to support this argument and the

defendant has not shown any prejudice that has inured to him. The defendant offers *United States*

---

[22] The answer may be as simple as these individuals were deferred or did not return their standard jury questionnaires to the Court or failed to appear on a summons. *See United States v. Aguero*, 248 F. Supp 2d, 1150, 1152 (S.D. Florida, Miami Division Jan. 23, 2003.)

*v. Royal*, 174 F3d 1, (1st Cir. 1999) as an example of a judge's displeasure of ten unrecorded dismissals of black jurors. However, the court found that those dismissals did not constitute a substantial violation of the Act. In *Carmichael*, 685 F.2d at 911, the Fourth Circuit ruled that technical violations do not qualify as substantial unless the two objectives furthered by the Act have been affected. These objectives are "random selection of juror names from voter lists and determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only". The defendant has the burden to show that the Court dismissed these jurors using for nonobjective reasons and he has not done so.

The defendant also claims that the petit venire excluded Native Americans and Asians. The defendant claims, according to the records, that one of the Native Americans was excluded by "court order", while the other was not given a reason for the exclusion. There were 16 Asians that were called for jury duty and five were excluded under a "court order", one because he/she no longer lived in the jurisdiction and three where no reason was given. The defendant states in his amended motion, "No other group was decimated at this level". If the defendant is making an argument regarding a violation of the fair cross-section requirement of the Act, he has failed. In order to prevail on this claim, the defendant must show: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to a systematic exclusion of the group in the jury-selection process. *Duren v. Mississippi*, 439 U.S. 357, 364 (1979) and *United Sates v. Lewis*, 10 F.3d 1086, 1089-90 (4th Cir. 1993). While Native Americans and Asians are distinctive groups, the defendant has failed to put forth any evidence that "the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the

142

**JA672**

number of such persons in the community; and (3) that this underrepresentation is due to a systematic exclusion of the group in the jury-selection process". Accordingly, these claims fail.

C.     A person who did not qualify did not participate in Runyon's trial   .

This claim is procedurally defaulted.  Nonetheless, there was no error committed by the court. The defendant contends that a juror with the initials of S.M.G. participated in the trial and is not listed in the qualified jury wheel therefore tainting the jury process. A person with the initials of S.M.G. (juror 84 from sealed Exhibit A list of jurors appearing on June 30, 2009) took part in the petit jury selection process. However, on the juror questionnaire for juror 84, the initials of S.M.R. filled out the questionnaire. The United States submits that the evidence shows that this is the same person. First, while the last initial is different, the first and middle initials are the same. Second, the 2007 Norfolk Qualified Wheel, participation number 100760415, shows a juror with the initials of S.M.R. who lives in Virginia Beach with a zip code of 23464. This person is a white female. The Juror Questionnaire filled out by juror 84 has the initials of S.M.R, who is a white female who lives in Virginia Beach with a zip code of 23464. Additionally, on page 15 of the questionnaire, question 67, the juror wrote that she knew a person on the potential witness list who has the initials of M.D.  On the first day of trial, June 30, 2009, juror S.M.G. told the court that she knew the same potential witness, M.D. TT, p 36. Accordingly, juror 84 is the same person. Perhaps this person changed their name due to a marriage or divorce.  The defendant's claim is without merit and should be denied.

D.     Trial counsel was not ineffective for failing to request and examine the Jury Lists.

While it is true that counsel has a right to inspect jury lists, the failure to make this request does not make counsel's performance deficient. *Test v. United States*, 420 U.S. 28, 30 (1975). According to *Strickland v. Washington*, 466 U.S. 668 (1984), in order to prevail on an

ineffective assistance claim, a criminal defendant must show both (1) that counsel's representation was deficient, and (2) that the defendant was prejudiced by counsel's performance. *Id*. at 693. Although a defendant must prove both prongs, a reviewing court need not examine or even address both prongs if a defendant makes an insufficient showing on one. *Id*. at 697.

Runyon has failed to show that his counsel's performance was deficient. He merely quotes from the ABA Guideline, which states only "Counsel should consider…." Runyon cites no case law to support the proposition that counsel was deficient for failing to request the jury lists. Furthermore, Runyon cannot prove that he was prejudiced by such failure; he merely makes a speculative conclusion. Accordingly, this claim fails.

**Claim 16:** **The United States did not engage in racial and gender discrimination during jury selection and defense counsels were not deficient in their performance for failing to object**.

Runyon asserts that the United States violated his Fifth Amendment Equal Protection right for the peremptory strikes used at trial, and that his trial counsel failed to object in violation of his Sixth Amendment right to effective assistance of counsel. These claims lack merit.

A. Procedural Default

Runyon's substantive Fifth Amendment claim, that the United States discriminated against blacks and women in the selection of the jury, has been procedurally defaulted. Runyon, who is white, did not make this claim at the time of trial, nor did he raise it on appeal. Instead, he raises this claim for the first time more than six years after his trial. Accordingly, Runyon must show cause for his failure to raise it at an earlier time and actual prejudice resulted from the error. *Frady*, 456 U.S. at 168–70. The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the crime or a denial of an effective

144

**JA674**

assistance of counsel. *Mikalajunas*, 186 F.3d at 493. The standard for prejudice is that the alleged error that led to the issue not being raised on appeal worked to the defendant's "actual and substantial disadvantage, infecting his entire trial with error." *Frady,* 456 U.S. at 170.

Runyon has failed to satisfy the standards set in *Frady* and *Mikalajunas.* Accordingly, his substantive claim fails. *See United States v. Lighty*, 2014 WL 5509205 (D. Maryland Oct. 30, 2014).

> B.  Ineffective Assistance of Counsel Claim

To prevail on an ineffective assistance of counsel claim, Runyon must show both that his attorney's performance fell below an objective standard of reasonableness and that he was prejudiced by that deficient performance. *See Strickland,* 466 U.S. at 687. Given there was no discrimination by the United States, Runyon cannot satisfy either of the *Strickland* requirements. Counsel was not ineffective for failing to press this futile motion at trial.

> 1.  Trial Counsels performance was not deficient.

There were six trial counsel present at trial selecting a jury. Two counsel a piece for both Runyon and co-defendant Draven and they shared the 20 peremptory strikes. There were two counsel for the United States. No objections were made during the jury selection by Runyon's defense counsel or Draven's.

In *Batson v. Kentucky*, the Supreme Court recognized the prohibition against litigants using peremptory challenges "solely on account of race." 476 U.S. at 89. In *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128-29 (1994), the Supreme Court extended *Batson*'s holding and found that a gender-based exercise of a peremptory challenge violates the Equal Protection Clause of the Constitution. As the Supreme Court detailed in *Rice v. Collins*, the *Batson*

<div align="center">

145

**JA675**

</div>

decision established the procedure for determining whether a party has improperly relied on race during jury selection:

> A defendant's *Batson* challenge . . . requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race…. Second, if the showing is made, the. . . prosecutor [must] present a race-neutral explanation for striking the juror in question. . . . "[T]he second step . . . does not demand an explanation that is persuasive, or even plausible"; so long as the reason is not inherently discriminatory, it suffices…. Third, the Court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike."

546 U.S. 333, 338 (2006).  As detailed below, Runyon has failed to present adequate evidence as to any of these steps.  Consequently, the Court should deny all claims based upon the submissions.

Under *Batson*, a defendant may establish a prima facie case of discrimination by showing that: (1) the defendant is a member of a distinct racial group; (2) the prosecutor has used the challenges to remove from the venire members of the defendant's race; and (3) other facts and circumstances surrounding the proceeding raise an inference that the prosecutor discriminated in his or her selection of the jury pool. *Batson*, 476 U.S. at 96-97.  The Supreme Court has modified *Batson* to allow defendants of races different than the excused jurors to have standing to raise *Batson* challenges. *See Powers v. Ohio,* 499 U.S. 400, 415 (1991).

Given the fact that the defendant and the victim are white males, and Runyon alleges discrimination against blacks and women, he patently cannot satisfy the first two elements of a prima facie case.  *See Keel v. French,* 162 F.3d 263, 271 (4th Cir. 1998) ("First, neither the defendant nor the victim is of the same race as the jury. While the defendant need not be a member of the same race as the excused jurors in order to raise a *Batson* challenge, that *Keel* and

the jurors are of different races eliminates the argument that the jurors sympathize with the defendant because they share the same race.") (internal citations omitted). Therefore, to establish a prima facie case here, Runyon must show other facts and circumstances surrounding the proceeding sufficient to raise an inference of purposeful intent by the United States to discriminate based on all of the relevant evidence. *United States v. Joe*, 928 F.2d 99, 102(4th Cir. 1991) (*citing Batson*, 476 U.S. at 96).

Runyon argues that by looking solely at the statistics of the strikes made by the United States, he has made a prima facie case of discrimination in violation of *Batson* and *J.E.B.* Runyon further argues that discrimination and the intent of the United States can be shown based upon the fact that the videotape of Runyon's questioning by police was introduced into evidence at the penalty phase of trial. In that videotape, officers referred to Runyon as "an honorable Asian man." Runyon does not make any further argument about the discrimination of women by the United States.

As the Fourth Circuit has noted, "[t]hough statistics are not utterly bereft of analytical value, they are, at best, manipulable and untrustworthy absent a holistic view of the circumstances to which they apply." *Allen v. Lee*, 366 F.3d 319, 330 (4th Cir. 2004). Rather, the defendant must come forward with something beyond mere raw data. *United States v. Tipton*, 90 F.3d 861, 881, n.11 (4th Cir. 1996) (rejecting a gender-discrimination claim where the defendants produced no evidence to support their argument other than "raw figures" of four men versus eight women stricken).

The jury which convicted Runyon, a white male, during the guilt phase consisted of eight women and four men, nine whites and three blacks. The four alternates chosen were two white males and two white females. The United States used 19 of its 20 peremptory strikes to select the

147

**JA677**

jury. The United States struck 13 women, six were white and seven were black. During the selection of the alternates, the United States struck one white female and one black male. Runyon and Draven struck, 20 whites, consisting of eight women and 12 men. During the selection of the alternates, Runyon and Draven struck one black male and a female, who failed to identify her race on her questionnaire (juror 166). Counsel for Runyon were not deficient in their performance in failing to make a *Batson* challenge because the United States struck women and blacks who answered question 61 of the questionnaires that they were either opposed to the death penalty (question 61(d)) (Jurors 7, 28, 52, 97, 81, 31, 40, 63, 46, ) or answered both that they were generally opposed and generally in favor of the death penalty (question 61( c) and (d)) (jurors 18, 73, 116, 15). Furthermore, a number of these jurors either had served in the military or had relatives serving in the military or had served in the military (Jurors 7, 52, 31, 63, 18, 15). Presumably, Runyon would not want people serving on the jury who may have sympathy for the victim Cory Voss, a Naval Officer. In *Keel*, 162 F.3d at 271, the Fourth Circuit stated, "Given these jurors opposition to, or hesitation toward, imposing the death penalty, it clear that the prosecutor acted well within constitutional bounds in excusing them." (quoting *Wainwright v. Witt*, 469 U. S. 412, 424 (1985)).

If the government were acting with a purposeful intent to exclude prospective jurors based upon gender or race, it would have used its peremptory remaining strike to exclude another female or black person from the venire. The various statistical permutations presented by the defendant are not only misleading, under the controlling precedent set forth in *Tipton,* they are inadequate to make a prima facie case of discrimination. *See also Keel,* 162 F.3d at 271-72 (defendant failed to establish prima facie case based upon the states use of nearly 70% of its peremptory challenges to strike African-American venire members). Clearly, trial counsels'

failure to raise a *Batson* challenge was based upon the premise that there was racially and gender neutral reasons for the prosecution's use of their peremptory strikes.  Accordingly, Runyon cannot make a prima facie case and trial counsels conduct did not fall below the conduct reasonably expected of counsel.

In order to prevail on a *Strickland* claim, a criminal defendant must show both (1) that counsel's representation was deficient, and (2) that the defendant was prejudiced by counsel's performance.  466 U.S. at 693.  Although a defendant must prove both prongs, a reviewing court need not examine or even address both prongs if a defendant makes an insufficient showing on one.  *Id*. at 697.  To establish counsel's representation was deficient, the defendant must show "that counsel's representation fell below an objective standard of reasonableness."  *Id*. at 688.  The reasonableness of attorney performance is simply "reasonableness under prevailing professional norms."  *Id*.  Counsel's performance need do no more than insure the trial was a "reliable adversarial testing process." *Id*.

Runyon fails to demonstrate that his counsel performed deficiently.  Moreover, based on this record, Runyon cannot show actual prejudice.  He proffers no evidence that the United States used race or gender in exercising its peremptory strikes.

Runyon has failed to produce sufficient evidence to overcome his procedural default and that his trial counsel were ineffective.  This claim should be denied.

> **Claim 17**:  **Runyon's constitutional challenge to the voir dire procedure is procedurally defaulted and trial counsel did not provide ineffective assistance during jury selection**

> A.   Runyon's constitutional challenge is procedurally defaulted and Teague-barred.

Runyon contends that the Court's voir dire procedure used in his trial violated his Fifth and Sixth Amendment rights.  Specifically, he claims that the questionnaire used in selecting the

**JA679**

jury was flawed (referencing Claim S2); that this Court gave the jurors no guidance regarding the law before completing the questionnaire; that this Court's oral voir dire was minimal; and that the Court's questions to potential jurors were inadequate.

At a threshold level, this claim is procedurally defaulted. Runyon failed to raise this claim on direct appeal and he fails to demonstrate cause and prejudice for his default. *Frady*, 456 U.S. at 170. This claim should be denied on this basis alone.

This claim is also barred by the non-retroactivity doctrine under *Teague*. As of October 6, 2014, when Runyon's convictions and sentences became final, existing precedent did not dictate a grant of relief on Runyon's claim. Runyon asks this court to apply a new rule contrary to existing precedent giving the trial court discretion to conduct voir dire. Further, neither of the *Teague* exceptions apply here because Runyon's proposal would only take discretion away from the trial court and not exclude certain offenses or offenders from the death penalty, and it is not a watershed rule.

B.     Runyon's claim fails on the merits in any event.

Procedural default notwithstanding, Runyon fails to demonstrate that this Court's voir dire procedure in his trial was constitutionally infirm.    The trial court conducted a proper voir dire and Runyon does not proffer any evidence that the jury was impartial.

Voir dire plays an essential role in guaranteeing a criminal defendant's Sixth Amendment right to an impartial jury. *United States v. Lancaster*, 96 F.3d 734, 738 (4th Cir. 1996) (citing *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Voir dire also "enable[s] the court to select an impartial jury and assist[s] counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). The conduct of voir dire is committed to the sound discretion of the trial court. *United States v. Bakker*, 925 F.2d 728, 733–34 (4th Cir. 1991). The

Supreme Court has generally refrained from dictating the form of voir dire questions. *Lancaster*, 96 F.3d at 739 (citing *Mu'Min*, 500 U.S. at 431). It is well settled that the trial court has discretion to question potential jurors without allowing counsel to question them, and to conduct the questioning collectively rather than individual. *Bakker*, 925 F.2d at 734; *see also* Fed.R.Crim.P. 24(a).

To obtain a new trial based on alleged juror dishonesty during voir dire, a defendant "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). In addition, "even where . . . the two parts of the *McDonough* test have been satisfied, a juror's bias is only established . . . if the juror's motives for concealing information or the reasons that affect the juror's impartiality can truly be said to affect the fairness of the trial." *Conaway v. Polk*, 453 F.3d 567, 588 (4th Cir. 2006) (internal quotation marks omitted).

Runyon first complains that the trial court's oral voir dire was minimal, asked follow-up questions of few potential jurors, and only addressed the potential jurors collectively.[23] But a review of the voir dire conducted by the trial court here reveals that the process the trial court conducted was fair and ensured that an impartial jury was impaneled. Runyon proffers no evidence that his jury was impartial.

Prior to jury selection, the parties submitted and the court accepted a jury screening questionnaire to assist in gathering information from potential jurors. ECF 211. After the parties culled the questionnaires and submitted a stipulated list of jurors they agreed were not qualified to serve, the trial court conducted collective questioning of a group of 62 potential

---

[23] Runyon also incorporates his argument in Claim S-2 that the jury questionnaire was flawed. The Government relies on its response to that argument in Claim S-2.

jurors. TT, p. 10. The trial court explained to the parties that they would be given the opportunity to have the court ask any follow-up questions or object to the voir dire process. *Id*. at 44. During questioning of the first group of 62 potential jurors, the trial court instructed them that they would be required to "put aside any feeling of passion or prejudice and decide this case solely on the evidence that would be introduced during the trial and the instructions that I would give you as the judge, as the court, concerning the law of the case." *Id*. at 52-53.

The trial court also asked appropriate screening questions regarding potential jurors opinions regarding the death penalty as required by *Morgan v. Illinois*, 504 U.S. 719 (1992). (*Id*. at 77, 98–99, 102–03, 124; TT, 7/1/09, pg. 175.) After questioning the potential jurors, the trial court gave the parties an opportunity to submit any follow-up questions to be considered, (*Id*. at 115), and did ask follow-up questions proposed by Runyon. *Id*. at 117–18. Throughout the jury selection process the trial court asked the parties if they had any objections to the voir dire process—as to the process, they did not. *Id*. at 62, 108–09, 125; TT, p. 176.

Runyon's complaint that oral voir dire was constitutionally flawed because it was "minimal" is without merit. He cites no case law requiring a quantitative comparison of voir dire. *See Bakker*, 925 F.2d at 733 (rejecting contention that voir dire was not sufficient because it was completed in one day). The relevant question is whether an impartial jury was seated. *United States v. LaRouche*, 896 F.2d 815, 830 (4th Cir. 1990). Runyon fails to demonstrate that his jury was impartial. The trial court here conducted a sufficient voir dire directed at disclosing those jurors impacted by either media exposure or personal beliefs that had a substantial impact on their ability to serve as jurors.

Runyon also contends that the trial court's collective questioning of potential jurors was inadequate. He argues that 34 percent of the potential jurors did not speak during voir dire and

**JA682**

the trial court therefore did not properly assess their credibility.  Runyon argues that questions addressed to groups of individuals provides an opportunity for potential jurors to conceal bias.  The trial court's collective questioning of potential jurors here was not constitutionally infirm.  The Constitution "does not dictate a catechism for *voir dire,* but only that the defendant be afforded an impartial jury," and the form of voir dire is in large measure left to the discretion of the trial court.  *Morgan,* 504 U.S. at 729.  Questioning potential jurors in a collective setting was well within the trial court's discretion.  *Bakker*, 925 F.2d at 734.

Moreover, Runyon fails to proffer any evidence that a juror concealed any information suggesting that a biased juror served at his trial.  Runyon asserts that this Court's voir dire failed to reveal that Juror 124 was purportedly employed by Langley Federal Credit Union, and that trial counsel was ineffective for failing to strike Juror 124.  Runyon's argument implies that the Court's voir dire process allowed a bias juror to serve on the jury.  The fact that Juror 124's employer was not revealed through oral voir dire does not mean that the juror intentionally concealed the information or that the Court's jury selection process was inadequate.  The juror's employer was revealed through a questionnaire, thus the juror did not conceal the information.  In addition, this information was available to counsel, through the questionnaire, for a determination as to whether to make a peremptory challenge.  Furthermore, any claim of bias as to Juror 124 is belied by the Court's dismissal of the bank robbery charge in count 3.  The basis for any bias was thus absent based on the dismissal of the charge.

Runyon points to no evidence that any member of his jury labored under any disqualifying criteria or that any impartiality affected the fairness of his trial.  *McDonough*, 464 U.S. at 556.  Likewise, for the same reasons, Runyon's claim of ineffective assistance of counsel

**JA683**

must fail. Runyon cannot demonstrate that he was prejudiced by counsel's failure to strike Juror 124.

Runyon argues that the trial court failed to properly inquire whether potential jurors could "make a decision about his guilt or innocence without considering the sentencing options that might follow." *See Petitioner Brief* at 120. He complains that the trial court simply asked potential jurors whether they "understood" that their duty was to determine guilt or innocence first without consideration of penalty instead of asking whether they could comply with that command. This argument places form over substance and is without merit.

Both Runyon and the Government submitted proposed voir dire questions, in addition to the jury screening questionnaire, to the trial court prior to jury selection. ECF 158, 173. The trial court, for the most part, used those questions in forming its questioning of potential jurors. At the beginning of the voir dire process, the trial court provided guidance to potential jurors as to their duty as jurors, and informed them that they would be required to put aside any feelings of passion and prejudice and decide the case solely on the evidence that would be presented and the instructions of law given by the court. TT, pgs. 12–13, 52–53.

Runyon contends that the trial court's questioning regarding consideration of penalty and *Morgan* bias were inadequate because the court asked whether jurors "understood" the law in those areas. But trial courts need not use precise questions suggested by counsel, "nor need a particular question be asked if the substance of the inquiry is covered in another question, differently phrased, or in the voir dire as a whole." *Darbin v. Nourse*, 664 F.2d 1109, 1113 (9th Cir. 1981); *see also United States v. Tipton*, 90 F.3d 861, 878 (4th Cir. 1996) (the Constitution dictates no particular catechism for voir dire). Here, prior to the complained of questions, the trial court had already informed potential jurors that if they were chosen they would need to

**JA684**

follow the instruction of law given by the court. TT, pgs. 52–53. Although it may have been better practice to ask whether potential jurors understood "and could follow" the law, it was unnecessary here because the trial court had informed the potential jurors of their duty to follow the court's instructions of law. Moreover, the trial court did ask potential jurors, pursuant to *Morgan*, whether they had a personal or moral opinion regarding the death penalty that would substantial impair their ability to weigh aggravating and mitigating factors and follow the court's instructions regarding the death penalty. *Id.* at 124–25. Runyon fails to demonstrate that the voir dire procedure used by the trial court failed to uncover bias or partiality in the venire. This claim should be denied.

<div align="center">

C. <u>Trial counsel was not ineffective for failing to object to this Court's voir dire procedure.</u>

</div>

Runyon argues that his trial counsel were constitutionally ineffective for failing to object to the following: (1) the trial court's failure to give guidance to potential jurors as to the death penalty in the jury screening questionnaire (Claim S-2), (2) the trial court's oral voir dire procedure, and (3) the trial court's failure to properly ask *Morgan* bias questions and whether potential jurors would comply with the law. A review of these claims above demonstrates that Runyon's contentions are meritless in that counsels' performance was neither deficient nor prejudicial.

In order to prevail on his claim of ineffective assistance of counsel, Runyon must show: (1) his attorney's performance fell below an objective standard of reasonableness, and (2) he suffered actual prejudice. *Strickland*, 466 U.S. at 687. A defendant alleging ineffective assistance of counsel must satisfy both prongs of the *Strickland* test to prevail. *See Roane*, 378 F.3d at 404. Where a court finds that "the defendant makes an insufficient showing on one" of

<div align="center">

155

**JA685**

</div>

the prongs, consideration of the other is unnecessary. *Merzbacher v. Shearin*, 406 F.3d 356, 365–66 (4th Cir. 2013) (citing *Strickland*, 466 U.S. at 697).

Runyon cannot satisfy either prong of *Strickland*. Runyon fails to demonstrate that his trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Trial counsel was not deficient for failing to make the objections Runyon now proffers. Prior to trial, counsel filed a motion seeking individual questioning of jurors, attorney questioning, a jury questionnaire, and additional peremptory challenges. ECF 156. Like Runyon's post-conviction counsel here, trial counsel suggested that the court use individual questioning instead of collective. In addition, during voir dire, trial counsel objected to the trial court's *Morgan* question and provided the court with purported corrective language that the court adopted. TT, pgs. 76–77.

Likewise, Runyon fails to demonstrate actual prejudice. In order to satisfy the prejudice prong of *Strickland*, Runyon must demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. In other words, he must demonstrate that had counsel objected to the voir dire procedure and the court's questions, the outcome of his case would have been different. But as stated above, the trial court's voir dire procedure here was not constitutionally infirm. Runyon fails to proffer any evidence that the voir dire procedure used by the trial court, including the wording of the trial court's questions, failed to seat an impartial jury. Nor does he demonstrate that counsel was hampered in their ability to exercise peremptory challenges. This claim should be denied.

**Claim S2:**     **The trial court did not violate Runyon's Fifth and Sixth Amendment rights by excluding potential jurors based solely on their juror questionnaire responses without voir dire and defense counsel did not fail to object and unreasonably participate.**

The United States' response to this claim is being filed under seal pursuant to the

156

**JA686**

Court's Order.  ECF 477.

## V.    __CONCLUSION__

For the foregoing reasons, the Court should deny Petitioner's Amended Motion to

Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. §2255.


DANA J. BOENTE
UNITED STATES ATTORNEY

By:    _____/s/_____

Lisa R. McKeel
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph:  (757) 591-4000
Fax: (757) 591-0866
Email: Lisa.McKeel@usdoj.gov


By:    _____/s/_____

Brian J. Samuels
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Ph:  (757) 591-4000
Fax: (757) 591-0866
Email: Brian.Samuels@usdoj.gov


By:_____/s/_____

Jeffrey A. Zick
Special Assistant United States Attorney
United States Attorney's Office


157
**JA687**

Fountain Plaza Three, Suite 300
21 Lakefront Commons
Newport News, Virginia 23606
Phone: 757/591-4000
Fax: 757/591-0866
Email: Jeffrey.Zick@usdoj.gov

158

**JA688**

CERTIFICATE OF SERVICE

I certify that on April 22, 2016, I electronically filed a copy of the foregoing with the

Clerk of the Court using the CM/ECF system who will send notice of such filing to the following

ECF users:

**Michele Jill Brace**
Virginia Capital Representation Resource Center
2421 Ivy Rd., Suite 301
Charlottesville, VA  22903
Ph:  434-817-2970, 202-223-6380
Email: mbrace@mindsort.com

**Dana Catherine Hansen Chavis**
Federal Defender Services of Eastern Tennessee, Inc.
800 S. Gay St, Suite 2400
Knoxville, TN  37929
Ph:  (865) 637-7979
Fax:  (865) 637-7999
Email:  dana_hansen@fd.org


By:  _____/s /_____
     Lisa R. McKeel
     Assistant United States Attorney
     Attorney for the United States
     United States Attorney's Office
     Fountain Plaza Three, Suite 300
     721 Lakefront Commons
     Newport News, VA 23606
     Ph:  (757) 591-4000
     Fax: (757) 591-0866
     Email: Lisa.McKeel@usdoj.gov

**JA689**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

      Petitioner,

                                    CIVIL NO. 4:15cv108
    v.                    [ORIGINAL CRIMINAL NO. 4:08cr16-3]

UNITED STATES OF AMERICA,

      Respondent.

OPINION

    This matter comes before the court on the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence ("Motion"), filed by David Anthony Runyon ("Petitioner") on February 4, 2016. ECF No. 511.[1] Further before the court are the Petitioner's First Motion for Discovery, filed on December 9, 2015, ECF No. 491, and Second Motion for Discovery, filed on April 1, 2016. ECF No. 530. All matters have been fully briefed and are ripe for decision. For the reasons contained herein, the First Motion for Discovery is **DENIED**, and the Second Motion for Discovery is **DENIED**. The Motion to Vacate brought pursuant to 28 U.S.C. § 2255 is **DENIED**.

---

[1] The Petitioner filed his original Motion under 28 U.S.C. § 2255 on October 5, 2015, ECF No. 478, after which he filed an amended Motion on February 4, 2016. ECF No. 511. This amended Motion is the operative pleading. See infra Part II.

**JA690**

## I. FACTUAL BACKGROUND[2]

On April 29, 2007, Cory Allen Voss ("Voss"), an officer in the United States Navy, was murdered. At the time, Voss was married to Catherina Voss ("Cat"), and the couple had two children, ages eight and seven. He was stationed out of Norfolk Naval Base, and lived in Newport News, Virginia, with his wife and children. On April 29, 2007, Voss returned home from a twenty-four hour shift aboard the USS Elrod, where he served as the Communications Officer. That night, Cat asked Voss to go to the ATM at Langley Federal Credit Union ("LFCU") in Newport News, Virginia. The next morning, Voss was found dead in his truck, after being shot five times with a .357 revolver as part of a murder-for-hire conspiracy. The facts neither start nor end here.

Testimony presented at trial revealed that in 2006, while Voss was at sea on a six-month deployment, Cat began having an extramarital affair with Michael Draven ("Draven"). After Voss returned home from that deployment, Cat and Cory Voss began experiencing financial difficulties, and the affair between Cat

---

[2] The following is a summary of the voluminous evidence presented to the jury, both through testimony and exhibits, during the guilt phase of trial. The appellate process is complete, and the case is now on collateral review. See infra Part II.

2

**JA691**

and Draven remained ongoing. Cat had no independent source of income, and Draven had no regular employment, but earned some money from participating in experimental clinical drug studies. Cat and Draven realized that if they were to stay together, and have the money to live the lavish lifestyle they wanted, they needed to get rid of Voss. As a member of the United States Navy, Voss had a life insurance policy through the Office of Servicemember's Group Life Insurance ("SGLI"), which named Cat as the primary beneficiary.  Once Voss was dead, Cat would receive the $400,000 SGLI life insurance policy benefit, together with other Navy spousal benefits.

Cat and Draven decided that the best way to accomplish their goal was to hire someone to commit the actual murder. Draven had met David Anthony Runyon ("Runyon") while participating in experimental clinical drug trials, and Draven now reached out to Runyon about joining the conspiracy. Runyon was a former police officer and former member of the United States Army, as well as a firearm enthusiast. Runyon agreed to act as the triggerman, in exchange for payment. Once Runyon agreed to participate, phone records show that the defendants began to communicate and plan how to commit the crime.

On April 20, 2007, Cat Voss opened an account with LFCU, into which she deposited only five dollars. On April 29, 2007,

**JA692**

the day of the murder, Runyon bought a .357 magnum Taurus revolver from George Koski in Morgantown, West Virginia, where Runyon was then living. Koski testified that he wrote down Runyon's driver's license number and phone number, and he also provided Runyon with some old ammunition. Koski further testified that the type of gun he sold Runyon could shoot both .357 magnum and .38 special cartridges. That same day, Runyon drove from Morgantown to Newport News, Virginia, to complete his part of the crime. He stopped at payphones along the way, including one at a Newport News Waffle House, to communicate with Draven, and Draven provided him with identifying information about Voss's truck. Runyon wrote down this information on a map of the Hampton Roads area, which police later discovered in Runyon's car. Phone records also indicate multiple calls between Draven and Cat Voss during this same time span.

Later on the night of April 29, 2007, around 11:00 p.m., Cat sent Voss to the ATM at LFCU. At approximately 11:31 p.m., Voss attempted a transaction but entered the wrong personal identification number. Surveillance footage and phone records reveal that Voss was talking to Cat on his cell phone at this time. At around 11:33 p.m., while Voss was still at the ATM, video shows that an assailant wearing a black hoodie climbed

4

**JA693**

into Voss's truck. Voss reentered his truck at around 11:36 p.m. and began to drive away from the ATM, before returning at approximately 11:41 p.m. to attempt three withdrawals. All the withdrawals were denied for insufficient funds, because unbeknownst to Voss, Cat had placed only five dollars in the account. Voss then got back in his truck and drove away. He was found dead in his truck the next morning in a nearby parking lot. He had been shot five times, with three of the shots being fatal. Four hollow-point bullets and one jacket were recovered. The bullets were identified as .38 class, which can be used with guns capable of firing .357 magnum and .38 special cartridges.

Just a few days after the murder, Runyon checked back into a clinical drug study, and ordered online a stainless steel bore brush, which is used to clean the inside of the barrel of a gun, to be shipped to his West Virginia address, but under a false name. Expert testimony revealed this type of brush can impact examinations that attempt to link bullets to a specific gun. Testimony also revealed that in the Fall of 2007, Runyon had a friend pawn his .357 Taurus magnum revolver several times. Then, in December 2007, Runyon instructed his friend to retrieve the firearm from the pawn shop one last time, and to give the gun back to him. The police were unable to locate the gun after its return to Runyon.

5

**JA694**

While the police were beginning the investigation into the crime, the defendants were working together to hide evidence of the murder. Although Cat had received an initial $100,000 death gratuity benefit from the United States Navy, which she and Draven quickly spent, she had yet to receive the $400,000 life insurance benefit on Voss. In order to receive the full payout, Cat had to clear herself from suspicion, and emails and wiretaps showed that the defendants coordinated amongst themselves to align their alibis and hide their relationships with each other from the investigators.

During police interviews, the defendants gave conflicting stories and attempted to obstruct the investigation. Runyon denied owning any firearms, and he was unable to confirm his whereabouts on April 29 and 30, 2007. All of the parties denied the relationship between Draven and Cat for several months, although Draven did eventually admit the affair to the police.[3] Both Draven and Runyon stated they had met or called each other from a Waffle House in Newport News during the Spring of 2007. Draven further admitted that Runyon used the payphone there to

---

[3] Cat admitted the relationship when she pled guilty, as set forth in her Statement of Facts accompanying her plea agreement. Case No. 4:08cr16-1, ECF Nos. 69, 70. Both the plea agreement and Statement of Facts were admitted into evidence by defense counsel, during the mitigation phase of trial. Def. Exs. 4, 7.

.

talk with him on the night of the murder, although Draven claimed that Runyon stopped at the Waffle House on his way to an out-of-state fishing trip.

In December 2007, nearly eight months after the murder, police executed search warrants in West Virginia for Runyon's residences, vehicle, and storage unit, and the contents of the search were introduced during the guilt phase of trial. In the console of Runyon's car, agents found a map of Newport News, Virginia, on which Runyon had written the following: "Langley Federal Credit Union, 97 grey Ford Ranger, FL hubcap missing, tailgate down, J. Morris Blvd, Cory." The description of the Ford Ranger matched the description of Voss's truck, and J. [Clyde] Morris Boulevard is a street near the LFCU that Voss went to on the night he was murdered. Also found with the map was a photograph of Cat and Draven, with their names, addresses, and social security numbers written on the back.

In Runyon's residence, the investigators located a shopping list written by Runyon, which included a taser, Spyderco knife, tarp, trash bag, boots, gloves, military-style pants, and a black hoodie. Runyon had also written on that list the location of LFCU, and travel time and mileage from Morgantown, West Virginia, to Newport News, Virginia. Although Runyon had apparently requested a payment of five hundred dollars ($500) up

7

**JA696**

front for the murder, a Western Union receipt indicated that Runyon received two hundred seventy-five dollars ($275) from Draven's brother, Randy Fitchett, on June 1, 2007. Fitchett testified, and while he denied that he sent the money order, he recalled going with Draven to send the money order to a friend of Draven's. Additionally, the police found boxes of .38 special and .357 magnum bullets in the basement of Runyon's former residence.[4] Five of the Winchester .357 magnum hollow-point bullets were missing from the box, and medical reports revealed that Voss had been shot five times by hollow-point .38 class bullets. Expert witness testimony provided that .38 class bullets include .357 magnum and .38 special bullets. Multiple witnesses also testified that Runyon had bragged about killing Voss, or a military member or other unidentified person, for money.

In February 2008, a five-count Indictment was returned against Runyon, Cat, and Draven. Although Cat pled guilty in exchange for a life sentence, the above facts were established through evidence and testimony during the trial against Runyon

---

[4] At the time of the search, Runyon had moved to a new address in Morgantown, West Virginia. Agents searched both Runyon's current and former residences, and the residents at his former address indicated that the bullets found in the basement belonged to Runyon.

8

**JA697**

and Draven. The jury then found Runyon guilty of Conspiracy to Commit Murder for Hire, Carjacking Resulting in Death, and Murder with a Firearm in Relation to a Crime of Violence.

## II. PROCEDURAL HISTORY

On February 13, 2008, a federal grand jury returned a five-count Indictment against the Petitioner and his co-defendants, Michael Draven and Catherina Voss, in the murder of Cat Voss's husband, Cory Voss. ECF No. 3. The Indictment charged the defendants with Conspiracy to Commit Murder for Hire, in violation of 18 U.S.C. § 1958(a) (Count One); Carjacking Resulting in Death, in violation of 18 U.S.C. §§ 2119 and 2 (Count Two); Bank Robbery Resulting in Death, in violation of 18 U.S.C. §§ 2113(a), (e), and 2 (Count Three); Conspiracy to Commit Robbery Affecting Commerce, in violation of 18 U.S.C. § 1951(a) (Count Four); and Murder with a Firearm in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(j) and 2 (Count Five). Id.

The Indictment also included a Notice of Special Findings for the death penalty, pursuant to 18 U.S.C. §§ 3591 and 3592. Id. at 13-14. The Notice set out the statutory requirements for the death penalty: the defendants were more than eighteen years old at the time of the offense; there was the requisite intent

**JA698**

to cause death, serious bodily injury, or engage in acts of violence using lethal force or knowingly creating a grave risk of death; and there were statutory aggravating factors. Id. at 13. As to Counts One, Two, Three, and Five, all three defendants were found to meet the statutory aggravating factors of having "committed the offense as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value," and having "committed the offense after substantial planning and premeditation to cause the death of a person." Id. at 13-14. Additionally, for those same counts, the grand jury found Cat Voss and Draven satisfied the statutory aggravating factor of having "procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value." Id. at 14.

On March 4, 2008, Lawrence Woodward and John Babineau were appointed to represent the Petitioner. On July 17, 2008, the government filed its Notice of Intent to Seek a Sentence of Death against the Petitioner. ECF No. 67. The government also filed a Notice stating that it would not seek the death penalty against Draven. Case No. 4:08cr16-2, ECF No. 68. Cat Voss pled guilty to all five counts the following day on July 18, 2008.

On February 13, 2009, Babineau withdrew from the Petitioner's case due to a conflict of interest, and attorney

Stephen Hudgins was appointed. ECF No. 161. The Petitioner filed various pre-trial motions and reports,[5] and on June 30, 2009, the jury trial against the Petitioner and Draven commenced. The first two days consisted of voir dire, and the jury was impaneled on July 2, 2009, after which opening statements and the presentation of evidence began. On July 15, 2009, at the conclusion of all evidence, the court dismissed Count Three, pursuant to Federal Rule of Criminal Procedure 29. On July 17, 2009, the jury found the Petitioner and Draven guilty as to Counts One, Two, and Five, and not guilty as to Count Four. Verdict Form, ECF No. 245, attached hereto as Exhibit A. On July 22, 2009, the trial continued with the eligibility phase, in which the government argued that the Petitioner was eligible to receive the death penalty. The jury found that the Petitioner intentionally killed Cory Voss. Special Verdict Form - Eligibility Phase, ECF No. 255, attached hereto as Exhibit B. The jury also found two statutory aggravators: (1) the Petitioner "committed the offense in consideration for the receipt of, or in expectation of the receipt, of anything of pecuniary value"; and (2) the Petitioner "committed the offense

---

[5] Due to the large volume of filings, the court will not review all the motions and reports at this point. To the extent the filings relate to this Motion, they will be discussed at such point as they are relevant to the claims for relief.

11

after substantial planning and premeditation to cause the death of a person." Id. On August 19, 2009, the penalty phase of the trial commenced. On August 27, 2009, the jury returned a recommendation for death on Counts One and Five, and life imprisonment on Count Two. Special Verdict Form – Selection Phase, at 5, ECF No. 291, attached hereto as Exhibit C. The jury found four non-statutory aggravating factors. Id.[6] The jury also found two statutory mitigating factors and eight non-statutory mitigating circumstances proposed by defense counsel, along with finding three mitigating factors of their own accord. Id.[7] On

---

[6] The non-statutory aggravating factors found by the jury were that the Petitioner (1) caused injury, harm, and loss to the victim, and the victim's family and friends; (2) utilized training, education, and experience gained during criminal justice college courses, his time in the Kansas National Guard, his work as a law enforcement officer, and his experience as a member of the United States Army; (3) engaged in acts of physical abuse towards women; and (4) demonstrated a lack of remorse. Special Verdict Form - Selection Phase, at 1-2, ECF No. 291.

[7] The statutory mitigating factors found by the jury were that (1) the Petitioner did not have a serious criminal record, and (2) other persons equally culpable in the crime will not be punished by death. Special Verdict Form - Selection Phase, at 1-2, ECF No. 291.

The non-statutory mitigators presented by defense counsel, and found by the jury, were that (1) the Petitioner will serve a sentence of life in prison without the possibility of release, if not sentenced to death; (2) the Petitioner has worked and been legally employed for all of his life; (3) the Petitioner committed acts of kindness and generosity for his neighbors and community; (4) the Petitioner grew up, witnessed, and

12

**JA701**

December 4, 2009, pursuant to the jury's verdict, the Petitioner was sentenced to death for Counts One and Five and to life imprisonment without the possibility of release for Count Two. ECF No. 313.[8]

The Petitioner timely filed an appeal, and on February 25, 2013, the Fourth Circuit Court of Appeals affirmed his conviction and sentence. United States v. Runyon, 707 F.3d 475 (4th Cir. 2013). On October 6, 2014, the Supreme Court denied his petition for writ of certiorari. Runyon v. United States, 135 S. Ct. 46 (2014) (No. 13-254). The Petitioner filed

---

experienced domestic violence and parental conflict until his mother and biological father separated; (5) the Petitioner's son will suffer emotional harm, if the Petitioner is executed; (6) the Petitioner's mother will suffer emotional harm, if the Petitioner is executed; (7) the Petitioner served his country as a member of the United States Army and was honorably discharged; and (8) the Petitioner graduated from high school, earned an associate of arts degree, and took further college courses. Id. at 3-4.

The jury also found the following three non-statutory mitigating factors of their own creation: (1) the Petitioner continued to witness and experience domestic violence and parental conflict/abuse from his mother and adoptive father; (2) the Petitioner's brother will suffer emotional harm, if the Petitioner is executed; and (3) the Petitioner was given the impression that Cory Voss was molesting his own daughter. Id. at 4.

[8] Cat Voss was sentenced to life in prison on Counts One, Two, Three, and Five, and twenty (20) years imprisonment on Count Four. Case No. 4:08cr16-1, ECF No. 127. Draven was sentenced to life in prison on all counts of conviction. Case No. 4:08cr16-2, ECF No. 304. Both of these cases are closed, and the convictions and sentences are final.

13

**JA702**

his Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence on October 5, 2015. ECF No. 478. The government filed its Response on January 11, 2016, ECF No. 497, and the Petitioner filed his Reply on March 28, 2016. ECF No. 526.

On December 9, 2015, the Petitioner filed his First Motion for Discovery. ECF No. 491. The government submitted its Response on January 15, 2016, ECF No. 500, and the Petitioner filed his Reply on January 29, 2016. ECF No. 506. Both the Response and the Reply to the Discovery Motion incorporated the Response and Reply to the § 2255 Motion. On April 1, 2016, the Petitioner filed his Second Motion for Discovery. ECF No. 530. The government filed a Response on April 8, 2016, ECF No. 532, and the Petitioner submitted a Reply on April 13, 2016. ECF No. 533.

On February 4, 2016, the Petitioner filed an amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct a Sentence. The government filed its Response to the amended Motion on April 22, 2016. The Petitioner submitted his Reply to the amended filings on July 7, 2016. As Fourth Circuit precedent provides that an amended pleading supersedes the original, the court will now consider the amended Motion and corresponding Response and Reply. See Young v. City of Mount Ranier, 238 F.3d

14

567, 573 (4th Cir. 2001) ("[A]n amended pleading supersedes the original pleading, rendering the original pleading of no effect.").[9] The court will also consider the First and Second Discovery Motions in the same sections as the claims to which each discovery request relates.

### III. STANDARDS OF REVIEW

#### A. MOTIONS BROUGHT PURSUANT TO 28 U.S.C. § 2255

A prisoner may challenge a sentence imposed by a federal court, if (1) the sentence violates the Constitution or laws of the United States; (2) the sentencing court lacked jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum; or (4) the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). A sentence is "otherwise subject to collateral attack" if a petitioner shows that the proceedings suffered from "'a fundamental defect which inherently results in a complete miscarriage of justice.'" United States v. Addonizio, 442 U.S. 178, 185 (1979) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).

The petitioner bears the burden of proving one of those grounds by a preponderance of the evidence. See Miller v. United

---

[9] All citations in this Opinion will refer to the amended pleadings unless otherwise specified.

15

**JA704**

States, 261 F.2d 546, 547 (4th Cir. 1958). If he satisfies that burden, the court may vacate, set aside, or correct the sentence. 28 U.S.C. § 2255(b). However, if the motion, when viewed against the record, shows that the petitioner is entitled to no relief, the court may summarily deny the motion. Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

### 1. Ineffective Assistance of Counsel

In cases where a petitioner claims to have received ineffective assistance of counsel as grounds for relief, a petitioner must show by a preponderance of the evidence that (1) the attorney's performance was deficient; and (2) such deficient performance prejudiced the petitioner by undermining the reliability of the judgment against him. Strickland v. Washington, 466 U.S. 668, 687 (1984).

To show deficient performance, counsel's actions or omissions must be measured against what "an objectively reasonable attorney would have done under the circumstances existing at the time of the representation." Savino v. Murray, 82 F.3d 593, 599 (4th Cir. 1996); see Lawrence v. Branker, 517 F.3d 700, 708-09 (4th Cir. 2008) (noting that this is a "difficult" showing for a petitioner to make). The court must attempt to "eliminate the distorting effects of hindsight," and instead "must indulge a strong presumption that counsel's

16

**JA705**

conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689.

To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. In doing so, a petitioner "must demonstrate that the error worked to his 'actual and substantial disadvantage,' not merely that the error created a 'possibility of prejudice.'" <u>Satcher v. Pruett</u>, 126 F.3d 561, 572 (4th Cir. 1997) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 494 (1986)). Because a petitioner must satisfy both parts of the <u>Strickland</u> test, a failure to carry the burden of proof as to one prong precludes relief and relieves the court of the duty to consider the other. <u>Strickland</u>, 466 U.S. at 700.

Due process of law also requires that a defendant receive effective assistance of counsel on direct appeal. <u>Evitts v. Lucey</u>, 469 U.S. 387, 396-97 (1985). As with trial counsel, effectiveness of appellate counsel is evaluated under the two prongs of <u>Strickland</u>. See <u>Smith v. Murray</u>, 477 U.S. 527, 535-36 (1986). To determine effectiveness of appellate counsel, a court must evaluate whether counsel failed to raise "a particular nonfrivolous issue [that] was clearly stronger than issues that counsel did present" on direct appeal. <u>Smith v. Robbins</u>, 528

17

**JA706**

U.S. 259, 288 (2000). However, appellate counsel need not raise every nonfrivolous claim in their brief. See id.; Jones v. Barnes, 463 U.S. 745, 753 (1983) ("A brief that raises every colorable issue runs the risk of burying good arguments."). As to prejudice, the Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

### 2. Procedural Default

Claims that could have been "fully and completely addressed on direct review based on the record" are considered procedurally defaulted, if raised for the first time during collateral review. Bousley v. United States, 523 U.S. 614, 622 (1998). In order to obtain collateral relief based on issues that could have been raised on direct appeal, but were not, the movant must ordinarily show "'cause' excusing his . . . procedural default," and "'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 167-68 (1982); see also Massaro v. United States, 538 U.S. 500, 504 (2003) ("[C]laims not raised on direct appeal may not be raised on collateral review unless the petitioner shows cause and prejudice."). "The existence of cause for a procedural default must turn on something external to the defense, such as

18

**JA707**

the novelty of the claim or a denial of effective assistance of counsel." United States v. Mikalajunas, 186 F.3d 490, 493 (4th Cir. 1999). Prejudice is shown when the alleged errors worked to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Frady, 456 U.S. at 170.

Even in the absence of cause for the procedural default and resulting prejudice, a defendant may proceed with a collateral attack, if he is able to show that a fundamental miscarriage of justice would result were his claim denied. United States v. Maybeck, 23 F.3d 888, 892 (4th Cir. 1994). To demonstrate a "miscarriage of justice," the petitioner "must show actual innocence by clear and convincing evidence." United States v. Williams, 396 F. App'x 951, 953 (4th Cir. 2010) (unpublished); Mikalajunas, 186 F.3d at 493.

### 3. Bar on Relitigating Claims Brought on Direct Appeal

A petitioner is generally not permitted to relitigate issues brought on direct appeal in a collateral attack. Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (per curiam). Accordingly, courts may "refuse to reach the merits of a constitutional claim previously raised and rejected on direct appeal." Withrow v. Williams, 507 U.S. 680, 720-21 (1993) (Scalia, J., concurring in part and dissenting in part)

19

**JA708**

(collecting cases). Exceptional circumstances, however, such as an intervening change in the law, may warrant a departure from this law-of-the-case doctrine. See Davis v. United States, 417 U.S. 333, 342-47 (1974) (holding that when relevant substantive law changed after the petitioner's trial and unsuccessful appeal, the petitioner could file a § 2255 motion for collateral relief based on the intervening change in the law); Jones v. United States, 178 F.3d 790, 796 (6th Cir. 1999) ("It is equally well settled that a § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law.").

### 4. Retroactive Application of New Rules to Cases on Collateral Review

Generally, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague v. Lane, 489 U.S. 288, 310 (1989). There are two exceptions to this bar on retroactivity. First, "[n]ew substantive rules generally apply retroactively." Schriro v. Summerlin, 542 U.S. 348, 351 (2004). The other exception is for "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." Saffle v. Parks, 494 U.S. 484, 495

20

(1990). Only if one of these exceptions is met may a court retroactively apply a new rule of criminal procedure to a case on collateral review.

### 5. Evaluation of New Claims Contained in Amended Pleadings

To be timely, a motion brought pursuant to 28 U.S.C. § 2255 must be filed within one year of the latest of

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

In the instant case, the Petitioner properly amended his Motion, but the amended Motion was filed more than one year after his conviction became final. For the arguments that were raised for the first time in the amended Motion, Rule 15 of the Federal Rules of Civil Procedure provides for "relation back of

**JA710**

amendments to the original pleading under certain circumstances." <u>United States v. Pittman</u>, 209 F.3d 314, 317 (4th Cir. 2000). Such circumstances occur when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Thus, in a collateral attack, a claim added by amendment relates back unless "it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." <u>Mayle v. Felix</u>, 545 U.S. 644, 650 (2005).

### B. DISCOVERY FOR MOTIONS BROUGHT PURSUANT TO 28 U.S.C. § 2255

Discovery for motions brought pursuant to 28 U.S.C. § 2255 can occur only upon leave of the court, and after a showing of good cause by the Petitioner. Rule 6(a), Rules Governing Section 2255 Proceedings for the United States District Courts. According to Rule 6(b), "[a] party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents." Good cause for discovery is found "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . .

22

entitled to relief.'" <u>Bracy v. Gramley</u>, 520 U.S. 899, 908-09 (1997) (quoting <u>Harris v. Nelson</u>, 394 U.S. 286, 300 (1969)); <u>see also</u> <u>United States v. Roane</u>, 378 F.3d 382, 402-03 (4th Cir. 2004) (clarifying that the good cause standard is met when a petitioner establishes a prima facie case for relief). Importantly, the petitioner must be able to point to specific factual allegations when making his request; he "may not use discovery to go on a 'fishing expedition' through the Government's files in search of evidence to support an imagined and fanciful claim." <u>United States v. Lighty</u>, No. CIV. PJM 12-3065, 2014 WL 5509205, at *3 (D. Md. Oct. 30, 2014) (citing <u>United States v. Wilson</u>, 901 F.2d 378, 381 (4th Cir. 1990)).

Once good cause is established, the district court has discretion to determine the scope and extent of discovery. <u>See</u> <u>Bracy</u>, 520 U.S. at 909; <u>see also</u> <u>Roane</u>, 378 F.3d at 394 (using an abuse of discretion standard to review a district court's denial of discovery in a § 2255 case). A judge may "authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a), Rules Governing Section 2255 Proceedings for the United States District Courts.

23

**JA712**

## IV. THE PETITIONER'S CLAIMS

The Petitioner has raised eighteen claims in his instant Motion, many with one or more subparts. He has also made requests for six different categories of discovery, including requests for both documents and interrogatories. The court will now address each of the eighteen claims in turn. The court will also address the arguments for discovery within the relevant section for each request.[10]

### A. CLAIM ONE – DISHONEST LAW ENFORCEMENT OFFICERS INVOLVED IN CASE

In this claim, the Petitioner asserts that Robert Glenn Ford and Clifford Dean Posey, who assisted in the investigation of the Petitioner's case, were also engaged in criminally dishonest acts before and/or during participation in his case. Mot. at 11. He alleges that their involvement in his case denied him of his right to a fair trial, and that the government should have provided him with information about the charges against both individuals and about Posey's work in the government's investigation. Id. at 11-16. The Petitioner further argues that,

---

[10] The court finds that based on the substantial amount of evidence presented and the extensive filings by both parties, there remain no factual disputes, and an evidentiary hearing is not necessary to resolve the Petitioner's claims.

24

if his trial counsel knew about the charges against Ford and Posey, trial counsel was ineffective for not taking appropriate action. Id. at 11, 14, 16. The Petitioner also seeks discovery of documents and records held by various agencies concerning both Ford and Posey, and he requests permission to propound corresponding interrogatories. First Mot. for Discovery at 26-29.

The United States asserts that this claim is procedurally defaulted, and, regardless of the default, lacks merit. Resp. at 20. In his Reply, the Petitioner asserts that the government never told his counsel about the charges against Ford and Posey, even during direct appeal. Reply at 10-11. He claims this prevented him from objecting or raising the issue on appeal, and, as such, the claim is not procedurally defaulted. Id.

### 1. Robert Glenn Ford

The Petitioner alleges that Robert Glenn Ford, a former police officer who was appointed at the request of the Petitioner's trial counsel as an investigator for the defense, ECF Nos. 40, 41, was a "dirty cop," and that his involvement in a bribery scheme may have tainted the investigation in the Petitioner's case. Mot. at 11.

Records show that an informant, Marcus Adams, entered into a plea deal for the charge of Felon in Possession of a Firearm.

United States v. Adams, 2:08cr103, ECF No. 37. As part of Adams's cooperation, he disclosed that Ford was involved in a scheme whereby Ford "accepted bribes from criminal defendants in exchange for making false representations to prosecutors and judges that the defendants had assisted him in homicide investigations," thereby leading to reduced sentences for the defendants. Id. at 1. On May 7, 2010, nearly six months after the Petitioner was sentenced and almost a year after his trial, Ford was indicted for these actions. United States v. Robert Glenn Ford, 2:10cr83, ECF No. 1. Ford's seven-day jury trial was held in October 2010, and he was sentenced on February 25, 2011. Id. ECF Nos. 57-60, 63, 66, 69, 87, 90. All of these proceedings were public and of record.

The Petitioner's appellate counsel filed their opening appellate brief on February 29, 2012, almost two years after Ford's indictment, and a year after sentencing. Appellate counsel had full benefit of knowledge of Ford's public indictment, trial, and sentencing. As such, the court is unconvinced that this claim could not have been discovered and raised at the time of appeal, and it finds that the claim is procedurally defaulted. However, the Petitioner argues that if appellate counsel knew about Ford's dishonest acts, then appellate counsel was ineffective for not raising this claim on

26

**JA715**

appeal, and such ineffectiveness would excuse default. Mot. at 11. The court will now examine the merits of this claim. If it lacks merit, then the Petitioner will have failed to show the required prejudice for ineffective assistance of appellate counsel, and he will be unable to excuse the procedural default.

First, the Petitioner only speculates about what dishonest acts Ford may have been involved in with regard to Ford's investigation of the Petitioner's case. Id. at 12. The Petitioner theorizes that Ford may have filed a false report or taken a bribe from a witness, but the Petitioner can provide no evidence or example of these, or any other, dishonest acts by Ford in the investigation of the Petitioner's case. Id. Frankly, this argument is merely speculation, with no support in fact. There was no evidence or argument presented at Ford's seven-day trial, sentencing, or motions hearings, that in any way involved the Petitioner's case. See United States v. Robert Glenn Ford, 2:10cr83, Transcripts, ECF Nos. 61, 64, 73, 74, 77, 79, 96-103, 108-110, 112.

Further, the Petitioner's lead attorney, Lawrence Woodward, indicated that Ford and Sheila Cronin, a mitigation investigator, "worked very hard and did a good job investigating the case and [the Petitioner's] background." Mot. Attach. 6, ¶ 4. Cronin stated that she often provided Ford with a list of

27

**JA716**

questions to ask witnesses. Id. Attach. 4, ¶ 3. The Petitioner's other attorney, Stephen Hudgins, also stated that, although he relied on Ford's and Cronin's witness interviews, he talked to the witnesses himself before and during the penalty phase. Id. Attach. 5, ¶ 8. In sum, defense counsel believed that Ford produced quality work, but counsel also provided questions for Ford to ask witnesses and interviewed witnesses themselves. Ford did not investigate the case alone, and counsel did not rely solely on Ford's reports.

Cronin also stated that she knew that Ford was "under considerable stress from the fall-out of the infamous 'Norfolk Four' case." Id. Attach. 4, ¶ 4. Presumably the Petitioner's defense team was on alert to watch over Ford's work, and yet counsel still found no reason to think that he was manipulating witnesses or performing any of the acts that the Petitioner now speculates occurred. Importantly, Ford's case involved his acceptance of bribes in exchange for lower sentences for defendants, and it was not a case where any judge or prosecutor was found to be corrupt. Ford was a person working for the Petitioner's trial counsel, at their request, under their supervision and direction, and with others of the Petitioner's defense team. The Petitioner offers no basis whatsoever why Ford would manipulate witnesses against him or try to harm his case.

28

**JA717**

Additionally, the Petitioner argues that the government should have told defense counsel about Ford's conduct, as it would have caused defense counsel to question the reliability and honesty of Ford's reports to the Petitioner's counsel. Mot. at 12-13. He bases this argument on Fifth Amendment due process principles found in <u>Berger v. United States</u>, 295 U.S. 78 (1935), and an argument that, by not providing trial counsel with this information, the government deprived the Petitioner of effective assistance of trial counsel. Mot. at 13-14. This argument is a bit far-fetched, but the court addresses it below.

As the Petitioner recognizes, the information the government had about Ford's misconduct at the time of the investigation was highly confidential and part of an ongoing criminal investigation <u>not</u> <u>involving</u> <u>the</u> <u>Petitioner's</u> <u>case</u>. <u>Id.</u> at 13 n.4. Ford was not a witness in the Petitioner's case. If anything, Ford would have been a defense witness, not a government witness, so there was no need for impeachment evidence. Ford had not been indicted at that time, and the government was still conducting its investigation. There was no reason that the government should have provided confidential information about the Ford investigation to the Petitioner's counsel. Moreover, as reflected by the transcripts of Ford's

**JA718**

trial, cited above, there was no evidence presented that even touched upon the Petitioner's case.

In sum, the Petitioner's conclusory, speculative statements do not show that he was harmed by Ford's involvement in his case, or that Ford's <u>unrelated</u> <u>extortion</u> <u>scheme</u>, in which he took bribes to reduce other defendants' sentences, affected the Petitioner or affected his Fifth Amendment right to a fair trial or his Sixth Amendment right to effective assistance of counsel. The Petitioner was not denied any constitutional rights here, and, as such, the court finds this claim has no merit. As this claim has no merit, the Petitioner fails to show any prejudice from appellate counsel's decision not to argue this claim on appeal, and he fails to overcome the procedural default.

The Petitioner's claim for discovery about Ford is further without merit. To receive discovery, the Petitioner must show good cause. Good cause is shown, "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" <u>Bracy</u>, 520 U.S. at 908-09 (quoting <u>Harris</u>, 394 U.S. at 300).

The Petitioner is unable to meet this standard. To learn about the scope of Ford's criminal acts and when the government first knew or should have known about those acts, the Petitioner

30

**JA719**

requests "[a]ll documents in the government's possession that both refer or relate to Robert Glenn Ford and this [the Petitioner's] case." First Mot. for Discovery at 29. The Petitioner has shown no cause, much less good cause, as to why this request would help him overcome procedural default or prove ineffective assistance of trial counsel. As Ford was a defense investigator, it would be the Petitioner's defense counsel that knew of Ford's involvement in the Petitioner's case, not the government. While Ford participated in a criminally dishonest scheme <u>to</u> <u>aid</u> <u>criminal</u> <u>defendants</u>, as discussed above, there is no evidence or allegation of record that it in any way involved the Petitioner's case. <u>See</u> <u>United States v. Robert Glenn Ford</u>, 2:10cr83. The Petitioner fails to show how gaining access to the government's records about Ford will help in his request for relief, and the court declines to grant this discovery request.

## 2. Clifford Dean Posey

The Petitioner next alleges that there was a second "dirty cop," Clifford Dean Posey, working on his case, and he argues Posey's involvement led to a due process violation. Mot. at 14. Posey was a special agent with the Bureau of Alcohol, Tobacco, and Firearms, and he was indicted on April 5, 2011, for embezzlement, money laundering, wire fraud, possessing or receiving stolen firearms, and false statements. <u>United States</u>

31

<u>v. Clifford Dean Posey</u>, 3:11cr94, ECF No. 3. The Statement of Facts for Posey's case indicates that this conduct began in or around 2007, but was not known or identified by the government until around October 2010, well beyond the Petitioner's trial. <u>Id.</u> ECF No. 14. Posey was sentenced on September 16, 2011. <u>Id.</u> ECF No. 38.

As discussed above, the government argues that this claim about Posey is procedurally defaulted. Resp. at 20. The Petitioner's appellate counsel filed their opening brief on February 29, 2012, and the indictment against Posey was filed sealed on April 5, 2011, and unsealed on April 6, 2011. Posey was sentenced on September 16, 2011. Again, Posey's case is of public record. The court finds that, based on these dates, appellate counsel could have raised this claim on appeal, and the claim is procedurally defaulted. The Petitioner, however, argues that appellate counsel was ineffective for not raising this claim on appeal, and that such ineffectiveness constitutes the cause and prejudice required to overcome default. Reply at 11. As such, the court will now examine the Petitioner's argument to determine if it has any merit. If it does, then the Petitioner may be able to show ineffective assistance of appellate counsel and overcome default.

32

**JA721**

Posey investigated Cory Voss's death, but did not testify at trial, and the Petitioner does not know the full extent of Posey's involvement. Mot. at 15. The Petitioner points to a trial exhibit where Posey is listed as the transcriber of a phone call and to a few unadmitted documents that contain Posey's name to support his belief that Posey "played a substantial role in investigating and preparing the evidence in this matter." Id. Posey's dishonest acts, however, were not discovered by the government, until over a year after the Petitioner's trial. Accordingly, the government did not have a duty to give anything to the defense prior to trial, nor did they even have anything to give.

This claim is also entirely speculative. Discovery during trial showed what work Posey had done on the Petitioner's case, and the records indicated this was minimal. The Petitioner presents unsupported theories as to what harmful acts he thinks Posey may have committed, Mot. at 15, but that is not enough for relief. The Petitioner can point to no specific harm, and is simply guessing that Posey may have converted firearms or falsified records, without indicating any such record or any shred of evidence to support this claim. The Petitioner does not make a claim for relief or show constitutional harm. Because the Petitioner fails to present a meritorious claim, he cannot show

33

that appellate counsel was ineffective for not raising this claim on appeal, and he does not overcome default.

Not only does the court find this claim to be procedurally defaulted, it also finds that the Petitioner fails to show good cause for discovery. The Petitioner requests information from the government about Posey's involvement with his case and Posey's illegal activities. First Mot. for Discovery at 28. However, trial counsel already conducted discovery and received all documents that showed Posey's involvement with the Petitioner's case. The Petitioner fails to show good cause for further discovery, as he does not show how gaining access to the government's records will assist him in overcoming default or proving ineffective assistance of counsel. As with Ford, the court does not dispute that Posey engaged in criminally dishonest acts in other cases. The Petitioner does not articulate how this current global discovery request will yield additional information about Posey's role in his case. This appears to the court to be an overly broad "fishing expedition," and the Petitioner simply is not entitled to further discovery here.

### 3. Ineffective Assistance of Trial Counsel

The Petitioner briefly alleges that, if trial counsel knew of the investigations into the law enforcement officers, then

34

they were ineffective for failing to take appropriate action. Mot. at 11, 14, 16. However, these brief allegations of ineffective assistance of trial counsel do not meet the deficiency and prejudice standard under Strickland. Even assuming counsel knew of the investigations, and nothing suggests they did, the court has already concluded that the claims have no merit. Thus, the Petitioner was not prejudiced by any decision trial counsel may have made not to further explore the issue.

### 4. Conclusion

The Petitioner has failed to overcome the procedural default on his due process claim about the involvement of Ford and Posey in his case. He has also failed to show that trial or appellate counsel were ineffective in their actions regarding Ford and Posey. For these reasons, Claim One is **DENIED**.

**B. CLAIM TWO – PROSECUTION FAILED TO DISCLOSE EXCULPATORY EVIDENCE ABOUT CO-DEFENDANT MICHAEL DRAVEN**

In Claim Two, the Petitioner argues that the government failed to disclose evidence of co-defendant Draven's violent criminal past, in violation of the Fifth, Sixth, and Eighth Amendments. Mot. at 16. According to the Petitioner, this evidence would demonstrate that Draven had a particularly violent history, including sexual assaults against children. Id.

at 16-17.[11] The Petitioner contends that the government should have turned this information over to defense counsel, as it would have been important to the mitigation strategy. Id. Specifically, the Petitioner alleges that such information "would have added substantial weight to the 'equally-culpable-codefendant' mitigator found by the jury and . . . would have also reduced the weight of the 'abuse of women' aggravator." Id. at 16. The Petitioner believes that failure by the government to hand over this information violated his constitutional rights and the holdings in Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), and Kyles v. Whitley, 514 U.S. 419 (1995). Mot. at 19. The government argues that this claim is procedurally defaulted, and, regardless of the default, it has no merit. Resp. at 24. For the reasons set forth below, the court agrees.

Claim Two is DENIED.

### 1. Procedural Default

As this claim was not brought on direct appeal, the government argues it is procedurally defaulted. Id. at 24. The Petitioner argues in his Reply that this claim could not have been brought on direct appeal because it contains information

---

[11] For the purpose of evaluating this claim, the court assumes that these allegations are true.

36

**JA725**

that was not disclosed by the prosecution. Reply at 19; see Bousley, 523 U.S. at 622 (petitioner's claim was defaulted because it could have been "fully and completely addressed on direct review based on the record" in the case). The Petitioner further argues that a successful Brady claim satisfies the cause and prejudice standard required to excuse default. Reply at 19-20 (citing Wolfe v. Clarke, 691 F.3d 410, 420 (4th Cir. 2012)).

The court does not agree with the Petitioner that this claim was unavailable on direct review. Information about Draven's past existed during the time of direct appeal, and, as mentioned by the Petitioner later in this claim, such information was cited in Draven's sentencing proceedings, which occurred on November 17, 2009. Case No. 4:08cr16-2, ECF No. 303. The Petitioner's appellate counsel filed their opening brief on February 29, 2012. As such, the court finds that had appellate counsel chosen to pursue this line of investigation, information about Draven's past was available and could have been discovered, and the claim could have been raised on appeal. Nevertheless, the Petitioner may still be able to overcome default, as a successful Brady claim would provide the necessary cause and prejudice. The court will now conduct such an analysis.

37

## 2. Brady Claim

In Brady, the Supreme Court held that suppression by the prosecution of evidence material to the defendant's guilt or punishment violates due process. 373 U.S. at 87. To make a successful Brady claim, the Petitioner must prove the following three elements: "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." Banks v. Dretke, 540 U.S. 668, 691 (2004) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). Prejudice for the final Brady requirement is met when the evidence is material. Id. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985); see also Kyles, 514 U.S. at 435 (describing materiality as "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"). This level of prejudice is also the prejudice

38

JA727

required to overcome procedural default. <u>Walker v. Kelly</u>, 589 F.3d 127, 137 (4th Cir. 2009).

There is no question that the government did not provide the Petitioner's trial counsel with information about Draven's past. What the parties now debate is whether this information is material under <u>Brady</u>.[12] As to whether the information is material to the Petitioner's guilt, Draven's past crimes do not affect whether the Petitioner was involved with the murder of Cory Voss. In fact, Draven's past crimes have little relation to his own guilt for the murder of Cory Voss. Although the defense did argue the other co-defendants were bad actors who were attempting to blame the Petitioner for their crimes, the information about Draven's previous violent acts is unrelated to the murder of Cory Voss and fails to suggest that the Petitioner was not involved with the Voss murder. The court finds that even had this information been introduced during the guilt phase,[13] the extensive direct and circumstantial evidence about the

---

[12] Although the parties do not argue the first prong of the test for a <u>Brady</u> violation, the court does not see how this evidence would be exculpatory or impeaching. Nevertheless, it will examine the arguments set forth regarding materiality.

[13] The court is unsure how information about Draven's past crimes could even have been introduced at the guilt stage, with Draven as a co-defendant who did not testify. <u>See also supra</u> note 12.

39

**JA728**

Petitioner's involvement in the murder-for-hire cannot support any finding of a reasonable probability that the proceeding would have resulted in a different outcome.

When the police searched the Petitioner's house and car in December 2007, some eight months after the murder, they found a list of items, written in the Petitioner's handwriting, including a taser, Spyderco knife, tarp, trash bag, boots, gloves, military-style pants, and a black hoodie.[14] The list also mentioned the location of Langley Federal Credit Union ("LFCU") and a distance of three hundred eighty (380) miles and driving travel time of 6.25 hours from Morgantown, West Virginia, to Newport News, Virginia. A map was located that contained identifying information about Cory Voss's car, and a Western Union receipt indicated that the Petitioner received $275 from Draven's brother on June 1, 2007. Telephone and email records showed extensive planning and communication by all three defendants, both before, during, and after the murder. The government established that the Petitioner had bought a .357 magnum revolver and ammunition the day of the murder, April 29, 2007, and then he drove from Morgantown, West

---

[14] Video surveillance from the night of the murder shows an intruder wearing a black hoodie enter Cory Voss's truck while Cory Voss is at the ATM.

40

**JA729**

Virginia, to Newport News, Virginia. A box of .357 bullets with five missing was found at the Petitioner's former residence in Morgantown, West Virginia. A video of the ATM at LFCU showed a man wearing a hoodie entering Cory Voss's car, and Cat Voss had already pled guilty and signed a statement of facts describing the murder of Cory Voss and the Petitioner's involvement.

The next question is whether the evidence is material as to the Petitioner's sentence. The Petitioner's argument centers on how evidence of Draven's past would have influenced a jury during the penalty phase, particularly the weight given to the abuse of women aggravator and the equally culpable co-defendant mitigator. Mot. at 16. The Petitioner argues that the government introduced testimony and incident reports against him to provide support for the abuse of women aggravating factor, and his counsel could have done the same with the requested materials to show that Draven had an equally, if not more, violent past. Id. at 19. He believes at least one juror would have been influenced by knowing the government thought that the Petitioner, but not Draven with his more violent past, was deserving of death. Id. at 19-20.

This argument is a "red herring." First, the jury did find the equally culpable co-defendant mitigator, even without this extra evidence about Draven's history. Special Verdict Form –

41

Selection Phase, at 2, ECF No. 291. The information about Draven may have added additional support for this mitigator, but it was clearly unnecessary because the jury did find this mitigating factor. Second, it is unclear how evidence of Draven's past would affect the abuse of women aggravator for the Petitioner. The past conduct of Draven and the Petitioner are separate and distinct. Just because Draven had a more violent past does not negate the Petitioner's violent criminal history. The court is unconvinced that a jury would not have considered the abuse of women factor to be serious in relation to the Petitioner, simply because Draven had past, separate violent acts from those of the Petitioner. Additionally, the Petitioner played a substantial role in the crime, and the evidence was overwhelming that the Petitioner was the actual perpetrator of the murder; Draven's criminal history does not lower the Petitioner's culpability as to his role in the crime of conviction as compared to his co-defendants. The reliability of the penalty phase is not undermined simply because information about a co-defendant's past was not included.

The Petitioner's cite to Banks v. Dretke, 540 U.S. 668 (2004), is not on point here. Mot. at 16-17. In that case, the Court held that information about an informant's role was material, as that information was central to the prosecution's

42

**JA731**

argument about the defendant's own propensity to commit violent acts and the jury was unable to accurately assess the informant's credibility without the withheld information. Banks, 540 U.S. at 700-01. That evidence went to the heart of the case and dealt directly with how the jury perceived the defendant's culpability and propensity for violence. Id. Such evidence is quite different from introducing a co-defendant's history in order to weaken already-established violent acts of the Petitioner during the penalty stage, after the Petitioner has been found guilty of the murder in phase one.

Further, in this case, the jury found two statutory aggravating factors in the eligibility phase of trial, and four non-statutory aggravating factors in the penalty selection phase of trial. Special Verdict Form - Eligibility Phase, ECF No. 255; Special Verdict Form – Penalty Selection Phase, ECF No. 291. The jury also found two statutory mitigating factors, and a majority of jurors found eleven other non-statutory mitigating factors, eight presented by defense counsel and three of their own creation. Special Verdict Form – Penalty Selection Phase, ECF No. 291. The jury weighed these factors, and even though it found more mitigating factors, it clearly attached substantial weight to the aggravating factors, such as to outweigh the mitigators. Thus, even had the evidence of Draven's past been

43

**JA732**

introduced, the Petitioner is unable to show prejudice. In light of the jury's decision on the other aggravating and mitigating factors and the apparent weight given to the mitigating and aggravating factors, along with all the evidence introduced against the Petitioner during the guilt and penalty phases, the court is not convinced that there is a reasonable probability that the proceeding would have been different, if evidence of another individual's past had been introduced. As such, the Petitioner is unable to show that the information about Draven's crimes is material, and the court finds that this Brady claim is both procedurally defaulted and without merit.

### 3. Ineffective Assistance of Trial Counsel

The Petitioner also raises an ineffective assistance of trial counsel claim. Mot. at 20-21. He argues that "[t]o the extent that counsel failed to investigate and present the information about Draven, despite the evidence being withheld by the prosecution, they were ineffective because the information supported the defense." Id. at 20. The Petitioner further claims that his attorneys were ineffective for not filing a motion to set aside the death penalty or for a new sentencing hearing after the government filed a position paper for Draven's sentencing, which revealed some of Draven's violent past. Id. at 21. In support for why counsel should have further

44

**JA733**

investigated the matter, the Petitioner cites the testimony of Draven's brother at trial and the brother's allegation that Draven raped him and his sister. Id. at 20 n.8.

Counsel does not have a duty to include co-defendant background information in the penalty phase or to perform an in-depth investigation because of a statement made by a witness during trial. Moreover, counsel's decision on how to proceed after judgment is entitled to deference, and the Petitioner fails to show how declining to request that his sentence be set aside based on information about Draven was deficient conduct on the part of counsel. Even had counsel discovered more evidence on Draven's past conduct, the lack of materiality discussed above shows that the Petitioner cannot prove a reasonable probability of a different outcome had counsel argued this information during sentencing or used it to support a motion for resentencing. For these reasons, the Petitioner fails to prove that trial counsel's conduct was either deficient or prejudicial to the Petitioner. There was no ineffective assistance of trial counsel on this claim.

### 4. Discovery

The Petitioner also requests discovery in the form of documents and corresponding interrogatories about Draven's past actions and the investigation into Draven's background. First

Mot. for Discovery at 21-25, 30. The Petitioner suggests no purpose for the requested documents other than using them to prove Draven's past. For purposes of this claim, the court assumed the truth of the Petitioner's allegations about Draven[15] and still found that the Petitioner failed to make a claim. Accordingly, the court finds that the Petitioner fails to make a showing of good cause, or any cause, for the request for discovery and corresponding interrogatories.

## C. CLAIM THREE – COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT GUILT PHASE OF TRIAL BY FAILING TO INVESTIGATE, PRESENT, HIGHLIGHT, AND/OR ARGUE EVIDENCE OF INNOCENCE

The Petitioner next argues that his trial counsel was ineffective during the guilt phase for failing to investigate and present evidence regarding his innocence. Mot. at 21. He cites multiple pieces of evidence and potential testimony that either were not introduced at trial or that he believes were not fully investigated by counsel, and the court will address each of these witnesses and types of evidence in turn.

To prove ineffective assistance of counsel, the Petitioner must show that (1) counsel's representation was deficient and (2) that he was prejudiced as a result. Strickland, 466 U.S. at 693. The court must evaluate counsel's conduct at the time

---

[15] See supra note 11 and accompanying text.

**JA735**

such decisions were made, and not with the "distorting effects of hindsight." Id. at 689. Additionally, counsel's decision to pursue certain lines of defense is owed deference when based on reasonable professional judgment. See id. at 681. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 691. This helps to prevent a court from second guessing counsel's strategy, after such a strategy, although reasonably pursued, was not successful. See id.

### 1. Chad Costa

The Petitioner first argues that counsel should have called Chad Costa to testify during the guilt phase of trial. Mot. at 21-25. He asserts that because defense counsel did not introduce witnesses who knew the Petitioner in the years prior to the murder and arrest, the prosecution was able to argue that there was no evidence to counter the claim that the Petitioner was a cold, calculated killer. Id. at 22. The Petitioner contends that Chad Costa could have testified as someone who knew the Petitioner in the "years that preceded the murder and Runyon's arrest," as Costa met the Petitioner in the second half of 2007, when they would drive together to New Jersey to work in clinical drug studies. Id. This contention again reflects a distortion of the facts, as Costa did not know the Petitioner

47

**JA736**

before the murder. The murder occurred on April 29, 2007, but in Costa's declaration, submitted by the Petitioner, Costa states that he met the Petitioner "in the second half of 2007." Id. Attach. 7, ¶ 2. Costa knew the Petitioner briefly before the Petitioner was arrested on March 4, 2008, which is why Costa was questioned by authorities.

The Petitioner next alleges that Costa could have testified that the Petitioner had a tendency to boast, but the Petitioner never told Costa that he killed anyone. Id. at 22-24. This argument does not relate to the Petitioner's innocence. Just because the Petitioner did not tell Costa that he murdered Cory Voss does not mean he is innocent. It is quite conceivable that one might brag or exaggerate to sound tough, but choose to avoid mentioning an actual crime, such as murder.

The Petitioner also argues that the police told Costa about the crime, and that doing so influenced Costa's grand jury testimony. Id. at 23. For this reason, the Petitioner claims that the police investigation into the murder-for-hire conspiracy, and the Petitioner's participation in the conspiracy, was unreliable, and Costa's testimony could have shown the jury this unreliability. Id. at 23-24. This simply is

48

**JA737**

not true.[16] The police telling someone about the facts of a crime is hardly coercion or improper conduct.[17]

not true. Finally, the Petitioner argues that Costa had seen the Petitioner with a black, six-shot revolver, and counsel should have questioned Costa to bring out inconsistencies in the government's statements about the murder weapon, which could have provided the jury with reasonable doubt about whether the Petitioner's gun was used to shoot Cory Voss. Id. at 22-23. These alleged inconsistencies deal with the type and number of bullets used, the fact that the gun was black or "blued,"[18] and the pattern of the gunshot wounds. This argument does not persuade the court that counsel acted deficiently. Counsel could reasonably have decided not to draw attention to the

---

[16] The court has reviewed the grand jury testimony and finds that nothing untoward occurred.

[17] Although grand jury testimony is not normally admissible, it would have been admissible to impeach Costa, had he testified, and there is plenty in the testimony that could have been used for such a purpose. Accordingly, were Costa's grand jury testimony to be introduced, it would only have added to the evidence about the Petitioner's gun ownership, and the pawning of such gun, and would have been quite damaging.

[18] "Bluing" refers to a procedure that is done to protect a gun against rust, and is so named because the process gives the gun a blue-black appearance.

49

**JA738**

Petitioner's gun ownership and use,[19] and the court fails to accept the Petitioner's argument that drawing more attention to the gun and his gun ownership would have created a reasonable probability of a different result.

The court declines to second guess counsel's decision not to call Costa to the stand, other than to comment in hindsight, after a review of the grand jury testimony, that it was a good one. Counsel is afforded much deference in litigation strategy, and this decision does not appear to be unreasonable. The Petitioner simply fails to show that Costa's lack of testimony undermines the confidence in the outcome here, particularly given their after-the-murder relationship. The Petitioner shows neither cause nor prejudice here.

### 2. Cat Voss

The Petitioner next argues that his trial counsel was ineffective for not calling his co-defendant, Cat Voss, to testify at trial. Mot. at 25-26. This argument is based on a declaration by Cat Voss, secured by the Petitioner's current habeas counsel on September 10, 2015, in which Cat Voss asserts that she did not have independent personal knowledge about the Petitioner's involvement in the conspiracy to murder Cory Voss.

---

[19] See supra note 17 and accompanying text.

50

**JA739**

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| Petitioner, | ) | No. 4:15-cv-108 |
| | ) | Original Criminal No. 4:08-cr-16-3 |
| v. | ) | |
| | ) | CAPITAL §2255 PROCEEDINGS |
| UNITED STATES OF AMERICA, | ) | HON. REBECCA BEACH SMITH |
| Respondent. | ) | |

**PETITIONER'S MOTION TO ALLOW ATTORNEY BRACE TO WITHDRAW,
AND TO APPOINT SUBSTITUTE COUNSEL**

In this matter, undersigned counsel Michele Brace is one of petitioner David Anthony Runyon's two appointed attorneys for federal habeas proceedings under 28 U.S.C. §2255, and the only one of Mr. Runyon's counsel who is currently a member of the Virginia bar. A recently developed medical problem impairs Attorney Brace's ability to continue representing Mr. Runyon competently at this time. Counsel has undergone medical testing, and her physician has referred her to a clinical program at a major medical center for further examination and treatment. Counsel had hoped to "push through" the completion of Mr. Runyon's federal habeas proceedings but has found herself unable to competently do so. Attorney Brace already has withdrawn from her representation of the petitioner in her other active habeas matter, and she seeks leave to do the same for her representation of Runyon.

Attorney Brace is pleased to inform the court that her law firm colleague, Elizabeth Peiffer, is highly qualified and available to be appointed as Runyon's substitute counsel. As shown in her appended resume, Attorney Peiffer has roots in this district, having obtained her J.D. at William and Mary School of Law, and also having had a semester-long externship with now-retired United

1

**JA740**

States Federal Magistrate Judge Tommy Miller. Prior to her current focus on habeas litigation, Peiffer represented pretrial capital defendants at state capital public defender offices in Virginia and Georgia, and she has conducted mitigation investigations. She is admitted to practice in this Court as well as the U.S. Court of Appeals for the Fourth Circuit and the U.S. Supreme Court.

Attorney Peiffer has a very general knowledge of Runyon's case, but she has not previously worked on it. Thus, she will need an initial accommodation to allow her to come up to speed while still attending to her other clients. Because the parties in Runyon's case are working through the pre-hearing tasks of investigation, discovery, and development of evidence, Attorney Peiffer's appointment is unlikely to have any effect on the ultimate date for the evidentiary hearing in Runyon's matter.

Wherefore, Petitioner asks this Court to grant Petitioner's Motion to Withdraw and asks the Court to appoint Attorney Peiffer as substitute counsel.

Respectfully Submitted,

| | |
|---|---|
| /s/_____ | /s/_____ |
| Elizabeth J. Peiffer | Michele J. Brace |
| Virginia Capital Representation | Virginia Capital Representation |
|    Resource Center |    Resource Center Michele J. Brace |
| 2421 Ivy Road, Suite 301 | 2421 Ivy Road, Suite 301 |
| Charlottesville, VA 22903 | Charlottesville, VA 22903 |
| Phone (434) 817-2970 | Work from Home: (202) 223-6380 |
| Fax: (434) 817-2972 | Phone: (434) 817-2970 |
| epeiffer@vcrrc.org | mbrace@mindsort.com |

Dated: November 16, 2021

2

**JA741**

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2021, I have electronically filed the foregoing Petitioner's Motion To Allow Attorney Brace to Withdraw And To Appoint Substitute Counsel with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Commons, Suite 300
Newport News, VA 23606
(757) 591-4032
Brian.Samuels@usdoj.gov

Lisa Rae McKeel
U.S. Attorney's Office
Fountain Plaza Three
721 Lakefront Commons Suite 300
Newport News, VA 23606
(757) 591-4040
Lisa.McKeel@usdoj.gov

Respectfully submitted,


_/s/_____
Michele J. Brace, VSB 36748
VIRGINIA CAPITAL REPRESENTATION
    RESOURCE CENTER
2421 Ivy Road, Suite 301
Charlottesville, Virginia 22903
Work from Home: (202) 223-6380
Phone: (434) 817-2970
Fax: (434) 817-2972
mbrace@mindsort.com

3

**JA742**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

          Petitioner,

v.

UNITED STATES OF AMERICA,

          Respondent.

                              CIVIL NO. 4:15cv108
                 [ORIGINAL CRIMINAL NO. 4:08cr16]

## ORDER

This matter comes before the court on Petitioner's "Sworn Statement of Returned Documents" ("Sworn Statement"), ECF No. 647, and "Petitioner's Motion to Allow Attorney Brace to Withdraw, and to Appoint Substitute Counsel" ("Motion to Withdraw"), ECF No. 648, filed by counsel on November 15 and 16, 2021, respectively. For the reasons explained in this Order, the court **GRANTS** the Motion to Withdraw and **ACCEPTS** the Sworn Statement, with the caveat provided below.

## I. MOTION TO WITHDRAW

Petitioner is currently represented by Michele J. Brace, of the Virginia Capital Representation Resource Center, and Dana Catherine Hansen Chavis, of Federal Defender Services of Eastern Tennessee, Inc. In the Motion to Withdraw, Ms. Brace seeks leave to withdraw as Petitioner's counsel for medical reasons. ECF No. 648 at 1. She also explains that her colleague at the Virginia Capital Representation Resource Center, Elizabeth J. Peiffer, is

**JA743**

prepared to step in as substitute counsel to represent Petitioner in this matter. Id. at 1-2. Ms. Peiffer is a member of the bar of this court, the United States Court of Appeals for the Fourth Circuit, and the United States Supreme Court, and she has extensive experience representing petitioners in federal habeas corpus proceedings. Id. at Ex. 1. Ms. Brace represents that the substitution "is unlikely to have any effect on the ultimate date for the evidentiary hearing in [this] matter." Id. at 2. For good cause shown, the court **GRANTS** the Motion to Withdraw and **APPOINTS** Ms. Peiffer as substitute counsel to represent Petitioner in his ongoing habeas corpus proceeding.[1]

## II. SWORN STATEMENT

In Memorandum Orders entered on April 7, 2015, and October 2, 2015, the court granted Petitioner's request to obtain copies of certain sealed jury selection records ("Records"). ECF No. 422 at 3, 5-7; ECF No. 475 at 15-16. The court entered another Memorandum Order on October 26, 2015, granting Petitioner's request to "make a single in-kind copy of [the Records], for use by co-counsel, Ms. Chavis." ECF No. 481 at 6. The court also explained as follows:

> [U]pon completion of the habeas litigation, with the return to the court of [the Records], both Ms. Brace and

---

[1] The Motion to Withdraw was made orally at the Status Conference held on November 15, 2021, with both Petitioner and the United States Attorney present. No objection was made to the withdrawal of Ms. Brace for health reasons.

2

**JA744**

> Ms. Chavis will be required to submit "a sworn statement that the [Records] have been maintained under seal, and no copies thereof of any nature – paper, electronic, or otherwise – have been made or exist" and that "no juror contact has been made, directly or indirectly, through someone else, or by any means."

Id. (emphasis added) (quoting ECF No. 475 at 16).

On November 15, 2021, Ms. Brace submitted a sworn statement explaining that she returned the following items to the court:

(1) Two sealed cartons that together contain the juror questionnaires of all 243 prospective jurors who completed a questionnaire in this case.

(2) One sealed paper envelope containing the Court's strike lists, identifying each prospective juror in this case who was struck peremptorily and by which party.

(3) Two sealed envelopes (one of which is padded) that together contain redacted CDs of the 2005 and 2007 master and qualified jury wheels for Newport News and Norfolk, with plus statistical information about the grand jury, statistical information about the individuals drawn for the petit jury venire, and the trial court's list of reasons for any disqualifications, excusals or exemptions.

ECF No. 647 at 2. Ms. Brace also included a statement explaining her compliance with this court's orders concerning reproduction of the Records and contact with jurors. Id. at 1-3.[2]

The court **ACCEPTS** the Sworn Statement and **FINDS** that Ms. Brace has complied with this court's orders concerning the Records.

---

[2] Ms. Brace notified that court that a copy of "62 juror questionnaires from the first day of voir dire" was created to complete the record for Petitioner's proceedings before the Fourth Circuit Court of Appeals. See ECF No. 647 at 1-2. She further noted that the questionnaires "were reprinted in sealed volumes of the

3

**JA745**

However, the court notes that Ms. Chavis's copy of the Records is still outstanding. Ms. Chavis is therefore **DIRECTED** to return her copy of the Records and to submit the required affidavit(1) upon the conclusion of Petitioner's habeas proceedings, or (2) when the Records are no longer needed for such proceedings, whichever is earlier.

### III. CONCLUSION

For good cause shown, the court **GRANTS** Petitioner's Motion to Withdraw and **ACCEPTS** the Sworn Statement, with the caveat noted above. The Clerk is **DIRECTED** to forward a copy of this Order to the United States Attorney at Newport News and counsel for Petitioner.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
Senior United States District Judge

REBECCA BEACH SMITH
SENIOR UNITED STATES DISTRICT JUDGE

November 19, 2021

---

Joint Appendix" for Petitioner's appeal. Id. at 1. This was permitted by this court's September 15, 2017, order. See ECF No. 597.

4

**JA746**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON,<br>Petitioner, | )<br>) | No. 4:15-cv-108 |
| | ) | Original Criminal No. 4:08-cr-16-3 |
| v. | ) | |
| | ) | CAPITAL §2255 PROCEEDINGS |
| UNITED STATES OF AMERICA,<br>Respondent. | )<br>)<br>) | HON. REBECCA BEACH SMITH |

## AGREED PRE-EVIDENTIARY HEARING SCHEDULING ORDER

Upon the motion of the United States and the Petitioner, DAVID ANTHONY RUNYON,

by and through counsel, it is hereby, ORDERED that:

On February 12, 2021, the Fourth Circuit Court of Appeals issued an order partially

reversing and remanding this case for an evidentiary hearing to determine, pursuant to Petitioner's

Claim 6 of Runyon's § 2255 Motion, whether his counsel was constitutionally ineffective in

failing to investigate mitigating evidence of brain injury and potential mental illness. *United*

*States v. Runyon*, 994 F.3d 192 (Feb. 12, 2021).

On November 15, 2021, in a status conference, the Court consulted with the parties

concerning the schedule associated with the evidentiary hearing. By agreement, the parties shall

abide by the following scheduling order in anticipation of an additional status hearing to take

place in 2022:

| | |
|---|---|
| January 31, 2022 | Deadline for the Petitioner to complete production of discoverable matters relevant to the claim of ineffective assistance of counsel. Counsel shall specifically provide all matters contained in the trial counsel file as related to trial defense counsel's investigation, strategy, and failure to present mitigation as set forth in Petitioner's Habeas Claim 6, to include documents related to relevant communications with any expert consultants, mitigation consultants, and potential expert witnesses, as well as materials provided to or otherwise relied upon by mitigation and expert consultants and potential expert witnesses. The Court notes that, by agreement of the parties, Petitioner shall provide discovery on a rolling basis throughout this time |

2

JA747

period.

Deadline for the Government to complete review of its files and produce any matters relevant to Petitioner's Habeas Claim 6, if not previously produced. Specifically, the Government shall provide all matters, should they exist, related to Petitioner's brain injury and mental illness, such matters that would have been disclosed if mental health evidence had been fully exchanged between the parties and presented to the jury.

February 11, 2022      Deadline for the parties to meet and confer regarding status of discovery.

February 21, 2022      Deadline for parties to file motions related to discovery produced by Petitioner to date pursuant to Rule 6(a) of the Rules Governing § 2255 Cases and the Federal Rules of Civil Procedure.

February 28, 2022      Deadline for the parties to file responses related to any Government motions referenced in the preceding paragraph.

March 16, 2022         The Court shall conduct an in-person status conference in this case, at which the parties shall discuss any additional anticipated needs for investigation and further motions to conduct discovery, pursuant to Rule 6(a) of the Rules Governing § 2255 Cases and the Federal Rules of Civil Procedure. Parties shall discuss anticipated needs for discovery, potential expert concerns, and suggested dates for a further status conference and/or the evidentiary hearing.

Any party seeking to extend any deadline set out in this Order shall file a motion setting forth good cause at least one week before the expiration of the deadline sought to be extended.

The Clerk is directed to send a copy of this Order to counsel for the Petitioner and to the United States Attorney at Newport News.

IT IS SO ORDERED.

_____/s/_____ —PBS

Rebecca Beach Smith
Senior United States District Judge

The Hon. Rebecca Beach Smith
Senior United States District Court Judge

January **21** , 2022

3

**JA748**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| Petitioner, | ) | Original Criminal No. 4:08-cr-16-3 |
| | ) | Original Civil No. 4:15-cv-108 |
| v. | ) | **CAPITAL §2255 PROCEEDINGS** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | HON. REBECCA BEACH SMITH |
| Respondent. | ) | |

**RUNYON'S NOTICE OF COMPLIANCE WITH ORDER**
**REGARDING PRE-HEARING DISCLOSURES**

Petitioner David Anthony Runyon, by counsel, gives notice that, pursuant to the Memorandum Order (ECF No. 685 at 25), he provided Respondent with a list of 23 witnesses and 141 exhibits that he either expects to present or he may present at the upcoming evidentiary hearing. The witness and exhibit lists were emailed on August 29, 2022, to those persons listed in the attached certificate of service.

**JA749**

Respectfully Submitted,

/s/Elizabeth J. Peiffer
Elizabeth J. Peiffer, VSB No. 71353
Virginia Capital Representation Resource Center
1155 Seminole Trail #6391
Charlottesville, VA 22906
Telephone (434) 817-2970
Fax (434) 817-2972
epeiffer@vcrrc.org


/s/Dana C. Hansen Chavis, *pro hac vice*
Dana C. Hansen Chavis
Asst. Federal Community Defender
Federal Defender Services of Eastern Tennessee
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

**JA750**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 31, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

Carrie Lee Ward
Department of Justice
Capital Case Section
1331 F Street, NW
Room 650
Washington, DC 20530
Telephone (202) 923-7154
Fax: (202) 305-9779
Carrie.Ward@usdoj.gov

/s/Nancy Hernandez
Nancy Hernandez
Paralegal, Capital Habeas Unit
nancy_hernandez@fd.org

**JA751**

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| Petitioner, | ) | Original Criminal No. 4:08-cr-16-3 |
| | ) | Original Civil No. 4:15-cv-108 |
| v. | ) | **CAPITAL §2255 PROCEEDINGS** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | HON. REBECCA BEACH SMITH |
| Respondent. | ) | |

**RUNYON'S NOTICE OF COMPLIANCE WITH ORDER
REGARDING PRE-HEARING DISCLOSURES**

Petitioner David Anthony Runyon, by counsel, gives notice that, pursuant to the Memorandum Order (ECF No. 685 at 25), he provided Respondent with Amended Pre-Hearing Disclosures. The disclosure was emailed on September 23, 2022, to those persons listed in the attached certificate of service.

**JA752**

Respectfully Submitted,

/s/Elizabeth J. Peiffer
Elizabeth J. Peiffer, VSB No. 71353
Virginia Capital Representation Resource Center
1155 Seminole Trail #6391
Charlottesville, VA 22906
Telephone (434) 817-2970
Fax (434) 817-2972
epeiffer@vcrrc.org


/s/Dana C. Hansen Chavis, *pro hac vice*
Dana C. Hansen Chavis
Asst. Federal Community Defender
Federal Defender Services of Eastern Tennessee
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

**JA753**

**CERTIFICATE OF SERVICE**

I hereby certify that on September 23, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

Carrie Lee Ward
Department of Justice
Capital Case Section
1331 F Street, NW
Room 650
Washington, DC 20530
Telephone (202) 923-7154
Fax: (202) 305-9779
Carrie.Ward@usdoj.gov

/s/Nancy Hernandez
  Nancy Hernandez
  Paralegal, Capital Habeas Unit
  nancy_hernandez@fd.org

**JA754**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

|  |  |  |
|---|---|---|
| | ) | |
| DAVID ANYHONY RUNYON, | ) | |
| Petitioner, | ) | Original Criminal No. 4:08-cr-16-3 |
| | ) | Original Civil No. 4:15-cv-108 |
| vs. | ) | **CAPITAL § 2255 PROCEEDINGS** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | HON. REBECCA BEACH SMITH |
| Respondent. | ) | |
| | ) | |

### MOTION FOR APPOINTMENT OF CO-COUNSEL

Comes now, DAVID ANTHONY RUNYON, an indigent federal prisoner under sentence of death, and respectfully moves the Court to appoint a third experienced capital habeas attorney to represent him in pursuing post-conviction remedies, including the investigation, preparation, prosecution of a motion for post-conviction relief pursuant to 28 U.S.C. § 2255, and in preparing for and conducting an evidentiary hearing. Mr. Runyon specifically asks the Court to appoint Helen Susanne Bales.[1] Assistant Federal Defender, of the Federal Defender Services of Eastern Tennessee, Inc. (FDSET), as additional co-counsel.

---

1 Ms. Bales is admitted to practice before the Fourth Circuit Court of Appeals as Helen Susanne Bales, which is also the name that appears on her Tennessee State Bar Card.

**JA755**

Pursuant to Local Rule 7(f), a Memorandum of Law in Support of Mr. Runyon's Motion for Appointment of Co-Counsel accompanies this motion.

<div style="margin-left: 45%;">

Respectfully Submitted,

/s/Elizabeth J. Peiffer
Elizabeth J. Peiffer, VSB No. 71353
Virginia Capital Representation Resource Center
1155 Seminole Trail #6391
Charlottesville, VA 22906
Telephone (434) 817-2970
Fax (434) 817-2972
epeiffer@vcrrc.org

/s/Dana C. Hansen Chavis, *pro hac vice*
Dana C. Hansen Chavis
Asst. Federal Community Defender
Federal Defender Services of Eastern Tennessee
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

</div>

**JA756**

**CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2022, I have electronically filed the foregoing Motion for Appointment of Co-Counsel and Memorandum of Law with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

Carrie Lee Ward
Department of Justice
Capital Case Section
1331 F Street, NW
Room 650
Washington, DC 20530
Telephone (202) 923-7154
Fax (202) 305-9779
Carrie.Ward@usdoj.gov

/s/Nancy Hernandez
   Nancy Hernandez
   Paralegal, Capital Habeas Unit
   nancy_hernandez@fd.org

**JA757**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | | |
|---|---|---|
| DAVID ANYHONY RUNYON, | ) | |
| Petitioner, | ) | Original Criminal No. 4:08-cr-16-3 |
| | ) | Original Civil No. 4:15-cv-108 |
| vs. | ) | |
| | ) | **CAPITAL § 2255 PROCEEDINGS** |
| UNITED STATES OF AMERICA, | ) | |
| Respondent. | ) | HON. REBECCA BEACH SMITH |
| | ) | |

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR APPOINTMENT OF CO-COUNSEL**

DAVID ANTHONY RUNYON by and through habeas counsel of record, Elizabeth Peiffer, asks the Court to appoint Helen Susanne Bales (Levi) of Federal Defender Services of Eastern Tennessee, Inc., as third habeas counsel of record in the case.[1]

This Court originally appointed as habeas counsel Michele J. Brace of the Virginia Capital Representation Resource Center to represent Mr. Runyon "on collateral review in this court." ECF 410. Elizabeth Peiffer was appointed when Ms. Brace retired from the practice of law. ECF 649. She had not previously been involved in Mr. Runyon's representation. This Court also appointed a second qualified attorney, Dana Hansen Chavis, of the Capital Habeas Unit of Federal Defender Services of Eastern Tennessee, Inc. (FDSET). The order appointing Ms. Chavis stated, "Ms. Chavis is permitted to work on the Defendant's case with her legal colleagues and support staff at FDSET." ECF 435 p.6.

---

[1] In its Order of June 3, 2015, ECF 439, the Court noted that, "[i]f [counsel] has some specific reason for Ms. Levi to be a third counsel of record in the case, she should so notify the court thereof in writing." Mr. Runyon's Motion and Memorandum are filed in compliance with the Court's Order.

**JA758**

In the request for appointment of Ms. Chavis, it was conveyed to the Court that Ms. Chavis would assign attorney Susanne Bales, who is also a qualified capital habeas attorney from FDSET, to work on Mr. Runyon's case. ECF 433 p.8. After appointing Ms. Chavis to represent Runyon, this Court accepted Ms. Chavis's application for pro hac vice admission. ECF 436 and 438. Ms. Bales also filed an application for pro hac vice admission, however, the Court denied that application. ECF 437 and 439. In denying Ms. Bales's application the Court noted that "neither Ms. Brace nor Ms. Chavis have moved the court to appoint" her as third habeas counsel, ECF 439 p.2. The Court also reminded counsel of record that they could "work on" Mr. Runyon's case with legal colleagues, ECF 439 p.3, and this would include attorney Bales.

Subsequently, attorney Bales assisted Ms. Brace and Ms. Chavis with research and writing for the written submissions to this Court. There were no in-person court proceedings before Mr. Runyon's § 2255 motion was summarily denied. Next, attorneys Bales, Brace, and Chavis represented Mr. Runyon before the Fourth Circuit Court of Appeals. Ms. Bales participated in the briefing process, appeared as a counsel of record, and argued the case to the panel.

Mr. Runyon's case has been remanded for an evidentiary hearing which will be soon set on the Court's calendar. In light of the upcoming evidentiary hearing, the large number of witnesses and exhibits to be presented to the Court, and the anticipated length of in-court proceedings, undersigned counsel finds it appropriate to request the appointment of a third habeas counsel. Ms. Bales is the ideal co-counsel due to her knowledge of and involvement in the case thus far.

Since 2015, when counsel Chavis was appointed, the habeas attorneys working on Mr. Runyon's case have been: Ms. Brace/Ms. Peiffer, Ms. Chavis, and Ms. Bales. Formal in-court proceedings are imminent, and Mr. Runyon needs the assistance of all three of his current attorneys

**JA759**

in court. Mr. Runyon has provided pre-hearing notice that he either expects or may present at the evidentiary hearing 23 witnesses and 141 exhibits. Mr. Runyon's three attorneys are dividing responsibilities for the upcoming hearing and for presentation of the proof. The upcoming work is critical to Mr. Runyon's case and it requires the continued work of attorneys Peiffer, Chavis, and Bales. The three attorneys need to be able to prepare for and fully participate in the evidentiary hearing to provide adequate representation to Mr. Runyon. Notably, the government has had three attorneys of record fully participating in the pre-hearing in-court proceedings.

Mr. Runyon respectfully asks the court to appoint Susanne Bales, Assistant Federal Defender, to represent Mr. Runyon.  Ms. Bales is an assistant federal defender within FDSET's 11-person Capital Habeas Unit (CHU). She is fully qualified for appointment under 18 U.S.C. § 3599.  She has more than fifteen years of experience representing capital habeas petitioners in federal court. She has served as lead counsel on two capital habeas cases that proceeded to evidentiary hearings. She not only has extensive experience representing capital habeas petitioners in federal courts, but Ms. Bales has already worked extensively on Mr. Runyon's case, including working closely with one of the expert witnesses who will testify at the upcoming evidentiary hearing.

Moreover, as with Ms. Chavis, having Ms. Bales represent Mr. Runyon is both efficient and cost-effective. First, she has extensive experience representing defendants in precisely this kind of case. Second, consistent with each district's Criminal Justice Act Plan, the CHU employees are on salary from their defender organization, and they cannot seek payment from the Court for any staff member's time or litigation expenses, or for any other case-related services.

Ms. Bales is not currently a member of the Virginia Bar. She has, however, assembled the necessary paperwork and is prepared to petition for her admission *pro hac vice* should the Court

**JA760**

enter an order granting Ms. Bales's appointment.

The circumstances exist for the appointment of a third habeas counsel, and therefore Mr. Runyon asks the Court to appoint Susanne Bales, Assistant Federal Defender, Federal Defender Services of Eastern Tennessee, Inc.

WHEREFORE, Mr. Runyon respectfully requests that the Court appoint Ms. Bales to represent him in collateral proceedings under § 2255. Ms. Bales's contact information is:

> Susanne Bales
> Assistant Federal Defender
> Federal Defender Services of Eastern Tennessee, Inc.
> 800 South Gay Street, Suite 2400
> Knoxville, TN 37929-9714
> Phone (865) 637-7979
> Fax (865) 637-7999
> Susanne_Bales@fd.org

Respectfully Submitted,

/s/Elizabeth J. Peiffer
Elizabeth J. Peiffer, VSB No. 71353
Virginia Capital Representation Resource Center
1155 Seminole Trail #6391
Charlottesville, VA 22906
Telephone (434) 817-2970
Fax (434) 817-2972
epeiffer@vcrrc.org

/s/Dana C. Hansen Chavis, *pro hac vice*
Dana C. Hansen Chavis
Asst. Federal Community Defender
Federal Defender Services of Eastern Tennessee
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

**JA761**

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2022, I have electronically filed the foregoing with the

Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF)

to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

Carrie Lee Ward
Department of Justice
Capital Case Section
1331 F Street, NW
Room 650
Washington, DC 20530
Telephone (202) 923-7154
Fax (202) 305-9779
Carrie.Ward@usdoj.gov

/s/Nancy Hernandez
Nancy Hernandez
Paralegal, Capital Habeas Unit
nancy_hernandez@fd.org

**JA762**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

DAVID ANTHONY RUNYON,

                    Petitioner,

v.                                        CIVIL NO. 4:15cv108
                                 [ORIGINAL CRIMINAL NO. 4:08cr16]

UNITED STATES OF AMERICA,

                    Respondent.

                              ORDER

     This matter comes before the court on the Fourth Circuit's

limited remand of Petitioner's "Motion Under 28 U.S.C. § 2255 to

Vacate, Set Aside, or Correct Sentence" ("Motion to Vacate"). ECF

No. 478. The Fourth Circuit remanded the matter for an evidentiary

hearing to explore a single issue, raised in Claim Six of the

Motion to Vacate: whether Petitioner's counsel "failed to provide

him with effective assistance, in violation of the Sixth Amendment,

by failing to investigate adequately his brain injury and

potential mental illness and introduce such evidence in mitigation

during the penalty phase of trial." United States v. Runyon, 994

F.3d 192, 204-209 (4th Cir. 2021); ECF No. 478 at 34-75.

     A status conference was held on October 18, 2022, to resolve

scheduling issues and to set the evidentiary hearing. For the

reasons stated from the bench, the Calendar Clerk is **DIRECTED** to

schedule the evidentiary hearing to begin on February 7, 2023,

at 11:00 AM, to continue through February 28, 2023, or until

**JA763**

completion. Counsel are **DIRECTED** to provide the court with copies of exhibits, witness lists, and pre-hearing disclosures exchanged between the parties on or before November 1, 2022.

At the status conference, the court also took Petitioner's Motion to Appoint Co-Counsel, ECF No. 691, under advisement. Petitioner may renew his motion before the evidentiary hearing, should the need arise. The parties are hereby **ORDERED** to comply with the court's instructions at the hearing, and the Clerk is **DIRECTED** to forward a copy of this Order to counsel for Petitioner, the United States Attorney at Newport News, and the Bureau of Prisons ("BOP").

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
Senior United States District Judge
_____
REBECCA BEACH SMITH
SENIOR UNITED STATES DISTRICT JUDGE

October 18, 2022

2

**JA764**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Newport News Division

|  |  |  |
|---|---|---|
| DAVID ANTHONY RUNYON, | ) | |
| Petitioner, | ) | Original Criminal No. 4:08-cr-16-3 |
| | ) | Original Civil No. 4:15-cv-108 |
| vs. | ) | **CAPITAL § 2255 PROCEEDINGS** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | HON. REBECCA BEACH SMITH |
| Respondent. | ) | |
| | ) | |

### RENEWED MOTION FOR ATTORNEY BALES TO APPEAR *PRO HAC VICE*

Comes now, DAVID ANTHONY RUNYON, an indigent federal prisoner under sentence of death, and respectfully renews his motion for Attorney Bales to appear *pro hac vice*, or to be appointed, to represent him in pursuing post-conviction remedies, including the investigation, preparation, prosecution of a motion for post-conviction relief pursuant to 28 U.S.C. § 2255, and in preparing for and conducting an evidentiary hearing. Mr. Runyon specifically renews his request that Attorney Bales appear *pro hac vice* or be appointed.

Pursuant to Local Rule 7(f), a Memorandum of Law in Support of Mr. Runyon's Renewed Motion for Attorney Bales to Appear *Pro Hac Vice* or to be Appointed accompanies this motion.

**JA765**

Respectfully Submitted,

/s/Elizabeth J. Peiffer
Elizabeth J. Peiffer, VSB No. 71353
Virginia Capital Representation Resource Center
1155 Seminole Trail #6391
Charlottesville, VA 22906
Telephone (434) 817-2970
Fax (434) 817-2972
epeiffer@vcrrc.org

/s/Dana C. Hansen Chavis, *pro hac vice*
Dana C. Hansen Chavis
Asst. Federal Community Defender
Federal Defender Services of Eastern Tennessee
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

**JA766**

**CERTIFICATE OF SERVICE**

I hereby certify that on January 13, 2023, I have electronically filed the foregoing **Renewed Motion for Attorney Bales to Appear *Pro Hac Vice* or to be Appointed** with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

Carrie Lee Ward
Department of Justice
Capital Case Section
1331 F Street, NW
Room 650
Washington, DC 20530
Telephone (202) 923-7154
Fax (202) 305-9779
Carrie.Ward@usdoj.gov

/s/Nancy Hernandez
 Nancy Hernandez
 Paralegal, Capital Habeas Unit
 nancy_hernandez@fd.org

**JA767**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | | |
|---|---|---|
| DAVID ANTHONY RUNYON,<br>      Petitioner, | )<br>)<br>) | Original Criminal No. 4:08-cr-16-3<br>Original Civil No. 4:15-cv-108 |
| vs. | )<br>) | **CAPITAL § 2255 PROCEEDINGS** |
| UNITED STATES OF AMERICA,<br>      Respondent. | )<br>)<br>)<br>) | HON. REBECCA BEACH SMITH |

MEMORANDUM IN SUPPORT OF RENEWED MOTION FOR
ATTORNEY BALES TO APPEAR *PRO HAC VICE*

DAVID ANTHONY RUNYON, by and through counsel, renews his motion that the Court

allow the admission *pro hac vice* of, and appoint pursuant to 18 U.S.C. § 3599(c), as the Court

deems necessary,[1] Helen Susanne Bales (Levi) (hereinafter "Bales") of Federal Defender Services

of Eastern Tennessee, Inc. (FDSET), as counsel of record in this case. In support of this Motion,

Mr. Runyon states as follows:

Mr. Runyon is an indigent federal prisoner, sentenced to death. ECF No. 313. As such, he

is entitled to appointment of counsel for the development and presentation of claims for relief

pursuant to 28 U.S.C. § 2255. *See* 18 U.S.C. § 3599(c). Consistent with § 3599, on November 10,

---

[1] Because she is an employee of the FDSET, Bales does not technically need to be appointed to this case under 18 U.S.C. § 3599, or other provision of law. As noted, *infra*, she will not seek compensation for her time or reimbursement for expenses under the Criminal Justice Act. The Court's docket has designated Bales's FDSET colleague Chavis as "retained" counsel (distinct from "CJA Appointed"), and Bales could receive the same designation. Mr. Runyon seeks Bales's appointment to the extent the Court finds that necessary in order for her to fully participate in Runyon's representation.

**JA768**

2014, the Court appointed counsel, Michele Brace, a staff attorney with the Virginia Capital Representation Resource Center (VCRRC). ECF No. 410.

On May 20, 2015, Brace filed a motion to appoint co-counsel, Mot. Appoint Counsel, ECF No. 432 (Mot.), and supporting memorandum, Mem. Supp. Mot. Appoint Counsel, ECF No. 433 (Mem.). She argued that her VCRRC colleagues were not able to assist on the case, and the work required exceeded her individual capacity. She sought second counsel, and noted that she had anticipated assistance from third counsel, who apparently was later considered conflicted from helping. Mem. at 6–7, ECF No. 433. She sought appointment of the FDSET, with Dana Hansen Chavis as supervising attorney for that office; Brace noted that Chavis was prepared to assign assistant federal public defender Bales to the case. *Id.* at 8, ECF No. 433. The motion asked for Chavis's appointment. Mot., ECF No. 432.

On May 22, 2015, Chavis and Bales each filed an application to appear *pro hac vice*. ECF Nos. 436 (Chavis), 437 (Bales). Chavis's application was granted, Order, ECF No. 438, and Bales's was denied, Order, ECF No. 439. The Court's June 3, 2015, Order, ECF No. 439, noted that Brace's motion did not ask that Bales be appointed, and provided no information about her qualifications and no justification for appointing third counsel. Order at 2–3, ECF No. 439. The Court advised that, if there was a specific reason for third counsel, the Court should be notified. *Id.* at 3, n. 3. The Court indicated that Hansen and Brace were free to work with colleagues on the case, including Bales.

On June 19, 2015, AUSA/DOJ Attorney Jeffrey Zick entered his appearance as third counsel representing the government in this post-conviction matter. ECF 441.[2] On November 15,

---

[2] Mr. Zick remains on the docket of this case as lead attorney, although he no longer is listed on pleadings and has not personally appeared in this Court in years. He appeared along with the

2021, the Court granted AUSA C. Ward's application to appear *pro hac vice* on behalf of the government, without comment or inquiry into her qualifications or the need for her involvement as third counsel on behalf of the government in this case. ECF 645.

On October 12, 2022, Mr. Runyon filed a motion for the appointment of Bales as counsel. Mot. Appointment Co-Counsel, ECF No. 691. The motion explained that Bales has worked on Mr. Runyon's case since 2015, and that she assisted in drafting the appellate brief and argued the case in the United States Court of Appeals for the Fourth Circuit. Mem. Supp. Mot. Appointment of Co-Counsel at 2, ECF No. 692. The motion also argued that because Petitioner anticipates presenting over 20 witnesses and offering over 140 exhibits at the hearing, her assistance as a third attorney will be necessary to provide adequate representation at the February 2023 hearing. *Id.* at 3. As noted above, the government has been represented by three attorneys in post-conviction proceedings in this case since 2015.

This Court heard argument on the 2022 motion for the appointment of Bales at the October 18, 2022, status conference. 10/18/2022 Conference Tr. at 16–17, 22–23, ECF No. 700. The Court took the motion under advisement and directed Petitioner to renew the motion should the need arise. Order at 2, ECF No. 695. Mr. Runyon now renews the motion.

There are at least five reasons why the participation of Attorney Bales is needed and appropriate for Mr. Runyon to have the effective assistance of counsel at his evidentiary hearing.

First, Attorney Bales's participation in the hearing is required for continuity and adequate assistance of counsel during the presentation of proof. Bales has worked with Chavis since the

---

government's current counsel, Mr. Samuels and Ms. McKeel, in the United States Court of Appeals in that Court's review of these proceedings. Appearance, *United States v. Runyon*, No. 17-5 (4th Cir. Sept. 1, 2017), ECF No. 11.

latter's appointment, and has knowledge of the facts and issues in the case. As colleagues at FDSET, Chavis and Bales worked in concert with Brace to prepare Mr. Runyon's § 2255 Motion and litigated it to initial conclusion.[3] Three attorneys—Brace,[4] Chavis, and Bales—presented Mr. Runyon's appeal to the Fourth Circuit, with Bales arguing the case to the panel. On remand, three attorneys—Elizabeth Peiffer,[5] Chavis, and Bales—have been working towards presenting proof to the Court in accordance with the Fourth Circuit's remand. Chavis and Bales have far greater exposure than Peiffer to the client, witnesses, and factual and legal issues to be addressed at the hearing. During the evidentiary hearing, Bales's presence at counsel table is needed to adequately advise Mr. Runyon and to assist counsel in the proper presentation of testimony and other evidence for the Court's consideration.[6] Depriving Mr. Runyon of her assistance will interfere with Mr. Runyon's ability to present the strongest case he believes is available. *Cf. United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006) ("[T]he Sixth Amendment . . . commands . . . that the accused be defended by the counsel he believes to be best."); *id.* at 150 ("We have little trouble concluding that erroneous deprivation of the right to counsel of choice, "with consequences that are necessarily unquantifiable and indeterminate unquestionably qualifies as 'structural error.'" (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 282 (1993)).

Second, Attorney Bales's participation in the hearing is needed to present proof. The upcoming hearing, requiring the testimony of more than twenty expert and lay witnesses, is a

___

[3] At no time after the appointment of Ms. Chavis and during the initial § 2255 proceedings was there an in-court appearance or proceeding requiring counsel's presence before the court.

[4] As noted above, Brace did not have the assistance of other VCRRC staff.

[5] Elizabeth Peiffer, also an attorney with VCRRC, substituted for Michele Brace when Ms. Brace retired from the practice of law.

[6] Counsel understand that only attorneys officially representing a party may sit before the bar and at counsel table. In a prior court hearing, Attorney Bales was directed to sit in the gallery.

significant undertaking for habeas counsel who are not seasoned trial lawyers. Indeed, even Respondent's counsel, who are seasoned trial lawyers, are appearing and participating in this case and the upcoming hearing as a group of three. Moreover, even highly experienced trial lawyers would have been challenged by the geographic diversity of witnesses in this case and the need to travel to prepare those witnesses, where witnesses span from Florida to Alaska, Texas to New Jersey, and in between. Counsel's schedules and professional and other obligations have required the distribution of responsibilities in preparing witnesses and evidence for the evidentiary hearing, including extensive and detailed testimony and exhibits from expert witnesses. *See, e.g.*, 10/18/2022 Conference Tr. at 8–9, ECF No. 700. As mentioned during the October 18, 2022, status conference, *id.,* attorney Bales has worked extensively with the experts and her familiarity with the witnesses and evidence is critical to the effective presentation of evidentiary support for Mr. Runyon's claims.

Third, Bales is specially qualified to represent Mr. Runyon at the evidentiary hearing. As explained in Mr. Runyon's original motion for Bales's appointment, Bales is an assistant federal defender within FDSET's 11-person Capital Habeas Unit (CHU), and is fully qualified for appointment under 18 U.S.C. § 3599. She has more than fifteen years of experience representing capital habeas petitioners in federal court and has served as lead counsel on two capital habeas cases that proceeded to evidentiary hearings. In addition, as discussed *supra*, Ms. Bales has worked extensively on Mr. Runyon's case, is familiar with the client, witnesses, and issues, and has worked specifically to develop expert testimony and evidence essential to the presentation and an accurate assessment of the evidence at issue in the upcoming evidentiary hearing.

Fourth, Bales's appearance at the evidentiary hearing is both efficient and cost-effective. She has extensive experience representing defendants in precisely this kind of case. And, as an

**JA772**

employee of the FDSET, she will not seek compensation for her time contributed to this case, expenses incurred, or for any other case-related services.

Finally, Bales's appearance *pro hac vice* in this case does not diminish or interfere with in any way the interest of the government, which will have the benefit of three attorneys to develop and present the government's case at the evidentiary hearing.

Ms. Bales is not currently a member of the Virginia State Bar, but she has assembled the necessary paperwork and is prepared to petition for her admission *pro hac vice* should the Court enter an order granting Ms. Bales's appearance or appointment.

The circumstances exist to justify the appearance and appointment of a third habeas counsel, and therefore Mr. Runyon asks the Court to allow the admission *pro hac vice* of Susanne Bales, Assistant Federal Defender, Federal Defender Services of Eastern Tennessee, Inc., and to appoint her as necessary to secure her full participation in Mr. Runyon's representation in these proceedings.

WHEREFORE, Mr. Runyon respectfully requests that the Court allow the admission *pro hac vice* of Ms. Bales in this case and appoint her as necessary to represent Mr. Runyon in collateral proceedings under § 2255. Ms. Bales's contact information is:

Susanne Bales
Assistant Federal Defender
Federal Defender Services of Eastern Tennessee, Inc.
800 South Gay Street, Suite 2400
Knoxville, TN 37929-9714
Phone (865) 637-7979
Fax (865) 637-7999
Susanne_Bales@fd.org

**JA773**

Respectfully Submitted,

/s/Elizabeth J. Peiffer
Elizabeth J. Peiffer, VSB No. 71353
Virginia Capital Representation Resource Center
1155 Seminole Trail #6391
Charlottesville, VA 22906
Telephone (434) 817-2970
Fax (434) 817-2972
epeiffer@vcrrc.org

/s/Dana C. Hansen Chavis, *pro hac vice*
Dana C. Hansen Chavis
Asst. Federal Community Defender
Federal Defender Services of Eastern Tennessee
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone (865) 637-7979
Fax (865) 637-7999
Dana_Hansen@fd.org

**JA774**

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2023, I have electronically filed the foregoing **Memorandum in Support of Renewed Motion for Attorney Bales to Appear *Pro Hac Vice*** with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Brian J. Samuels
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4032
Fax (757) 591-0866
Brian.Samuels@usdoj.gov

Lisa R. McKeel
Asst. United States Attorney
United States Attorney's Office
Fountain Plaza Three, Suite 300
721 Lakefront Commons
Newport News, VA 23606
Telephone (757) 591-4040
Fax (757) 591-0866
Lisa.McKeel@usdoj.gov

Carrie Lee Ward
Department of Justice
Capital Case Section
1331 F Street, NW
Room 650
Washington, DC 20530
Telephone (202) 923-7154
Fax (202) 305-9779
Carrie.Ward@usdoj.gov

/s/Nancy Hernandez
  Nancy Hernandez
  Paralegal, Capital Habeas Unit
  nancy_hernandez@fd.org

**JA775**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division


DAVID ANTHONY RUNYON,

               Petitioner,

v.                                    CIVIL NO. 4:15cv108
                            [ORIGINAL CRIMINAL NO. 4:08cr16]

UNITED STATES OF AMERICA,

               Respondent.


ORDER

    This matter comes before the court on Petitioner's "Renewed Motion for Attorney Bales to Appear Pro Hac Vice," filed January 13, 2023, and its accompanying memorandum in support. See ECF Nos. 725-26. In his motion, Petitioner requests that Ms. Helen Susanne Bales ("Bales") either be admitted pro hac vice or be appointed, pursuant to 18 U.S.C. § 3599, to assist with Petitioner's ongoing habeas representation, with particular attention to the upcoming evidentiary hearing. See ECF No. 726 at 1. Bales serves as an attorney with the Federal Defender Services of Eastern Tennessee, Inc. ("FDSET"), for which one of Petitioner's appointed counsel, Ms. Dana Hanson Chavis, is the supervising attorney. Id. at 1-2.

    This court took Petitioner's first motion to this effect under advisement at the October 18, 2022, status conference. See ECF Nos. 691, 692, 700. In the instant motion, Petitioner now submits various arguments to show good cause for Bales to be admitted pro

**JA776**

hac vice; the court finds unnecessary an appointment under § 3599. Pro hac vice admission will allow Bales to assist, as Petitioner requests, with the presentation of specific witnesses with exhibits at Petitioner's evidentiary hearing.[1]

Accordingly, Petitioner is **DIRECTED** to submit an Application to Qualify as a Foreign Attorney under Local Civ. R. 83.1(D), for the specific witnesses and exhibits pertaining thereto and for which pro hac vice admission is sought. The application must list each witness separately and the admission will be limited to those witnesses. Petitioner is further **ADVISED** that the court will not entertain a motion for continuance or delay based on Bales' potential unavailability or scheduling conflicts during the course of the evidentiary hearing.

Petitioner is hereby **ORDERED** to comply with the court's instructions, and the Clerk is **DIRECTED** to forward a copy of this Order to counsel for Petitioner and the United States Attorney at Newport News.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
Senior United States District Judge

REBECCA BEACH SMITH
SENIOR UNITED STATES DISTRICT JUDGE

February 2, 2023

---

[1] Petitioner has already been appointed two attorneys to assist in his post-conviction proceedings, as required in a capital case. 18 U.S.C. § 3599; see ECF No. 435 (appointing Ms. Chavis), ECF No. 649 (appointing Ms. Peiffer). Appointing a third attorney is not required by statute and is especially unnecessary considering Ms. Bales' employment with Ms. Chavis' office.

2

**JA777**

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on July 21, 2023. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

July 21, 2023
/s/ Catherine E. Stetson
Catherine E. Stetson